Fee Paid

FILED
CLERK, U.S. DISTRICT COURT

11/22/2019

CENTRAL DISTRICT OF CALIFORNIA
BY: DD_____ DEPUTY

1 | SPERTUS, LANDES & UMHOFER, LLP
2 | Matthew Donald Umhofer (SBN 206607)
  | matthew@spertuslaw.com
3 | J. Anthony King (SBN 297279)
  | anthony@spertuslaw.com
4 | 1990 South Bundy Dr., Suite 705
  | Los Angeles, California 90025
5 | Telephone: (310) 826-4700
  | Facsimile: (310) 826-4711

6 | Attorneys for *Qui Tam* Plaintiff [Under Seal]

7

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA, ex rel. [Under Seal] , <br><br> Plaintiffs, <br><br> v. <br><br> [Under Seal] <br><br> Defendants. | **Case No.:** CV 19-9983-CAS(JPRx) <br><br> *[Assigned to the Hon.  , Dept.  ]* <br><br> **COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, THE ANTI-KICKBACK STATUTES AND FOR UNLAWFUL RETALIATION AGAINST RELATOR** <br><br> **JURY TRIAL DEMANDED** <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

1   SPERTUS, LANDES & UMHOFER, LLP
2   Matthew Donald Umhofer (SBN 206607)
    matthew@spertuslaw.com
3   J. Anthony King (SBN 297279)
    anthony@spertuslaw.com
4   1990 South Bundy Dr., Suite 705
    Los Angeles, California 90025
5   Telephone: (310) 826-4700
    Facsimile: (310) 826-4711

6   Attorneys for *Qui Tam* Plaintiff Joy DioQuino-Smith

7

8               **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10  UNITED STATES OF AMERICA          | **Case No.:**
    and STATE OF CALIFORNIA, ex
11  rel. JOY DIOQUINO-SMITH,          | *[Assigned to the Hon.  , Dept.  ]*
12                      Plaintiffs,   | **COMPLAINT FOR VIOLATION
                                        OF FEDERAL AND STATE
13            v.                        FALSE CLAIMS ACT, THE ANTI-
                                        KICKBACK STATUTES AND
14  ROCKPORT HEALTHCARE               | **FOR UNLAWFUL RETALIATION
    SUPPORT SERVICES LLC, an            AGAINST RELATOR**
15  entity; BRIUS LLC, an entity; ALTA
    VISTA HEALTHCARE &               | **JURY TRIAL DEMANDED**
16  WELLNESS CENTRE INC., an
    entity; SHLOMO RECHNITZ, an      | **FILED IN CAMERA AND UNDER
17  individual; JOSEPH FRUSTACI, an    SEAL PURSUANT TO 31 U.S.C. §
    individual; and DOES 1 through 10  3730(b)(2)**
18  inclusive,
19                      Defendants.
20
21
22
23
24
25
26
27
28
    ─────────────────────────────────────────────
    *COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE
    CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL
    RETALITION AGAINST RELATOR*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

Relator-Plaintiff JOY DIOQUINO-SMITH (hereinafter referred to as "Relator-Plaintiff" or "DIOQUINO") through her undersigned attorneys, on behalf of the United States of America ("United States") and the State of California, files this Complaint against Defendants Rockport Healthcare Support Services LLC ("ROCKPORT"), Brius LLC ("BRIUS"), Alta Vista Healthcare & Wellness Center Inc. ("ALTA VISTA"), Shlomo Rechnitz ("RECHNITZ"), and Joseph Frustaci ("FRUSTACI") (collectively, "DEFENDANTS"), and alleges as follows:

## INTRODUCTION

1.      DEFENDANTS, owners and operators of dozens of skilled nursing facilities in California, engaged in illegal business practices that caused the admission, retention, and submission of false claims to Medicare, Medicaid, Medi-Cal, and other governmental programs.  Those business practices included, among other things: setting aggressive census targets for each BRIUS facility; paying staff and other marketers incentives and monetary bonuses for meeting the aggressive census targets; threatening staff with terminations or reductions in hours if the census fell below targets; employing physicians as "medical directors" with the understanding that the physician would exclusively refer his or her patients to BRIUS facilities; and offering cash payments to privately insured or cash-paying patients to leave their facilities to make room for higher-paying Medicare, Medicaid, and Medi-Cal patients.

2.      DEFENDANTS were fixated upon meeting aggressive patient "census" targets that were being dictated by RECHNITZ, FRUSTACI, and other corporate managers.  DEFENDANTS pressured their employees to meet patient "census" targets without regard to the medical necessity of the services provided, whether patients were eligible under the law for benefits, or the patients' wellbeing and safety.  DEFENDANTS' staff also received regular

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

*1*

1    communications from superiors informing them of each branch's census goals,

2    current census, and the need to increase census.

3        3.    To boost census numbers, DEFENDANTS had a practice of paying

4    employees cash for recruiting profitable Medicare patients to their skilled nursing

5    facilities, without regard to the medical necessity of the services DEFENDANTS

6    provided.  Emails sent within the DEFENDANT entities left no doubt this

7    practice was occurring:

**Subject:** Hunger Games Admissions Competition- June

Some folks get their kicks by hitting up the beach or
BBQ'ing—not me, I'm psychotic about admissions. I get
my kicks by rockin' a June 10th to 30th skilled admissions
competition and seeing which region are the Kings/Queens
of skilled. So here it is crew, you're in teams set below.
Starting **today** June 10 for the remainder of this month the
Team with the most <u>skilled</u> admissions wins. What's a
skilled admission?....MCARE, Mgd Care, Mgd MCAL
Skilled, CCI skilled, VA skilled, LOA, etc. There are NO
PPD minimums for HMO's!!

The winners get a righteous reputation amongst their peers.
But just in case that's not good enough the entire winning
teams Administrator, DON, DBD, Admissions, and VPO
all get $1,000!!



Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

*2*

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE
CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL
RETALIATION AGAINST RELATOR*

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

4.     Plaintiff-Relator Joy DioQuino-Smith—a loyal, long-time employee of the DEFENDANT entities—repeatedly blew the whistle on this practice, the company's aggressive census-based scheme, and on the "medical director" scheme, by communicating her concerns to DEFENDANTS through counsel, in writing and orally.

5.     Outside counsel for the DEFENDANT entities expressed concern about the practices outlined in the communications from DIOQUINO's counsel, and said the practices would be and had been addressed.  Outside counsel also assured DIOQUINO that her job was secure.

6.     The emails, the kickbacks, and the other problematic practices continued unabated.  And then DIOQUINO was fired.

7.     When she was terminated over the phone after 10 years of service to the DEFENDANT entities, DIOQUINO was told she was fired "for census"—meaning that she had failed to ensure that there were a sufficient number of patients at the facilities for which she was responsible.  This was objectively, provably, and mathematically untrue—DIOQUINO's census numbers were among the highest in the company.

8.     The fake reason offered for her termination was designed to obscure the true reason for her termination: to retaliate against her for blowing the whistle on practices that flouted federal law.

## NATURE OF THE ACTION

9.     This is a False Claims Act, Anti-Kickback, and whistleblower retaliation case.  Relator-Plaintiff brings this action to recover treble damages and civil penalties on behalf of the United States and the State of California arising from false and/or fraudulent records, statements and claims made, used and/or caused to be made, used or presented by DEFENDANTS and/or their agents, and employees in violation of the federal False Claims Act, 31 U.S.C. §

*3*

3729 *et seq*. and the California False Claims Act, California Government Code Section 12650 *et seq*.  DEFENDANTS' acts also constitute violations of the Whistleblower Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h); Violation of the Whistleblower Protection Provisions of the California False Claims Act, California Government Code Section 12653(A); Retaliation in Violation of California Labor Code Section 1102.5; and Retaliation in Violation of California Labor Code Section 98.6.

## **JURISDICTION AND VENUE**

10.     This is a civil action arising under the laws of the United States to redress violations of 31 U.S.C. §§ 3729 et seq., and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  This court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730; (ii) pursuant to 28 U.S.C. § 1331, the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h), as well as the Anti–Kickback Statute, 42 U.S.C. § 1 320a- 7b(b), which confer federal subject matter jurisdiction; and (iii) pursuant to 28 U.S.C. § 1345, because the United States is a plaintiff.  This court has ancillary jurisdiction of the state law claims because they are sufficiently related to and arise from the same transactions or occurrences as the federal claims.

11.     This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting office or Auditor General's report, hearing, audit, or investigation, or from the news media.

12.     To the extent that there has been a public disclosure unknown to her, Relator-Plaintiff is an original source under 31 U.S.C. § 3730(e)(4) and the California False Claims acts.  She has direct and independent knowledge of the

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

*4*

information on which the allegations are based and has voluntarily provided the information to the government in this Complaint.

13.     Venue is proper under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because DEFENDANTS' principal place of business and/or residence is in this district, and DEFENDANTS transact business in this judicial district.  Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### **THE PARTIES**

14.     The United States of America and the State of California are the plaintiffs for whom recovery is sought for false and fraudulent claims submitted to Medicaid, Medi-Cal, and other government-funded health programs, including Champus/TriCare and Veteran's Administration funded programs, as well as those of the respective Federal and State plaintiffs.

15.     Relator-Plaintiff JOY DIOQUINO-SMITH is and was at all times relevant hereto a citizen and resident of the County of Los Angeles, State of California.  Plaintiff was an employee of DEFENDANT ROCKPORT, and/or ALTA VISTA, from approximately October 2009 until August 1, 2019, when she was unlawfully terminated in retaliation for complaining about potential Anti-Kickback Statute and False Claims Act violations by DEFENDANTS.

16.     DEFENDANT ROCKPORT is and was at all times relevant hereto a limited liability company with its principal place of business located at 3699 Wilshire Blvd., Suite 1000, Los Angeles, 90010.  ROCKPORT is the "management company" which runs BRIUS's skilled nursing facilities.

17.     DEFENDANT BRIUS is and was at all times relevant hereto a limited liability company with its principal place of business located at 3699 Wilshire Boulevard, Suite 1000, Los Angeles, California 90036, and is the owner of RECHNITZ's skilled nursing facilities—including ALTA VISTA

*5*

---

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

HEALTHCARE & WELLNESS CENTRE, INC. that Plaintiff worked at and developed business for.

18.     DEFENDANT ALTA VISTA is and was at all times relevant hereto a business entity operating as a skilled nursing facility located at 9020 Garfield St, Riverside, California 92503, and is controlled by RECHINTZ, ROCKPORT and/or BRIUS.

19.     DEFENDANT RECHNITZ is an individual who is and was at all times relevant hereto a citizen and resident of the State of California, County of Los Angeles.

20.     DEFENDANT FRUSTACI is the Chief Business Development Officer for ROCKPORT and/or ALTA VISTA.

21.     DEFENDANTS BRIUS, RECHNITZ, ROCKPORT, FRUSTACI, and DOES 1 through 10 were at all relevant times the operators of ALTA VISTA.

22.     Relator-Plaintiff does not know the true names and capacities of those DEFENDANTS sued herein as DOES 1 through 10, and for that reason has sued such DEFENDANTS by fictitious names. Relator-Plaintiff will seek leave of the Court to amend this Complaint to identify said DEFENDANTS when their identities are ascertained.

## **ALTER EGO ALLEGATIONS**

23.     DEFENDANTS set forth hereinabove fail to recognize the uniqueness and independence of each of the DEFENDANTS.  That at all times relevant hereto there was a such a unity of interest and ownership between the DEFENDANTS such that the individual distinctions between them had ceased and that the facts as alleged herein are such that an adherence to the fiction of the separate existence of the DEFENDANTS would, under the particular circumstances alleged herein, sanction a fraud and/or promote injustice.

*6*

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

24.   At all relevant times, the DEFENDANTS, and each of their tortious acts and omissions, as alleged herein, were done in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely maximizing profits from the operation of the BRIUS facilities by engaging in illegal kickbacks and strong-arming physicians for referrals to improperly goose revenues at taxpayer expense—all the while underfunding and understaffing their facilities leading to dangerous and unsanitary conditions at DEFENDANTS' facilities.  Moreover, DEFENDANTS aided and abetted each other in accomplishing the acts and omissions alleged herein. (See Restatement (Second) of Torts § 876 (1979)).

25.   Upon information and belief, it is alleged that the misconduct of the DEFENDANTS, which led to the violation of the rights of Plaintiffs as alleged herein, was the direct result and product of the policies and practices set forth by RECHNITZ and the other officers, directors, and/or managing agents of Defendants.

26.   ROCKPORT is RECHNITZ's company that "manages" the various nursing facilities in the RECHNITZ empire, including ALTA VISTA. ROCKPORT was created by Certified Public Accountant Steven Stroll who, by no coincidence, is not only the accountant for RECHNITZ but also the authorized agent for service of process for some of RECHNITZ's companies. In fact, during her seven-year tenure at ROCKPORT, DIOQUINO does not recall ever meeting, speaking to, or even receiving a single email from Stroll. Conversely, Relator-Plaintiff was personally interviewed and hired by RECHNITZ, and was told on several occasions by RECHNITZ, as recently as this spring, to contact him directly should she need any problems addressed. ROCKPORT reports its principal place of business to the Secretary of State of California as 3699 Wilshire Boulevard, Suite 1000, Los Angeles County, State of

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

*7*

California, which is, at least in some submissions to the Secretary of State of California, also the principal place of business and/or mailing address for several of RECHNITZ's companies, including BRIUS.

27.    Upon information and belief, RECHNITZ operates each of his companies, including ROCKPORT, as one single enterprise, by (1) commingling of funds and other assets between his various companies, as well as between his companies and himself; (2) treating each entity, and their assets, as if it was solely his own; (3) failing to maintain separate corporate records; (4) usage of the same directors and officers; (5) and using the same business offices.  In reality, there is no distinction between RECHNITZ and his companies—he has total control over and makes all of the major decisions for all of his companies, including ROCKPORT.  Thus, while RECHNITZ may have disguised his ownership through shell companies and other mechanisms, the truth is that RECHNITZ, BRIUS, ROCKPORT, and ALTA VISTA are all alter egos of one another.

## STATUTORY AND REGULATORY FRAMEWORK

**A.    Medicare**

28.    Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. establishes the Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare program.  Medicare is a federally operated and funded program.  It is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"), a department of HHS.

29.    The Medicare program is comprised of four parts, Parts A, B, C, and D.  Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

30. To participate in Medicare, providers must certify that their services are provided economically and only when, and to the extent medically required, or that the services are "reasonable and necessary," as required by statute. 21 U.S.C. § 1395n; 42 U.S.C. § 1395y(a)(l)(A).

31. A service is expressly excluded from coverage if it is "not reasonable and necessary" for "the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 41 l.15(k)(l). In other words, it is an express condition of payment that the treatment sought under Medicare must be medically necessary. Id.; 42 C.F.R. § 411.15 (delineating "[p]articular services excluded from coverage"); id. at § 411.l(b)(l) (stating that "[t]his subpart identifies: (1) The particular types of services that are excluded" from coverage); see also 42 C.F.R. Subpart 411 (titled "Exclusions from Medicare and Limitations on Medicare Payment").

**B.   Medicaid**

32. Under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, federal money is distributed to the states, which in turn provide certain medical services to the poor. Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS ("the Secretary").

33. After the Secretary approves the plan submitted by the state, the

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

*9*

state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan.  42 U.S.C. § 1396b(a)(l).  Individuals may be "dual eligible" for both the Medicare program (as the primary insurer) and the Medicaid program (as the secondary insurer).

**C.    Medi-Cal**

34.    California's Medi-Cal program ("Medi-Cal") is a crucial safety net for Californians unable to afford health care.  Medi-Cal is a program that offers free or low-cost health coverage for children and adults with limited income and resources.  Intended to provide essential care for California's growing indigent population, Medi-Cal funds are stretched to their limit. Too many times, MediCal has been subject to fraud and abuse by unscrupulous providers who have put profits above the public good.  Funds that have been designated for essential services to the neediest among Californians have been diverted away because of false billing schemes.  Those fraudulent schemes have threatened to diminish the quality of care, unnecessarily burdened taxpayers, and degraded the medical profession.

## BACKGROUND FACTS

**A.    THE RECHNITZ NURSING HOME SCHEME**

35.    RECHNITZ owns and operates approximately 80 for-profit skilled nursing facilities in California.  On the backs of taxpayers and the elderly, RECHNITZ has become a billionaire.  RECHNITZ's business model is simple— bring in as many high-paying Medicare, Medicaid, Medi-Cal, VA, and other government-sponsored patients as possible, submit claims for unnecessary medical services, direct as much federal and state funds into his own pockets as he can, and operate the facilities on the remaining crumbs, no matter the consequences for the patients.  Unsurprisingly, RECHNITZ's skilled nursing

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

*10*

facilities are chronically understaffed, deteriorating, and unsafe for the patients that live there.

36.     According to state records, RECHNITZ's skilled nursing facilities receive about 80 percent of their funding through taxpayer-funded Medicare and Medicaid, which is known as "Medi-Cal" in California.  In 2015, the Medicare and Medicaid programs paid BRIUS—a RECHNITZ-controlled company that owns RECHNITZ-run skilled nursing facilities—approximately $507 million to care for elderly and disabled residents in the company's approximately 80 California skilled nursing facilities.

37.     RECHNITZ has created a byzantine web of related companies to profit from these government-funded programs, redirecting government funds to his related companies that charge inflated prices for services, products, and rent.

38.     BRIUS skilled nursing facilities paid $67 million to 65 companies controlled by CEO RECHNITZ and his family members, according to OSHPD records.  About two-thirds of the payments were delivered to RECHNITZ-related companies serving as landlords to the skilled nursing facilities.  BRIUS skilled nursing facilities also paid RECHNITZ-controlled companies millions of dollars for financial consulting, medical supplies, "nutrition shakes," loan repayments and other goods and services.  Overall, according to reports, BRIUS skilled nursing facilities paid rental prices that were 36.6 percent higher per nursing home bed than non-BRIUS for-profit skilled nursing facilities operating in the same county during 2015.

39.     Even after steering money to insider companies, BRIUS skilled nursing facilities nonetheless recorded profits nearly twice as high as the average for-profit California nursing home.  In 2015, BRIUS facilities reported an average profit margin of 6.1 percent compared to 3.7 percent for California's remaining for-profit skilled nursing facilities, according to OSHPD.

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

*11*

40.     In 2015, BRIUS skilled nursing facilities paid $46.3 million in rent-related costs to property firms controlled by RECHNITZ and his relatives, according to annual reports filed with state oversight agencies.  In many cases, RECHNITZ owns the properties outright and charges his skilled nursing facilities above-market rent, according to lease documents.  Even when RECHNITZ does not own the underlying property, he often creates firms that serve as a middleman between the property owner and the nursing home. These RECHNITZ-owned companies rent the property from the owner at a market rate and then sublease it to the nursing home at inflated prices.  The net result is that skilled nursing facilities have less money to care for residents.

41.     RECHNITZ's stewardship of the 54-bed San Rafael Healthcare & Wellness Center in Marin County illustrates how these rental arrangements drain vital patient-care funds from BRIUS skilled nursing facilities. The home paid $152,535 a year in rent before BRIUS took control.  In 2012, as BRIUS prepared to begin operating the facility, RECHNITZ set up a middle-man property firm to lease the facility from its longtime independent owner and then sublease it to BRIUS.  According to copies of the lease agreements, the middle-man firm, Eretz San Rafael Properties, paid $259,200 a year in rent to the owner, and then subleased the facility to the BRIUS nursing home for $388,800 – a 50 percent markup.  RECHNITZ's firm is not responsible for performing any services in exchange for its 50 percent surcharge, according to the lease agreements, thus this arrangement appears to grant RECHNITZ's middleman firm the $129,600 markup as pure profit.  To execute the agreement, RECHNITZ signed the sublease on behalf of both the nursing home and the middleman firm that charged the 50 percent rental surcharge. No one else signed the document.

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

| Sublessor: | Subtenant: |
|---|---|
| Eretz San Rafael Properties, LLC, a California limited liability company | SAN RAFAEL HEALTHCARE & WELLNESS CENTRE, LP, a California limited partnership |
| By: SYTR REAL ESTATE HOLDINGS, LLC, Its Manager | By: San Rafael Wellness GP, LLC, Its Manager |
| By: _____ Shlomo Rechnitz, Managing Member | By: _____ Shlomo Rechnitz, Managing Member |

Copies of the 2012 Lease to SYTR Real Estate Holdings, LLC and the 2012 Sublease from SYTR to San Rafael Healthcare are attached hereto as Exhibits A and B respectively.

42.     In 2014, RECHNITZ purchased the San Rafael property from its longtime owner.  Now operating as the direct landlord, RECHNITZ continued to increase his nursing home's rent sharply.  As of 2016, the facility's rent had nearly tripled to $421,177 since 2012 (when BRIUS took it over), according to state records.

43.     Likewise, rental costs at the 99-bed Eureka Rehabilitation & Wellness Center nearly tripled after BRIUS took over in 2011.  Specifically, the facility reported its lease costs jumping from $333,530 in 2010 to $827,751 in 2012, according to state data.  The facility, and others controlled by RECHNITZ in the same county, now pay higher rental rates than many skilled nursing facilities in San Francisco and Los Angeles.  A copy of excerpts from Eureka Healthcare's Integrated Disclosure and Medi-Cal Cost Reports from 2010, 2012, and 2016 is attached hereto as Exhibit C.

44.     In 2015, 76 BRIUS skilled nursing facilities paid a combined $3.5 million to Boardwalk West Financial Services, LLC, a Los Angeles-based company owned by RECHNITZ.  In a 2013 deposition, RECHNITZ testified that he was the firm's only employee and that his job at the company was to spend

*13*

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   approximately 20 hours a week providing financial advice and consulting

2   services to BRIUS skilled nursing facilities, which included reviewing each

3   nursing home's "profit & loss" statements once a month.

4         45.    RECHNITZ also appears to own and operate an internal banking

5   system that extends millions of dollars of loans and credit to BRIUS skilled

6   nursing facilities, according to government records.  In 2015, 61 BRIUS skilled

7   nursing facilities reported owing $23.3 million in net debt to "insider" companies

8   controlled by RECHNITZ.  These companies include YTR Capital, LLC and SR

9   Capital, LLC, the latter of which operates a luxury private jet used by

10   RECHNITZ and his family, according to records from the Federal Aviation

11   Administration.  A copy of the September 13, 2013 FAA registration, bearing his

12   signature, and the September 20, 2013 Bill of Sale for RECHNITZ's Gulfstream

13   jet is attached hereto as Exhibit D.

**B.**     **DEFENDANTS' MISUSE AND MISAPPROPRIATION OF FEDERAL AND STATE FUNDS HAS RESULTED IN SERIOUS INJURIES AND DEATH**

16         46.    DEFENDANTS' siphoning of money that was earmarked for

17   patients' healthcare through these inflated related-party transactions has left their

18   skilled nursing facilities without adequate resources to care for its residents.

19   According to a 2015 Sacramento Bee investigation, BRIUS skilled nursing

20   facilities scored below statewide averages on 35 of 46 quality-of-care indicators

21   such as staffing levels, complaints, and deficiencies.

22         47.    At the same time DEFENDANTS were wringing hundreds of

23   thousands of dollars from San Rafael Healthcare & Wellness Center through

24   inflated rents, state investigators were citing the facility for providing

25   substandard care to the facility's elderly and disabled residents.  For instance, in

26   June 2017, investigators fined San Rafael $15,000 for violating California's

27   minimum staffing requirements for nursing personnel.  A copy of the June 8,

28

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

*14*

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

2017 letter from CDPH regarding Penalty Number 110013245 is attached hereto as Exhibit E.

48.     Government oversight agencies have also cited BRIUS skilled nursing facilities for hundreds of state and federal violations including failing to staff facilities with sufficient nursing personnel to care for residents. Understaffing can lead to pressure sores, resident falls, and even deaths— violations for which BRIUS has been repeatedly fined by government investigators.  According to the Sacramento Bee's investigation, BRIUS skilled nursing facilities "were tagged with nearly triple as many serious deficiencies per 1,000 beds as the statewide average in 2014."  That year, California Attorney General Kamala Harris sought to block the company from acquiring more than a dozen skilled nursing facilities, stating definitively:

> There are five grounds for this motion:
>
> 1.     **RECHNITZ IS A VIOLATOR OF INDUSTRY LAWS AND REGULATIONS**. The principal individual behind the Stalking Horse Parties is Shlomo Rechnitz.  Rechnitz and his companies (Brius Management Company and Brius LLC) have a history of failing to comply with laws and regulations enforced by DHCS and the federal Centers for Medicare and Medicaid Services ("**CMS**").

A copy of DHCS and CDPH's Emergency Motion to Disqualify RECHNITZ from managing or purchasing the Plaza Healthcare Center is attached hereto as Exhibit F.

49.     DEFENDANTS' facilities also lack basic supplies.  Over the past two years, the California Department of Public Health cited San Rafael Healthcare & Wellness Center for stocking its kitchen with expired food and requiring caregivers to use paper towels to dry residents because the facility lacked sufficient numbers of towels and washcloths.  The federal government's Center for Medicare & Medicaid Services has assigned the facility its lowest

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

*15*

possible overall quality rating.

50.     The Eureka facility, deprived of vital resources because of the above-market rents being imposed by DEFENDANTS, caused its patient care record to rapidly decline.  In February 2017, the California Department of Public Health fined the facility $160,000 for eight "Class A" citations, the second-highest level of violation available to state regulators.  According to government investigators, the facility required nursing assistants to care for up to three times more patients than they could reasonably handle.  This understaffing contributed to multiple falls by residents, resulting in injuries including a broken arm, a broken nose, a broken neck and a fractured pelvis.  Residents also reported sitting in soiled clothes after waiting more than 30 minutes for staff to answer their calls to assist them to the bathroom.  A copy of Citation Number 11-27007-0012902-F for the Eureka facility is attached hereto as Exhibit G.

51.     In March of 2017, the nursing home was sued separately by two families whose loved ones died due to allegedly substandard care, including one resident who died after developing a fist-sized pressure sore on his tailbone that penetrated to the bone and became infected.  Copies of the complaints in Kruger v. Eureka Rehabilitation & Wellness, LP et al., Case No. DR 170144 (Cal. Super. Ct. Cty. Of Humboldt March 7, 2017) and McKenna v. Eureka Rehabilitation & Wellness, LP et al., Case No. DR 170143 (Cal. Super. Ct. Cty. Of Humboldt March 10, 2017) are attached hereto as Exhibits H and I respectively.

## SUBSTANTIVE ALLEGATIONS

52.     Relator-Plaintiff DIOQUINO was originally hired by ALTA VISTA, on or around October 1, 2009.

53.     Beginning on or around September 1, 2012, DIOQUINO was promoted to a position with ROCKPORT as the Regional Director of Business

*16*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

1   Development.

2       54.     However, DEFENDANTS provided their marketing employees,

3   including DIOQUINO, with no meaningful training regarding compliance with

4   federal and state law related to remunerations to induce referrals from physicians,

5   such as the Anti-Kickback Statute and the Stark Law.

6       55.     California Health & Safety Code Section 1250 *et seq.* establishes

7   licensing requirements for health facilities, which includes skilled nursing

8   facilities.  Section 1253, subdivision (a) prohibits any "person, firm, partnership,

9   association, corporation, or political subdivision of the state, or other

10  governmental agency within the state" from "operat[ing], establish[ing],

11  manag[ing], conduct[ing], or maintain[ing] a health facility ... without first

12  obtaining a license."  (See also § 1298, subd. (a)(1) ["No person, firm,

13  partnership, association, corporation, political subdivision of the state, or other

14  governmental agency within the state shall continue to operate, conduct, or

15  maintain an existing health facility without having applied for and obtained a

16  license or a special permit as provided for in this chapter."].)

17      56.     Despite the explicit licensing requirements, ROCKPORT managed

18  and continues to manage DEFENDANTS' skilled nursing facilities without

19  having obtained a license.

20      57.     In or around October 2015, a federal search warrant was executed at

21  ALTA VISTA, seeking documents related to kickbacks paid to doctors by ALTA

22  VISTA in exchange for referring patients to ALTA VISTA.

23      58.     In September 2016, a federal search warrant was served on

24  DIOQUINO seeking documents related to kickbacks paid to doctors by ALTA

25  VISTA.

26      59.     The United States Attorney's Office for the Central District of

27  California sought DIOQUINO's cooperation against the DEFENDANTS in its

28

*17*

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE
CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL
RETALIATION AGAINST RELATOR*

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    investigation and made a "reverse proffer" to DIOQUINO's counsel in an effort

2    to convince DIOQUINO to cooperate.  DIOQUINO declined to cooperate.

3    Through counsel, DIOQUINO shared information about the criminal

4    investigation with counsel for DEFENDANTS and assisted counsel for

5    DEFENDANTS in preparing a defense against the allegations in the federal

6    criminal investigation.

7        60.    As a result of the federal investigation, in or around September

8    2016, DIOQUINO learned about the Anti-Kickback Statute and the nature of its

9    restrictions on remuneration to physicians.  Since September 2016, DIOQUINO

10   has attempted to comply with the Anti-Kickback Statute and expected

11   DEFENDANTS to do the same.

12       61.    However, DEFENDANTS, in or around January 2019, began

13   demanding that the facilities meet extremely aggressive census targets.  For

14   instance, on January 24, 2019, ROCKPORT Chief Business Development

15   Officer FRUSTACI sent an email to the administrator and sales and marketing

16   team of the ALTA VISTA facility (and DIOQUINO) that demanded that the

17   facility average at minimum a 96% occupancy rate and a minimum number of

18   skilled patients.  FRUSTACI further demanded that the sales and marketing team

19   "bring them [patients] in" no matter the means or medical necessity, even if this

20   meant departing from DEFENDANTS' typical preference for higher paying

21   Medicare and Medi-Cal patients.

22

23

24

25

26

27

28

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE
CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL
RETALIATION AGAINST RELATOR*

**From:** Joe Frustaci <JFrustaci@rockporthc.com>
**Date:** January 24, 2019 at 10:17:49 PM PST
**To:** Administrator - Alta Vista HC & Wellness <Administrator@altavistarehab.com>
**Cc:** Joy Dioquino-Smith <JSmith@rockporthc.com>, Sales and Marketing - Alta Vista HC & Wellness <SalesandMarketing@altavistarehab.com>, Assistant Administrator - Alta Vista <AsstAdministrator@altavistarehab.com>
**Subject: Alta Vista Directives**

Chris, this facility continues to lose money. Let's attack this simply with clear directives;

1) average at minimum 96% occupancy
2) no less than 28 skilled pts (no time to be MCARE choosey)...bring them in. We will not lose money anymore.

62.     DIOQUINO had multiple, weekly telephone conversations with defendant RECHNITZ during which RECHNITZ fixated on the census count, encouraged DIOQUINO to increase the census count at her facilities, and discussed firing employees who failed to recruit enough patients to satisfy RECHNITZ's expectations.  DIOQUINO performed her duties to the best of her ability but declined to take any steps that she believed would violate the Anti-Kickback Statute or the False Claims Act.

63.     FRUSTACI also began taking aggressive steps to increase the census at DEFENDANTS' facilities.  FRUSTACI began running admissions contests with commission-like prizes for securing referrals for Medicare, Medi-Cal and other managed care patients, despite the fact that the Anti–Kickback Statute prohibits receiving commissions in return for referring a Medicare patient to a Medicare provider."  United States v. St. Junius, 739 F.3d 193, 210 (5th Cir. 2013); see also 42 U.S.C. § 1320a-7b(b)(1)(A).

64.     For example, in June 2019, FRUSTACI announced he was "psychotic about admissions" and was instituting a "Hunger Games Admissions

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

*19*

Competition" with a cash prize for the "most skilled admissions" to nursing

BRIUS facility employees, as well as for ROCKPORT VPOs:

**Subject:** Hunger Games Admissions Competition- June

Some folks get their kicks by hitting up the beach or BBQ'ing—not me, I'm psychotic about admissions. I get my kicks by rockin' a June 10th to 30th skilled admissions competition and seeing which region are the Kings/Queens of skilled. So here it is crew, you're in teams set below. Starting **today** June 10 for the remainder of this month the Team with the most <u>skilled</u> admissions wins. What's a skilled admission?....MCARE, Mgd Care, Mgd MCAL Skilled, CCI skilled, VA skilled, LOA, etc. There are NO PPD minimums for HMO's!!

The winners get a righteous reputation amongst their peers. But just in case that's not good enough the entire winning teams Administrator, DON, DBD, Admissions, and VPO all get $1,000!!



*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700| FACSIMILE 310-826-4711

65.     The Hunger Games Competition concluded at the end of June, with "Team Toni" taking the $1,000 cash prize for the most admissions.

**Subject: FINAL Hunger Games Admissions Competition- June**

And the results are in......CONGRATULATIONS Team Toni for snagging 1st place for the June "Hunger Games Admissions Competition" and earning $1,000 for Administrator, DON, DBD, Admissions Coordinator and VPO. Special shout out goes out to team Windsor Gardens of Anaheim for leading all facilities with 37 skilled admissions in that 20 day time period. Nice job team!!........And in 2nd place earning $100 for the same positions is Team Amy/Shimi. Winning teams please input these amounts into PAS and be sure to use this email as justification for approval.

Everybody, don't forget about this month's "Lucky Number 7 Competition" where the only one you're competing against is yourself.

66.     July 2019 brought a "Lucky Number 7" competition, again offering cash prizes to BRIUS employees and ROCKPORT VPOs for the most admissions, without regard to medical necessity.

*21*

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

**From:** Joe Frustaci <JFrustaci@rockporthc.com>
**Date:** July 1, 2019 at 8:55:24 AM PDT
**Cc:** Amanda Moore <AMoore@rockporthc.com>, Toni Mazzeo <TMazzeo@rockporthc.com>, Marcus Weenig <MWeenig@burlingamesn.com>, Canny Christian <CChristian@snfoperations.com>, Amy Johnson <AJohnson@rockporthc.com>, Avi Saada <ASaada@snfoperations.com>, Matthew Lysobey <MLysobey@rockporthc.com>, Jonathan Weiss <JWeiss@snfoperations.com>, Gavin Wiswell <GWiswell@snfoperations.com>
**Subject: Lucky Number 7 Competition**

First off, June Competition Results will be computed this Friday. Looking forward...

It's a new month so why not a new competition. This time the teams are the facility Administrator, DON, DBD, & Admission Coordinator and everyone can win. In celebration of this the 7th month of the year we're going to roll with the Lucky Number 7 theme. **Here's how it works,** take your starting MCARE OR Total HMO (Managed Care, MCAL Skilled, CCI Skilled, etc) number, add 7 to it, and hold it for 1 midnight. So for ex, your 7/1 starting HMO census number is 8. If you hit 15 and hold it for a midnight you win (same for MCARE).....you CAN win on both MCARE AND HMO.

Winning teams get $1,000 each!!....which can be doubled if you do it for both MCARE and HMO....VPOs win too IF all buildings in their region win.....Be sure to check out the attached "Here to help reference guide"

67.     FRUSTACI's "Lucky Number 7 Competition" email concluded with an image of a slot machine hitting a jackpot:



68.     These emails troubled DIOQUINO for two reasons:

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

(i) DEFENDANTS appeared to be directly violating the Anti-Kickback Statute by compensating individuals, including non-employee ROCKPORT "consultants," for referring Medicare and Medi-Cal patients to DEFENDANTS' skilled nursing facilities without regard to the medical necessity of the admissions; and (ii) ROCKPORT appeared to be incentivizing its marketers to pay kickbacks to physicians to admit patients.

69.    Through her counsel, DIOQUINO repeatedly raised and forwarded these and other similar emails and expressed concerns about cash-prizes-for-patient-admissions competitions.  Outside counsel for ROCKPORT received these emails, expressed concern about their impropriety, and assured DIOQUINO through counsel that the concerns would be addressed with the company.  Outside counsel later confirmed that the company was made aware of DIOQUINO's concerns.

70.    The emails nevertheless continued.  Because she was viewed as a potential whistleblower, DEFENDANTS began leaving off DIOQUINO from the emails that clearly laid out the cash-for-patients kickback scheme, as well as the scheme to increase the census at DEFENDANTS' facilities, all at the service of submitting false claims to the government for unnecessary medical service.

71.    DIOQUINO also became aware that DEFENDANTS were using paid positions to disguise kickback payments to physicians for exclusively referring their patients to BRIUS facilities.  Specifically, when ROCKPORT management learned that Christopher Salem, M.D., who was a compensated medical director for a BRIUS facility, was referring patients to non-ROCKPORT skilled nursing facilities, DEFENDANTS threatened to terminate Dr. Salem's paid position with DEFENDANTS and bar him from ROCKPORT facilities.  Dr. Salem refused to be bullied, and ROCKPORT made good on its threats, not only terminating his employment, but also transferring his patients that were in their

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

1   facilities to other physicians without any notice to Dr. Salem.  DIOQUINO was

2   concerned that this conduct was inappropriate and could violate the Anti-

3   Kickback Statute and expressed her concerns to ROCKPORT through counsel in

4   June 2019.

5       72.    DIOQUINO had expressed concerns about other ROCKPORT

6   misconduct as well.  For example, through counsel, DIOQUINO shared with

7   ROCKPORT another troubling email written by FRUSTACI:

8

9   From: Joe Frustaci <JFrustaci@rockporthc.com<mailto:JFrustaci@rockporthc.com>>
    Date: June 20, 2019 at 9:23:10 AM PDT

10  To: Admissions - Mesa Verde Healthcare
    <Admissions@mesaverdehealthcare.com<mailto:Admissions@mesaverdehealthcare.com>>

11  Cc: Toni Mazzeo <TMazzeo@rockporthc.com<mailto:TMazzeo@rockporthc.com>>, Joy

12  Dioquino-Smith <JSmith@rockporthc.com<mailto:JSmith@rockporthc.com>>, Administrator -
    Mesa Verde Healthcare

13  <Administrator@mesaverdehealthcare.com<mailto:Administrator@mesaverdehealthcare.com
    >>, Sales and Marketing - Mesa Verde Healthcare

14  <SalesandMarketing@mesaverdehealthcare.com<mailto:SalesandMarketing@mesaverdehealt

15  hcare.com>>, DON - Mesa Verde Healthcare
    <DON@mesaverdehealthcare.com<mailto:DON@mesaverdehealthcare.com>>

16  Subject: Re: DAILY CENSUS

17  This operation should be at 20 HMO in addition to the MCARE census. Let's identify custodials
    that 1) have capacity and 2) have a physician order to DC. Once you have custodials that meet

18  that criteria let's pay an ALF/ILF to take them and/or even extend money to the resident

19  themselves to leave.

20

21       73.    This email showed that DEFENDANTS were engaged in the

22  "dumping" of patients who were no longer eligible for Medicare payments.  The

23  term "custodial" refers to patients whose Medicare eligibility has expired.

24  FRUSTACI's idea was to kick out patients for whom the facility would no

25  longer be paid in order to make room for other more profitable patients.

26       74.    Among other things, the practice of inappropriately discharging

27  patients violates the Federal Nursing Home Reform Amendment (FNHRA),

28

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE
CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL
RETALIATION AGAINST RELATOR*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

which requires that "[a] nursing facility must permit each resident to remain in the facility and must not transfer or discharge the resident from the facility unless" one of six exceptions apply, none of which were in FRUSTACI's email. 42 U.S.C. § 1396r(c)(2); 42 CFR § 483.15(c)(1)(i).  DIOQUINO was fired after sending this email to ROCKPORT through counsel.

75.    DIOQUINO also raised concerns that there were unsafe conditions at DEFENDANTS' facilities with DEFENDANTS, including directly to RECHNITZ and FRUSTACI.  However, DIOQUINO's concerns were completely dismissed and ignored.  For instance, in early 2019 DIOQUINO informed FRUSTACI that the ALTA VISTA facility was in desperate need of 99 new mattresses, as many of the mattresses had cuts, stains, and other unsanitary conditions.  DIOQUINO also informed FRUSTACI that the ALTA VISTA facility was severely understaffed—needing approximately an additional ten (10) full-time certified nursing assistants to properly care for its patients.  FRUSTACI refused to respond to DIOQUINO's concerns.

76.    When FRUSTACI did not respond, DIOQUINO raised these same safety concerns with RECHNITZ.  While RECHNITZ promised DIOQUINO that he would have these safety concerns addressed, he never followed through and the staffing and bedding issues remained unaddressed.

77.    During the same time period, ROCKPORT began taking adverse employment actions against DIOQUINO.  For example, in late May 2019, another business development employee at ROCKPORT was given a title that overlapped with DIOQUINO's, signaling to DIOQUINO that she was being replaced.  In June and July 2019, additional responsibilities were taken away from DIOQUINO.  Throughout this time period, through counsel, DIOQUINO expressed concern about whether she would be fired.  She was repeatedly assured, through counsel, that the leadership of ROCKPORT appreciated her

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

*25*

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

work, her job was secure, and "[t]hey want her to stay."

78.     In fact, DEFENDANTS did not want DIOQUINO to stay.  On August 1, 2019, DIOQUINO received a telephone call from ROCKPORT's outside general counsel, who informed her that she was being terminated "for census," despite the fact that the census numbers for the facilities for which she was responsible were at or near capacity.  Indeed, after DIOQUINO was fired, ALTA VISTA received accolades from ROCKPORT management for having a high census count.

79.     When DIOQUINO's counsel called outside counsel for DEFENDANTS —who had only weeks prior indicated that DEFENDANTS wanted DIOQUINO to stay—outside counsel communicated that he was unaware of any intention to fire DIOQUINO and was unaware that she had been terminated.

80.     Since being fired, DIOQUINO has heard rumors that ROCKPORT management suspected she was assisting a competing business run by a former ROCKPORT manager and sabotaging ROCKPORT's relationship with physicians who were referral sources.  This was untrue.

81.     DIOQUINO was fired in retaliation for raising the above-identified concerns.  The legitimate reasons proffered for her firing were mere pretexts for the true reason—her whistleblowing concerning potential Anti-Kickback Statute and False Claims Act Violations.

82.     It is anticipated that DEFENDANTS justified their illegal kickback scheme by reference to an employee safe-harbor under the Anti-Kickback Statute, which, in the DEFENDANTS' view, permits compensation to employees that would otherwise be considered a kickback.  This justification is flawed on several levels.  First, several of the individuals compensated under the DEFENDANTS' kickback scheme were not employees of the skilled nursing

*26*

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

facilities, and were therefore outside any employment-based safe harbor. Second, courts have limited the employee safe harbor to circumstances where the remuneration must be made to the employee for the purpose of furnishing or providing covered items or services payable under Medicare or other federal healthcare programs, and must not be made for referring patients while employed by an entity that is in the business of furnishing covered items or services. United States v. Starks, 157 F. 3d 833, 839 (11th Cir. 1998) ("Both the particular facts of this case and the nature of the Anti–Kickback statute, however, undercut Starks and Siegel's vagueness argument. First, even if Starks and Siegel believed that they were bona fide employees, they were not providing "covered items or services."  As the government has shown, Starks received payment from Siegel and Future Steps only for referrals and not for any legitimate service for which the Hospital received any Medicare reimbursement."); United States v. Luis, 966 F. Supp. 2d 1321, 1331 (S.D. Fla. 2013) (regulation implementing the Anti-Kickback Statute "makes clear that the safe-harbor provisions will only apply when payments made to an employee compensate the employee for furnishing or providing covered items or services or items or services payable by Medicare, not simply for referring patients"); see also United States v. Borrasi, 639 F.3d 774, 782 (7th Cir. 2011) (cases attached hereto as Exhibit J, K, and L).  This case involves medically unnecessary services that were not covered under Medicare, Medicaid, or other government programs.

83.    The DEFENDANTS' aggressive census-based policies are consistent with cases where claims have been upheld under the False Claims Act. For example:

a. in U.S., ex rel. Landis v. Hospice Care of Kansas, LLC, No. 06-2455-CM, 2010 WL 5067614, at *2 (D. Kan. Dec. 7, 2010), the court specifically identified such business practices as those capable

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700| FACSIMILE 310-826-4711

*27*

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

1    of showing that false submissions were submitted.  For instance, the

2    court noted, among other things, that "[d]espite a warning from an

3    outside consultant that incentives based on census could be

4    inappropriate, defendants set up census-based bonus programs.

5    These included the 2005 'Summer Sizzle,' 'Christmas Cash Blitz,'

6    and 'Fall Frenzy.' In 2007, Voyager began a promotion in which it

7    offered to pay for a trip to Cancun for all HCK full-time staff if

8    HCK maintained an average daily census of 725 patients for 30

9    consecutive days between September 2007 and September 2008."

10    (Case attached as Exhibit M.)

11    b.  Similarly in <u>United States ex rel. Fowler v. Evercare Hospice, Inc.</u>,

12    No. 11-CV-00642-PAB-NYW, 2015 WL 5568614, at *2 (D. Colo.

13    Sept. 21, 2015) the court observed that allegations that "Evercare

14    pressured its employees, including its physician Medical Directors,

15    to meet patient 'census' targets without regard to whether patients

16    were eligible for hospice benefits. These census targets were handed

17    down by Evercare's corporate office, and Evercare's director of

18    finance and one Regional Director acknowledged that the census

19    targets were unrealistic. Despite the acknowledged unrealistic

20    census targets, Evercare's leadership pressured site leaders to meet

21    them in a 'hostile, aggressive, and intimidating' manner (citations

22    omitted)" were sufficient to render the government's FCA claims

23    plausible.  (Case attached as Exhibit N.)

24    84.    The DEFENDANTS' practices mirror the same behavior that these

25    courts found to be indicative of causing false claims for the government.  Here,

26    as in the above instances, DEFENDANTS sent emails demanding the facilities

27    hit aggressive targets (minimum 96%) no matter the medical necessity—

28

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE
CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL
RETALIATION AGAINST RELATOR*

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

mandating that the marketing representatives "bring them in.  We will not lose money anymore."  DEFENDANTS also ran census-based contests, such as the "Lucky Number 7 Competition" and the "Hunger Games Admission Contest" that offered cash incentives (of $1,000 per person or more) just as the defendant in <u>Landis</u> had done.  It is also clear that DEFENDANTS "pressured site leaders to meet them [census targets] in a 'hostile, aggressive, and intimidating' manner," as was the case in <u>Fowler</u>.  DEFENDANTS even went so far as to threaten and then fire its medical director, Dr. Salem, for refusing to refer all of his patients to DEFENDANTS' facilities.

## COUNT I
### Violations of the Federal Anti-Kickback Statute
### 42 U.S.C. § 1320a-7b(b)
### (Relator-Plaintiff DioQuino-Smith Against All Defendants)

85.    Relator-Plaintiff incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

86.    DEFENDANTS devised schemes to provide cash and other incentives to employees, physicians, consultants, and other health care providers to induce, or in return for, the referral of business paid for by federal and state programs, including Medicare, Medicaid, and other federal programs in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

87.    DEFENDANTS' illegal kickbacks to employees, physicians, consultants, and other health care providers induced improper referrals of services provided to beneficiaries of federally-funded healthcare programs.

88.    Since ROCKPORT employees were consultants that were not being paid for furnishing or provision of covered items and services, the illegal kickback payments made to Rockport employees do not fall within any safe harbor provision of the Anti-Kickback Statute.

89.     For each of these federal Anti-Kickback Statute violations, DEFENDANTS are subject to penalties of up to $50,000 for each improper act, plus damages of up to three times the amount of the improper remuneration at issue. 42 U.S.C. § 1320a-7a(a).

## COUNT II
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)-(a)(2)
### (Relator-Plaintiff DioQuino-Smith Against All Defendants)

90.     Relator-Plaintiff incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

91.     This Count is brought by Relator-Plaintiff in the name of the United States against DEFENDANTS under the qui tam provisions of 31 U.S.C. § 3730 for DEFENDANTS' violation of 31 U.S.C. §§ 3729(a)(l) and (a)(2).

92.     DEFENDANTS provided incentives to employees, physicians, and other health care providers to induce improper referrals of services to their facilities for the provision of health services to beneficiaries of federally funded health care programs in violation of the federal Anti-Kickback Statute.

93.     The Anti-Kickback Statute makes it illegal to offer, receive, or solicit any remuneration, kickback, bribe, or rebate, whether directly or indirectly, overtly or covertly, in cash or in kind, to or from, any person in order to induce such person to purchase, lease, or order, or to arrange for or recommend the purchasing, leasing, or ordering of any good, service, or item for which payment may be made in whole or in part under a Government Health Care Program.

94.     Each claim submitted by DEFENDANTS to a federally-funded health care program (including Medicare, Medicaid, etc.) for a service provided to a patient referred by a DEFENDANT "advisor" is false because it is tainted by

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

1   a referral obtained through an illegal kickback.  DEFENDANTS' violations of

2   the federal Anti-Kickback Statute give rise to liability under the federal False

3   Claims Act.

4        95.    As a prerequisite to participating in federally funded health care

5   programs, DEFENDANTS expressly certified (or, through their participation in a

6   federally funded program, impliedly certified) their compliance with the federal

7   Anti-Kickback Statute.

8        96.    Plaintiff United States, unaware of the falsity of the claims and/or

9   statements which DEFENDANTS caused doctors, pharmacists, and other health

10   care providers to make to the United States, and in reliance on the accuracy

11   thereof, paid those doctors, pharmacies, and other health care providers for

12   claims that would otherwise not have been allowed.

13       97.    The amounts of the false or fraudulent claims to the United States

14   were material.

15       98.    Plaintiff United States, being unaware of the falsity of the claims

16   and/or statements made by DEFENDANTS, and in reliance on the accuracy

17   thereof, paid and may continue to pay DEFENDANTS for health care services

18   that otherwise should not have been paid under the Medicaid,

19   CHAMPUS/TRICARE, CHAMPVA, and the Federal Health Benefit Program,

20   and other federal health care programs.

21       99.    The United States and the state Medicaid programs have been

22   damaged by the payment of false or fraudulent claims.

23                                **COUNT III**
                   **Violations of the California False Claims Act**
24              **California Government Code Section 12650** *et seq.*
25         **(Relator-Plaintiff DioQuino-Smith Against All Defendants)**

26       100.   Relator-Plaintiff incorporates by reference and re-alleges all above

27

28

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE
CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL
RETALIATION AGAINST RELATOR*

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

paragraphs as if fully set forth herein.

101.    DEFENDANTS' practices are independently unlawful as kickback schemes, strictly prohibited by California's health care providers licensing and Medi-Cal statutes.  Specifically, Business and Professions Code Section 650 prohibits, inter alia, the offer or acceptance "of any rebate, refund, . . . preference, . . . discount or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers."  Welfare and Institutions Code Section 14107.2 similarly prohibits every Medi-Cal provider from soliciting or receiving "any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind ... [i)n return for the referral, or promised referral, of any person for the furnishing ... of any service" covered by the Medi-Cal program.

102.    Likewise, California Health & Safety Code Section 445, prohibits any person from profiting from referring patients to a physician or clinic for care; California Business & Professions Code Section 2273(a) prohibits "the employment of runners, cappers, steerers, or other persons to procure patients." Kickbacks are specifically prohibited in treatment of Medi-Cal patients pursuant to California Welfare & Institutions Code Section 14107.2.

103.    As participating Medi-Cal providers, DEFENDANTS were also subject to DHCS regulations that require them to declare, under penalty of perjury, that they "shall not offer, give, furnish, or deliver any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary.  Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

1   rendering of health care services to any Medi-Cal beneficiary."

2       104.   DEFENDANTS, and each of them, knowingly (as defined in

3   California Government Code Section 12650, subdivision (b)(2)) presented or

4   caused to be presented false claims for payment or approval to an officer or

5   employee of California.

6       105.   Each DEFENDANT knowingly submitted false claims for services

7   performed by means of, and as a result of, illegal kickbacks.

8       106.   Each DEFENDANT knowingly made, used, and/or caused to be

9   made and used false records and statements, including but not limited to bills,

10   invoices, requests for reimbursement, and records of services, in order to obtain

11   payment or approval of charges to the Medi-Cal program that were higher than

12   they were permitted to claim or charge by applicable law, including but not

13   limited to section 51501 of title 22 of the California Code of Regulations.

14   Among other things, Defendants, and each of them, charged more for services

15   than would have been charged for the same services to other purchasers of

16   comparable services under comparable circumstances.

17       107.   Each DEFENDANT knowingly submitted false claims for services

18   performed by means of, and as a result of, illegal kickbacks.

19       108.   Each DEFENDANT knowingly made, used, and/or caused to be

20   made and used false records and statements, including but not limited to bills,

21   invoices, requests for reimbursement, and records of services, in order to obtain

22   payment or approval of charges to the Medi-Cal program that were higher than

23   they were permitted to claim or charge by law, including but not limited to

24   section 51501 of title 22 of the California Code of Regulations.

25       109.   Each DEFENDANT knowingly made, used, and caused to be made

26   and used false certifications that the services for which it charged Medi-Cal were

27   rendered in full compliance with all applicable statutes and regulations.

28

*Spertus, Landes & Unhofer, LLP*
*1990 SOUTH BUNDY DR., SUITE 705*
*LOS ANGELES, CA 90025*
*TELEPHONE 310-826-4700 FACSIMILE 310-826-4711*

*33*

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE*
*CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL*
*RETALIATION AGAINST RELATOR*

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

110.   The conduct of DEFENDANTS, and each of them, violated Government Code Section 12651, subdivision (a)(l) and was a substantial factor in causing California to sustain damages in an amount according to proof pursuant to California Government Code Section 12651, subdivision (a).

111.   Plaintiff California, unaware of the falsity of the claims and/or statements which DEFENDANTS caused doctors, pharmacists, and other health care providers to make to the State of California, and in reliance on the accuracy thereof, paid DEFENDANTS, DEFENDANTS' related entities, doctors, pharmacists, and other health care providers for claims that would otherwise not have been allowed.

112.   The amounts of the false or fraudulent claims to the State of California were material.

## COUNT IV
### Whistleblower Retaliation in Violation of the False Claims Act
### 31 U.S.C. § 3730(h)
### (Relator-Plaintiff DioQuino-Smith Against All Defendants)

113.   Relator-Plaintiff incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

114.   At all material times 42 U.S.C. § 1320a-7b(b) was in effect and binding on DEFENDANTS.  This statute prohibits employers such as DEFENDANTS from discharging, constructively discharging, demoting, threatening, harassing or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency.

115.   The False Claims Act ("FCA"), 31 U.S.C. § 3730(h), prohibits

*34*

DEFENDANTS from retaliating against an employee who engages in protected conduct by taking lawful actions in furtherance of an FCA or by making efforts to stop one or more violations of the FCA.

116.   DIOQUINO had an employer-employee relationship with ROCKPORT.

117.   Plaintiff had reasonable cause to believe, and did believe, that the information contained in the emails from FRUSTACI promising awards of thousands of dollars to employees as an incentive and reward for obtaining high-paying Medicare, Medicaid, VA and Medi-Cal patients were violations of state or federal statutes, or violations of or noncompliance with local, state, or federal rules or regulations.

118.   DEFENDANTS discharged and retaliated against DIOQUINO, after she made oral and written complaints regarding what she reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes, rules and regulations.

119.   DIOQUINO is informed and believes, and thereon alleges that DEFENDANTS knew that Plaintiff was engaging in a protected activity, by her making complaints regarding DEFENDANTS' illegal conduct and/or conduct Plaintiff reasonably believed to be illegal, and because of these actions Plaintiff was discharged from her employment and/or otherwise discriminated and retaliated against by DEFENDANTS.

120.   DEFENDANTS' conduct was a substantial factor in causing Plaintiff's harm, which includes, without limitation:  past and future lost earnings; past and future lost benefits; emotional distress; mental suffering; reputational damage; and other pecuniary loss.

121.   DEFENDANTS' actions constituted a willful violation of the abovementioned federal laws and regulations.  As a direct result, Plaintiff has

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

1  suffered and continues to suffer substantial losses related to the loss of wages and

2  is entitled to recover costs and expenses and attorney's fees in seeking to compel

3  DEFENDANTS to fully perform its obligations under state and federal law, in

4  amounts according to proof at time of trial.

5      122.   DEFENDANTS committed the outrageous acts alleged hereinabove

6  by acting knowingly and willfully, with the wrongful and illegal deliberate

7  intention of injuring DIOQUINO, from improper motives amounting to malice,

8  fraud and oppression and in conscious disregard of her rights.  DIOQUINO is

9  thus entitled to recover punitive and exemplary damages in amounts according to

10  proof at the time of trial, to the full extent allowable by law, in addition to any

11  other remedies and damages allowable by law.

**COUNT V**
**Violation of the Whistleblower Protection Provisions of the California False**
**Claims Act**
**California Government Code Section 12653(A)**
**(Relator-Plaintiff DioQuino-Smith Against All Defendants)**

17      123.   Relator-Plaintiff incorporates by reference and re-alleges all above

18  paragraphs as if fully set forth herein.

19      124.   Government Code Section 12653(a) provides that "[a]ny employee

20  [. . .] shall be entitled to all relief necessary to make that employee [. . .] whole, if

21  that employee [. . .] is discharged, demoted, suspended, threatened, harassed, or

22  in any other manner discriminated against in the terms and conditions of his or

23  her employment because of lawful acts done by the employee [. . .] in

24  furtherance of an action under" the California False Claims Act.

25      125.   DIOQUINO had an employer-employee relationship with

26  ROCKPORT.

27      126.   DIOQUINO reasonably believed (and continues to believe) that

28

*36*

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE*
*CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL*
*RETALIATION AGAINST RELATOR*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

1  false or fraudulent claims have been submitted to Medi-Cal, Medicare, Medicaid,

2  and other government entities for inflated charges and for payment pursuant to

3  illegal contracts, as illustrated by the examples alleged herein, and that

4  DEFENDANTS have sought payment or reimbursement from the State of

5  California and/or the United States of America for all or a portion of the funds

6  used to pay such claims, all thereby having defrauded the government of money,

7  property, and/or services through the submission of false or fraudulent claims for

8  payment or approval.

9      127. DIOQUINO had reasonable cause to believe, and did believe, that

10  the information she was reporting were violations of state or federal statutes, or

11  violations of or noncompliance with local, state, or federal rules or regulations,

12  including, but not limited to California Business & Professions Code Section 650

13  *et seq.* Relator-Plaintiff was concerned about the foregoing efforts to submit,

14  cause to submit, and/or conspire to submit false claims based upon incentives

15  paid merely to artificially inflate DEFENDANTS' revenues. DIOQUINO

16  engaged in protected activity by reporting this information to DEFENDANTS.

17      128. DIOQUINO is informed and believes, and thereon alleges that

18  DEFENDANTS knew that Plaintiff was engaging in a protected activity, by her

19  making complaints regarding DEFENDANTS' illegal conduct and/or conduct

20  DIOQUINO reasonably believed to be illegal, and because of these actions she

21  was discharged from her employment and/or otherwise discriminated and

22  retaliated against by DEFENDANTS.

23      129. DIOQUINO's acts in furtherance of a false claims action and/or to

24  stop the submission and payment of false claims were a substantial motivating

25  factor for DEFENDANTS' decision, made through its employees and agents, to

26  terminate Relator-Plaintiff.

27      130. DEFENDANTS' conduct was a substantial factor in causing

28

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

*37*

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

DIOQUINO's harm, which includes, without limitation: past and future lost earnings; past and future lost benefits; emotional distress; mental suffering; reputational damage; and other pecuniary loss.

131.   Relator-Plaintiff is also entitled to reinstatement, double back pay, interest on the double back pay, and other special damages pursuant to California Government Code Section 12653(b).

132.   DEFENDANTS committed the outrageous acts alleged hereinabove by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, fraud and suppression and in conscious disregard of Plaintiff's rights.  Accordingly, in addition to the damages provided above, Plaintiff also seeks punitive damages for DEFENDANTS' acts pursuant to California Government Code Section 12653(b).

133.   Relator-Plaintiff also seeks reasonable attorneys' fees and costs of litigation incurred in bringing this action pursuant to California Government Code Section 12653(b).

## COUNT VI
### Retaliation in Violation of California Labor Code Section 1102.5
### (Relator-Plaintiff DioQuino-Smith Against All Defendants)

134.   Relator-Plaintiff incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

135.   California Labor Code Section 1102.5 provides, in part, that "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information [. . .] to a government or law enforcement agency, to a person with authority over the employee [. . .] who has the authority to investigate, discover, or correct the violation or noncompliance [.

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

. .] if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

136.   Relator-Plaintiff had an employer-employee relationship with ROCKPORT.

137.   DEFENDANTS had authority over DIOQUINO in that they were empowered to terminate Plaintiff's employment and/or discipline her.

138.   DIOQUINO had a reasonable belief that DEFENDANTS were violating state and federal laws, and reported those violations to DEFENDANTS' attorneys, as DEFENDANTS well knew, and as alleged hereinabove.

139.   DIOQUINO engaged in protected activity when she reported reasonable suspicions of violations of state and/or federal statutes, rules, and/or regulations to DEFENDANTS, who had authority over her and had authority to investigate, discover, or correct the violations or noncompliance alleged above.

140.   DEFENDANTS retaliated against DIOQUINO for her whistleblowing, by harassing and taking adverse employment action against her by terminating her employment, among other things, all in violation of Labor Code Section 1102.5

141.   DIOQUINO's disclosure of information was a significant factor in DEFENDANTS' decision to discharge DIOQUINO.

142.   As a direct and proximate result of such retaliation, DIOQUINO has been damaged.

143.   DEFENDANTS' conduct was a substantial factor in causing DIOQUINO'S harm, which includes, without limitation:  past and future lost earnings; past and future lost benefits; emotional distress; mental suffering;

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

reputational damage; and other pecuniary loss.

144.   Pursuant to California Code of Civil Procedure Section 1021.5, which provides that a "court may award attorney's fees to a successful party against one or more opposing party in any action which has resulted in the enforcement of an important right affecting the public interest," DIOQUINO seeks reasonable attorneys' fees and costs incurred in bringing this claim.

## COUNT VII

### Retaliation in Violation of California Labor Code Section 98.6
### (Relator-Plaintiff DioQuino-Smith Against All Defendants)

145.   Relator-Plaintiff incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

146.   California Labor Code Section 98.6 provides that an employer may not "discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee [. . .] because of the exercise by the employee [. . .] on behalf of himself, herself, or others of any rights afforded him or her."  Courts have determined that a plaintiff may assert a claim under Section 98.6 for adverse action taken because of an employee's exercise of rights afforded to him or her by other provisions of the Labor Code, such as Section 1102.5.  See Grinzi v. San Diego Hospice Corp., 120 Cal. App. 4th 72, 87 (2004); Couch v. Morgan Stanley & Co., Inc., No. 14-cv-10, 2015 WL 4716297, at *17 (E.D. Cal. Aug. 7, 2015).

147.   Relator-Plaintiff had an employer-employee relationship with ROCKPORT.

148.   DEFENDANTS took adverse employment action against DIOQUINO by terminating her employment.

149.   DEFENDANTS' decision to terminate DIOQUINO's employment

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

1   resulted from DIOQUINO's exercise of her rights under Labor Code Section

2   1102.5.

3       150.   Labor Code Section 1102.5, in part, affords Relator-Plaintiff the

4   right to be free from retaliation by her employer and/or any person acting on

5   behalf of her employer, for disclosing information to an employer with authority

6   to investigate, discover, or correct the violation, so long as Relator-Plaintiff

7   reasonably believed that the information disclosed was a violation of state or

8   federal statutes.

9       151.   By reason of the foregoing, DIOQUINO has been harmed.

10       152.   DEFENDANTS' conduct was a substantial factor in causing

11   DIOQUINO's harm, which includes, without limitation:  past and future lost

12   earnings; past and future lost benefits; emotional distress; mental suffering;

13   reputational damage; and other pecuniary loss.

14       153.   In addition to the remedies requested above, for each violation of

15   California Labor Code Section 98.6 by DEFENDANTS, Relator-Plaintiff seeks

16   civil penalties of $10,000 pursuant to California Labor Code Section 98.6(b)(3).

17       154.   Relator-Plaintiff is also entitled to reinstatement and reimbursement

18   for lost wages and benefits pursuant to California Labor Code Section 98.6(b)(1).

19       155.   Pursuant to California Code of Civil Procedure Section 1021.5,

20   which provides that a "court may award attorney's fees to a successful party

21   against one or more opposing party in any action which has resulted in the

22   enforcement of an important right affecting the public interest," Relator-Plaintiff

23   seeks reasonable attorneys' fee and costs incurred in bringing this claim.

24

25

26

27

28

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE
CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL
RETALIATION AGAINST RELATOR*

## **PRAYER FOR RELIEF**

WHEREFORE, Relator-Plaintiff, acting on behalf and in the name of the United States of America and the State of California, demands and prays that judgment be entered against DEFENDANTS under the federal Anti-Kickback Statute, False Claims Act, and California False Claims Act as follows:

## **COUNT I**

(1)     That DEFENDANTS cease and desist from violating 42 U.S.C. § 1320a-7b(b), as set forth above;

(2)     Judgment against the DEFENDANTS in an amount equal to up to three times the amount of the improper remuneration at issue;

(3)     Imposition of penalties of up to $50,000 for each kickback violation;

(4)     That Relator-Plaintiff be awarded all of her attorneys' fees, litigation and investigation costs, and expenses; and

(5)     Such other relief as the Court deems just and appropriate.

## **COUNT II**

(1)     That DEFENDANTS cease and desist from violating 31 U.S.C. § 3729, *et seq*., as set forth above;

(2)     Judgment against DEFENDANTS for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of the federal False Claims Act;

(3)     That Relator-Plaintiff be awarded 25% of the proceeds of this actions if the United States elects to intervene and 30% if it does not;

(4)     That Relator-Plaintiff be awarded all of her attorneys' fees, litigation and investigation costs, and expenses; and

(5)     Such other relief as the Court deems just and appropriate.

*42*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700 FACSIMILE 310-826-4711

## COUNT III

(1)     That DEFENDANTS cease and desist from violating California Government Code Section 12650, *et seq.,* as set forth above;

(2)     Judgment against the DEFENDANTS in an amount equal to up to three times the amount the State of California has sustained because of DEFENDANTS' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of California Government Code Section 12651(a)(l)-(3);

(3)     That Relator-Plaintiff be awarded the maximum amount allowed pursuant to California Government Code Section 12651(a);

(4)     That Relator-Plaintiff be awarded all of her attorneys' fees, litigation and investigation costs, and expenses; and

(5)     Such other relief as the Court deems just and appropriate.


WHEREFORE, Relator-Plaintiff requests the following relief strictly on behalf of herself:

## COUNTS IV-VII

(1)     For reinstatement with the same seniority, status, duties, and working conditions applicable at the time of her termination, and abatement of the retaliatory conduct directed toward her, or alternatively, front pay;

(2)     For economic damages for lost wages and benefits, including double back pay, interest on the double back pay, and compensation for any special damages sustained as a result of the retaliation;

(3)     For special damages, including, but not limited to, damages for mental and emotional distress and harm to reputation;

(4)     For a civil penalty of $10,000 per employee for each violation of this section;

*43*

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL RETALIATION AGAINST RELATOR*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700| FACSIMILE 310-826-4711

1     (5)    For punitive damages;

2     (6)    For an award of reasonable attorneys' fees and costs incurred in this

3   action;

4     (7)    For prejudgment interest; and

5     (8)    For such other and further relief as the Court may deem just and

6   proper.

7

8   Dated:   November 21, 2019          SPERTUS, LANDES & UMHOFER, LLP

9

10                                      By:   _____

11                                            Matthew Donald Umhofer
                                              J. Anthony King
12                                            Attorneys for Plaintiff Joy DioQuino

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE
CLAIMS ACT, ANTI-KICKBACK STATUTES, AND FOR UNLAWFUL
RETALIATION AGAINST RELATOR*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

# EXHIBIT A

**EXHIBIT A**

# LEASE

Landlord:     Joseph Augello Credit Exemption Trust, Robert Augello, Richard Augello, Kathleen Augello, Jacqueline Owen, Michael A. & Anne J. Augello Family Trust, Wayne L. Barnes and Daryl E. Barnes

Tenant:       Eretz San Rafael Properties, LLC, a California limited liability company

Address:      1601 5th Avenue, San Rafael, California

418201.5/dml

# LEASE

THIS LEASE ("Lease"), dated for reference purposes only this 7th day of August, 2012, is entered into by and between Joseph Augello Credit Exemption Trust, Robert Augello, Richard Augello, Kathleen Augello, Jacqueline Owen, Michael A. & Anne J. Augello Family Trust, Wayne L. Barnes and Daryl E. Barnes (hereinafter collectively called "Landlord"), and Eretz San Rafael Properties, LLC, a California limited liability company (hereinafter called "Tenant") at Los Angeles, California.

## 1.    DESCRIPTION OF LEASED PROPERTY

Landlord hereby leases to Tenant and Tenant leases from Landlord, for the terms, at the rental, and upon all of the conditions set forth herein, the following real and personal property:

1.1    Skilled Nursing Facility.   Those certain premises with improvements thereon, situated in the City of San Rafael, State of California, located at 1601 Fifth Avenue, San Rafael, California, on which there is presently operating a skilled nursing facility, known as Kindred Nursing and Rehabilitation – Fifth Avenue, which real property is more particularly described on Exhibit "1", annexed hereto and incorporated herein by reference, and which is hereinafter referred to as the "Facility" or the "Premises".

1.2    Facility Equipment.   At a minimum, all of the furniture, furnishings, fixtures and equipment required as of the date hereof for the Premises to operate under Title 22 as a skilled nursing facility, and at a maximum, all of the furniture, furnishings, fixtures and equipment presently being used in the operation of the Facility, as more particularly described and itemized on Exhibit "2" annexed hereto and incorporated herein by reference, and hereinafter referred to as "Equipment".

1.3    The Facility and Equipment are hereinafter collectively referred to as the "Leased Property".

## 2.    TENANT'S ACCEPTANCE OF LEASED PROPERTY

2.1    Tenant accepts the Leased Property and each and every part thereof in their state and condition as of the Commencement Date (hereafter defined) and without any representation or warranty by Landlord as to the condition of such property or as to the use which may be made thereof except as may otherwise be set forth herein.

In the event any repair or improvement is required for any part of the Leased Property by appropriate governmental authority at any time after the Commencement Date of this Lease, said repairs or improvements shall be made by Tenant at Tenant's sole cost and expense.

2.2    Notwithstanding any other provision of this Lease, including but not limited to Section 2.1 above, Landlord shall not be responsible for any latent defect in the Facility nor shall

Landlord be responsible for any change or condition in the Leased Property, and the Minimum Rent (defined below), additional rent and/or any sum payable by Tenant hereunder shall in no case be withheld, diminished or abated on account of any reason whatsoever, including but not limited to, any defect in or use being made of the Leased Property, any change in the condition or use thereof, and damage occurring thereto, or the existence in connection thereto of any violation of the laws or regulations of any governmental authority.

2.3 Tenant shall have the right, but in no case the obligation, to pay any sums owing by Landlord which threaten the continued operation of the Facility or the Premises by Tenant as a 54-bed SNF and/or the continued possession of the Facility or the Premises by Landlord, including but not limited to the default on any mortgage or other lien and/or encumbrance, and deduct same from rent (or any sums payable by Tenant to Landlord).

2.4 Landlord acknowledges that the Facility is licensed as a 54-bed Skilled Nursing Facility ("SNF") (the "License").

3. RESERVED.

4. INITIAL TERM

As of the date of execution of this Lease, the Premises is leased to Kindred Nursing Centers West, LLC, ("Current Tenant"), pursuant to a lease whose term expires November 30, 2012 (the "Existing Lease"). The Initial Term of this Lease shall commence (the "Commencement Date") on December 1, 2012 unless Landlord, Tenant and Current Tenant mutually agree to an earlier termination of the Existing Lease, in which event the Initial Term of this Lease shall commence immediately upon the termination of the Existing Lease. The Initial Term shall expire on the day preceding the tenth (10th) anniversary of the Commencement Date (each a "Lease Year" and collectively, the "Initial Term"). For purposes of this Lease, each consecutive twelve (12) month period measured from the Commencement Date, throughout the Lease term, is referred to hereinafter as a "Lease Year". The Initial Term and any extension periods exercised and granted are collectively referred to herein as the "Term".

5. RENEWAL TERM

Tenant may elect to extend the term of this Lease for up to two (2) additional terms, the first of which shall be five (5) years in length and the second of which shall be ten (10) years in length (each a "Renewal Term") by giving written notice to Landlord no later than 180 days prior to the Expiration Date (as extended).

6. RENT

6.1 Minimum Monthly Rent. Tenant shall pay to Landlord in lawful money of the United States, as monthly rent, without deduction, setoff, prior notice, or demand, the sums set forth in Section 6.2 below, in advance no later than the first day of each month (and if such day is not a business day, then on the next following business day), throughout the Term. Minimum Rent for the first month, or portion of it, shall be paid on the Commencement Date. Minimum

Rent for any partial month shall be prorated at the rate of one-thirtieth (1/30th) of the then current Minimum Rent per day. Tenant hereby acknowledges that Landlord is not required to send monthly statements and/or invoices as a condition to Tenant paying any Minimum Rent due under this Lease. Tenant further acknowledges that this Lease is intended as a net lease, with Tenant responsible for all costs of maintenance and repair, operation, insurance and taxes on the Premises during the Term except as otherwise expressly provided herein.

6.2   Minimum Rent Schedule.

(a)   Subject to Section 6.2(b) below, the Minimum Rent ("Minimum Rent") payable by Tenant to Landlord during the first Lease Year shall be Twenty-One Thousand Six Hundred and No/100 Dollars ($21,600.00) per month.

(b)   The Minimum Rent payable throughout the Term (including any Renewal Options, as applicable), is set forth on "Exhibit 4", attached hereto and incorporated hereby herein.

7.   TAXES

7.1   Real Property Taxes.   In addition to the payment of Minimum Rent specified in Article 6, Tenant shall pay all real property taxes and general and special assessments, levied or assessed against said Premises during the Term in the following manner:

(a)   Tenant shall pay to the taxing authority the full amount of such taxes and assessments each year prior to its delinquency date and shall provide Landlord with evidence of such timely payment upon request. On receipt, Landlord shall furnish Tenant with the tax bill for said Premises.

(b)   Should any special assessments that may be bonded be levied against said Premises during the Term, they shall be allowed to be bonded and only the installments of principal and interest becoming due each year on the bonds evidencing the special assessments shall be included in the amounts payable by Tenant to Landlord under this section.

(c)   The taxes and assessments levied against said Premises during the first and last years of this Lease or any renewal or extension of this Lease shall be prorated between Landlord and Tenant for purposes of this section as of 12:01 A.M. on the Commencement Date and termination respectively of this Lease or any renewal or extension periods of this Lease.

7.2   Tax Impound Account.   Notwithstanding the foregoing, if a lender of Landlord who has a mortgage or deed of trust against the Premises (a "Mortgagee") requires Landlord to impound real property taxes on a periodic basis during the Term, Tenant, on notice from Landlord indicating this requirement, shall pay a sum of money towards its liability under this Lease to Landlord on a periodic basis in accordance with the Mortgagee's requirements. Landlord shall impound the tax payments received from Tenant in accordance with the requirements of the Mortgagee and shall utilize such funds to timely pay real property taxes. In no event shall Tenant have any obligation to pay to a tax impound account more than 1/12th of the real property taxes assessed against the Premises during any month of the Term.

7.3   Definition of "Real Property Tax".  As used herein, the term "real property tax" shall include any form of assessment, commercial rent tax, levy, penalty, or tax (other than inheritance or estate taxes), imposed by any governmental authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement district thereof, as against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part, as against Landlord's right to rent or other income therefrom or as against Landlord's business of leasing the Premises (other than Landlord's income taxes) or any tax imposed in substitution, partially or totally, or any tax previously included within the definition of real property tax, or any additional tax the nature or which was previously included within the definition of real property tax.

7.4   Personal Property Taxes.  Tenant shall pay, before delinquency, all taxes, assessments, and other charges that are levied and assessed against trade fixtures, furnishings, the Equipment and all of Tenant's personal property installed or located in or on the Premises, and that become payable during the Term.  On demand by Landlord, Tenant shall furnish Landlord with satisfactory evidence of these payments.

7.5   Right to Contest Taxes.  Tenant shall have the right, at Tenant's sole cost and expense, to protest or contest, in the name of Landlord or otherwise, any tax or assessment, or any increase in any tax or assessment, levied on said Premises, but Tenant shall have no right to direct Landlord not to pay any tax or assessment before it becomes delinquent pending final determination of the protest or contest unless Tenant deposits with Landlord:

    (a)    The full amount of the tax or assessment, plus

    (b)    The amount of penalty that will be imposed on said Premises for failure to pay the tax or assessment before it became delinquent; and

    (c)    One year's interest at the rate charged by the government entity imposing the tax or assessment on the amount of the tax or assessment.

    Even if the cash deposit is furnished by Tenant as provided in the preceding subsections, Landlord shall not be required to withhold payment of any levy or assessment if at any time is in immediate danger of portion of the Leased Property being forfeited or sold because of nonpayment of any levy or assessment.

8.   RESERVED.

9.   USE

9.1   Landlord is leasing the Facility to Tenant for the purpose of operating a skilled nursing facility (including the right of Tenant to provide for sub-acute services ) on the Premises. Tenant shall not use or permit the Leased Property or any part thereof, to be used for any purpose or purposes other than the purpose for which the Leased Property is hereby leased, as aforesaid,

without the prior written consent of Landlord, which consent Landlord shall not unreasonably withhold.

9.2     Tenant shall not undertake any act nor suffer or permit any licensing change which would alter, change or reduce any use of the Leased Property permitted hereunder, nor shall Tenant undertake any act nor suffer or permit any change in the configuration of the Leased Property which would alter, change or reduce the potential occupancy of the Leased Property.

9.3     Tenant acknowledges that it knows that a license is required to operate the Facility as a skilled nursing facility on the Premises and that the license of the present occupant to operate the Facility is not transferable, and the Tenant will have to obtain its own license to operate the Facility as a skilled nursing facility on the Premises. The failure of Tenant to obtain any one or more required permit, license or other authorization or approval shall not affect or eliminate Tenant's obligations under this Lease.

9.4     Tenant shall not remove the Equipment, any part thereof, or any improvement, alteration, addition or replacement thereof during the Term or any renewal or extension of this Lease; provided, however, Tenant may remove particular items of Equipment, where such removal is required to repair the same. Neither Tenant, nor any sublessee, assignee nor any other person or firm operating, occupying or managing the Facility shall enter into any lifetime care agreement or any lease or other term arrangement in excess of six (6) months, nor shall they accept any prepaid rent, fees, deposits or other compensation in excess of an aggregate of Twenty Thousand Dollars ($20,000.00) for any occupant or patient; provided, however, that in no event shall they enter into any agreement or accept any funds except in accordance with all applicable laws, ordinances, statutes, regulations or other authority.

9.5     Tenant, Tenant's sublessees, licensees and assignees or other persons or firms operating or managing the Facility shall promptly inform Landlord in writing of any damage or destruction to any part of the Leased Property in excess of Twenty-Five Thousand Dollars ($25,000.00), and of any notice or claim or violation of any law, statute, building code, ordinance, rule or regulation or other matter concerning or affecting the Leased Property.

9.6     Compliance with Law.

(a)  Tenant shall (i) not use the Premises or permit anything to be done in or about the Premises which will in any way conflict with or violate any law, statute, zoning restrictions, ordinance or governmental rule or regulation (collectively, the "Regulations") or requirements of duly constituted public authorities now in force or which may hereafter be in force and with the requirements of any board of fire underwriters or other similar body now or hereafter constituted relating to or affecting the condition, use, or occupancy of the Premises (collectively, the "Requirements"); and (ii) promptly comply with all Regulations and Requirements. Notwithstanding any provisions in this Lease to the contrary, Tenant shall not be required to bring the Facility up to current Regulations and/or Requirements, including but not limited to complying with any provisions of the Americans with Disabilities Act ("ADA"), unless Tenant or Landlord is informed by any authority having jurisdiction over the Facilities that the Facilities are required to comply with any Regulations and/or Requirements, in which event Tenant shall, at its sole cost and expense, subject to any rights to contest, comply with all applicable

Regulations and/or Requirements. The judgment of any court of competent jurisdiction or the admission of Tenant in any action against Tenant, whether Landlord be a party thereto or not, that Tenant has violated any Regulation or Requirement, shall be conclusive of the fact as between Landlord and Tenant. Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other tenants or occupants of the Premises or of property of which the Premises may be a part, or injure or annoy them or use or allow the Premises to be used for any unlawful or objectionable purpose, nor shall Tenant cause, maintain, or permit any nuisance in, on, or about the Premises. Tenant shall not commit or suffer to be committed any waste in or upon the Premises nor shall Tenant conduct any auction upon the Premises.

   (b) Tenant shall fully comply with the provisions of any State or local laws prohibiting discrimination in housing on the basis of race, color, creed or national origin.

  9.7 <u>Insurance Hazards</u>. No use shall be made or permitted to be made of the Leased Property or any part thereof, nor acts done, which will cause the cancellation of any insurance policy covering said Leased Property, or any part thereof, nor shall Tenant sell, or permit to be kept, used, or sold, in or about the Premises any article which may be prohibited by the standard form of fire insurance policies. Tenant shall, at its sole cost and expense, comply with any and all requirements pertaining to the Leased Property, or any insurance organization or company necessary for the maintenance of reasonable fire and extended coverage, public liability or other insurance required to be provided hereunder covering said Leased Property or the operations thereof.

10. <u>MAINTENANCE, REPAIRS AND ALTERATIONS</u>

  10.1 <u>Tenant's Obligations</u>.

   (a) Tenant shall, at its own cost and expense, make all repairs and replacements to the Leased Property and to the pipes, heating or cooling system, plumbing system, window glass, fixtures and other appliances and appurtenances belonging thereto, all Equipment used in connection with the Leased Property, and the sidewalks, curbs, landscaping, driveways, parking lots, fences, signs and vaults adjoining or appurtenant to the Premises, necessary to keep the Leased Property and all such parts thereof and the Equipment, in good condition and repair. Such repairs and replacements, interior and exterior, ordinary as well as extraordinary, and structural as well as nonstructural, shall be made promptly, as and when necessary. All repairs and replacements shall be in quality and class at least equal to the original work.

   (b) Without limiting the generality of Paragraph 10.1(a), Tenant acknowledges that Landlord has no obligation to make any repairs or perform any maintenance on the Leased Property or the Equipment, and Tenant hereby expressly waives all rights to make repairs at the expense of Landlord as provided in §1942 of the Civil Code of the State of California, and all rights provided for by §1941 of said Civil Code.

418201.5/dml

10.2    Alterations and Additions.

(a)    Tenant shall not, without Landlord's prior written consent, make any alterations, improvements, additions, or Utility Installations in, on or about the Premises, except for non-structural alterations not exceeding Fifty Thousand Dollars ($50,000.00) in cost. Tenant shall endeavor to give Landlord prior notice of all material, non-emergency repairs, provided however, that a failure by Tenant to provide Landlord with prior notice shall not be an event of default. As used in this Section 10.2 the term "Utility Installation" shall collectively mean bus ducting, power panels, wiring, fluorescent fixtures, space heaters, conduits, air-conditioning and plumbing.  Landlord may require that Tenant remove any and all alterations, improvements, additions or Utility Installations at the expiration of the Term, and restore the Premises to their prior condition. Landlord may require Tenant to provide Landlord, at Tenant's sole cost and expense, a lien and completion bond in an amount equal to one hundred fifty percent (150%) of the estimated cost of such improvements, to insure Landlord against any liability for mechanics' and materialmens' liens and to insure completion of the work.  Should Tenant make any alterations, improvements, additions or Utility Installations without the prior written approval of Landlord, Landlord may require that Tenant remove any or all of such at Tenant's sole cost and expense.

(b)    Any alterations, improvements, additions or Utility Installations in, or about the Premises that Tenant shall desire to make and which require the consent of Landlord shall be presented to Landlord in written form, with proposed detailed plans.  If Landlord shall give its consent, the consent shall be deemed conditioned upon Tenant acquiring a permit to do so from appropriate governmental agencies, the furnishing of a copy thereof to Landlord prior to the commencement of the work and the compliance by Tenant of all conditions of said permit in a prompt and expeditious manner.

(c)    Tenant shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use in the Premises, which claims are or may be secured by any mechanics' or materialmens' liens against any portion of the Premises. Tenant shall give Landlord not less than ten (10) days written notice prior to the commencement of any work in the Premises the cost of which is in excess of $50,000, and Landlord shall have the right to post notices of non-responsibility in or on the Premises as provided by law. If Tenant shall, in good faith, contest the validity of any such lien, claim or demand, then Tenant shall, at its sole expense, defend itself and Landlord against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof against Landlord or the Premises, upon the condition that if Landlord shall require, Tenant shall furnish to Landlord a surety bond satisfactory to Landlord in an amount equal to such contested lien claim or demand indemnifying Landlord against liability for the same and holding the Premises free from the effect of such lien or claim.  In addition, Landlord may require Tenant to pay Landlord's reasonable attorneys' fees and costs in participating in such action.

(d)    Tenant shall be responsible for the replacement of all items of Equipment to the extent they require replacement during the Term.  All replacement items of Equipment shall be deemed the property of Landlord and shall remain upon and be surrendered with the Premises at the expiration of the Term.  Notwithstanding the provisions of this

Paragraph 10.2(d), Tenant's personal property and/or equipment, exclusive of the Equipment as described on Exhibit "A-2" and the replacements as provided for herein, and other than that which is affixed to the Premises so that it cannot be removed without material damages to the Premises, shall remain the property of Tenant ("Tenant's Personal Property") and may be removed by Tenant subject to the provisions of Article 11.

  (e) Unless Landlord requires their removal, as set forth in Paragraph 10.2(a), and subject to Paragraph 10.2(d), all alterations, improvements, additions and Utility Installations (whether or not such Utility Installations constitute trade fixtures of Tenant), which may be made on the Premises, shall become the property of Landlord and remain upon and be surrendered with the Premises at the expiration of the Term.

11.  ADDITIONAL COVENANTS

11.1 Tenant Covenants:

  11.1.1 Tenant shall not reduce or expand, allow to be reduced or expanded, or cause the expansion or reduction of the bed capacity of the Facility from its capacity as of the Commencement Date without the prior written consent of the Landlord, which consent shall not be unreasonably withheld.

  11.1.2 Within thirty (30) days after being called upon to do so, Tenant shall furnish Landlord a financial report in form reasonably satisfactory to Landlord covering the operations of the Facility.

  11.1.3 The Leased Property and the books, records, documents and other papers relating to the Facility and its operation, shall at all times be maintained by Tenant in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Landlord or its duly authorized agents.

  11.1.4 Tenant (or Tenant's sublessee) shall, during the term of this Lease, maintain, at its cost, in full force and effect, and reserve and promptly comply with all present and future laws, regulations, and rules applicable to the following:

  (a) The License;

  (b) All Medicare and Medicaid/Medi-Cal provider agreements associated with the operation of the facilities ("Provider Agreements"); and

  (c) All Certificates of Need, if any, with respect to the Facility ("Certificates of Need").

11.2 Landlord Covenants:

  11.2.1 Landlord hereby warrants that to Landlord's actual current knowledge, without inquiry, there is no (pending, contemplated, threatened or otherwise) litigation, administrative

proceedings, vendor hold or similar lien on State or Federal payments to the Facility, nor are there arbitration proceedings or governmental investigations relating to the Facility, or the business conducted thereon.  In addition, Landlord has not received notice of any pending probes, audits or recoupment actions pending, contemplated, or threatened, by any governing agency, including but not limited to Medi-Cal and Medicare.

11.2.2 Landlord hereby warrants that to Landlord's actual current knowledge, without inquiry, no occurrence or state of facts which might give rise to any action, suit, proceeding, or claim of any kind against Landlord relating to the Facility or against the Facility exist, that were not previously disclosed in writing to Tenant by Landlord.

11.2.3 To Landlord's actual current knowledge, without inquiry,, the business operations of the Facility comply with all local, State and Federal zoning, labor and other applicable laws, ordinances, rules and regulations applicable to the Facility, and no waivers have been obtained which in the event of damage or destruction to the Facility would prevent restoration of the Facility to the condition it was in prior to the damage or destruction, and operation of the Facility as it was operated immediately before such damage or destruction.  To Landlord's actual current knowledge, without inquiry, all written requirements or recommendations known to Landlord and/or Landlord's affiliates of all applicable licensing or certification authorities regarding the Facility have been, and at the Commencement Date shall have been, fully complied with.

11.2.4 To Landlord's actual current knowledge, without inquiry, there is not any pending, contemplated or threatened condemnation of the Facilities or any part of the Facility.

11.2.5 To Landlord's actual current knowledge, without inquiry, all patient trust funds have been handled in accordance with all applicable rules and regulations of the California Department of Health, and such other agencies as have jurisdiction over the Facilities.

11.2.6 To Landlord's actual current knowledge, without inquiry, the Facility is licensed for and equipped with fifty-four (54) licensed skilled nursing (SNF) beds, and necessary related patient room furniture and furnishings as required by Title 22 of the CCR and other applicable regulations to operate the Facility at their full licensed capacity.

11.2.7 To Landlord's actual current knowledge, without inquiry, all pre-Commencement Date liabilities, including but not limited to QA Fees, Medical and Medicare recoupments, payroll taxes and any amounts outstanding owed to vendors, shall have been paid as of the Commencement Date.

## 12.   SURRENDER ON TERMINATION

12.1    Tenant shall vacate and surrender the Leased Property and any additions to or replacements thereof in good order and repair, ordinary wear and tear excepted, in a condition acceptable to all governing or licensing authorities and, in accordance with the terms of this Lease, Tenant shall remove all of Tenant's Personal Property therefrom so that Landlord can take possession of the Leased Property no later than three (3) days after the Term expires, or upon three (3) days after any sooner termination of this Lease.

12.2     Landlord shall have the same rights to enforce this covenant by summary proceedings, ejectment and/or for damages or otherwise as for the breach of any other condition or covenant of this Lease.

12.3     Subject to the provisions of Article 10, Tenant may at any time prior to or upon the expiration or earlier termination of this Lease or any renewal or extension thereof, remove from the Premises, Tenant's Personal Property; provided, however, that the removal of Tenant's Personal Property can be accomplished without substantial injury to the Leased Property. Subject to the provisions of Article 10, any and all other alterations, improvements, additions and replacements of and/or to the Leased Property, and all Utility Installations shall remain with the Premises.

No injury shall be considered substantial if it is properly corrected at Tenant's expense by restoration to the condition as it was prior to the installation of such property, if so requested by Landlord. Any such property not removed shall become the property of Landlord.

12.4     Upon the expiration of this Lease (such date being referred to as the "Closing Date"), Tenant shall cooperate with Landlord to effectuate an orderly transfer of operations from Tenant to Landlord or its designee. Tenant and Landlord each, for itself, its successors and assigns hereby indemnifies and agrees to defend and hold the other and its successors and assigns harmless from any and all claims, demands, obligations, losses, liabilities, damages, recoveries and deficiencies (including interest, penalties and reasonable attorney's fees, costs and expenses) (hereinafter collectively the "Claims") which either of them may suffer as a result of the breach by the other party in the performance of any of its commitments, covenants, or obligations under this Section 12.4. Tenant does further agree to indemnify, defend and hold harmless Landlord (and its designee) from any Claims or with respect to any suits, arbitration proceedings, administrative actions or investigations, including actions for the collection of QA and other fees, which relate to the use by Tenant of the Facility prior to the Closing Date or any liability which may arise from operation of the Facility as a skilled nursing facility prior to the Closing Date. Landlord does further agree to indemnify, defend and hold harmless Tenant from any such Claims or with respect to any suits, arbitration proceedings, administrative actions or investigations, including actions for the collection of QA and other fees, which relate to the ownership of the Facility by Landlord (and its designee) or the use of the Facility by Landlord (and its designee) or the operation thereon of a long term care facility after the Closing Date. The rights of Landlord (and its designee) and Tenant under this paragraph are without prejudice to any other remedies not inconsistent herewith which Landlord (and its designee) and Tenant may have against each other pursuant to the terms of this Lease. Notwithstanding anything in this Section 12.4 or any other provision of the Lease to the contrary, Tenant's cooperation with Landlord to transfer its operations shall be expressly contingent upon Landlord and New Operator providing Tenant adequate assurances and indemnifications under any agreement contemplated by the parties. Tenant (or its sublessee) shall be entitled to require, as a condition precedent to the transfer of Tenant's operations, that Landlord and New Operator indemnify Tenant from any liability or damage whatsoever arising out of Landlord and New Operator's use of the Facility from and after the Closing Date.

13.   UTILITIES

Tenant shall pay prior to delinquency for all water, gas, heat, light, power, telephone, sewage, air-conditioning and ventilating, janitorial, landscaping, and all other materials and utilities supplied to the Premises, together with any taxes thereon.  If any such services are not separately metered to Tenant, Tenant shall pay a reasonable proportion of all charges which are jointly metered, and payment to be made by Tenant within ten (10) days of receipt of a statement for such charges.  Absent any negligence, action and/or omission on Landlord's part, Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility service furnished to the Premises, and no such failure or interruption shall entitle Tenant to terminate this Lease or withhold Minimum Rent or other sums due hereunder.

14.   INDEMNITY

14.1   Landlord Indemnity.  Tenant shall indemnify and hold harmless Landlord, its managers, members, employees and agents (all of whom are included where the term Landlord is used) from and against any and all loss of rents and/or claims, damages, liabilities, costs, expenses, liens, penalties, permits, attorneys fees and consultants fees arising from Tenant's use of the Leased Property, or from the conduct of Tenant's or sublessee's business, or from any activity, work or thing done, permitted or suffered by Tenant in or about the Premises, or elsewhere.  Tenant shall further indemnify and hold Landlord harmless from and against any and all claims arising from any breach or default in the performance of any obligation on Tenant's part to be performed under this Lease, or arising from any negligence of Tenant or Tenant's agents, contractors, employees, assignees, sublessees, business invitees or entities through or under Tenant and from and against all costs, reasonable attorney's fees, expense, and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon.  In the event any action or proceeding is brought against Landlord by reason of any such claim, Tenant upon written notice from Landlord shall defend same at Tenant's expense by counsel reasonably satisfactory to Landlord.  Excluded from Tenant's obligations set forth in this Paragraph are claims for damages which are the result of Landlord's negligence, willful acts or omissions, or Landlord's material breach of this Lease.

14.2   Exemption of Landlord from Liability.

(a)   Landlord shall not be liable for injury to Tenant, Tenant's business or loss of income therefrom or for damage which may be sustained by the person, goods, wares, merchandise, or property of Tenant, its employees, invitees, customers, patients, agents, or contractors, or any other person in or about the Premises, from any cause whatsoever, and/or caused by or resulting from fire, steam, electricity, gas, water, or rain, which may leak or flow from or into any part of the Leased Property, or from the breakage, leakage, obstruction, or other defects of the pipes, sprinklers, wires, appliances, plumbing, air-conditioning, or lighting fixtures of the same, whether the said damage or injury results from conditions arising upon the Leased Property, or from other sources or places and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible to Tenant, provided that if Landlord's cooperation was required to mitigate any damages, Landlord has reasonably complied in providing such cooperation and except to the extent any of the foregoing were caused or arose by

the negligence, willful misconduct or omissions of Landlord, or Landlord's material breach of this Lease. Landlord shall not be liable for any damages arising from any act or neglect of any other Tenant (if any) of the Premises or of the buildings adjacent to the Premises.

(b)     The foregoing shall not apply to the extent caused by or resulting from the gross negligence or intentional acts of Landlord, its agents, employees or representatives.

14.3     Tenant Indemnity: Notwithstanding any provisions of this Lease to the contrary, and in furtherance of anything contained in this Lease, Landlord and its principal(s) ("Landlord Indemnitors") hereby agree, jointly and severally, to indemnify, protect, defend, and hold harmless Tenant and its directors, officers, employees, agents, affiliates, successors, sublessees, and assigns from and against any and all demands, claims, causes of action, fines, penalties, damages (but specifically excluding lost profits and consequential damages), losses, liabilities (including strict liability), judgments, and expenses (including, without limitation, reasonable attorneys' and other professionals' fees and court costs) (collectively, a "Loss") incurred in connection with or arising from the following (collectively, the "Retained Liabilities"): (a) a breach by Landlord of its representations, warranties and obligations under this Lease which is not cured within seven (7) days after receipt of written notice from Tenant setting forth, in reasonable detail, the nature of such breach, (b) a breach by Landlord or any of the Landlord Indemnitors of the lease in existence for the Facility prior to the date of execution of this Lease, or (c) any acts, omissions, elder abuse (as that term is defined in California Welfare and Institutions Code §15610) or negligence of any of the Landlord Indemnitors or any person (other than the current operator of the Facility) claiming under the Landlord Indemnitors, or the contractors, agents, employees, invitees or visitors of the Landlord Indemnitors with respect to the Facility occurring prior to the Commencement Date and (e) any failure by the Landlord Indemnitors to pay any liabilities incurred by the Landlord Indemnitors or any person (other than the current operator of the Facility) claiming under the Landlord Indemnitors in connection with the Facility attributable to periods prior to the Commencement Date. As used herein, "current operator of the facility" includes the Current Tenant and its affiliates.

15.     INSURANCE

15.1     Required Coverage. Tenant shall keep the Leased Property and each and every part thereof and the operation of the skilled nursing facility insured throughout the Term against the following:

(a)     Loss or damage by fire, vandalism, malicious mischief, special extended perils (all risk), and such other risks as may be included in the broadest form of extended coverage insurance, from time to time available in amounts sufficient to prevent Landlord or Tenant from becoming a co-insurer within the terms of the applicable policies, and in any event, in an amount not less than one hundred percent (100%) of the then full insurable value of the improvements on the Leased Property and the Equipment. Such insurance shall include coverage of any additional costs resulting from debris removal and reasonable amounts of coverage for the enforcement of any ordinance or law regulating the reconstruction or replacement of any undamaged sections of the Premises required to be demolished or removed

by reason of the enforcement of any building, zoning, safety or land use laws as a result of a covered cause of loss.

        (b)    Loss or damage from leakage of sprinkler systems now or hereafter installed in the buildings on the Premises in any amount not less than one hundred percent (100%) of the then full insurable value.

        (c)    Loss or damage by explosion of steam boilers, pressure vessels, or similar apparatus, now or hereafter installed in the buildings on the Premises, in such limits with respect to any one accident as may be reasonably requested by Landlord from time to time.

        (d)    Loss of rental, under a rental value insurance policy covering risk of loss due to the occurrence of any on the hazards described in the preceding subparagraphs of this Section 15.1, in an amount sufficient to prevent Landlord from becoming a co-insurer, but in any event, in an amount not less than one hundred percent (100%) of the then full basic rental income of twelve (12) months, including all other charges to be paid hereunder, such policy or policies to be obtained and paid for by Tenant as frequently as required.

        (e)    Claims for personal injury and/or property damage, under a policy of comprehensive general public liability insurance against any liability arising out of the ownership, use, occupancy or maintenance of the Leased Property and all areas appurtenant thereto, with such limits as may reasonably be requested by Landlord from time to time, but not less than One Million Dollars ($1,000,000.00) for injury to or death of any one person in any one accident or occurrence and in an amount of not less than Three Million Dollars ($3,000,000.00) for injury to or death of more than one person in any one accident or occurrence and One Million Dollars ($1,000,000.00) for property damage or in such other reasonable amounts requested by Landlord from time to time.

        (f)    Against such other hazards and in such amounts as the holder of any security interest, mortgage or deed of trust to which this Lease is subordinate may reasonably require from time to time pursuant to the provisions of said security interest, mortgages and deeds of trust.

        (g)    Against claims, losses and damages under a policy of full coverage plate glass insurance.

        (h)    Any and all risks covered by a full coverage policy of workman's or worker's compensation insurance under the laws of the State of California.

        (i)    Against all risks under a full coverage policy of malpractice insurance or other such insurance covering the operation of Facility, with such limits as may reasonably be requested by Landlord from time to time, but not less than One Million Dollars ($1,000,000.00) per incident.

        (j)    Against all risks under an employee practice liability policy regarding Tenant's employees with such limits as may be reasonably required by Landlord.

418201.5/dml

15.2     Commercially Reasonable.  With respect to any insurances required by the Landlord, the amounts and types of such insurance coverage shall be subject to what is commercially reasonable in the San Rafael, California insurance market for a similar health care facility.

15.3     Named Insured.

(a)     Subject to Section 15.3(b) below, the fire and extended coverage insurance policies and the rental value insurance policy above described shall name Landlord as an additional insured.  However, Tenant may furnish a combined rental and use and occupancy policy; provided that, Landlord shall be named as an additional insured and the first loss payee with respect to an amount equal to the annual Minimum Rent and real estate taxes and additional rent, hereunder if any, and Tenant shall be named as the payee with respect to any remaining proceeds for business interruption insurance.  Any payments actually received by Landlord under the rental value insurance or business interruption insurance policy or policies, shall be applied by Landlord toward the Minimum Rent or other sums due or payable by Tenant.

(b)     All other policies of insurance shall name Tenant and Landlord, as the insureds or additional insureds, as their respective interests may appear.  At the request of Landlord, any insurance policy shall be made payable to Mortgagee as such Mortgagee's interest may appear.

15.4     Miscellaneous Requirements of Policies.

(a)     All insurance provided for in this Lease shall be effected under enforceable policies issued by insurers of recognized responsibility licensed to do business in this State and rated A: Class VII status (or such other status as may be acceptable to Landlord) as rated in the most recent edition of "Best's Key-Rating Guide".

(b)     All policies shall contain an agreement by the Insurers:

(i)     That any loss shall be payable to Landlord or the holders of any security interest, mortgage or deed of trust to which this Lease is subordinate, as the interest of such holders may appear, notwithstanding any act or negligence of Tenant which might otherwise result in the forfeiture of such insurance; (ii) That such policies shall not be canceled or subject to reduction of coverage or other modification except after ten (10) days written notice to Landlord and to the holders of any security interest, mortgage or deed of trust to whom loss may be payable; and (iii) That the coverage afforded thereby shall not be affected by the performance of any work in or about the Premises.

(c)     If Tenant provides any insurance required by this Lease in the form of a blanket policy, Tenant shall furnish satisfactory proof that such blanket policy complies in all respects with the provisions of this Lease, and that the coverage thereunder is at least equal to the coverage which would be provided under a separate policy covering only the Leased Property.

15.5     Tenant's Obligations, Rights and Remedies of Landlord.

(a)     Tenant agrees that it will pay all premiums and charges on all of the insurance required to be carried by the terms of this Lease, promptly when same become due and to furnish Landlord with satisfactory evidence of the payment of the premium of any policy within ten (10) days after such premium shall become due and payable, and if Tenant shall fail to pay such premiums and charges when due, or fail to furnish satisfactory evidence of payment of premiums on any policy upon request, or fail to place or maintain such insurance, then Landlord may, without having the obligation to do so, place such insurance or pay the premiums and charges therefor, and in the event of such payment by Landlord, the amount paid may, at the option of Landlord, be added as additional rent to the installment of next accruing Minimum Rent, or to any subsequent installment and shall be collectible as additional rent in the same manner and with the same remedies as if it had been originally reserved and designated as Minimum Rent.

(b)     All policies of insurance herein provided, or certificates thereof, at the option of Landlord, shall be delivered to Landlord upon request, accompanied by evidence satisfactory to Landlord that coverage has been secured for at least one (1) year, and thereafter, upon the renewal period or extension periods, further satisfactory evidence is to be submitted to Landlord that coverage for the next ensuing period (never less than for one (1) year) on such insurance policies has been secured. Nothing herein shall prevent Tenant from entering into an agreement with any insurance provider to finance the insurance premium amounts.

15.6     Waiver of Subrogation. Anything in this Lease to the contrary notwithstanding, Tenant and Landlord each hereby waives any and all rights of recovery against the other, or against the officers, employees, agents and representatives of the other, for loss of or damage to such waiving party of its property or the property of others under its control, where such loss or damage is insured against under any insurance policy in force at the time of such loss or damage or was required by this Lease to be insured against.  Tenant and Landlord shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Lease.

15.7     Insurance Impound Account

If a Mortgagee, requires Landlord to impound insurance premiums on a periodic basis during the Term, Tenant, upon receipt of written notice from Landlord indicating this requirement, shall pay a sum of money towards its liability under this Lease to Landlord on a periodic basis in accordance with such Mortagee's requirements.  Landlord shall impound the premium payments received from Tenant in accordance with the requirements of Mortgagee and shall utilize such funds to timely pay insurance premiums, but in no event shall Tenant have any obligation to pay to an impound account more than 1/12th of the premium amounts during any month of the Term.

16.    DAMAGE OR DESTRUCTION

16.1    Partial Damage-Insured.  Subject to the provisions of Sections 16.3 and 16.4, if the Premises are damaged and such damage was caused by a casualty fully covered under an insurance policy required to be maintained pursuant to Section 15.1, and provided the proceeds of such policy are paid to Landlord, Landlord shall at Landlord's expense repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect but Landlord shall not repair or replace Tenant's Personal Property. Notwithstanding the foregoing, in the event as a result of any such damage or destruction of the Leased Property, Tenant is required by any governmental authority to remove any of the patients licensed to occupy the Facility or any beds are otherwise not lawfully available for occupancy, the following shall apply: (a) in the event Tenant is unable to obtain rental or business interruption insurance, then the Minimum Rent for the damaged Facility shall, until three (3) months after the repair of such damage or destruction be decreased in proportion to the ratio of the number of beds not available lawfully for occupancy by patients to the total number of beds in such facility available lawfully for occupancy prior to such damage or destruction, or (b) in the event Tenant's business interruption or rental insurance is in an amount less than one hundred percent (100%) of the Minimum Rent then in effect, Tenant shall until the sooner of three (3) months after the repair of such damage or destruction pay Minimum Rent in an amount equal to the amount of such insurance. In either of such events, Tenant shall pay all additional rent or other sums hereunder.

16.2    Partial Damage-Uninsured.  Subject to the provisions of Sections 16.3 and 16.4, if at any time during the Term, the Premises are damaged, except by a negligent or willful act of Tenant (in which event Tenant shall make the repairs, at its sole cost and expense) and such damage was caused by a casualty not covered under an insurance policy required to be maintained pursuant to Section 15.1, Landlord may at Landlord's option either (i) repair such damage as soon as reasonably possible at Landlord's expense, in which event this Lease shall continue to be in full force and effect (subject to Minimum Rent being abated to reflect the percentage of beds no longer available) , or (ii) give written notice to Tenant within thirty (30) days after the date of the occurrence of such damage of Landlord's intention to cancel and terminate this Lease as of the date of the occurrence of such damage. In the event Landlord elects to give such notice of Landlord's intention to cancel and terminate this Lease, Tenant shall have the right within ten (10) days after the receipt of such notice to give written notice to Landlord of Tenant's intention to repair such damage at Tenant's expense, without reimbursement from Landlord, in which event this Lease shall continue in full force and effect, and Tenant shall proceed to make such repairs as soon as reasonably possible. If Tenant does not give such notice within such ten (10) day period this Lease shall be canceled and terminated as of the date of the occurrence of such damage.   Anything hereinabove to the contrary notwithstanding, if the casualty should have been covered under an insurance policy required to be maintained pursuant to Section 15.1, but Tenant failed to maintain the required policy, Tenant shall make the repairs at its sole cost and expense.

16.3    Total Destruction.  If at any time during the Term the Premises are totally destroyed from any cause whether or not covered by the insurance required to be maintained pursuant to Section 15.1 (including any total destruction required by any authorized public authority) this Lease shall automatically terminate as of the date of such total destruction.

16.4   Damage Near End of Term. If the Premises are partially destroyed or damaged during the last six (6) months of the Term, Landlord may at Landlord's option cancel and terminate this Lease as of the date of occurrence of such damage by giving written notice to Tenant of Landlord's election to do so within thirty (30) days after the date of occurrence of such damage.

16.5   Abatement of Rent; Tenant's Remedies.

(a)   If the Premises are partially destroyed or damaged and Landlord repairs or restores them pursuant to the provisions of this Section 15, the Minimum Rent payable hereunder for the period during which such damage, repair or restoration continues shall be abated in proportion to the degree to which Tenant's use of the Premises is impaired, but only to the extent rental interruption insurance proceeds are paid to Landlord for such abated Minimum Rent.

(b)   If Landlord shall be obligated to repair or restore the Premises under the provisions of this Article 16 and shall not commence such repair or restoration within sixty (60) days after such obligations shall accrue, Tenant may, at Tenant's option, cancel and terminate this Lease by giving Landlord written notice of Tenant's election to do so at any time prior to Landlord's commencement of such repair or restoration. In such event this Lease shall terminate as of the date of such notice.

16.6   Termination - Advance Payments. Upon termination of this Lease pursuant to this Article 16, (i) an equitable adjustment shall be made concerning any advance rent and/or payments made by Tenant to Landlord; (ii) Landlord shall return to Tenant so much of Tenant's security deposit as has not theretofore been applied by Landlord; and (iii) the proceeds of all casualty insurance paid on account of physical damage to the improvements shall belong to Landlord.

17.   CONDEMNATION

17.1   If any part of the Premises shall be taken or condemned for a public or quasi-public use, and a part thereof remains which is susceptible of occupation hereunder, this Lease shall, as to the part so taken, terminate as of the date title shall vest in the condemnor, and the Minimum Rent payable hereunder shall be adjusted so that the Tenant shall be required to pay for the remainder of the Term only such portion of such Minimum Rent as the value of the part remaining after the condemnation bears to the value of the entire Premises at the date of condemnation; but in the event the remainder is so diminished that the economic feasibility of operating the Facility is unreasonably diminished as to Tenant, either Landlord or Tenant shall have the option to terminate this Lease as of the date when title to the part so condemned vests in the condemnor, and by written notice to the other within ten (10) days after title vests in the condemnor.

17.2   If all or part of the Premises, is taken or condemned so that there does not remain a portion susceptible for occupation hereunder, as described in Section 17.1, this Lease shall thereupon terminate. If all or part of the Premises is taken or condemned, all compensation

awarded upon such condemnation or taking which does not relate to Tenant's Personal Property, relocation expenses, or goodwill of Tenant's business, shall go to Landlord, and the Tenant shall have no claim thereto, and Tenant hereby irrevocably assigns and transfers to Landlord any right to compensation or damages to which Tenant may become entitled during the Term by reason of the condemnation of all or any part of the Premises.

17.3    Each party waives the provisions of California Code of Civil Procedure §1265.130 allowing either party to petition the Superior Court to terminate this Lease in the event of a partial taking of the Premises.

18.    ASSIGNMENT AND SUBLETTING

18.1    Tenant shall not assign, mortgage or encumber this Lease, in whole or in part, or sublet all or any part of the Premises without the prior consent of the Landlord, which consent shall not be unreasonably withheld.  The consent by Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Notwithstanding the foregoing, or any other provision of this Lease, Landlord hereby consents to the sublease of the Premises to San Rafael Healthcare & Wellness Centre, LP, a California limited partnership.

18.2    Notwithstanding the foregoing, or any other provision of this Lease to the contrary, (a) Tenant may make a Transfer to an affiliate of Tenant or any entity which Shlomo Rechnitz controls or in which Shlomo Rechnitz has at least a 51% equity or ownership interest, without Landlord's consent, but with prior notice to Landlord, (b) Tenant may Transfer less than 51% equity or ownership interest in the Tenant  provided Tenant gives prior notice to Landlord and the cumulative effect of all such Transfers do not exceed 51% of the equity or ownership interest of Tenant.  As used in this Lease, a "Tenant Affiliate" means an entity which controls, is controlled by, or is under common control with, Tenant.

18.3    No subletting or assignment shall release Tenant from its obligations under this Lease or alter the primary liability of Tenant to pay the rent and to perform all other obligations to be performed by Tenant hereunder.  The acceptance of rent by Landlord from any other person shall not be deemed to be a waiver by Landlord of any provision hereof.  Consent to one assignment or subletting shall not be deemed consent to any subsequent assignment or subletting.

19.    DEFAULT

19.1    Tenant's Default.  The occurrence of any one or more of the following shall constitute an event of default and breach of this Lease by Tenant:

(a)  Failure to pay Minimum Rent, any additional rent or any other sum or sums payable by Tenant hereunder when due, if the failure continues for five (5) days after written notice to Tenant.

(b)  Abandonment and vacation of any of the Leased Property for more than twenty-four (24) consecutive hours.

(c)   Failure to perform any other provision of this Lease if the failure to perform is not cured within thirty (30) days after written notice has been given to Tenant; provided, however, if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, Tenant shall not be deemed to be in default if Tenant commences such cure within said initial thirty (30) day period and thereafter diligently prosecutes such cure to completion.

(d)   (1) The making by Tenant of any general assignment for the benefit of creditors; (2) the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within ninety (90) days); (3) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within sixty (60) days; or (4) the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within sixty (60) days.

(e)   Notwithstanding any other provisions of this Lease to the contrary, the failure of Tenant to comply with any of the provisions of this Lease, or Tenant's failure to operate the Facility in accordance with all applicable laws, rules and regulations applicable to the Leased Property and the operation thereon of a skilled nursing facility, if such failure (in the reasonable and good faith judgment of Landlord) places in imminent jeopardy the continued licensing of the Facility as then currently licensed and/or its certification as either a Medicare or Medi-Cal provider, and if, within seventy-two (72) hours after written notice thereof from Landlord to Tenant, Tenant shall not have either (1) cured such failure, or (2) obtained an injunction or other order preventing revocation or suspension of licensing and/or decertification of the Leased Property by virtue of such failure or alleged failure, or (3) provided Landlord with assurances reasonably satisfactory to Landlord that the Facility will not be subject to license suspension or revocation and/or decertification as a result of such failure or alleged failure.

19.2   Landlord's Remedies.  In the event of a default by Tenant under this Lease, Landlord shall have the following remedies; these remedies are not exclusive; they are cumulative and are in addition to any remedies now or later allowed by law and in addition to any other rights and remedies of Landlord under any provision of this Lease:

(a)   Re-Entry Without Termination.  Landlord shall have the immediate right of re-entry and may remove all persons and property from the Premises; such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of, Tenant.

(1)   Should Landlord elect to re-enter, as herein provided, or should it take possession pursuant to legal proceedings or pursuant to any notice provided for by law, Landlord may either terminate this Lease or Landlord may from time to time, without terminating this Lease, relet the Premises and/or the Equipment, or any part thereof, for such term or terms (which may be for a term extending beyond the Term) and at such rental or rentals

and upon such other terms and conditions as Landlord in his reasonable discretion may deem advisable with the right to make repairs to said Leased Property upon each such reletting.

(2)     Tenant shall be liable immediately to pay to Landlord:

(A)     All reasonable costs Landlord incurs in reletting the Leased Property, including, without limitation, broker's commissions, expenses of remodeling the Leased Property required by the reletting, expenses of repairing the Leased Property and like costs.  Reletting can be for a period shorter or longer than the remaining Term; and

(B)     The amount, if any, by which the Minimum Rent, additional rent and all other sums reserved in this Lease from the period of such reletting (up to but not beyond the Term) exceeds the amount agreed to be paid as Minimum Rent for the Leased Property for such reletting, payable monthly.

(3)     At the option of Landlord, rents received by Landlord from such reletting shall be applied:  first, to the payment of any indebtedness, other than Minimum Rent due hereunder from Tenant to Landlord; second, to the payment of any costs and expenses of such reletting and of such repairs; third, to the payment of Minimum Rent due and unpaid hereunder and the residue, if any, shall be held by Landlord and applied in payment of future Minimum Rent as the same may become due and payable hereunder.

(4)     If Tenant has been credited with any rent received by such reletting under this Section 19.2, and such rent shall not be promptly paid to Landlord by the new tenant, or if such rentals received from such reletting under this Section 19.2 during any month be less than that to be paid during that month by Tenant hereunder, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly.

(5)     No such re-entry or taking possession of said Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such intention shall be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction.   Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach and such re-entry by Landlord.

(b)     Termination.  Landlord may terminate this Lease and Tenant's right to possession of the Leased Property, or any part thereof, at any time.  No act by Landlord other than giving written notice to Tenant shall terminate this Lease.  Acts of maintenance, efforts to relet the Leased Property, or the appointment of a receiver on Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's right to possession. On termination, Landlord has the right to recover from Tenant:

(1)     The worth, at the time of the award of the unpaid Minimum Rent, additional rent and all other sums that had been earned at the time of termination of this Lease;

(2)     The worth, at the time of the award of the amount by which the unpaid sums that would have been earned after the date of termination of this Lease until the time of award exceeds the amount of the loss of sums that Tenant proves could have been reasonably avoided;

(3)     The worth, at the time of the award of the amount by which the unpaid Minimum Rent for the balance of the Term after the time of award exceeds the amount of the loss of Minimum Rent that Tenant proves could have been reasonably avoided;

(4)     Any other amount, and court costs, necessary to compensate Landlord for all detriment proximately caused by Tenant's default; and

(5)     "The worth, at the time of the award", as used in Sections 19.2(b)(1) and (2), is to be computed by allowing interest at the rate of ten percent (10%) per annum. "The worth, at the time of the award", as used in Section 19.2(b)(3), is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%).

(c)     Receiver.  Landlord shall have the right, at Tenant's sole cost and expense, to have a receiver appointed to collect all sums owing pursuant to this lease and conduct Tenant's business.  If a receiver be appointed at the instance of Landlord in any action against Tenant to take possession of said Leased Property, or any portion thereof, and/or to collect the rents or profits derived therefrom, the receiver may, if it be necessary or convenient in order to collect such rents and profits, conduct the business of Tenant then being carried on at the Premises and may take possession of any personal property belonging to Tenant and used in the conduct of such business, and may use the same in conducting such business at the Premises without compensation of Tenant for such use.  Neither the application for the appointment of such receiver, nor the appointment of such a receiver, shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such intention is given to Tenant.

19.3     Default by Landlord. Landlord shall not be in default unless Landlord fails to perform obligations required of Landlord within a reasonable time, but in no event later than fifteen (15) days after written notice by Tenant to Landlord, specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than fifteen (15) days are required for performance, then Landlord shall not be in default if Landlord commences performance within such fifteen (15) day period and thereafter diligently prosecutes the same to completion.

19.4     Late Charges.  Tenant hereby acknowledges that late payment by Tenant to Landlord of Minimum Rent or any additional rent and other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Landlord by any Mortgagee. Accordingly, if any installment of Minimum Rent, additional rent, or any other sum due from Tenant hereunder shall not be received by Landlord or Landlord's designee within five (5) days

after written notice to Tenant, Tenant shall pay to Landlord a late charge equal to five percent (5%) of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder or given to it by law.

20.    BOOKS AND RECORDS

20.1    Subject to all applicable legal requirements, Tenant shall keep and maintain on the Premises full and complete medical records covering all occupants in the Facility, including a daily census of all patients and beds occupied in the Facility, and all records required to be maintained by or provided under Medicare, Medi-Cal or any other governmental authority, for a period of at least seven (7) years or the period of time required by applicable law, and Tenant shall cause all its assignees, subtenants, licensees and agents to do the same.

20.2    Landlord shall have the right to review the operating records of Tenant in any month where Tenant fails to timely pay its full rental obligation to Landlord, or any other payments due and owing to Landlord or Landlord's affiliates.

20.3    Tenant shall provide Landlord with copies of Tenant's operating statements for the Facility on a quarterly basis when said operating statements have been completed by Tenant in the ordinary course of Tenant's business operations; any material correspondence from DPH affecting the Facility; and upon request from Landlord any other correspondence from DPH affecting the Facility, provided, however, that a failure by Tenant to provide Landlord with said operating statements shall not be an event of default unless Tenant fails to provide said operating statements within ten (10) days after receipt of a written request thereof from Landlord. At the request of Mortgagee, Tenant shall provide Mortgagee with said operating statements and other financial statements and information they request concerning the Leased Property and the business operations conducted therein.

21.    ABANDONMENT OF LEASED PROPERTY

Tenant shall not vacate or abandon the Leased Property or cease operating a skilled nursing facility business thereon. If Tenant shall abandon, vacate or surrender the Leased Property, or be dispossessed by process of law, or otherwise, any Tenant Personal Property left on the Premises shall be deemed to be abandoned, at the option of Landlord.

22.    RESERVED.

23.    SECURITY DEPOSIT

Tenant shall not be required to post any security deposit under this Lease.

24.    RESERVED.

25.    HAZARDOUS MATERIAL

As used in this Lease, the term "Hazardous Material" shall mean any hazardous or toxic substance, material or waste which is or becomes regulated by any local governmental authority, the State of California or the United States Government and includes, without limitation, any material or substance which is defined as (i) a "hazardous waste", "extremely hazardous waste" or "restricted hazardous waste" under §§§ 25115, 25117 or 25122.7, or listed pursuant to §25140, of the California Health and Safety Code, Division 20, Chapter 6.5 (Hazardous Waste Control Law), (ii) a "hazardous substance" under §25316 of the California Health and Safety Code, Division 20, Chapter 6.8 (Carpenter-Presley-Tanner Hazardous Substance Account Act), (iii) a "hazardous material", "hazardous substance", or "hazardous waste" under §25501 of the California Health and Safety Code, Division 20, Chapter 6.95 (Hazardous Materials Release Response Plans and Inventory), (iv) a "hazardous substance" under §25281 of the California Health and Safety Code, Division 20, Chapter 6.7 (Underground Storage of Hazardous Substances), (v) petroleum, (vi) asbestos, (vii) listed under Article 9 or defined as hazardous or extremely hazardous pursuant to Article 11 of Title 22 of the California Administrative Code, Division 4, Chapter 20, (viii) designated as a "hazardous substance" pursuant to §311 of the Federal Water Pollution Control Act (33 U.S.C. §1317), (ix) a "hazardous waste" pursuant to §1004 of the Federal Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq. (42 U.S.C. §6903), (x) a "hazardous substance" pursuant to §101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq. (42 U.S.C. §9601), or (xi) so defined in the regulations adopted and publications promulgated pursuant to any such laws, or as such laws or regulations may be further amended, modified or supplemented. As used in this Lease, the definition of Hazardous Materials shall not include any of the foregoing that is of the type and quantity commonly used in licensed skilled nursing facilities and residential care facilities for the elderly, subject to the condition that they are used, stored and disposed of in accordance with all applicable legal requirements.  Tenant shall indemnify Landlord, its and their agents and employees from and against any and all clean-up costs and expenses, losses, damages, claims, or liability for any damage to any property or injury, illness or death of any person resulting from any release of Hazardous Material on the Premises by Tenant during the term of this Lease.  The covenants contained herein shall survive the expiration or earlier termination of the Lease.  California Health and Safety Code Section 25359.7(b) requires any tenant of real property who knows, or has reasonable cause to believe, that any release of a hazardous substance has come to be located on or beneath such real property to give written notice of such condition to the owner.  Tenant shall comply with the requirements of Section 25359.7(b) and any successor statute thereto and with all other statutes, laws, ordinances, rules, regulations and orders of governmental authorities with respect to hazardous substances.

26.    GENERAL PROVISIONS

    26.1    Estoppel Certificate.

        (a)    Tenant shall at any time upon not less than fifteen (15) days' prior written notice from Landlord execute, acknowledge and deliver to Landlord a statement in writing (i) certifying that this Lease is unmodified and in full force and effect (or, if modified,

stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the Minimum Rent and other charges are paid in advance, if any, (ii) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed; and (iii) acknowledging such other factual matters as are reasonably requested by Landlord. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises.

(b) .Tenant's failure to deliver such statement within such time shall be conclusive upon Tenant (i) that this Lease is in full force and effect, without modification except as may be represented by Landlord, (ii) that there are no uncured defaults in Landlord's or Tenant's performance, (iii) no security deposit has been paid in connection with this Lease, and (iv) that not more than one (1) month's Minimum Rent has been paid in advance or such failure may be considered by Landlord as a default by Tenant under this Lease.

(c) Notwithstanding the above or any other provision of this Lease, if any Lender (whether current or future) requires that this Lease be subordinate to any encumbrance, whether existing or not existing as of the Commencement Date of this Lease, this Lease shall be subordinate to that encumbrance only if Landlord first obtains from the Lender a written agreement that provides substantially the following: As long as no Event of Default exists under this Lease, no foreclosure of, deed given in lieu of foreclosure of, or sale under the encumbrance, and no steps or procedures taken under the encumbrance, shall affect Tenant's rights under this Lease. Provided further, that as to any lenders which may take an interest in the Premises on or after the Commencement Date of this Lease, the Tenant's right to possession of the Facility shall not be disturbed so long as no Event of Default exists under this Lease and further provided that, such instrument or instruments contain non-disturbance language in favor of Tenant which provides that as long as Tenant performs its obligations under the Lease no steps or procedures taken under the encumbrance shall affect Tenant's rights under the Lease. Landlord shall reasonably cause each Mortgagee and/or any Lienholders with an interest which commences on or after the Commencement Date of this Lease to enter into a commercially reasonable subordination and non-disturbance agreement in form and substance reasonably acceptable to Landlord, Tenant and such Mortgagee. With respect to any Mortgagee and/or any Lienholder with an interest which predates the Commencement Date, Landlord shall reasonably cause such Mortgagee and/or Lienholder to enter into a commercially reasonable subordination and non-disturbance agreement in form and substance reasonably acceptable to Landlord, Tenant and such Mortgagee.

26.2     Severability.  The invalidity of any provision of this Lease as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

26.3     Interest on Past-Due Obligations.  Except as expressly herein provided, any amount due to Landlord not paid when due shall bear interest at the rate of ten percent (10%) per annum from the date due.  Payment of such interest shall not excuse or cure any default by Tenant under this Lease; provided, however, that interest shall not be payable on late charges incurred by Tenant nor on any amounts upon which late charges are paid by Tenant.

418201.5/dml

26.4     Time of Essence.  Time is of the essence.

26.5     Captions.  Article and section headings are not a part hereof.

26.6     Incorporation of Prior Agreements; Amendments.  This Lease and all ancillary documents pertaining thereto, contain all agreements of the parties with respect to any matter mentioned herein.  No prior agreement or understanding pertaining to any such matter shall be effective.  This Lease may be modified in writing only, signed by the parties in interest at the time of the modification.

26.7     Notices. Any notice required or desired to be given under this Lease shall be in writing and shall be addressed to the address of the party to be served, at the address provided in this Section. Each notice shall be deemed effective and given upon actual receipt or refusal of receipt regardless of the method of delivery used.  Either party hereto may from time to time, by written notice to the other in accordance with this Section 26.7, designate a different address than that set forth below for the purpose of giving notice hereunder.

| | |
|---|---|
| To Landlord: | c/o Rob Augello<br>1801 Astor Drive<br>San Leandro, CA 94577 |
| To Tenant: | Eretz San Rafael Properties, LLC<br>5967 West Third Street, Suite 200<br>Los Angeles, CA 90036 |
| With copies to:<br>(which shall not<br>constitute notice) | Alain Kuppermann, Esq.<br>110 S. Fairfax Avenue, Suite 250<br>Los Angeles, CA 90036 |

26.8     Waivers.  No waiver by Landlord of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach of Tenant of the same or any other provision.  Landlord's consent to or approval of any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act by Tenant.  The acceptance of the payment of Minimum Rent hereunder by Landlord shall not be a waiver of any preceding breach by Tenant of any provision hereof, other than the failure of Tenant to pay the particular amount so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Minimum Rent.

26.9     Recording.  Tenant may record a memorandum of this Lease in form and substance reasonably acceptable to Landlord and Tenant. On the expiration or termination of this Lease, Tenant shall, immediately after Landlord's request, execute and deliver to Landlord, in recordable form, a quitclaim deed or other instrument prepared by Landlord, evidencing the expiration or termination of the Lease and/or any interest Tenant and its assignees and sublessees may have in the Leased Property.

26.10   RESERVED.

26.11   Cumulative Remedies.   No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

26.12   Covenants and Conditions.   Each provision of this Lease to be performed by Tenant shall be deemed both a covenant and condition.

26.13   Binding Effect; Choice of Law.   Subject to any provisions hereof restricting assignment or subletting by Tenant and subject to the provisions of Article 18 hereof, this Lease shall bind the parties, their personal representatives, successors and assigns.  This Lease shall be governed by the laws of the State of California.

26.14   Purchase Option.  Tenant is hereby granted an option to purchase the Facility on the following terms: (1) the purchase price of the Facility shall be Three Million Two Hundred and Fifty Thousand Dollars ($3,250,000.00); (2) Tenant must give Landlord notice that it is exercising the option ("Exercise Notice") at least 45 days prior to the closing date and the notice shall specify the proposed closing date ("Proposed Closing Date"); (3) the exercise of the purchase option shall occur from the date which is twelve (12) months from the Commencement Date until the date which is thirty-one (31) months from the Commencement Date; (4) the Facility shall be sold in its as-is condition; (5) Tenant and Landlord shall each pay their own legal fees associated with the sale and shall use the form of Purchase and Sale Agreement attached hereto as Exhibit "5"; and (6) Landlord shall deliver title free of any monetary liens. Tenant may assign this Purchase Option to a Tenant Affiliate without Landlord's consent but with prior written notice to Landlord.

26.15   Tenant's Right Of First Refusal. Landlord shall not sell or agree to sell, transfer or convey the Premises without first giving written notice thereof to Tenant (the "Notice of Sale").  The Notice of Sale shall include the exact and complete terms of the proposed sale and shall have attached thereto a photocopy of a bona fide offer and counteroffer, if any, duly executed by both Landlord and the prospective third party purchaser. Tenant shall have until 5:00 p.m. (local California time) on the day that is fifteen (15) days after receipt by Tenant of the Notice of Sale (the "Acceptance Period") to give written notice to Landlord of Tenant's exercise of Tenant's right to purchase the Premises on the same terms, price and conditions as set forth in the Notice of Sale. If Tenant declines to exercise its right of first refusal on or before the expiration of the Acceptance Period, then Tenant's right of first refusal shall terminate with respect to the particular Notice of Sale and Landlord may sell the Premises to the prospective purchaser on terms no less favorable than those set forth in the Notice of Sale. If Tenant exercises its right to purchase the Premises, Tenant shall consummate the purchase of the Premises pursuant to the terms and conditions of the Notice of Sale and at the later of ninety (90) days following Tenant's notice of election, or the time period specified in the Notice of Sale ("Closing Period"), subject to the terms set forth in this Section 26.15.  If Tenant fails to consummate the purchase of the Premises within the Closing Period, the amount of any earnest money provided for in the Notice of Sale shall be paid to Landlord as Landlord's liquidated damages; the agreement to purchase the Premises pursuant to the acceptance of the Notice of Sale shall terminate; and this Lease shall continue in effect. If after Tenant declines to exercise

its right to purchase the Premises, Landlord does not consummate the sale of the Premises to the prospective purchaser within 150 days after the Notice of Sale or reduces the sale price by more than five percent (5%) or materially changes any other payment terms, Landlord shall not sell or agree to sell the Premises without giving Tenant another Notice of Sale pursuant to this Section 26.15. If Tenant declines to exercise its right of first refusal within the Acceptance Period, and, thereafter the proposed transfer or sale is not consummated, then Tenants' fifteen (15) day period to elect to purchase the Premises shall apply to any subsequent transactions.

26.16   <u>Signs and Auctions</u>.   Tenant shall not place any sign (other than Facility signage) upon the Premises or conduct any auction thereon without Landlord's prior written consent.

26.17   <u>Surrender of Lease Not a Merger</u>.   The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, or a termination by Landlord, shall not work a merger, and shall terminate all or any existing subtenancies or other rights to use or occupy the Leased Property.

26.18   <u>Entity Authority</u>.   Each individual executing this Lease on behalf of a corporation, limited partnership, limited liability company or other entity represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of such entity, and that this Lease is binding upon said entity in accordance with its terms.

26.19   <u>AR Financing</u>.   Landlord acknowledges that this Lease (or any provision herein) does not create a lien or security interest in Tenant's account receivables and Landlord shall take no action to prevent or restrict Tenant's ability to obtain and/or maintain accounts receivable financing to fund its business operations.

26.20   <u>Consents</u>.   Wherever in this Lease the consent of one party is required to an act of the other party such consent shall not be unreasonably withheld.

26.21   <u>Guarantor</u>.   Brius, LLC, a California limited liability company ("Guarantor") is the guarantor of this Lease, as evidenced by the Lease Guaranty attached hereto as Exhibit "3".

26.22   <u>Quiet Possession</u>.   Upon Tenant paying the Minimum Rent reserved hereunder and observing and performing all of the covenants, conditions and provisions on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Premises for the entire Term subject to each provision of this Lease.

26.23   <u>Attorney's Fees and Costs</u>. In the event of any action at law or in equity between the parties hereto to interpret or enforce any of the provisions of or rights established by this Lease, including any action in bankruptcy court, the non-prevailing party or parties to such action or litigation shall pay to the prevailing party or parties all costs and expenses, including reasonable attorneys' fees, incurred therein by such prevailing party or parties.  The prevailing party shall be the party who is entitled to recover his or its costs of suit, whether or not the suit proceeds to final judgment.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED THIS LEASE ON THE DATE FIRST SET FORTH ABOVE.

"LANDLORD"

_____
Joseph Augello Credit Exemption Trust
Lucille M. Augello, Trustee

_____
Robert Augello

_____
Richard Augello

_____
Kathleen Augello, Trustee of the Kathleen
E. Augello Trust dated July 29, 2010

_____
Jacqueline Owen

_____
Michael A. & Anne J. Augello Family Trust
Anne J. Augello, Trustee

_____
Wayne L. Barnes

_____
Daryl E. Barnes

_____
Clarke Family Trust
Wayne L. Barnes Trustee

Landlord Signatures Continued on Next Page

28

_[signature]_
Richard Randall Augello, Trustee of the
Richard and Rebecca Augello Trust UDT 11/7/08

_[signature]_
Rebecca Anne Augello, Trustee of the
Richard and Rebecca Augello Trust UDT 11/7/08

_[signature]_
Wayne L. Barnes, Trustee of the Revocable
Trust Agreement of Wayne L. Barnes & Jodi
R. Barnes, Dated August 8, 2010

_[signature]_
Jodi R. Barnes, Trustee of the Revocable
Trust Agreement of Wayne L. Barnes & Jodi
R. Barnes, Dated August 8, 2010

"TENANT"

Eretz San Rafael Properties, LLC
a California limited liability company

By:   SYTR Real Estate Holdings, LLC, its Manager

By: _____
        Shlomo Rechnitz, Managing Member

EXHIBIT "1"

**LEGAL DESCRIPTION**

[To be attached when title report is received]

EXHIBIT "2"

## EQUIPMENT

At a minimum, all of the furniture, furnishings, fixtures and equipment required as of the date hereof for the Premises to operate under Title 22 as a skilled nursing facility, and at a maximum, all of the furniture, furnishings, fixtures and equipment presently being used in the operation of the Facility.

EXHIBIT "3"

## LEASE GUARANTY

THIS LEASE GUARANTY is made by Brius, LLC, a California limited liability company ("Guarantor") for the benefit of Joseph Augello Credit Exemption Trust, Robert Augello, Richard Augello, Kathleen Augello, Jacqueline Owen, Michael A. & Anne J. Augello Family Trust, Wayne L. Barnes, Daryl E. Barnes and Clarke Family Trust U/T/A dated March 30, 1993 (collectively, "Landlord").

R E C I T A L S :

This Lease Guaranty is entered into based upon the following facts and undertakings of the parties:

a)      Eretz San Rafael Properties, LLC, a California limited liability company ("Tenant") has agreed to lease from Landlord certain real property and improvements located at 1601 Fifth Avenue, San Rafael, California ("the Leased Premises") pursuant to the terms of a written Lease dated as of _____, 2012 (the "Lease").

b)      As a condition to its agreement to execute the Lease, Landlord has required that Guarantor execute this Lease Guaranty.

NOW, THEREFORE, in order to induce Landlord to enter into the Lease and for other good and valuable consideration, receipt of which is hereby acknowledged, Guarantor agrees as follows:

1.      Scope of Guaranty:   Guarantor unconditionally guarantees and promises, to and for the benefit of Landlord, that Tenant shall pay when due all monetary obligations to be performed by Tenant pursuant to the terms of the Lease.   If the Lease contains any options to renew or extend the term of the Lease, then this Lease Guaranty shall guarantee all monetary obligations of Tenant accruing during any such extended or renewed term.   All said obligations of Tenant are hereinafter called the "Lease Obligations."

2.      Limitation:    In the event of an assignment of the Lease that Landlord has consented to pursuant to Article 18 of the Lease, if Landlord in its good faith judgment is comfortable that assignee or the new guarantor of assignee's obligations under the Lease have the ability to perform all of the obligations of tenant under the Lease, Landlord shall release Guarantor from its obligations under the guaranty upon the effectiveness of the assignment. If in Landlord's good faith judgment the assignee or the new guarantor do not have the ability to perform all of the obligations of Tenant under the lease, this guaranty shall remain effective following the assignment; provided, however, that if there has been no event of default under the Lease for a period of twenty-four (24) months following the assignment, this guaranty shall have no further force or effect as to Guarantor.   Notwithstanding the preceding sentence, (i) if the only defaults during the twenty-four (24) month period, are for tenant's failure to pay rent prior to the expiration of the grace period in the Lease, and (ii) such late payments have not occurred more

than once in any calendar year, and (iii) tenant or guarantor has paid all amounts due within five (5) business days after notice of late payment is given, Landlord shall release Guarantor.

3.     Nature of Guaranty:    The obligations of Guarantor hereunder are independent of the obligations of Tenant, and the obligations of Guarantor are joint and several.  A separate action may be brought or prosecuted against any Guarantor whether or not an action is brought or prosecuted against any other Guarantor or Tenant or all of them, or whether or not any other Guarantor or Tenant or all of them is joined in the action. Without limiting the generality of the foregoing, the obligations of Guarantor hereunder shall in no way be released, diminished or otherwise affected by reason of any voluntary or involuntary proceedings by or against Tenant in bankruptcy or for an arrangement or reorganization or for any other relief under any provision of the Bankruptcy Act or any other insolvency or debtor's relief law from time to time in effect.

4.     Multiple Guaranties:  The granting of a written release of liability hereunder of less than all of the signatories hereto shall be effective with respect to the liability hereunder of those specifically so released, but shall in no way affect the liability hereunder of any of the signatories not so released.  Any prior or subsequent guaranty by Guarantor or by any other guarantor of Tenant's obligations to Landlord shall not be deemed to be in lieu of or to supersede or terminate this Lease Guaranty but shall be construed as an additional or supplementary guaranty unless otherwise expressly provided therein.

5.     Modification of Lease:   The provisions of the Lease may be changed by agreement between Landlord and Tenant at any time, or by course of conduct, with or without the consent of and/or notice to Guarantor.  Guarantor's liability under this Lease Guaranty shall not be in any way affected by such change, and this Lease Guaranty shall guarantee the performance in full of the Lease Obligations as so changed.  The election by Landlord to secure the consent of Guarantor before making one or more changes in the Lease shall not be deemed a waiver of the provisions of this paragraph with regard to any past or future change in the Lease.

6.     Assignment:   Subject to Article 2 above, Assignment of the Lease by either Landlord or Tenant (as permitted by the Lease) with or without notice to or the consent of Guarantor shall not affect this Lease Guaranty or in any way exonerate or release Guarantor from its obligations under this Lease Guaranty.  Landlord may without notice assign its interest in the Lease Guaranty in whole or in part to any person. Guarantor may not assign their rights or delegate their duties under this Lease Guaranty.

7.     Waivers by Guarantor:  Guarantor waives any right it may otherwise have to now or hereafter:  (i) require Landlord to proceed against Tenant or to pursue any other remedy in Landlord's power; (ii) require Landlord to proceed against or exhaust any security it now or hereafter acquires from Tenant; (iii) assert any defense it may acquire by reason of any waiver, act, omission, extension, modification, forbearance or delay by Landlord and/or by reason of Landlord's election to make any presentment, demand for performance, notice of non-performance, protest, notice of protest, notice of dishonor, notice of acceptance of this Lease Guaranty, or notice of the existence or creation of all or any part of the Lease Obligation.

8.     Limitations on Subrogation:  Notwithstanding any payments made by Guarantor under this Lease Guaranty, Guarantor shall have no right, and waive any right it may have, to

subrogation and/or to enforcement of any remedy it may have against Tenant until after any existing defaults under the Lease Obligations shall have been cured in full.

9.    Non-Waiver of Terms:  No waiver of any breach, or failure or delay to enforce any rights hereunder or under the Lease, or default of any term or condition of this Lease Guaranty or the Lease shall constitute or be construed as a waiver by Landlord of any subsequent breach or default of that term or condition or of any breach or default of any other such term or condition.

10.    Notices:  Guarantor agrees that any notice or demand upon it shall be deemed to be sufficiently given or served if it is in writing and is personally served or mailed by first class certified mail, postage prepaid, addressed to Guarantor at the following address:

Brius, LLC
4929 Wilshire Boulevard, Suite 388
Los Angeles, CA 90036

With a copy to (which shall not constitute notice):

Alain Kuppermann, Esq.
110 S. Fairfax Avenue, Suite 250
Los Angeles, CA 90036

Each notice shall be deemed effective and given upon actual receipt or refusal of receipt regardless of the method of delivery used.

11.    General Provisions:  This Lease Guaranty shall be enforced and construed in accordance with the laws of the State of California.  Any action or proceeding brought for the breach or enforcement of this Lease Guaranty shall be initiated in the courts of the State of California located in Los Angeles County, California. All remedies of Landlord hereunder shall be cumulative, and no delay or omission by Landlord in the exercise of its rights or remedies under the Lease or under this Lease Guaranty shall impair or otherwise affect the right of Landlord to later pursue any remedy available to it in connection with the enforcement of the Lease or this Lease Guaranty.  Successive demands may be made upon, and successive actions for the enforcement of such demands may be brought against, Guarantor upon the successive breach of or default under any Lease Obligation. The enforcement of this Lease Guaranty against Guarantor with respect to any particular breach of or default under any Lease Obligations shall not operate to exhaust this Lease Guaranty or to waive Landlord's right to proceed under this Lease Guaranty with respect to any future default or breach.  If any provision hereof and/or any of Guarantor' obligations hereunder shall be, or are adjudged to be, unenforceable, the remainder of this Lease Guaranty and/or all of the Guarantor's other obligations hereunder shall subsist and remain in full force and effect and not be affected thereby.

12.    Successors:  This Lease Guaranty shall not be discharged or in any way affected by the death of a Guarantor, or the dissolution of a Guarantor that is not a natural person.  This Lease Guaranty shall be binding upon and shall inure to the benefit of Landlord and Guarantor and their respective heirs, successors, assigns, executors, and administrators.

13. <u>Modification</u>:   This Lease Guaranty may not be changed, waived, discharged or terminated orally or by course of conduct, but rather only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

14. <u>Counterparts</u>:  This Lease Guaranty may be executed in counterparts, and all counterparts together shall be construed as one document.

IN WITNESS WHEREOF, the undersigned have executed this Guaranty to be effective as of _____, 2012.

<u>GUARANTOR</u>:

Brius, , LLC
a California limited liability company

By:   _____

      Shlomo Rechnitz,
      CEO

418201.5/dml

EXHIBIT "4"

## MINUMUM RENT SCHEDULE

YEAR                                    Monthly Rent

Initial Term:

Lease Year 1 (Months 1-12)              $21,600.00
Lease Year 2 (Months 13-24)            $22,248.00
Lease Year 3 (Months 25-36)            $22,915.44
Lease Year 4 (Months 37-48)            $23,602.90
Lease Year (Months 49-60)              $24,310.99
Lease Year (Months 61-72)              $25,040.32
Lease Year (Months 73-84)              $25,791.53
Lease Year (Months 85-96)              $26,565.28
Lease Year (Months 97-108)             $27,362.23

Option Terms:  The Monthly Rent shall be increased as of the first day of the first option term and on each anniversary thereof, and as of the first day of the second option term and on each anniversary thereof, by an amount equal to three percent (3%) of the then-current rent.

EXHIBIT "5"

## FORM OF PURCHASE AND SALE AGREEMENT
(Section 26.14)

# PURCHASE AND SALE AGREEMENT

by and between

Joseph Augello Credit Exemption Trust, Robert Augello, Richard Augello, Kathleen Augello, Jacqueline Owen, Michael A. & Anne J. Augello Family Trust, Wayne L. Barnes and Daryl E. Barnes

("**Seller**")

and

_____,

_____

("**Purchaser**")

# PURCHASE AND SALE AGREEMENT
## (San Rafael, CA)

This PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into this _____ day of _____, 201__ (the "**Execution Date**") by and Joseph Augello Credit Exemption Trust, Robert Augello, Richard Augello, Kathleen Augello, Jacqueline Owen, Michael A. & Anne J. Augello Family Trust, Wayne L. Barnes and Daryl E. Barnes (collectively, "**Seller**") and _____, a California limited liability company ("**Purchaser**").

## RECITALS

A.      Seller is the owner of the real property described in EXHIBIT A attached hereto (the "**Real Property**") and the improvements thereon and furniture, fixtures and equipment therein that constitute that skilled nursing facility with a mailing address at 1601 Fifth Avenue, San Rafael, CA (the "**Facility**").

B.      The Facility is leased to Eretz San Rafael Properties, LLC, a California limited liability company ("**Tenant**"), under the terms of a Lease dated _____, 2012 (the "**Lease**").

C.      Under the Lease, Seller, as Landlord, granted Tenant an option to purchase the Facility on the terms contained in Section 26.14 of the Lease (the "**Option**").

D.      Prior to the Execution Date, Tenant delivered written notice to Seller of his intent to exercise the Option (the "**Exercise Notice**") and Tenant assigned the Option to Purchaser (strike if not applicable).

E.      Purchaser and Seller are interested in documenting the terms and conditions of the sale of the Real Property and the Facility by Seller to Purchaser (the "**Transaction**").

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants of the parties set forth herein, IT IS HEREBY AGREED AS FOLLOWS:

1.      PURCHASE AND SALE.  On the terms and conditions set forth herein, Seller shall sell to Purchaser and Purchaser shall purchase from Seller the following:

(a)      **Real Property and Facility**.  The Real Property and the Facility, together with all of Seller's right, title and interest in all tenements, hereditaments, rights, privileges, interests, easements and appurtenances now or hereafter belonging or in any way pertaining to the Real Property and/or the Facility.  Seller agrees to pay off any monetary liens created by Seller in order to cause such liens to be released from title at closing.

(b)      **Personal Property**.  All of Seller's right, title and interest in and to any and all equipment, furniture, fixtures, appliances, tools, instruments, and other tangible personal property owned by Seller as of the date of this Agreement, located on the Real Property and used in connection with the operation of the Facility (the "**Personal Property**").

1

Hereinafter the Real Property, the Facility, and the Personal Property shall sometimes be collectively referred to as "**Seller's Assets.**" Purchaser is not assuming or acquiring, and shall not be obligated to pay any liabilities of Seller except as specifically provided in this Agreement.

2.   PURCHASE PRICE.

(a)   **Payment.** The purchase price for Seller's Assets (the "**Purchase Price**") shall be Three Million Two Hundred and Fifty Thousand and No/100 Dollars ($3,250,000.00), and shall be payable as follows:

(i)   On_____, Purchaser delivered to Seller a non-refundable Option exercise fee in the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "**Exercise Fee**").

(ii)   At Closing, the Exercise Fee shall be applied to the Purchase Price, and Purchaser shall pay the remainder of the Purchase Price (the "**Closing Funds**") to Seller by wire transfer of immediately available funds.

(b)   **Allocation of Purchase Price.** The Purchase Price shall be allocated in the manner required by Section 1060 of the Internal Revenue Code of 1986 and regulations thereunder as follows: $_____ of the Purchase Price shall be allocated to the Personal Property, and the remaining $_____ of the Purchase Price shall be allocated to the Real Property and the Facility.

3.   CLOSING

(a)   **The Closing Date.** The closing of the purchase and sale under this Agreement (the "**Closing**") shall take place on _____, _____ (the "**Closing Date**"). If the Transaction does not close on the Closing Date, Seller and Purchaser may pursue their remedies under Section 13 of this Agreement. *Time is of the essence in this Agreement.*

(b)   **The Closing Process.** Closing shall occur through escrow and accordingly, at or prior to the Closing Date, Purchaser and Seller shall deposit in escrow with _____. Escrow Officer ("**Escrow Agent**"), at _____, at _____ (the "**Title Company**"), all monies and documents necessary to close the Transaction. Closing shall occur in accordance with the procedures and instructions given by Purchaser and Seller to the Escrow Agent prior to Closing.

4.   RESERVED

5.   COSTS AND PRORATIONS

(a)   **Costs and Expenses.** Purchaser and Seller shall each pay their own attorneys' fees associated with the Transaction. The other costs and expenses of and prorations related to the Transaction shall be the responsibility of Purchaser as follows:

2

(i)    Seller shall pay the cost of any state, county, or local transfer tax, sales tax, excise tax and use tax due and payable by virtue of the transfer to Purchaser of the Real Property, the Facility and the Personal Property;

(ii)    Seller shall pay the cost of the premium attributable to an CLTA Policy of Title Insurance for the Real Property in an amount equal to the Purchase Price and issued by the Title Company, and Purchaser shall pay the cost of (A) any incremental cost for an ALTA extended coverage policy, (B) any endorsements desired by Purchaser and (C) the cost of a lender's title insurance policy, including the cost of any title endorsements to the lender's title insurance policy required by Purchaser's lender, if any;

(iii)    Seller and Purchaser shall each pay ½ of any and all escrow fees and recording fees; and

(iv)    Purchaser shall pay any and all costs related to Purchaser's financing of the Transaction.

(b)    **Prorations and Adjustments.**  Purchaser acknowledges and agrees that Tenant is responsible prior to Closing and will be responsible after the Closing for all costs and expenses associated with the operation of the Facility including, but not limited to, Real Property and Personal Property taxes assessed against Seller's Assets, and that accordingly, as between Purchaser and Seller, there shall be no prorations at Closing for any such costs or expenses. Any prorations of such expenses shall be between Purchaser and Tenant. Any tax impounds being held by Seller as Landlord under the Lease for taxes coming due for the year in which the Closing occurs shall be applied by Seller to the payment of taxes to the extent then due and payable. If no taxes are due and payable as of the Closing Date, then any impounds held by Seller as Landlord under the Lease as of the Closing Date shall be credited to Purchaser at Closing for the account of the Tenant, and Purchaser agrees to use such funds solely for payment of property taxes even if the property taxes relate to periods prior to the Closing Date. Upon such transfer of the tax impounds to Purchaser, Purchaser hereby agrees that it shall be obligated to use such funds for the sole purpose of paying the real and personal property taxes assessed against the Seller's Assets and Purchaser hereby indemnifies and holds Seller harmless from any failure to do so.

(c)    POSSESSION OF FACILITY/RIGHTS TO INVENTORY AND INTANGIBLE PERSONAL PROPERTY. Tenant currently has possession of the Facility. Purchaser and Seller acknowledge and agree that the following property is currently in possession of Tenant and Seller asserts no interest in such property:  (i) all inventories of every kind and nature whatsoever (specifically including, but not limited to, all pharmacy supplies, medical supplies, office supplies, other supplies and foodstuffs) relating to the Facility (collectively, the "**Inventory**"), and (ii) the name of the Facility, all permits, certificates, and approvals related to the operation of the Facility, including, without limitation, all telephone numbers of the Facility, and all books and records relating directly to the operation of the Facility and located therein (collectively, the "**Intangible Personal Property**").

6.     REPRESENTATIONS AND WARRANTIES OF SELLER.   Seller hereby warrants and represents to Purchaser that:

(a)     **Status of Seller.**  Each of the Sellers that is a trust is duly organized, validly existing and in good standing under the laws of the State of California.

(b)     **Authority.**  Seller has full power and authority to execute and deliver this Agreement and all related documents and to carry out the transactions contemplated herein.  This Agreement is valid, binding and enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy laws and general principles of equity.

(c)     **The Personal Property.**  At Closing, all of Seller's right, title and interest in the Personal Property, shall be vested in Purchaser.  Seller represents that it has not sold or encumbered its interest in the Personal Property to anyone other than granting a security interest to Seller's Lender, if any, which shall be released at Closing.

7.     REPRESENTATIONS AND WARRANTIES OF PURCHASER.  Purchaser hereby warrants and represents to Seller that:

(a)     **Status of Purchaser.**  Purchaser is a _____, duly organized, validly existing and in good standing under the laws of the State of California.

(b)     **Authority.**  Purchaser has full power and authority to execute and to deliver this Agreement and all related documents, and to carry out the transactions contemplated herein. This Agreement is valid, binding and enforceable as against Purchaser in accordance with its terms, except as such enforceability may be limited by applicable creditors' rights laws, applicable bankruptcy laws and general principles of equity.

8.     BROKER.  Purchaser and Seller each represents, covenants, and warrants to the other that it has not employed a broker or finder in connection with the Transaction.  Each of Purchaser and Seller agrees to indemnify, defend and hold harmless the other from and against any and all claims of any broker or finder allegedly employed by it.

9.     SELLER'S COVENANTS

(a)  **Pre-Closing.**  Between the date hereof and the Closing, except as contemplated by this Agreement or with the consent of Purchaser, Seller agrees that:

(i)     Seller will not knowingly take any action inconsistent with its obligations under this Agreement or that could hinder or delay the consummation of the Transaction; and

(ii)     Seller will promptly advise Purchaser of any facts or circumstances that would cause a material change in any of Seller's representations and warranties set forth in Paragraph 7.

4

(b)     **Closing**.  At the Closing, unless otherwise waived in writing by Purchaser, Seller shall deliver to Purchaser or to Escrow Agent, as appropriate, the following documents executed by Seller:

(i)     A Grant Deed, in the form attached hereto as EXHIBIT **B** conveying title to the Real Property and the Facility to Purchaser free and clear of all liens and encumbrances;

(ii)    A Bill of Sale, in the form attached hereto as EXHIBIT **C**;

(iii)   A Lease Assignment and Assumption Agreement (the "**Lease Assignment**") in the form attached hereto as EXHIBIT **D**;

(iv)    An affidavit, under penalty of perjury, which shall include Seller's United States taxpayer identification number, stating that Seller is not a foreign person under Section 1445 of the Internal Revenue Code and the Regulations;

(v)     A California Form 593-C; and

(vi)    A Settlement Statement as agreed to by each party.

10.   PURCHASER'S COVENANTS

(a)     **Pre-Closing**.  Between the date hereof and the Closing, Purchaser agrees that:

(i)     Purchaser will not knowingly take any action inconsistent with its obligations under this Agreement or which could hinder or delay the consummation of the Transaction; and

(ii)    Tenant will continue to operate the Facility and will otherwise fulfill its obligations under the Lease, and Purchaser will promptly advise Seller of any facts or circumstances that would cause a material change in any of Purchaser's representations and warranties set forth in Paragraph 8.

(b)     **Closing**.  At the Closing, Purchaser shall pay for any of the costs and expenses identified in Paragraph 5 for which Purchaser is responsible and, unless otherwise waived in writing by Seller, Purchaser shall deliver to Seller or to the Escrow Agent, as appropriate, the following:

(i)     The Closing Funds in immediately available funds;

(ii)    A signed copy of the Lease Assignment;

(iii)   Any transfer forms required to be signed by the Purchaser under the laws of the State of California or the County of Marin, California;

(iv)    A signed certificate listing Purchaser's Tax ID number; and

(v)      A signed Settlement Statement as agreed to by each party.

11.   MUTUAL COVENANTS.  Following the execution of this Agreement, Purchaser and Seller agree that if any event should occur that would prevent fulfillment of the conditions to the obligations of any party hereto to consummate the Transaction, to use its reasonable efforts to cure the same as expeditiously as possible.

12.   RESERVED

13.   TERMINATION

(a)      The delivery of the Exercise Notice by Purchaser is non-rescindable and neither Seller nor Purchaser shall be entitled to terminate this Agreement.

(b)      In the event the Closing fails to occur as a result of a default by Seller in its obligations hereunder or under the Lease, then Purchaser shall have the right either to seek specific performance of the obligations of Seller hereunder, or to demand the return of the Exercise Fee, with interest accrued thereon.

(c)      If the Closing fails to occur for any reason, then the Lease and Guaranty shall continue in full force and effect.

14.   NOTICES.   Any notice, request or other communication to be given by any party hereunder shall be in writing and shall be sent by registered or certified mail, postage prepaid, by courier guaranteeing overnight delivery or by facsimile transmission, to the following addresses:

To Seller:          c/o Rob Augello
                    1801 Astor Drive
                    San Leandro, CA  94577
                    Telephone:
                    Facsimile:

To Purchaser:       _____
                    _____
                    _____
                    Attention:
                    Telephone:
                    Facsimile:

with a copy to:     Alain Kuppermann, Esq.
                    110 S. Fairfax Avenue, Suite 250
                    Los Angeles, CA  90036
                    Attention:
                    Telephone:
                    Facsimile:

Notice shall be deemed received upon actual receipt or refusal of receipt thereof regardless of the method of delivery used.

15.     AMENDMENT.  This Agreement may not be amended or modified in any respect whatsoever except by an instrument in writing signed by the parties hereto.  This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior negotiations, discussions, writings and agreements between them.

16.     SUCCESSORS/ASSIGNMENT.  The terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by and against the heirs, successors and assigns of the parties hereto.

17.     CAPTIONS.  The captions of this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

18.     SURVIVAL.  All covenants, warranties and representations of Purchaser and/or Seller herein and in the documents delivered by such party at closing shall survive the Closing, and shall continue in effect for a period of one (1) year after the Closing Date, after which they shall terminate and be of no further force or effect; *provided, however*, that if Seller notifies Purchaser in writing of a claim prior to the expiration of such one (1) year period such representation or warranty shall survive until the resolution of such claim; and *provided further*, that nothing herein shall be construed as relieving either party of liability for fraud with respect to any such warranties or representations.  The indemnity obligations of both parties shall survive the Closing Date until all indemnified claims are barred by the applicable statute of limitations.

19.     GOVERNING LAW.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

20.     SEVERABILITY.  Should any one or more of the provisions of this Agreement be determined to be invalid, unlawful or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

21.     COUNTERPARTS.  This Agreement may be executed by facsimile and in any number of counterparts, each of which shall be an original; but such facsimiles and counterparts shall together constitute but one and the same instrument.

22.     CONFIDENTIALITY.  In the event the Transaction fails to close for any reason, Purchaser and Seller agree to keep confidential any proprietary information disclosed to them by the other party during the course of the Transaction.

23.     RESERVED

24.     CONSTRUCTION.  Each party acknowledges and agrees that it has participated in the drafting and the negotiation of this Agreement and has been represented by counsel during the course thereof.  Accordingly, in the event of a dispute with respect to the interpretation or

enforcement of the terms hereof, no provision shall be construed so as to favor or disfavor either party hereto.

**25.** **ATTORNEYS' FEES.** In the event of litigation or other proceedings involving the parties to this Agreement to enforce any provision of this Agreement, to enforce any remedy available upon default under this Agreement, or seeking a declaration of the rights of either party under this Agreement, the prevailing party shall be entitled to recover from the other any and all attorneys' fees and costs as may be actually incurred, including its costs and fees on appeal.

**26.** **RESERVED**

**27.** **CALCULATION OF TIME PERIODS.** Unless otherwise specified, in computing any period of time described herein, the day of the act or event on which the designated period of time begins to run shall not be included and the last day of the period so computed shall be included, unless such last day is a Saturday, Sunday or legal holiday, in which event the period shall run until the next day that is not a Saturday, Sunday or a legal holiday.

**28.** **THIRD PARTY BENEFICIARY.** Nothing in this Agreement express or implied is intended to and shall not be construed to confer upon or create in any person (other than the parties hereto) any rights or remedies under or by reason of this Agreement, including without limitation, any right to enforce this Agreement.

**29.** **RISK OF LOSS.** In the event that after the Execution Date and prior to Closing Seller's Assets shall have been damaged, destroyed or condemned in any material respect, at Purchaser's option, either (A) any and all insurance proceeds and or condemnation awards shall be assigned by Seller to Purchaser, in which case the closing shall proceed and there shall be no adjustment to the Purchase Price, or (B) Purchaser shall have the right to rescind its Exercise Notice, in which case the Lease shall continue in full force and effect and the provisions of the Lease shall control with respect to such damage, destruction or condemnation.

**30.** **AS-IS CONDITION.** PURCHASER ACKNOWLEDGES THAT SELLER'S ASSETS ARE BEING SOLD IN THEIR "AS IS, WHERE IS WITH ALL FAULTS CONDITION" AND THAT SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO (A) THE DESIGN, CONSTRUCTION, LOCATION, SIZE, CHARACTER, PHYSICAL CONDITION OR STATE OF REPAIR OF SELLER'S ASSETS OR ANY PORTION THEREOF; (B) THE TOPOGRAPHY, DRAINAGE OR CONDITION OF THE SURFACE AND SUBSURFACE SOILS OF OR ON THE REAL PROPERTY; (C) THE PRESENCE OR ABSENCE OF HAZARDOUS WASTE OR HAZARDOUS SUBSTANCES ON OR FROM THE REAL PROPERTY OR THE FACILITY; (D) THE MERCHANTABILITY, HABITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF SELLER'S ASSETS; (E) THE PAST OR FUTURE TAXES OR ASSESSMENTS OF SELLER'S ASSETS; (F) THE COMPLIANCE OF SELLER'S ASSETS WITH ANY APPLICABLE GOVERNMENTAL REQUIREMENT OR ANY OTHER REPRESENTATION OR WARRANTY NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. BY EXECUTION OF THIS AGREEMENT, PURCHASER REPRESENTS AND WARRANTS TO SELLER THAT PURCHASER IS AN EXPERIENCED, SOPHISTICATED PURCHASER OF COMMERCIAL REAL ESTATE, WITH KNOWLEDGE AND EXPERIENCE SUFFICIENT TO ENABLE PURCHASER TO EVALUATE THE MERITS AND RISKS OF THE SALE, AND THAT PURCHASER IS

8

REPRESENTED BY KNOWLEDGEABLE AND EXPERIENCED LEGAL COUNSEL OF PURCHASER'S OWN CHOOSING AND AGREES THAT NEITHER SELLER NOR ITS AGENTS OR REPRESENTATIVES HAS MADE AND THAT PURCHASER HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY OF ANY KIND THAT IS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT IN CONNECTION WITH THE SALE OF SELLER'S ASSETS OR PURCHASER'S ACTUAL PURCHASE THEREOF PURSUANT TO THE TERMS OF THIS AGREEMENT.   PURCHASER REPRESENTS AND WARRANTS THAT PURCHASER'S PURCHASE OF THE ASSETS WILL BE BASED SOLELY UPON THE FAMILIARITY OF PURCHASER WITH SELLER'S ASSETS THROUGH AFFILIATION WITH THE TENANT, AND THAT PURCHASER HEREBY RELEASES SELLER FROM ANY LIABILITY WITH RESPECT TO THE OPERATIONS OF THE FACILITY UNDER THE LEASE.

-----------------------------

Purchaser's Initials

88888/8893
DML/418216.4

IN WITNESS WHEREOF, the Seller hereby executes this Purchase and Sale Agreement as of the day and year first written above.

SELLER:

_____
Joseph Augello Credit Exemption Trust
Lucille M. Augello, Trustee


_____
Robert Augello


_____
Richard Augello


_____
Kathleen Augello


_____
Jacqueline Owen


_____
Michael A. & Anne J. Augello Family Trust
Anne J. Augello, Trustee


_____
Wayne L. Barnes


_____
Daryl E. Barnes

IN WITNESS WHEREOF, the Purchaser hereby executes this Purchase and Sale Agreement as of the day and year first written above.

PURCHASER:

_____, a California

_____

By: _____
Its: Manager

By: _____
Its: _____

EXHIBITS

EXHIBIT A LEGAL DESCRIPTION
EXHIBIT B FORM OF DEED
EXHIBIT C BILL OF SALE
EXHIBIT D LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT A

LEGAL DESCRIPTION

[insert when title report is received]

EXHIBIT B

FORM OF GRANT DEED

WHEN RECORDED RETURN TO

Alain Kuppermann, Esq.
110 S. Fairfax Avenue, Suite 250
Los Angeles, CA 90036

Mail tax statements to:

(Space Above This
Line for Recorder's Use Only)

GRANT DEED

THE UNDERSIGNED GRANTOR DECLARES:

Documentary transfer tax is $ _____
☐ _____ unincorporated area
☐ City of San Rafael
Parcel No.: _____
☐    computed on full value of property conveyed, or
☐    computed on full value less value of liens and
     encumbrances remaining at time of sale.

BY THIS INSTRUMENT DATED _____, 201____, for a valuable consideration, receipt of which is hereby acknowledged, Joseph Augello Credit Exemption Trust, Robert Augello, Richard Augello, Kathleen Augello, Jacqueline Owen, Michael A. & Anne J. Augello Family Trust, Wayne L. Barnes and Daryl E. Barnes, hereby GRANTS to _____, a _____, property located in the County of Marin, State of California, and described on EXHIBIT A, attached hereto and incorporated herein by this reference;

1

IN WITNESS WHEREOF, this instrument is executed effective as of the _____ day of _____, 201_.

SELLER:

_____
Joseph Augello Credit Exemption Trust
Lucille M. Augello, Trustee

_____
Robert Augello

_____
Richard Augello

_____
Kathleen Augello

_____
Jacqueline Owen

_____
Michael A. & Anne J. Augello Family Trust
Anne J. Augello, Trustee

_____
Wayne L. Barnes

_____
Daryl E. Barnes

EXHIBIT B – FORM OF GRANT DEED
88888/8893
DML/418216.4

ACKNOWLEDGMENT

STATE OF CALIFORNIA         )
                                         ) ss.
County of _____ )

On _____, 201____ before me, _____, a Notary
Public in and for said County and State, personally appeared _____, who proved to
me on the basis of satisfactory evidence to be the person whose name is subscribed to the within
instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature on the instrument the person, or the entity upon behalf of which the person
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

        Witness my hand and Official Seal.         (Seal)

_____
Notary Signature

3

EXHIBIT "A"
TO
GRANT DEED

LEGAL DESCRIPTION

[To be inserted when title report is received]

Exhibit C

## FORM OF BILL OF SALE
### (Personal Property)

In consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Joseph Augello Credit Exemption Trust, Robert Augello, Richard Augello, Kathleen Augello, Jacqueline Owen, Michael A. & Anne J. Augello Family Trust, Wayne L. Barnes and Daryl E. Barnes ("Seller") does hereby grant, bargain, sell, convey and transfer to _____, a _____ ("Purchaser"), all of its right, title and interest in and to, all and singular, the Personal Property as that term is defined in that certain Purchase and Sale Agreement dated _____ between Purchaser and Seller (the "**Purchase Agreement**").

TO HAVE AND TO HOLD, all and singular, the Personal Property hereby sold, assigned, transferred and conveyed to Purchaser, its successors and assigns, to and for its own use and benefit.

Dated this ___ day of _____, 201___.

_____
Joseph Augello Credit Exemption Trust
Lucille M. Augello, Trustee

_____
Michael A. & Anne J. Augello Family Trust
Anne J. Augello, Trustee

_____
Robert Augello

_____
Wayne L. Barnes

_____
Richard Augello

_____
Daryl E. Barnes

_____
Kathleen Augello

_____
Jacqueline Owen

EXHIBIT C - FORM OF BILL OF SALE
88888/8893
DML/418216.4

EXHIBIT D

FORM OF LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION OF LEASE (the "**Assignment**") is dated for reference purposes as of this ___ day of _____, 201__, by and among Joseph Augello Credit Exemption Trust, Robert Augello, Richard Augello, Kathleen Augello, Jacqueline Owen, Michael A. & Anne J. Augello Family Trust, Wayne L. Barnes and Daryl E. Barnes ("**Assignor**"), _____, a _____ ("**Assignee**"), Eretz San Rafael Properties, LLC, a California limited liability company ("**Facility Tenant**").

WITNESSETH:

A.      Assignor is the owner of the real property described in <u>Exhibit A</u> (the "Real Property") and the improvements thereon and furniture, fixtures and equipment therein that constitute that skilled nursing facility with a mailing address at 1601 Fifth Avenue, San Rafael, CA 94901 (the "**Facility**"). Assignor leases the Facility to Facility Tenant under the terms of a Lease dated _____, 2012 (the "**Lease**").

B.      The Lease has been guaranteed by Brius, LLC, a California limited liability Company, pursuant to that certain Lease Guaranty dated _____, 2012 (the "**Lease Guaranty**").

C.      Assignor and Assignee are parties to that Purchase and Sale Agreement dated _____, 201__ (the "**Purchase Agreement**").

D.      Concurrently with the consummation of the Transaction provided for in the Purchase Agreement, Assignor will assign to Assignee and Assignee will assume from Assignor all of Assignor's rights and obligations under the Lease and all of Assignors rights under the Lease Guaranty, which assignment and assumption the parties wish to evidence by this Assignment.

E.      All capitalized terms used herein and not otherwise defined, shall have the meaning set forth in the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants of the parties set forth herein, IT IS HEREBY AGREED AS FOLLOWS:

AGREEMENT

1.      <u>Assignment and Assumption of Lease</u>. Effective as of the Closing Date, Assignor does hereby assign to Assignee, and Assignee does hereby take and assume from Assignor, all of Assignor's right, title and interest in and to and obligations under the Lease, and Assignor does

1

hereby assign to Assignee, and Assignee does hereby take and assume from Assignor, all of Assignor's right, title and interest in and to the Lease Guaranty, and Assignee does hereby agree to perform all of the obligations of Assignor under the Lease.

2.    Closing Date.  This Agreement shall be effective contemporaneously with the Closing under the Purchase Agreement (the "Closing Date").

3.    Governing Law/Amendment.   This Agreement shall be governed by and construed in accordance with the laws of the State in which the Facility is located and may not be amended or modified except by written instrument signed by the parties hereto.

4.    Attorneys Fees.  In the event of a dispute among the parties hereto with respect to the subject matter hereof the prevailing party in any such dispute shall be entitled to collect from the other any and all attorneys' fees and costs, including its fees and costs on appeal.

5.    Entirety.  This Agreement and any documents executed in furtherance hereof or in conjunction herewith represent the entire agreement of the parties with respect to the subject matter hereof.

6.    Notices.  Any notice, request or other communication to be given by either party hereunder shall be in writing and shall be sent to the parties and in the manner and at the addresses specified in the Purchase Agreement.

7.    Severability.  Should any one or more of the provisions hereof be deemed to be invalid or unenforceable said determination shall not affect the validity or enforceability of the remaining terms hereof.

8.    Captions.  The captions in this Agreement have been inserted for convenience of reference only and shall not be construed to define or to limit any of the terms or conditions hereof.

9.    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be a duplicate original, but all of which together shall constitute one and the same instrument.

10.    Acknowledgement by Facility Tenant and Guarantor.  By their signatures below, Facility Tenant and Guarantor hereby acknowledge and agree that they are aware of the assignment of the Lease to Assignee.

EXHIBIT D - FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE
88888/8893
DML/418216.4

**IN WITNESS WHEREOF**, Assignor has executed this Assignment and Assumption of Lease as of the date first above written.

ASSIGNOR:

_____
Joseph Augello Credit Exemption Trust
Lucille M. Augello, Trustee

_____
Robert Augello

_____
Richard Augello

_____
Kathleen Augello

_____
Jacqueline Owen

_____
Michael A. & Anne J. Augello Family Trust
Anne J. Augello, Trustee

_____
Wayne L. Barnes

_____
                    es

3

IN WITNESS WHEREOF, Assignee, Tenant and Guarantor have executed this Assignment and Assumption of Lease as of the date first above written.

ASSIGNEE:

_____, a _____

By: _____
Its:  Manager

By: _____
Its: _____

FACILITY TENANT:

Eretz San Rafael Properties, LLC
a California limited liability company

By:    SYTR   Real   Estate   Holdings,   LLC,
       its Manager

       By: _____
            Shlomo Rechnitz, Managing Member

GUARANTOR:

Brius, LLC,

By: _____
     Shlomo Rechnitz,
     CEO

EXHIBIT D – FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE
88888/8893
DML/418216.4

# EXHIBIT A

## LEGAL DESCRIPTION OF REAL PROPERTY

[To be inserted when title report is received]

# EXHIBIT B

**EXHIBIT B**

## Sublease Agreement

This Sublease Agreement (this "Sublease") dated November 1st, 2012 (the "Effective Date") is to sublet real property according to the terms specified below.

Sublessor agrees to sublet, and Subtenant agrees to take the premises described below, which shall include the real property, improvements and personal property constituting a licensed skilled nursing facility. Both parties agree to keep, perform, and fulfill the promises, conditions and agreements expressed below:

1.    **SUBLESSOR**: ERETZ SAN RAFAEL PROPERTIES, LLC

2.    **SUBTENANT**: SAN RAFAEL HEALTHCARE & WELLNESS CENTRE, LP

3.    **PREMISES**: The location of the premises is: 1601 5th Avenue, San Rafael, CA 94901

4.    **TERM**: The initial term of this Sublease shall commence on the Commencement Date (as defined in the Lease) and shall continue for two (2) years (each a "Lease Year" and collectively, the "Initial Term"). Subtenant shall have a two (2) year extension option as follows: at least 90 days prior to the expiration of the Initial Term, Subtenant may notify Sublessor of its intention to extend the term for an additional two (2) year period. Upon Sublessor's receipt of such notice, Sublessor may elect either to terminate this Sublease at the end of the Initial Term or to accept Subtenant's extension notice and extend this Sublease for an additional two (2) year term. The Initial Term and any extension periods exercised and granted are collectively referred to herein as the "Term".

5.    **RENT PAYMENTS**: Subtenant shall pay Sublessor a monthly rent ("Base Monthly Rent") for each month of each Lease Year during the Term, without deduction, set off, prior notice or demand. Base Monthly Rent for the first Lease Year is Thirty Two Thousand Four Hundred Dollars and No/100 Dollars ($32400.00). Beginning on November 1st, 2013 and on each Rent Adjustment Date thereafter through the Term, Base Monthly Rent shall increase by Three Percent (3%) from the Base Monthly Rent due during the last month of the immediately preceding Lease Year. Base Monthly Rent and Reserves shall be paid on the first day of each month commencing with the month in which the term of this Sublease commences. If the Commencement Date is on a day other than the first day of a month, Base Monthly Rent and Reserves for such partial month or for any other partial month during the Term, shall be calculated as follows: the full amount of the Base Monthly Rent and Reserves shall be divided by the number of days in such partial month, and the resulting figure shall be multiplied by the number of days in such partial month that fall during the Term.

Subtenant shall pay Sublessor, in addition to the Base Monthly Rent, any Reserves or Impound amounts (as defined in the Lease), and any amounts Sublessor is required to pay to Landlord in excess of Sublessor's Base Monthly Rent pursuant to the Master Lease (as

hereinafter defined), on a monthly basis or as Sublessor may direct Subtenant from time to time (collectively, "Rent").  Subtenant will pay Rent directly to Sublessor.

6.     **AGREEMENT TERMINATION:**  The term of this Sublease will not in any event extend past the termination date or earlier expiration of the Master Lease.  There shall be no holding over under the terms of this Sublease under any circumstances, and upon the termination or earlier expiration of the Master Lease, this Sublease shall terminate concurrently.

7.     **LEASE:**  This Sublease incorporates and is subject to the Master Lease dated November 1st, 2012 (the "Lease") between Joseph Augello Credit Exemption Trust, Robert Augello, Richard Augello, Kathleen Augello, Jacqueline Owen, Michael A. & Anne J. Augello Family Trust, Wayne L. Barnes and Daryl E. Barnes (collectively, the "Landlord") and Sublessor, a copy of which is attached hereto and incorporated herein as if it were set out here at length. Subtenant agrees to assume all of the obligations and responsibilities of Sublessor under the Master Lease for the duration of the Lease. Subtenant shall have no greater rights than Sublessor has under the Master Lease.  Upon termination of the Master Lease, this Sublease shall terminate.

8.     **SOLE AGREEMENT:**  The parties hereby agree that this document contains the entire agreement between the parties and this Sublease Agreement shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto. (Any oral representations made at the time of executing this Sublease are not legally valid, and therefore, are not binding upon either party).

9.     **GOVERNING LAW.**  This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of California.

10.   **ACKNOWLEDGEMENT OF COPY RECEIVED:**  Each party signing this Sublease acknowledges receipt of a copy of the Master Lease.

The parties hereby bind themselves to this agreement by their signatures affixed below on this 1st day of November, 2012.

-Signature Page Follows-

2

Sublessor:

Eretz San Rafael Properties, LLC,
a California limited liability company

By: SYTR REAL ESTATE HOLDINGS,
LLC,
Its Manager

By: _____
     Shlomo Rechnitz, Managing Member

Subtenant:

SAN RAFAEL HEALTHCARE &
WELLNESS CENTRE, LP,
a California limited partnership

By: San Rafael Wellness GP, LLC, Its
Manager

By: _____
     Shlomo Rechnitz, Managing Member

3

# EXHIBIT C

**EXHIBIT C**

**LONG-TERM CARE FACILITY INTEGRATED DISCLOSURE AND MEDI-CAL COST REPORT**

| 8 (1) | Statement of Income - General Fund | | (Audited Data) |
|---|---|---|---|

Facility D.B.A. Name: **EUREKA HEALTHCARE AND REHABILITATION CTR**     OSHPD ID: 206121033

Address: **2353 23RD STREET, EUREKA, CA 95501**     Report Period End: **12/31/2010**

| Line No. | Description | Acct No. | (1) Current Period | (2) Prior Period |
|---|---|---|---|---|
| | **Health Care Revenues** | | | |
| 5 | Gross Routine Services Revenue | Pg 4.2 Col 11 Ln 70 | $ 5,764,354 | $ 4,389,283 |
| 7 | Gross Ancillary Services Revenue | Pg 4.2 Cols 11 + 12 Ln 170 | 2,978,174 | 2,150,765 |
| 10 | Less: Deductions from Revenue | Pg 4.2 Col 1 Ln 240 | 2,066,908 | 837,130 |
| 15 | NET PATIENT SERVICE REVENUE | Ln 5 + Ln 7 - Ln 10 | $ 6,675,620 | $ 5,702,918 |
| 20 | Other Operating Revenue from Health Care Operations | Pg 10.2 Ln 100 | 568 | 2,357 |
| 25 | NET OPERATING REVENUE FROM HEALTH CARE OPERATIONS | Ln 15 + Ln 20 | $ 6,676,188 | $ 5,705,275 |
| | **Health Care Expenses** | | | |
| | **Routine Services** | | | |
| 30 | Skilled Nursing Care | 6110 | $ 2,031,450 | $ 1,848,649 |
| 35 | Intermediate Care | 6120 | | |
| 40 | Mentally Disordered Care | 6130 | | |
| 45 | Developmentally Disabled Care | 6140 | | |
| 50 | Sub-Acute Care | 6150 | | |
| 51 | Sub-Acute Care - Pediatric | 6160 | | |
| 53 | Transitional Inpatient Care | 6170 | | |
| 55 | Hospice Inpatient Care | 6180 | | |
| 60 | Other Routine Services | 6190 | | |
| 65 | TOTAL ROUTINE SERVICES | Lns 30 thru 60 | $ 2,031,450 | $ 1,848,649 |
| | **Ancillary Services** | | | |
| 70 | Patient Supplies | 8100 | $ 42,979 | $ 55,956 |
| 72 | Specialized Support Surfaces | 8150 | 52,628 | 41,258 |
| 75 | Physical Therapy | 8200 | 352,675 | 314,971 |
| 76 | Respiratory Therapy | 8220 | 13,178 | 12,830 |
| 77 | Occupational Therapy | 8250 | 273,705 | 296,057 |
| 78 | Speech Pathology | 8280 | 58,153 | 30,417 |
| 80 | Pharmacy | 8300 | 163,348 | 173,333 |
| 85 | Laboratory | 8400 | 12,232 | 10,655 |
| 90 | Home Health Services | 8800 | | |
| 95 | Other Ancillary Services | 8900 | 29,913 | 17,745 |
| 100 | TOTAL ANCILLARY SERVICES | Lns 70 thru 95 | $ 998,811 | $ 953,222 |
| | **Support Services** | | | |
| 105 | Plant Operations and Maintenance | 6200 | $ 248,022 | $ 266,115 |
| 110 | Housekeeping | 6300 | 127,696 | 103,950 |
| 115 | Laundry and Linen | 6400 | 86,781 | 83,129 |
| 120 | Dietary | 6500 | 382,589 | 325,007 |
| 125 | Social Services | 6600 | 46,474 | 39,147 |
| 130 | Activities | 6700 | 61,447 | 53,687 |
| 135 | Inservice Education - Nursing | 6800 | 111,460 | 104,379 |
| 140 | Administration | 6900 | 1,418,459 | 1,268,490 |
| 145 | TOTAL SUPPORT SERVICES | Lns 105 thru 140 | $ 2,482,928 | $ 2,243,904 |
| | **Property Expenses** | | | |
| 155 | Depreciation and Amortization | 7110 thru 7160 | $ 29,174 | $ 25,813 |
| 160 | Leases and Rentals | 7200 | 333,530 | 326,700 |
| 165 | Property Taxes | 7300 | 27,152 | 26,860 |
| 170 | Property Insurance | 7400 | 22,303 | 25,651 |
| 175 | Interest - Property, Plant, Equipment | 7500 | | |
| 180 | TOTAL PROPERTY EXPENSES | Lns 155 thru 175 | $ 412,159 | $ 405,024 |

CHFC 7041 d-1 & MC530

**LONG-TERM CARE FACILITY INTEGRATED DISCLOSURE AND MEDI-CAL COST REPORT**

| 8 (1) | Statement of Income - General Fund | | (Audited Data) |
|---|---|---|---|

Facility D.B.A. Name: **EUREKA REHABILITATION AND WELLNESS CENTER**    OSHPD ID: 206121033
Address: **2353 23RD STREET, EUREKA, CA 95501**    Report Period End: **10/31/2012**

| Line No. | Description | Acct No. | (1) Current Period | (2) Prior Period |
|---|---|---|---|---|
| | **Health Care Revenues** | | | |
| 5 | Gross Routine Services Revenue | Pg 4.2 Col 11 Ln 70 | $ 7,305,050 | $ 3,606,486 |
| 7 | Gross Ancillary Services Revenue | Pg 4.2 Cols 11 + 12 Ln 170 | 3,271,906 | 1,453,279 |
| 10 | Less: Deductions from Revenue | Pg 4.2 Col 1 Ln 240 | 2,733,393 | 1,003,600 |
| 15 | NET PATIENT SERVICE REVENUE | Ln 5 + Ln 7 - Ln 10 | $ 7,843,563 | $ 4,056,165 |
| 20 | Other Operating Revenue from Health Care Operations | Pg 10.2 Ln 100 | $ 1,514 | $ 535 |
| 25 | NET OPERATING REVENUE FROM HEALTH CARE OPERATIONS | Ln 15 + Ln 20 | $ 7,845,077 | $ 4,056,700 |
| | **Health Care Expenses** | | | |
| | **Routine Services** | | | |
| 30 | Skilled Nursing Care | 6110 | $ 2,453,903 | $ 1,302,327 |
| 35 | Intermediate Care | 6120 | | |
| 40 | Mentally Disordered Care | 6130 | | |
| 45 | Developmentally Disabled Care | 6140 | | |
| 50 | Sub-Acute Care | 6150 | | |
| 51 | Sub-Acute Care - Pediatric | 6160 | | |
| 53 | Transitional Inpatient Care | 6170 | | |
| 55 | Hospice Inpatient Care | 6180 | 0 | |
| 60 | Other Routine Services | 6190 | | |
| 65 | TOTAL ROUTINE SERVICES | Lns 30 thru 60 | $ 2,453,903 | $ 1,302,327 |
| | **Ancillary Services** | | | |
| 70 | Patient Supplies | 8100 | $ 4,439 | $ 28,611 |
| 72 | Specialized Support Surfaces | 8150 | 17,760 | |
| 75 | Physical Therapy | 8200 | 380,190 | 187,526 |
| 76 | Respiratory Therapy | 8220 | 11,534 | 6,312 |
| 77 | Occupational Therapy | 8250 | 277,563 | 144,115 |
| 78 | Speech Pathology | 8280 | 55,777 | 26,513 |
| 80 | Pharmacy | 8300 | 124,636 | 83,083 |
| 85 | Laboratory | 8400 | 8,253 | 2,552 |
| 90 | Home Health Services | 8800 | | |
| 95 | Other Ancillary Services | 8900 | 27,908 | 13,766 |
| 100 | TOTAL ANCILLARY SERVICES | Lns 70 thru 95 | $ 908,060 | $ 492,478 |
| | **Support Services** | | | |
| 105 | Plant Operations and Maintenance | 6200 | $ 321,388 | $ 209,962 |
| 110 | Housekeeping | 6300 | 128,842 | 73,967 |
| 115 | Laundry and Linen | 6400 | 93,166 | 51,447 |
| 120 | Dietary | 6500 | 462,783 | 233,311 |
| 125 | Social Services | 6600 | 39,428 | 24,292 |
| 130 | Activities | 6700 | 74,938 | 36,938 |
| 135 | Inservice Education - Nursing | 6800 | 216,173 | 110,691 |
| 140 | Administration | 6900 | 1,409,058 | 821,810 |
| 145 | TOTAL SUPPORT SERVICES | Lns 105 thru 140 | $ 2,745,776 | $ 1,562,418 |
| | **Property Expenses** | | | |
| 155 | Depreciation and Amortization | 7110 thru 7160 | $ 8,091 | $ 2,081 |
| 160 | Leases and Rentals | 7200 | 827,751 | 450,450 |
| 165 | Property Taxes | 7300 | 28,128 | 15,766 |
| 170 | Property Insurance | 7400 | 17,880 | 10,585 |
| 175 | Interest - Property, Plant, and Equipment | 7500 | | |
| 180 | TOTAL PROPERTY EXPENSES | Lns 155 thru 175 | $ 881,850 | $ 478,872 |

CHFC 7041 d-1 & MC530

**LONG-TERM CARE FACILITY INTEGRATED DISCLOSURE AND MEDI-CAL COST REPORT**

| 3.1 | Related Persons and Organizations and Other Information | (Audited Data) |
|---|---|---|

**Facility D.B.A. Name:** EUREKA REHABILITATION AND WELLNESS CENTER    **OSHPD ID:** 206121033
**Address:** 2353 23RD STREET, EUREKA, CA 95501    **Report Period End:** 10/31/2012

The purpose of this schedule is to identify the facility's transactions during the current reporting period with related persons or organizations related by common ownership or control as defined in Title 42, Code of Federal Regulations (CFR), Section 413.17. For an explanation of related party control see the instructions for this form.

**A) Are there any costs or revenues included in the Statement of Income for the current period which are a result of transactions with related persons or organizations as defined in the instructions? (Exclude compensation of owners and their relatives reported in Item G).**

5   [X] Yes   [ ] No   (If "Yes", complete item A1)

**A1) Related Party Transactions - Statement of Income. List below those transactions referred to in A.**

| Line No. | (1) Account Title | (2) Related Party | (3) Service or Supply | (4) Transaction Amount DR/(CR) |
|---|---|---|---|---|
| 10 | ADMINISTRATION | BOARDWALK FINANCIAL SERVICES | ADMINISTRATIVE SERVICES | $ 36,500 |
| 11 | LEASE AND RENTALS | EUREKA-LET LP | BUILDING LEASE | 827,751 |
| 12 | SKILLED NURSING CARE | TWIN MEDICAL LLC | ROUTINE SUPPLIES | 172,636 |
| 13 | DIETARY/HOUSEKEEPING/LAUNDRY | TWIN MEDICAL LLC | VARIOUS SUPPLIES | 37,754 |
| 14 | | | | |

**B) Are there any assets or liabilities which are included in the Balance Sheet for the current period which are a result of transactions with related persons or organizations as defined in the instructions for this form?**

35   [X] Yes   [ ] No   (If "Yes", complete item B1)

**B1) Related Party Transactions - Balance Sheet. List below those transactions referred to in B.**

| Line No. | (1) Account Title | (2) Related Party | (3) Transaction Amount DR/(CR) |
|---|---|---|---|
| 40 | PAYABLE TO RELATED PARTY | SEAVIEW REHAB & WELLNESS | $ (298,782) |
| 41 | PAYABLE TO RELATED PARTY | FORTUNA REHAB & WELLNESS | (738,553) |
| 42 | PAYABLE TO RELATED PARTY | GRANADA REHAB & WELLNESS | (1,373,969) |
| 43 | PAYABLE TO RELATED PARTY | PACIFIC REHAB & WELLNESS | (656,781) |
| 44 | | | |

**C) Is this facility part of an organization with two or more health facilities under common ownership or control, as defined in the instructions for this form?**

60   [X] Yes   [ ] No   (If "Yes", complete items D and F, if "No" proceed to Item G)

**D) Is this facility a:**

65   OTHER   (Parent, Subsidiary, Division, or Other) (If Subsidiary or Division, complete item E)

**E) Name and Address of Parent Organization**

| | | |
|---|---|---|
| 70 | Name: | |
| 75 | Address: | |
| 76 | City: | |
| 77 | State: | |
| 78 | ZIP Code: | |

**F) Name, Address, and Percent of Ownership of Health Facilities Under Common Ownership or Control**

| Line No. | (1) Name | (2) Address | (3) Percent of Ownership |
|---|---|---|---|
| 80 | 26 OTHER SNF | CA | 100 |
| 81 | | | |
| 82 | | | |
| 83 | | | |
| 84 | | | |
| 85 | | | |
| 86 | | | |
| 87 | | | |
| 88 | | | |
| 89 | | | |

CHFC 7041 h-4 & MC530

**LONG-TERM CARE FACILITY INTEGRATED DISCLOSURE AND MEDI-CAL COST REPORT**

| 8 (1) | Statement of Income - General Fund | | (Submitted Data) |
|---|---|---|---|

Facility D.B.A. Name: **EUREKA REHABILITATION AND WELLNESS CENTER**        OSHPD ID: 206121033
Address: **2353 23RD STREET, EUREKA, CA 95501**        Report Period End: **10/31/2016**

| Line No. | Description | Acct No. | (1) Current Period | (2) Prior Period |
|---|---|---|---|---|
| | **Health Care Revenues** | | | |
| 5 | Gross Routine Services Revenue | Pg 4.2 Col 11 Ln 70 | $ 8,383,950 | $ 7,295,767 |
| 7 | Gross Ancillary Services Revenue | Pg 4.2 Cols 11 + 12 Ln 170 | 2,393,540 | 2,016,486 |
| 10 | Less: Deductions from Revenue | Pg 4.2 Col 1 Ln 240 | 4,163,122 | 3,613,732 |
| 15 | NET PATIENT SERVICE REVENUE | Ln 5 + Ln 7 - Ln 10 | $ 6,614,368 | $ 5,698,521 |
| 20 | Other Operating Revenue from Health Care Operations | Pg 10.2 Ln 100 | 6,564 | 1,896 |
| 25 | NET OPERATING REVENUE FROM HEALTH CARE OPERATIONS | Ln 15 + Ln 20 | $ 6,620,932 | $ 5,700,417 |
| | **Health Care Expenses** | | | |
| | **Routine Services** | | | |
| 30 | Skilled Nursing Care | 6110 | $ 3,323,731 | $ 2,505,801 |
| 35 | Intermediate Care | 6120 | | |
| 40 | Mentally Disordered Care | 6130 | | |
| 45 | Developmentally Disabled Care | 6140 | | |
| 50 | Sub-Acute Care | 6150 | | |
| 51 | Sub-Acute Care - Pediatric | 6160 | | |
| 53 | Transitional Inpatient Care | 6170 | | |
| 55 | Hospice Inpatient Care | 6180 | | |
| 60 | Other Routine Services | 6190 | | |
| 65 | TOTAL ROUTINE SERVICES | Lns 30 thru 60 | $ 3,323,731 | $ 2,505,801 |
| | **Ancillary Services** | | | |
| 70 | Patient Supplies | 8100 | $ 8,976 | $ 9,570 |
| 72 | Specialized Support Surfaces | 8150 | 63,136 | 52,665 |
| 75 | Physical Therapy | 8200 | 252,206 | 247,813 |
| 76 | Respiratory Therapy | 8220 | | |
| 77 | Occupational Therapy | 8250 | 176,483 | 190,645 |
| 78 | Speech Pathology | 8280 | 49,654 | 31,839 |
| 80 | Pharmacy | 8300 | 91,370 | 52,157 |
| 85 | Laboratory | 8400 | 3,671 | 2,463 |
| 90 | Home Health Services | 8800 | | |
| 95 | Other Ancillary Services | 8900 | 16,894 | 22,414 |
| 100 | TOTAL ANCILLARY SERVICES | Lns 70 thru 95 | $ 662,390 | $ 609,566 |
| | **Support Services** | | | |
| 105 | Plant Operations and Maintenance | 6200 | $ 365,620 | $ 351,260 |
| 110 | Housekeeping | 6300 | 151,452 | 145,896 |
| 115 | Laundry and Linen | 6400 | 86,924 | 94,347 |
| 120 | Dietary | 6500 | 449,392 | 410,109 |
| 125 | Social Services | 6600 | 26,352 | 36,772 |
| 130 | Activities | 6700 | 281,654 | 287,138 |
| 135 | Inservice Education - Nursing | 6800 | 190,324 | 193,339 |
| 140 | Administration | 6900 | 1,661,072 | 1,558,456 |
| 145 | TOTAL SUPPORT SERVICES | Lns 105 thru 140 | $ 3,212,790 | $ 3,077,317 |
| | **Property Expenses** | | | |
| 155 | Depreciation and Amortization | 7110 thru 7160 | $ 52,850 | $ 53,774 |
| 160 | Leases and Rentals | 7200 | 890,846 | 864,899 |
| 165 | Property Taxes | 7300 | 29,534 | 29,356 |
| 170 | Property Insurance | 7400 | 17,078 | 18,059 |
| 175 | Interest - Property, Plant, and Equipment | 7500 | | |
| 180 | TOTAL PROPERTY EXPENSES | Lns 155 thru 175 | $ 990,308 | $ 966,088 |

CHFC 7041 d-1 & MC530

**LONG-TERM CARE FACILITY INTEGRATED DISCLOSURE AND MEDI-CAL COST REPORT**

| 3.1 | Related Persons and Organizations and Other Information | (Submitted Data) |
|---|---|---|

**Facility D.B.A. Name:** EUREKA REHABILITATION AND WELLNESS CENTER      **OSHPD ID:** 206121033

**Address:** 2353 23RD STREET, EUREKA, CA 95501     **Report Period End:** 10/31/2016

The purpose of this schedule is to identify the facility's transactions during the current reporting period with related persons or organizations related by common ownership or control as defined in Title 42, Code of Federal Regulations (CFR), Section 413.17. For an explanation of related party control see the instructions for this form.

**A)** Are there any costs or revenues included in the Statement of Income for the current period which are a result of transactions with related persons or organizations as defined in the instructions? (Exclude compensation of owners and their relatives reported in Item G).

5   [X] Yes    [ ] No (If "Yes", complete item A1)

**A1)** Related Party Transactions - Statement of Income. List below those transactions referred to in A.

| Line No. | (1) Account Title | (2) Related Party | (3) Service or Supply | (4) Transaction Amount DR/(CR) |
|---|---|---|---|---|
| 10 | ADMINISTRATION | BOARDWALK FINANCIAL SVCS, LLC | ADMINISTRATIVE SERVICES | $ 42,000 |
| 11 | LEASE AND RENTALS | EUREKA-LET LP | BUILDING LEASE | 890,846 |
| 12 | SKILLED NURSING CARE | TWIN MED, LLC | ROUTINE SUPPLIES | 111,992 |
| 13 | LAUNDRY/PLANT OP/DIETARY/HSKPG | TWIN MED, LLC | VARIOUS SUPPLIES | 5,389 |
| 14 | INTEREST- OTHER | SR CAPITAL LLC, YTR CAPTAL LLC | INTEREST EXPENSE | 171,938 |

**B)** Are there any assets or liabilities which are included in the Balance Sheet for the current period which are a result of transactions with related persons or organizations as defined in the instructions for this form?

35   [X] Yes    [ ] No (If "Yes", complete item B1)

**B1)** Related Party Transactions - Balance Sheet. List below those transactions referred to in B.

| Line No. | (1) Account Title | (2) Related Party | (3) Transaction Amount DR/(CR) |
|---|---|---|---|
| 40 | PAYABLE TO RELATED PARTY | SEAVIEW REHAB & WELLNESS | $ 150,715 |
| 41 | PAYABLE TO RELATED PARTY | FORTUNA REHAB & WELLNESS | 44,133 |
| 42 | PAYABLE TO RELATED PARTY | GRANADA REHAB & WELLNESS | (381,968) |
| 43 | PAYABLE TO RELATED PARTY | PACIFIC REHAB & WELLNESS | 16,747 |
| 44 | PAYABLE TO RELATED PARTY | SR CAP. LLC | YTR CAP. LLC | (2,180,000) |

**C)** Is this facility part of an organization with two or more health facilities under common ownership or control, as defined in the instructions for this form?

60   [X] Yes    [ ] No (If "Yes", complete items D and F, if "No" proceed to Item G)

**D)** Is this facility a:

65   OTHER (Parent, Subsidiary, Division, or Other) (If Subsidiary or Division, complete item E)

**E) Name and Address of Parent Organization**

| | |
|---|---|
| 70 | Name: |
| 75 | Address: |
| 76 | City: |
| 77 | State: |
| 78 | ZIP Code: |

**F) Name, Address, and Percent of Ownership of Health Facilities Under Common Ownership or Control**

| Line No. | (1) Name | (2) Address | (3) Percent of Ownership |
|---|---|---|---|
| 80 | 81 NURSING FACILITIES | | |
| 81 | LIST ON FILE W/ OSHPD | | |
| 82 | | | |
| 83 | | | |
| 84 | | | |
| 85 | | | |
| 86 | | | |
| 87 | | | |
| 88 | | | |
| 89 | | | |

CHFC 7041 h-4 & MC530

# EXHIBIT D

**EXHIBIT D**

FORM APPROVED

Accepted DP Nov/06/2013

UNITED STATES OF AMERICA DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION-MIKE MONRONEY AERONAUTICAL CENTER
AIRCRAFT REGISTRATION APPLICATION

**CERT: ISSUE DATE**

UNITED STATES
REGISTRATION NUMBER  N  719SA

AIRCRAFT MANUFACTURER & MODEL

Gulfstream Aerospace Model G-IV

AIRCRAFT SERIAL No.
1155

**FOR FAA USE ONLY**

TYPE OF REGISTRATION (Check One box)

☐ 1. Individual   ☐ 2. Partnership   ☒ 3. Corporation   ☐ 4. Co-Owner   ☐ 5. Government
☐ 8. Non-Citizen Corporation   ☐ 9. Non-Citizen Corporation Co-Owner

NAME OR APPLICANT (Person(s) shown on evidence of ownership. If individual, give last name, first name, and middle initial.)

SR Administrative Services, LLC

TELEPHONE NUMBER: (818) 989-2900

ADDRESS (Permanent mailing address for first applicant on list) (If P.O. Box is used, physical address must also be shown.)

c/o Clay Lacy Aviation, Inc.

Number and street: 7435 Valjean Avenue

Rural Route:          P.O. Box:

| CITY | STATE | ZIP CODE |
|------|-------|----------|
| Van Nuys | California | 91406 |

☐ **CHECK HERE IF YOU ARE ONLY REPORTING A CHANGE OF ADDRESS**
**ATTENTION! Read the following statement before signing this application.**
**This portion MUST be completed.**

A false or dishonest answer to any question in this application may be grounds for punishment by fine and/or imprisonment
(U.S. Code, Title 18, Sec. 1001).

## CERTIFICATION

I/WE CERTIFY:

(1) That the above aircraft is owned by the undersigned applicant, who is a citizen (including corporations)
of the United States.

(For voting trust, give name of trustee: _____ ), or:

CHECK ONE AS APPROPRIATE:

a. ☐ A resident alien, with alien registration (Form 1-151 or Form 1-551) No. _____

b. ☐ A non-citizen corporation organized and doing business under the laws of (state) _____
and said aircraft is based and primarily used in the United States. Records or flight hours are available for
inspection at _____

(2) That the aircraft is not registered under the laws of any foreign country; and

(3) That legal evidence of ownership is attached or has been filed with the Federal Aviation Administration.

NOTE: If executed for co-ownership all applicants must sign. Use reverse side if necessary.

TYPE OR PRINT NAME BELOW SIGNATURE

| EACH PART OF THIS APPLICATION MUST BE SIGNED IN INK. | SIGNATURE | TITLE | DATE |
|---|---|---|---|
| | Shlomo Rechnitz | Managing Member ~~Manager~~ of | 9/17/13 |
| | | SR Capital, LLC- it's sole Member | 9-20-13 |
| | | and manager | |

NOTE Pending receipt of the Certificate of Aircraft Registration, the aircraft may be operated for a period not in excess of 90
days, during which time the PINK copy of this application must be carried in the aircraft.

AC Form 8050-1 (5/12) (NSN 0052-00-628-9007)

FILED WITH FAA
AIRCRAFT REGISTRATION BR

2013 SEP 20 PM 12 41

OKLAHOMA CITY
OKLAHOMA

# EXHIBIT E

**EXHIBIT E**



State of California -- Health and Human Services Agency
# California Department of Public Health



KAREN L. SMITH, MD, MPH
*Director and State Public Health Officer*

EDMUND G. BROWN JR.
*Governor*

## NURSING HOURS PER PATIENT DAY ADMINISTRATIVE PENALTY NOTICE

June 8, 2017                                                    <u>**CERTIFIED MAIL**</u>

San Rafael Healthcare & Wellness Centre, Lp
1601 5th Street
San Rafael, CA 94901-1808

Dear San Rafael Healthcare & Wellness Centre, Lp:

**Facility ID:  010000936**                          **Penalty Number: 110013245**

The California Department of Public Health has determined the following facility failed to maintain the 3.2 Nursing Hours per Patient Day (NHPPD) as required by Health and Safety Code (HSC) Section 1276.5:

San Rafael Healthcare & Wellness Center, Lp
1601 5th Ave
San Rafael, CA 94901-1808

This determination is based upon findings during a staffing visit done September 27, 2016, which is hereby incorporated by reference into this notice.

Pursuant to California Welfare and Institutions (W&I) Code Section 14126.022, the Department hereby assesses an administrative penalty of $15,000 based on the facility's failure to meet the HSC 1276.5 requirements between 5 and 49 percent of the audited days.

For accurate and timely processing, include the facility ID and penalty number on the check. Please submit the payment to the following address:

Department of Public Health
Licensing and Certification
Grant & Fiscal Assessment Unit, MS 3202
P.O. Box 997434
Sacramento, CA 95899-7434



San Rafael Healthcare & Wellness Centre, Lp
Page 2
June 8, 2017

Pursuant to W&I Code Section 14126.022(f)(2)(C)(i), a facility may request a hearing as follows:

A written request in accordance with Section 3(b) of All Facilities Letter (AFL) 11-20 shall be filed with the Department of Health Care Services, with a copy served on the Department of Public Health, within 15 days of the receipt of the written notice of the audit or examination findings. The request shall be sent by facsimile or regular mail to the following:

Office of Administrative Hearings and Appeals
1029 J Street, Suite 200, MS 0016
Sacramento, CA 95814
Facsimile (916) 323-4477

And

Department of Public Health
Office of Legal Services
Attention: Tara Stratton
1415 L Street, Suite 500
Sacramento, CA 95899-7377
Facsimile (916) 440-5513

If you have any questions regarding this notice, you may contact me at (916) 552-8900 or via email at CDPHL&CStaffingAudits@cdph.ca.gov.

Sincerely

Muree Larson-Bright
Chief, Staffing Audits and Research Branch

Enclosure:    AFL 11-20

cc:    Santa Rosa/Redwood Coast District Office
       2170 Northpoint Parkway
       Santa Rosa, CA. 95407

       Administrator Abby C Ma
       San Rafael Healthcare & Wellness Center, Lp
       1601 5th Ave
       San Rafael, CA 94901-1808

San Rafael Healthcare & Wellness Centre, Lp
Page 3
June 8, 2017

cc, cont.:

       Tze Ming U, Assistant Chief Counsel
       California Department of Public Health
       1415 L Street, Suite 500
       Sacramento, CA 95814

       Cliff Donaldson, AGPA
       California Department of Public Health
       Licensing and Certification
       Grant & Fiscal Assessment Unit, MS 3202
       P.O. Box 997434
       Sacramento, CA 95899-7434

# EXHIBIT F

**EXHIBIT F**

KAMALA D. HARRIS
Attorney General of California
JENNIFER KIM
Supervising Deputy Attorney General
ELISA B. WOLFE-DONATO
KENNETH K. WANG
Deputy Attorneys General
State Bar No. 120357
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013-1256
 Telephone: (213) 897-0633
 Fax: (213) 897-5775
 E-mail: Elisa.Wolfe@doj.ca.gov
*Attorneys for California Department of Health Care
Services and California Department of Public Health*

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| **In re:** | Case No. 8:14-bk-11335-CB |
| | Jointly administered with |
| | Case No. 8:14-bk-11337-CB |
| | Case No. 8:14-bk-11358-CB |
| | Case No. 8:14-bk-11359-CB |
| | Case No. 8:14-bk-11360-CB |
| **PLAZA HEALTHCARE** | Case No. 8:14-bk-11361-CB |
| **CENTER LLC,** | Case No. 8:14-bk-11362-CB |
| | Case No. 8:14-bk-11363-CB |
| | Case No. 8:14-bk-11364-CB |
| | Case No. 8:14-bk-11365-CB |
| Debtor and Debtor-in- | Case No. 8:14-bk-11366-CB |
| Possession. | Case No. 8:14-bk-11367-CB |
| | Case No. 8:14-bk-11368-CB |
| /x/ Affects all Debtors. | Case No. 8:14-bk-11370-CB |
| | Case No. 8:14-bk-11371-CB |
| | Case No. 8:14-bk-11372-CB |
| | Case No. 8:14-bk-11373-CB |
| | Case No. 8:14-bk-11375-CB |
| | Case No. 8:14-bk-11376-CB |
| | |
| | **EMERGENCY MOTION TO DISQUALIFY** |
| | **STALKING HORSE PARTIES FROM** |
| | **(1) INTERIM MANAGEMENT OF DEBTORS'** |
| | **FACILITIES, AND (2) PURCHASING** |
| | **DEBTORS' FACILITIES OR ASSETS** |
| | |
| | Courtroom:  5-D |
| | Judge      Hon. Catherine Bauer |

1

1          Pursuant to Local Bankruptcy Rules 2081-1(a)(12) and 9075-1, the

2    California Department of Health Care Services ("**DHCS**") and the California

3    Department of Public Health ("**CDPH**") hereby move on an emergency basis for an

4    order disqualifying the Stalking Horse Parties from (1) the interim management of

5    any of the Debtors' skilled nursing facilities, and (2) purchasing any of the Debtors'

6    skilled nursing facilities or assets.

7          There are five grounds for this motion:

8    1.    **RECHNITZ IS A VIOLATOR OF INDUSTRY LAWS AND**

9    **REGULATIONS**. The principal individual behind the Stalking Horse Parties is

10   Shlomo Rechnitz.  Rechnitz and his companies (Brius Management Company and

11   Brius LLC) have a history of failing to comply with laws and regulations enforced

12   by DHCS and the federal Centers for Medicare and Medicaid Services ("**CMS**").

13   Specifically - -

14         A:    Rechnitz and his companies currently own 57 skilled nursing

15   facilities.

16         B:    In October 2013, DHCS issued an enforcement order which has

17   been and is continuing to cause the withholding of 100% of Medi-Cal payments to

18   two of Rechnitz's skilled nursing facilities.  This order was imposed because

19   Rechnitz repeatedly and continuously failed or refused to submit required audit

20   materials to DHCS.

21         C:    ***Within the last week***, DHCS issued a new enforcement order which

22   threatens to withhold 20% of Rechnitz's Medi-Cal payments for the remaining 55

23   of his 57 skilled nursing facilities.  This order is being imposed because Rechnitz

24   has again failed or refused to submit required audit materials to DHCS.

25         D:    In or around April 2014, the federal CMS issued an enforcement

26   order to one of Rechnitz's skilled nursing facilities.  This federal enforcement order

27   seeks to (i) deny payment for new admissions; (ii) impose civil monetary penalties;

28   and (iii) terminate the facility's Medicare provider agreement no later than October

1  2, 2014, if substantial compliance with Medicare participation requirements is not

2  promptly achieved and maintained.

3       E:  Rechnitz's continued and repeated refusals to comply with industry

4  laws and regulations is harming the skilled nursing industry.

5      2.  **RECENT ENFORCEMENT ACTIONS WILL HARM**

6  **RECHNITZ'S FINANCIAL STABILITY.**  The financial impact of these

7  enforcement orders will hurt Rechnitz's operational revenue.  Accordingly, he will

8  have less income with which to provide quality patient care.

9      3.  **RECHNITZ PROBABLY WON'T BE ABLE TO GET**

10  **REGULATORY APPROVAL TO BE A MEDI-CAL PROVIDER.**  The

11  pending sale promises to entrust Rechnitz with another 19 skilled nursing facilities.

12  However, because of Rechnitz's history of enforcement activity with DHCS, DHCS

13  is unlikely to approve a transfer of Medi-Cal provider contracts from Debtors to

14  Rechnitz.

15      4.  **RECHNITZ PROBABLY WON'T BE ABLE TO GET**

16  **REGULATORY APPROVAL TO OPERATE DEBTORS' SKILLED**

17  **NURSING FACILITIES.**  Additionally, for Rechnitz to become licensed to

18  operate Debtors' 19 skilled nursing facilities, Rechnitz must meet a "good

19  character" requirement.  CDPH is unlikely to grant licensure to Rechnitz because he

20  will be unable to satisfy the "good character" requirement.

21      5.  **THIS COURT SHOULD NOT PERMIT AN UNQUALIFIED**

22  **BUYER TO TAKE OVER DEBTORS' 19 SKILLED NURSING**

23  **FACILITIES.**  Because (i) Rechnitz tends to not comply with regulatory

24  requirements, (ii) Rechnitz's revenue is being markedly reduced and could

25  compromise patient care, (iii) Rechnitz is unlikely to be approved as a Medi-Cal

26  provider for Debtors' facilities, and (iv) Rechnitz is unlikely to be licensed to

27  operate Debtors' facilities, this Court should not allow Rechnitz to manage

28

1   Debtors' skilled nursing facilities on an interim basis, and should not approve

2   Rechnitz's purchase of Debtors' facilities or assets.

3

4        The grounds for this motion are supported by the appended declarations from

5   the following individuals:

6            1.  Jean Iacino, Interim Deputy Director for the Center for Health Care

7   Quality at the California Department of Public Health.

8            2.  Bob Sands, Assistant Deputy Director of Audits and Investigations

9   ("**A&I**") at the California Department of Health Care Services.

10

11       A separate declaration re notice and service of process will be provided at the

12  time of hearing.

13

14            **MEMORANDUM OF POINTS AND AUTHORITIES**

15       Local Bankruptcy Rule 2081-1(a)(12) provides that a movant may request

16  emergency or expedited relief where special circumstances exist.  Moreover, "The

17  motion must be supported by evidence that exigent circumstances exist justifying

18  an expedited hearing."  Here, the special circumstances are that Shlomo Rechnitz, a

19  serial violator of rules within the skilled nursing industry, is slated to take over

20  interim management of Debtors' 19 skilled nursing facilities on September 1, 2014,

21  i.e., in four days.  Because of his multiple enforcement actions and repeated

22  violations of regulatory authority, Rechnitz is not qualified to assume such an

23  important role.  During the last week, the regulatory situation involving Rechnitz

24  suddenly became markedly worse: he was the subject of a new DHCS enforcement

25  action which threatens to hold back 20% of his Medi-Cal payments for 55 of his 57

26  skilled nursing facilities.  This new enforcement action, when it goes into effect on

27  September 22, 2014, will affect Rechnitz's business revenue and threaten his ability

28  to deliver high quality patient care.  The appended declarations of Jean Iacino and

4

1  Bob Sands establish the background facts and circumstances which give rise to the

2  special circumstances and the threat to patient care created by Rechnitz.

3      Local Bankruptcy Rule 9075-1, subdivision (a), sets forth the requirement for

4  bringing an emergency motion. The moving parties have met, or are in the process

5  of meeting these requirements.

6

7      Wherefore, the California Department of Health Care Services and the

8  California Department of Public Health urge this Honorable Court to (i) allow the

9  instant motion to be heard on an emergency basis, (ii) disqualify the Stalking Horse

10  Parties/ Bidder from taking over the interim management of Debtors' 19 skilled

11  nursing facilities, and (iii) disqualify the Stalking Horse Parties/ Bidder from

12  purchasing Debtors' 19 skilled nursing facilities or the assets thereof.

13

14  Dated: August 28, 2014                    Respectfully submitted,

15                                            KAMALA D. HARRIS
                                             Attorney General of California
16                                            JENNIFER KIM
                                             DIANE S. SHAW
17                                            Supervising Deputy Attorneys General

18

19                                            /s/ *Elisa B. Wolfe-Donato*
                                             ELISA B. WOLFE-DONATO
20                                            Deputy Attorney General
                                             *Attorneys for California Department*
21                                            *of Health Care Services and*
                                             *California Department of Public*
22                                            *Health*

23

24

25

26

27

28

5

**DECLARATION OF JEAN IACINO
IN SUPPORT OF EMERGENCY MOTION TO
DISQUALIFY STALKING HORSE PARTIES FROM (1) INTERIM
MANAGEMENT OF DEBTORS' FACILITIES, AND (2) PURCHASING
DEBTORS' FACILITIES OR ASSETS**

I, Jean Iacino, declare as follows:

1.      I have personal knowledge of the following facts, and I am competent to testify to their truth, under oath, if called as a witness.

2.      I am the Interim Deputy Director for the Center for Health Care Quality at the California Department of Public Health (CDPH).

3.      CDPH is responsible for overseeing and regulating skilled nursing facilities for the protection of the health and safety of the residents.  As the Interim Deputy Director for the Center for Health Care Quality, I am responsible for developing, implementing, and enforcing programs to protect patient health and safety; ensuring quality health care for patients, clients and residents in health facilities; and ensuring the quality of healthcare staff and professionals who work in health facilities through licensing, examination, inspection, education, and proficiency testing.

4.      I am familiar with Shlomo Rechnitz (Rechnitz) and his corporate entities, Brius Management Company and Brius LLC (collectively as Brius). Rechnitz currently owns and controls fifty-seven (57) skilled nursing facilities licensed by CDPH.

5.      On Tuesday, August 26, 2014, the Department of Health Care Services (DHCS) notified me that (i) Rechnitz and Brius have refused to provide necessary audit documentation to DHCS after being given many opportunities to do so, and that (ii) on August 22, 2014, DHCS notified Rechnitz's counsel, Mark Johnson of Hooper, Lundy, and Bookman, P.C., that DHCS will commence withholds of twenty percent (20%) of Medi-Cal funding from fifty-five (55) skilled nursing facilities owned and controlled by Rechnitz, if the requested documentation is not provided to DHCS by September 22, 2104.  In my experience and observation, this

2

1  near across-the-board 20% withholding of Medi-Cal payments is a significant,

2  serious enforcement action by DHCS.

3        6.    Also on August 26, 2014, I learned that in October 2013, DHCS

4  imposed a one hundred percent (100%) withhold of Medi-Cal funding upon the two

5  other skilled nursing facilities controlled and owned by Rechnitz for their repeated

6  and ongoing refusal and failure to file a cost report for the 2012 cost reporting year.

7  The repeated and ongoing failure and refusal to file the necessary cost reports for

8  the 2012 year has delayed DHCS's ability to complete its audit of the fifty-seven

9  (57) facilities owned and controlled by Rechnitz and has impeded DHCS's ability

10  to establish the NF B (continuous nursing care) nursing rates for the new rate year

11  that started on August 1, 2014. This is a very serious violation that creates

12  significant harm to the State of California and the skilled nursing community.

13        7.    I have reviewed the events leading to the imposition of the current one

14  hundred percent (100%) withhold of Medi-Cal funding to two facilities, and the

15  pending twenty percent (20%) withhold of that funding from fifty-five facilities.

16  Rechnitz's conduct shows repeated and ongoing disregard for regulatory

17  requirements.

18        8.    Given the significant number and portion of the current and future

19  Medi-Cal funding withhold, CDPH has grave concerns, in the instant case, about

20  the pending sale of additional facilities to Rechnitz.

21        9.    A reduction of Medi-Cal funding to Rechnitz's currently-owned group

22  of fifty-seven (57) skilled nursing facilities could seriously jeopardize the services

23  and compromise the care provided to residents at those facilities, as well as at any

24  new facilities that Rechnitz may acquire.

25        10.    I recently became aware that the federal Centers for Medicare &

26  Medicaid Services (CMS) has taken several enforcement actions against a facility

27  owned and controlled by Rechnitz – Gridley Healthcare & Wellness Centre LLC –

28  for substantial noncompliance with federal requirements for participation in the

3

Medicare and/or Medicaid programs. The CMS enforcement actions include:

- denial of payment for new admissions;

- civil monetary penalties; and

- termination of the facility's Medicare provider agreement no later than October 2, 2014, if substantial compliance with Medicare participation requirements is not promptly achieved and maintained.

11.    These developments and enforcement actions by both state and federal agencies raise significant concerns as to the wisdom of the sale of additional skilled nursing facilities to Rechnitz. Chief among those concerns is the safety of placing additional residents under the care of Rechnitz and his corporate entities, even on a temporary basis, given their demonstrated record of repeated and ongoing noncompliance with state and federal regulatory requirements, and resultant enforcement actions.

12.    Furthermore, as the state licensing agency for skilled nursing facilities, CDPH is required by section 1265 of the California Health and Safety Code (West 2006) to consider several factors in making its decisions to grant or deny licensure. One of those factors is the demonstration by the applicant of reputable and responsible character. Rechnitz's failure to cooperate fully with DHCS and CMS creates great doubt as to whether Rechnitz can satisfy this "good character" requirement.

13.    I make this declaration in my official capacity.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed on August 28, 2014, at Sacramento, California.

Jean Iacino
Declarant

4

### DECLARATION OF BOB SANDS IN SUPPORT OF EMERGENCY MOTION TO DISQUALIFY STALKING HORSE PARTIES FROM (1) INTERIM MANAGEMENT OF DEBTORS' FACILITIES, AND (2) PURCHASING DEBTORS' FACILITIES OR ASSETS

I, Robert Sands, declare as follows:

1.     I have personal knowledge of the following facts, and I am competent to testify to their truth, under oath, if called as a witness.

2.     I am employed as the Assistant Deputy Director of Audits and Investigations (A&I), California Department of Health Care Services (DHCS). As the Assistant Deputy Director of A&I, I am responsible for directing and overseeing the audit and investigations operations of A&I.

3.     On September 4, 2013, DHCS sent the first letter to Brius Management Company (Brius) regarding the placement of Highland Park and Brighton Place Spring Valley (Brighton) on twenty percent withhold for failure to file a home office cost report.

4.     On October 10, 2013, DHCS sent the second letter to Brius Management Company regarding the placement of Highland Park and Brighton on one hundred percent withhold for failure to file a home office cost report.

5.     On October 30, 2013, DHCS and Axiom Healthcare (Axiom - cost report preparer) exchanged e-mails regarding the filing of a home office cost report for Brius Management Company.

6.     On December 20, 2013, DHCS sent a letter to Mr. Mike Lesnick of Axiom, which stated that Highland Park and Brighton will remain on withhold pending the filing of a home office cost report as required under Title 42, Code of Federal Regulations, Section 413.24 and CMS Pub. 15-1, Section 2413, for Brius. The letter listed five specific items for Axiom to submit along with the home office cost report. Among the items requested was a full disclosure of all facilities owned

1  by Shlomo Rechnitz (Rechnitz).  In prior years, Axiom had not disclosed to the

2  audit staff all of the facilities owned by Mr. Rechnitz.

3       7.    On January 29, 2014, DHCS held a telephone conference with Mr.

4  Rechnitz's representative, Mike Lesnick of Axiom (Lesnick) and Mark Johnson of

5  Hooper, Lundy, and Bookman (Johnson) to discuss the facilities on withhold.  Both

6  parties agreed that Mr. Rechnitz's operations need to be reviewed on a global basis

7  which would a home office cost report that incorporated all of the various regional

8  offices such as Boardwalk West Financial Services LLC (Boardwalk), Citrus

9  Wellness LLC (Citrus), Core Healthcare Centers LLC (Core), and all the related

10  party transactions such as Twin Med and JI Medical.  Mr. Lesnick stated that he

11  would give DHCS a proposal for a global home office cost report.  To date, Mr.

12  Lesnick has not submitted a proposal for a global home office cost report.

13       8.    On February 6, 2014, DHCS received a home office cost report for

14  Brius and a home office cost report for Brius LLC.  The two home office cost

15  reports disclose no assets, no liabilities, no income, and no expense for either Brius

16  or Brius LLC.

17       9.    On February 7, 2014, DHCS informed Mr. Johnson that the auditors

18  found fees for Rockport Healthcare Services (Rockport) during the review of the

19  2012 cost report and inquired if a home office cost report would be filed for

20  Rockport.

21       10.    On February 7, 2014, Mr. Johnson stated that Rockport is an

22  administrative service company that provides various consulting and administrative

23  services to facilities in which Mr. Rechnitz had an ownership interest.  Neither Mr.

24  Rechnitz nor anyone related to Mr. Rechnitz had any ownership interest in

25  Rockport.

26       11.    On February 14, 2014, DHCS asked Mr. Johnson if a home office cost

27  report for Rockport would be filed and if not, why not.  DHCS also asked if

28

3

1    Rockport is a related party and that the issue of related party through control must

2    be addressed. Mr. Johnson did not believe Rockport was a related party.

3        12.     On February 18, 2014, DHCS sent Mr. Johnson a request for nine

4    specific items to document the relationship between Rockport and Mr. Rechnitz.

5    There was no response.

6        13.     On February 24, 2014, DHCS e-mailed Mr. Johnson regarding the

7    status of the home office documentation. Again, there was no response.

8        14.     On March 7, 2014, DHCS again e-mailed Mr. Johnson regarding the

9    status of the home office documentation, for which it did not receive a response

10       15.     On March 17, 2014, DHCS, once again, e-mailed Mr. Johnson

11    regarding the status of home office documentation, again, DHCS did no receive a

12    response.

13       16.     On March 24, 2014, DHCS formally requested from Mr. Johnson that

14    a home office cost report be filed for Rockport.

15       17.     On March 31, 2014, Mr. Johnson wrote to respond to DHCS's

16    December 20, 2013 letter. The response included a list of fifty-eight facilities in

17    which Mr. Rechnitz had an ownership interest and a list of business entities in

18    which Mr. Rechnitz had an ownership interest. This is the first time the number of

19    facilities owned by Mr. Rechnitz was disclosed to DHCS's Financial Audits

20    Branch.

21       18.     Mr. Johnson's March 31, 2014 letter claimed that Rockport was not a

22    related party and directed DHCS to contact Foley Hoag (Hoag), the attorney for

23    Rockport for any questions related to Rockport. The letter stated, "We are

24    informed that Rockport Healthcare Services, LLC ("Rockport") is owned by Steven

25    Stroll and Marsha Stroll, each as individuals." The letter also disclosed that Steven

26    Stroll was Mr. Rechnitz's certified public account and had been providing tax

27    services to Mr. Rechnitz since 1998.

28

1   19. On April 8, 2014, DHCS contacted Mr. Hoag and requested

2 documentation regarding the relationship between Rockport and Mr. Rechnitz.

3 DHCS also requested an explanation on why Rockport was not a related party to

4 Mr. Rechnitz and to specifically address the issue of relationship through control.

5   20. On April 9, 2014, DHCS e-mailed Mr. Johnson regarding his March

6 31, 2014 letter.  DHCS inquired about the relationship of Rechnitz to Boardwalk

7 and Citrus and if a home office cost report should be filed for the two entities.

8 DHCS also inquired if the related party profit had been removed from the filed cost

9 reports at the facilities.  DHCS asked some additional questions regarding the

10 relationship of Mr. Rechnitz to Rockport and requested documentation of the

11 related party costs for facility lease expense.

12   21. On April 22, 2014, DHCS inquired on the status of its April 9, 2014

13 request.

14   22. On the same day, DHCS also inquired with Mr. Hoag regarding the

15 status of its April 8, 2014 request for the documentation related to Rockport.

16   23. On April 23, 2014, Mr. Johnson requested clarification on the

17 outstanding documentation requests and inquired about removing the withholds

18 from the two facilities.

19   24. On April 29, 2014, DHCS inquired with Mr. Hoag regarding the status

20 of its April 8, 2014 request for the documentation related to Rockport.

21   25. On April 30, 2014, DHCS reminded Mr. Johnson that, on January 29,

22 2014, he and Mr. Lesnick agreed that the review of Mr. Rechnitz's operations

23 should be on a global basis and that Mr. Lesnick was going to present a

24 proposal for a global home office cost report that incorporated all the regional

25 offices and the related party transactions.  DHCS informed Mr. Johnson that the

26 two Brius home office cost reports were incomplete and inconsistent with other

27 information previously disclosed.  Specifically, the two home office cost reports

28 failed to disclose any assets, liabilities, equity, income, or expense.  Mr. Johnson

<div align="center">5</div>

1  was informed that the two Brius home office cost reports did not constitute proper

2  home office cost reports and the Highland Park and Brighton facilities would

3  remain on a one hundred percent withhold.

4      26.    On May 15, 2014, DHCS held a telephonic conference with Mr.

5  Johnson to clarify the outstanding document requests and the need to file home

6  office cost reports.

7      27.    On May 15, 2014, DHCS inquired with Mr. Hoag regarding its April

8  8, 2014 request for the Rockport documentation.

9      28.    On May 22, 2014, DHCS again inquired with Mr. Hoag regarding its

10  April 8, 2014 request for the Rockport documentation.

11      29.    On May 28, 2014, Mr. Johnson wrote to DHCS, stating that

12  Boardwalk and Citrus are related parties and that home office cost reports should

13  have been filed but were not. Mr. Johnson's letter also stated that the related party

14  profit for Boardwalk and Citrus were not eliminated on the filed facilities' cost

15  reports. The same letter also stated that Mr. Stroll was not Mr. Rechnitz's agent.

16  However, the statement is contrary to the records at the Secretary of State's Office.

17      30.    On June 4, 2014, Mr. Hoag confirmed that Mr. Stroll is the owner of

18  Rockport, that Rockport provides services to all fifty-eight of Mr. Rechnitz's

19  facilities and three non-Rechnitz-owned facilities.

20      31.    On August 22, 2014, DHCS sent a formal letter to Mr. Johnson that

21  the failure of Mr. Rechnitz to submit a home office cost report for Rockport,

22  Boardwalk, and Citrus has impeded the State's ability to complete the audits of 57

23  nursing facilities and to establish NF B rates when the rate year started on August 1,

24  2014. If the home office cost reports are not received by September 22, 2014,

25  DHCS will place 55 facilities on 20% withhold under Title 42, Code of Federal

26  Regulations, Section 413.24 and CMS Pub. 15-1, Section 2413. The two facilities

27  currently on 100% withhold will remain on 100% withhold.

28

1       32.   If DHCS does not to receive Rockport, Boardwalk, and Citrus home

2    office cost reports by September 22, 2014, DHCS will place 100% withhold to all

3    55 facilities, all interim payments since the beginning of the cost reporting period

4    can be deemed overpayments per CMS. Pub. 15-1, Section 100.

5       33.   If Rechnitz does not submit the Rockport, Boardwalk, Citrus home

6    office cost reports after the 100% withhold, DHCS can take administrative action to

7    temporarily suspend the facilities from providing Medi-Cal services.

8       34.   Given the significant degree of non-compliance by Rechnitz in

9    submitting home office cost reports, DHCS has grave concerns, in the instant case,

10    about the pending sale of additional facilities.

11       I declare under penalty of perjury of the laws of the State of California that the

12    foregoing is true and correct.

13       Executed on August _28_, 2014, at _Sacramento_ California.

14

15

16                        Bob Sands

                      Declarant

17

18

19

20

21

22

23

24

25

26

27

28

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 300 South Spring Streeet, Room 1072, Los Angeles, CA 90012.

A true and correct copy of the foregoing document described **EMERGENCY MOTION TO DISQUALIFY STALKING HORSE PARTIES FROM (1) INTERIM MANAGEMENT OF DEBTORS' FACILITIES , AND (2) PURCHASING DEBTORS' FACILITIES OR ASSETS** _____ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 28, 2014,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below


SEE ATTACHED SERVICE LIST

[X] Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On **August 28, 2014,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.


SEE ATTACHED SERVICE LIST

[X] Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 28, 2014,** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Honorable Catherine E. Bauer                    **(VIA OVERNIGHT MAIL)**
U.S. Bankruptcy Court, Courtroom 365
411 W. Fourth Street, Suite 2030, Santa Ana, CA  92701-4593
☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 28, 2014 | Evelyn Mendoza | /s/ Evelyn Mendoza |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

I. __TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")__

- **Michael A Abramson maa@abramsonlawgroup.com**
- **Russell S Balisok balisok@stopelderabuse.org**
- **Robert D Bass rbass@greenbass.com**
- **Ron Bender rb@lnbyb.com**
- **Richard S Berger rberger@lgbfirm.com,**
  **marizaga@lgbfirm.com;ncereseto@lgbfirm.com;msutton@lgbfirm.com**
- **Manuel A Boigues bankruptcycourtnotices@unioncounsel.net**
- **Matthew Borden borden@braunhagey.com, fair@braunhagey.com**
- **Michael J Bujold Michael.J.Bujold@usdoj.gov**
- **Steven Casselberry scasselberry@mrllp.com, jjacobs@mrllp.com**
- **Cheryl S Chang Chang@Blankrome.com, Lalocke@Blankrome.com;RMerten@Blankrome.com**
- **Baruch C Cohen bcc4929@gmail.com, pjstarr@starrparalegals.com**
- **Michael T Delaney mdelaney@bakerlaw.com, sgaeta@bakerlaw.com**
- **Marianne M Dickson MDickson@seyfarth.com, shobrien@seyfarth.com**
- **Caroline Djang cdjang@rutan.com**
- **Joseph A Eisenberg jae@jmbm.com,**
  **vr@jmbm.com;tgeher@jmbm.com;bt@jmbm.com;jae@ecf.inforuptcy.com**
- **Andy J Epstein taxcpaesq@gmail.com**
- **Fahim Farivar lawyercpa@gmail.com**
- **William L Foreman wforeman@oca-law.com, laiken@oca-law.com**
- **Eric J Fromme ejf@jmbm.com, lo2@jmbm.com**
- **Jeffrey K Garfinkle jgarfinkle@buchalter.com,**
  **docket@buchalter.com;dcyrankowski@buchalter.com**
- **Fredric Glass fglass@fairharborcapital.com**
- **Christina Goebelsmann cgoebelsmann@wargofrench.com**
- **Matthew A Gold courts@argopartners.net**
- **Nancy S Goldenberg nancy.goldenberg@usdoj.gov**
- **D Edward Hays ehays@marshackhays.com, ecfmarshackhays@gmail.com**
- **Mark S Horoupian mhoroupian@sulmeyerlaw.com,**
  **ppenn@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com;ppenn@ecf.inforuptcy.com**
- **Ivan L Kallick ikallick@manatt.com, ihernandez@manatt.com**
- **David I Katzen katzen@ksfirm.com, schuricht@ksfirm.com**
- **Gerald P Kennedy gerald.kennedy@procopio.com,**
  **kristina.terlaga@procopio.com;calendaring@procopio.com;efile-bank@procopio.com**
- **Monica Y Kim myk@lnbrb.com**
- **K Kenneth Kotler kotler@kenkotler.com, zoe@kenkotler.com**
- **Ian Landsberg ilandsberg@landsberg-law.com, bgomelsky@landsberg-**
  **law.com;cdonoyan@landsberg-law.com;dzuniga@landsberg-law.com**
- **Mary D Lane mal@msk.com, mec@msk.com**
- **Leib M Lerner leib.lerner@alston.com**
- **Elan S Levey elan.levey@usdoj.gov, louisa.lin@usdoj.gov**
- **Howard S Levine howard@cypressllp.com, jennifer@cypressllp.com**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_August 2010_                                                                 **F 9013-3.1.PROOF.SERVICE**

- Elizabeth A Lossing elizabeth.lossing@usdoj.gov
- Samuel R Maizel smaizel@pszjlaw.com, smaizel@pszjlaw.com
- Craig G Margulies craig@marguliesfaithlaw.com, staci@marguliesfaithlaw.com;mhillel@marguliesfaithlaw.com;fahim@marguliesfaithlaw.com
- Ashley M McDow amcdow@bakerlaw.com, mdelaney@bakerlaw.com;sgaeta@bakerlaw.com;rojeda@bakerlaw.com
- Krikor J Meshefejian kjm@lnbrb.com
- Kenneth Miller kmiller@ecjlaw.com, kanthony@ecjlaw.com
- Benjamin Nachimson ben.nachimson@wgfllp.com
- Tara L Newman tara.newman@doj.ca.gov
- Robert B Orgel rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Christopher E Prince cprince@lesnickprince.com
- Hanna B Raanan hraanan@marlinsaltzman.com, jhawkes@marlinsaltzman.com;sshepard@marlinsaltzman.com;irvinefileclerk@marlinsaltzman.com
- Hamid R Rafatjoo hrafatjoo@venable.com, kfox2@venable.com;bclark@venable.com
- Kurt Ramlo kr@lnbyb.com
- Brett Ramsaur bramsaur@swlaw.com, kcollins@swlaw.com
- Paul R Shankman pshankman@jhindslaw.com
- Lindsey L Smith lls@lnbyb.com
- Adam D Stein-Sapir info@pfllc.com
- Alan Stomel alan.stomel@gmail.com, astomel@yahoo.com
- Kelly Sweeney ksweeney@spiwakandiezza.com
- United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
- Jeanne C Wanlass jwanlass@loeb.com, karnote@loeb.com;ladocket@loeb.com
- Joshua D Wayser joshua.wayser@kattenlaw.com, jessica.mickelsen@kattenlaw.com;kim.johnson@kattenlaw.com,ecf.lax.docket@kattenlaw.com,adelle.shafer@kattenlaw.com
- Andrew F Whatnall awhatnall@daca4.com
- Elisa B Wolfe-Donato Elisa.Wolfe@doj.ca.gov
- Jennifer C Wong bknotice@mccarthyholthus.com
- David Wood dwood@marshackhays.com, ecfmarshackhays@gmail.com
- Benyahou Yeroushalmi ben@yeroushalmilaw.com
- Kristin A Zilberstein bknotice@mccarthyholthus.com, kzilberstein@mccarthyholthus.com

II. SERVED BY U.S. MAIL

Hooper Lundy and Bookman, Inc.
,

JCH Consulting Group, Inc.
,

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                            F 9013-3.1.PROOF.SERVICE

LF Enterprises Partnership
c/o Law Offices of Alan F. Broidy, APC
1925 Century Park East
17th Floor
Los Angeles, CA 90067

Levene, Neale Bender Rankin & Brill LLP
10250 Constellation Blvd Ste 1700
Los Angeles, CA 90067

NSBN
,

Sanders Collins & Rehaste, LLP
,

Benjamin P Wasserman
235 E Broadway Ste 206
Long Beach, CA 90802

Bradley Yourist
Yourist Law Corporation
11111 Santa Monica Blvd.
Suite 100
Los Angeles, CA 90025

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010

F 9013-3.1.PROOF.SERVICE

# EXHIBIT G

**EXHIBIT G**

**SECTION 1424 NOTICE**

Page 1 of 32

**CITATION NUMBER:** 11-2707-0012902-F

Date: 02/28/2017 Time: 11:25 Am

Type of Visit :

YOU ARE HEREBY FOUND IN VIOLATION OF APPLICABLE CALIFORNIA STATUTES AND REGULATIONS OR APPLICABLE FEDERAL STATUTES AND REGULATIONS

Incident/Complaint No.(s) : No complaints found

| | |
|---|---|
| Licensee Name: | Eureka Rehabilitation & Wellness Center, LP |
| Address: | 2353 23rd Street    Eureka, CA  95501 |
| License Number: | 010000054    Type of Ownership:    Partnership |

| | |
|---|---|
| Facility Name: | Eureka Rehab & Wellness Center, LP |
| Address: | 2353 23rd St    Eureka, CA  95501 |
| Telephone: | |
| Facility Type: | Skilled Nursing Facility |
| Facility ID: | 010000078 |

Capacity: 99

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS | PENALTY ASSESSMENT $20,000.00 | DEADLINE FOR COMPLIANCE 3/13/17  12:00 a.m. |
|---|---|---|---|
| F353 | **CLASS  A   CITATION -- STAFFING** | | |

F353 §483.35(a)(1)-(4) Sufficient 24-Hr Nursing Staff Per Care Plans
483.35 Nursing Services

The facility must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population in accordance with the facility assessment required at §483.70(e).[As linked to Facility Assessment, §483.70(e), will be implemented beginning November 28, 2017 (Phase 2)]

(a) Sufficient Staff.
(a)(1) The facility must provide services by sufficient numbers of each of the following types of personnel on a 24-hour basis to provide nursing care to all residents in accordance with resident care plans:

(i) Except when waived under paragraph (e) of this section, licensed nurses; and

(ii) Other nursing personnel, including but not limited to nurse aides.

| | |
|---|---|
| Name of Evaluator:<br>Clara Wu<br>HFEN<br><br>Evaluator Signature : _James Shannon_ | Without admitting guilt, I hereby acknowledge receipt of this SECTION 1424 NOTICE<br><br>Signature : _Dana Webb_<br>Name : _Dana A. Webb_<br>Title : _Administrator_ |

JAMES SHANNON
HFEN

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

**SECTION 1424 NOTICE**

Page 2 of 32

**CITATION NUMBER:**    11-2707-0012902-F

Date: 02/28/2017   Time:   11:35 am

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | (a)(2) Except when waived under paragraph (e) of this section, the facility must designate a licensed nurse to serve as a charge nurse on each tour of duty. |
| | (a)(3) The facility must ensure that licensed nurses have the specific competencies and skill sets necessary to care for residents' needs, as identified through resident assessments, and described in the plan of care. |
| | (a)(4) Providing care includes but is not limited to assessing, evaluating, planning and implementing resident care plans and responding to resident's needs. |
| | The facility failed to ensure adequate nursing staff to provide quality care, which caused harm to their residents as evidenced by: |
| | 1. The facility did not provide adequate supervision and assistance, revise fall risk care plans and implement the care plans, follow fall protocol for post-fall assessment and management to prevent falls and injuries for Residents 1, 2, 3, 4, 5, 6, and 14 when: |
| | a. Resident 1 walked to the restroom unassisted, grabbed the rod across the restroom entrance and fell on the floor on 8/28/16. This caused Resident 1 to sustain a left humeral neck (upper arm bone just under the shoulder joint) fracture which required admission to an acute care hospital for treatment. |
| | b. Resident 2 had five falls during a one month period from 8/12/16 to 9/14/16. Resident 2 sustained a head injury from the last fall on 9/14/16, which required Resident 2 to be sent to an acute care hospital for evaluation and treatment. After 9/14/16, Resident 2 had three more falls on 10/26/16, 11/5/16, and 11/26/16. |
| | c. Staff did not follow their fall protocol for post-fall assessment and notify the physician of a fall when Resident 3 reported having fallen on 10/20/16. This resulted in Resident 3 not being evaluated after the fall until 10/25/16 (five days later). |
| | d. Resident 5 had six falls during a six and one-half months period from 5/24/16 to 12/6/16. On 5/24/16, Resident 5 fell and sat on the floor in the bathroom which was wet with urine. A fall on 11/23/16, resulted in Resident 5 sustaining a small skin tear on the top ridge of the nose on 11/23/16 at 9:35 p.m. (This was the second fall that day). |
| | e. Resident 4 had three falls during a one-month period from 8/16/16 to 9/17/16. Resident 4 sustained a skin tear on the right hand from a fall on 8/16/16, and re-opened |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

Case 2:19-cv-09983-MWF-JPR  Document 1  Filed 11/22/19  Page 150 of 257  Page ID #:414

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | a skin tear on the right hand from a fall on 8/21/16. Resident 4 had three more falls during a one-week period from 10/13/16 to 10/17/16, which resulted in a nasal bone (nose) fracture from a fall on 10/13/16.

f. Resident 6 had multiple falls in a six-month period from 5/22/16 to 11/25/16. Resident 6 sustained bleeding in the head from the fall on 8/1/16; a laceration (cut) on the left side of the head, which required eight staples from the fall on 10/13/16. Resident 6 sustained a laceration on the right side of the head from the fall on 11/25/16.

g. Licensed Staff did not revise Resident 14's (who had one unwitnessed fall on 11/4/16, which resulted in a skin tear to the left elbow and a fractured pelvis), "Fall Care Plan" to indicate Resident 14 was to be on, "one-on-one" with staff at all times starting 11/5/16, per physician's order. This failure to revise Resident 14's, "Fall Care Plan" had the potential for Resident 14 to fall again causing injury or even death.

2. Residents' care needs were not being met when call lights were not answered in a timely manner for Resident 17 and 18, and Resident 17's need of getting out of the bed earlier in the morning was not honored. These failures resulted in Resident 17 staying wet with the urine and feeing bad, and potentially compromised residents' physical and psychosocial well-being.

1a. Resident 1's admission record indicated Resident 1 was admitted to the facility on 1/22/16, with diagnoses including blindness both eyes, difficulty in walking, and generalized muscle weakness.

Resident 1's Minimum Data Set (MDS), a clinical assessment process provides a comprehensive assessment of the resident's functional capabilities and helps staff identify health problems), dated 7/29/16, revealed a BIMS (Brief Interview for Mental Status) score of 14, which indicated Resident 1 was cognitively intact. The MDS assessment indicated Resident 1 required limited assistance of one person with physical assistance for walking in the corridor and toilet use.

The Fall Risk Assessment, dated 7/27/16, indicated Resident 1 was at high risk for falls due to multiple problems, including intermittent confusion, one to two falls in past three months, and being legally blind.

Resident 1's care plan for fall risk prevention and management, initiated on 1/22/16 and re-evaluated on 7/16, indicated approaches for fall risk prevention and management |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

**SECTION 1424 NOTICE**

**CITATION NUMBER:** 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | including, "Orient resident to environment each time changes are made and provide an environment that supports minimized hazards over which the Facility has control..." The care plan did not specify how the facility would provide supervision to prevent Resident 1 from falling. |
| | Resident 1's care plan for visual impairment, initiated on 1/22/16, indicated, "Provide environment with items kept in consistent location, free from obstacles and clutter...uses handrails in hallway..." The care plan for activities of daily living, initiated on 1/22/16 and re-evaluated on 7/16, indicated Resident 1 required assistance for toilet use and personal hygiene. |
| | The Nurse's Note, dated 8/28/16, revealed Resident 1 had an unwitnessed fall at 9:10 a.m., when Resident 1 was ambulating to the restroom and walked onto wet floor sign. |
| | The IDT (Interdisciplinary Team) Conference Record, dated 8/29/16, indicated on 8/28/16, at 9:10 a.m., Resident 1 walked to the bathroom and stopped at the restroom doorway. Resident 1's hands grabbed the spring rod, which the housekeeper placed in the doorway for cleaning, and simultaneously leaned her weight backward expecting the rod to be stable like a handrail. Resident 1 fell to her left side and had left shoulder pain and left hip discomfort. Resident 1 was sent to an Emergency Department and admitted to an acute care hospital. |
| | The CT (Computerized Tomography, combines of X-ray images using computer process to create images) examination result, dated 8/28/16, and the History and Physical Report from the acute care hospital, dated 8/28/16, indicated Resident 1 sustained a non-operable left humeral neck (upper arm bone) fracture and was admitted to the hospital for pain control and evaluation. |
| | During an interview on 10/26/16 at 10:02 a.m., regarding Resident 1's fall on 8/28/16, Licensed Staff A stated Resident 1 usually used the handrails in the hallway when Resident 1 was walking. Licensed Staff A stated Resident 1 had visual impairment. Resident 1 liked to grab the handrail and lean backward while talking to staff or other residents. Licensed Staff A stated on the day Resident 1 fell, Resident 1 walked to the restroom in the hallway and grabbed the spring rod, which the housekeeper placed in the doorway for cleaning. Licensed Staff A stated Resident 1 thought the rod was the handrail, so Resident 1 leaned her body backward while grabbing the rod. Licensed Staff A stated Resident 1 fell on the floor because the rod was not stable and fell off the doorway. Licensed Staff A stated no staff walked with Resident 1 because it was |

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

**SECTION 1424 NOTICE**

Page 5 of 32

**CITATION NUMBER:** 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | Resident 1's routine to walk to the restroom by herself using the handrails. Licensed Staff A stated the biggest mistake was lack of communication. Licensed Staff A stated the housekeeper did not tell her (Licensed Staff A) about placing the rod in the restroom doorway, otherwise she would have educated Resident 1 and let her feel the rod or walked with her. Licensed Staff A stated the rod was a new product, but they should not use it on the floor because it was dangerous.

During an interview on 10/26/16, at 11:50 a.m., regarding Resident 1's fall on 8/28/16, Housekeeping Staff P stated she put the rod with a sign across the restroom doorway and two signs on the floor when she was mopping the restroom. Housekeeping Staff P stated she told Resident 1 the restroom was closed. Housekeeping Staff P stated after she cleaned the restroom, she left the rod with a sign across the restroom doorway and went to another hall. Housekeeping Staff P stated she did not tell Resident 1 that the rod was left in the doorway. Housekeeping Staff P stated she did not tell any staff about the rod because they could see it. Housekeeping Staff P stated from the beginning of using this type of rod, she told the Housekeeping Supervisor that the rod was terrible and not good for use because the rod did not have spring and was easy to fall off. She stated the rod was not stable and when people grabbed the rod, the rod fell.

During a concurrent observation and interview on 10/26/16, at 11:25 a.m., in the Housekeeping Supervisor's office, Housekeeping Supervisor Q showed a yellow rod with a yellow sign, "CLOSED FOR CLEANING" hanging to the rod. Housekeeping Supervisor Q stated this was the rod with the sign Housekeeping Staff P used when she cleaned the restroom where Resident 1 fell. Housekeeping Supervisor Q stated the housekeeper put the rod across the doorway to indicate the room was being cleaned. Housekeeping Supervisor Q stated the housekeeper should tell the nurse when the rod was placed. Housekeeping Supervisor Q stated the rod was light metal and was not strong. Housekeeping Supervisor Q stated the facility had been using the rod for about six to seven months, but they did not have a policy and procedure regarding the use of the rod.

Upon request for the manufacturer's guidelines for the rod, Housekeeping Supervisor Q provided a page documentation titled, "FACILITY MAINTENANCE," undated, under A. Site Safety Hanging Sign, which did not indicate how to use the rod and sign safely.

1b. Resident 2's admission record indicated Resident 2 was re-admitted to the facility on 8/11/16, with diagnoses including Alzheimer's disease (a brain disease causing memory loss, impaired thinking and disorientation), dementia, and neuromuscular |

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

State of California - Health and Human Services Agency                                    Department of Public Health

**SECTION 1424 NOTICE**                                                      Page 6 of 32

**CITATION NUMBER:**   11-2707-0012902-F

Date: 02/28/2017  Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | (relating to the nerves and muscles) dysfunction of bladder. |
| | Resident 2's MDS assessment, dated 8/19/16, indicated Resident 2 was not able to complete the Brief Interview for Mental Status (BIMS). The MDS assessment indicated staff interview for mental status was conducted, and indicated Resident 2's cognitive skills for daily decision making was, "moderately impaired - decisions poor; cues/supervision required." |
| | Resident 2's Fall Risk Evaluation, dated 8/12/16, indicated Resident 2 was at high risk for falls due to multiple problems including mental status, history of falls, ambulatory and elimination status, and gait/balance problems. |
| | The care plan for fall risk prevention and management, initiated on 8/12/16, with approach started date 8/11/16, indicated approaches including, "Bed in low position, pad alarm (a device attached to the resident that triggers an alarm when the resident attempts to get up from the wheelchair or the bed) in bed..." The care plan did not specify how the facility would provide supervision to prevent Resident 2 from falling. |
| | First Fall: |
| | The Nurse's Note, dated 8/12/16 at 12 a.m., revealed Resident 2 had an unwitnessed fall in the his room. Resident 2 sustained a 3 cm X 3 cm skin tear with bruising at left elbow. |
| | The care plan for the actual fall on 8/12/16, indicated a goal, "No serious injury from fall [for 7 days]." The approaches included observing and monitoring for 72 hours, mobility alarm, pads at bedside, and visual monitor just for one shift. |
| | The IDT (Interdisciplinary Team) Conference Record, dated 8/12/16, regarding Resident 2's fall on 8/12/16 at midnight, did not indicate new approaches to the fall risk care plan to prevent further falls. The fall risk care plan, initiated on 8/12/16, did not indicate new approaches and did not specify providing supervision to Resident 2 to prevent further falls. |
| | Second Fall: |
| | The Nurse's Note, dated 8/29/16, at 7 a.m., indicated nursing staff from the last two work shifts reported Resident 2 had a fall at 7:15 a.m., on 8/28/16. However, there was no |

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
|  | documentation of Nurses' Notes on 8/28/16, regarding the fall. |

The IDT Conference Record, dated 8/30/16, indicated Resident 2 had a fall with no injury on 8/28/16. The IDT note indicated to resume Risperdal (an antipsychotic medication, which works by changing the effects of chemicals in the brain), which was discontinued, due to increased agitation, re-emergence of aggressive verbal outbursts, pressured speech, and etc.

The care plan for the actual fall on 8/28/16, included to teach the new nurses on fall follow-up process and continue plan of care. The fall risk care plan, initiated on 8/12/16, did not indicate new approaches and did not specify providing supervision to Resident 2 to prevent further falls.

Third Fall:

The Nurse's Note, dated 9/5/16, at 4:20 p.m., indicated Resident 2 fell out from the wheelchair when he was watching TV in the TV room with other residents.

The IDT Conference Record, dated 9/6/16, regarding Resident 2's fall on 9/5/16, indicated Resident 2 had, "very poor safety awareness." The IDT determined to continue using the alarm with a goal, "no serious injury [with] fall." The IDT note did not specify providing supervision to Resident 2 to prevent further falls.

The care plan for the actual fall on 9/5/16, was to continue plan of care. The fall risk care plan initiated on 8/12/16, did not indicate new approaches and did not specify providing supervision to Resident 2 to prevent further falls.

Fourth Fall:

The Nurse's Note, dated 9/10/16, with unknown time of the note, indicated, "Am shift reports fall [with] no injury 10:30 Am..." The Nurse's Note did not describe how Resident 2 fell.

The IDT Conference Record, dated 9/12/16, indicated Resident 2 stood up and fell at the Nurse's Station. The IDT note indicated Resident 2 continued having poor safety awareness. The IDT note indicated, "Comfort is goal and [with] regard to falls, minimizing serious injury is goal..." The IDT note indicated, "Will continue use of alarm, encourage wheelchair..." The IDT note did not specify providing supervision to Resident

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

State of California—Health and Human Services Agency Case 2:19-cv-09663-MWF-JPR Document 1 Filed 11/22/19 Page 155 of 267 Page ID #:419 Department of Public Health

SECTION 1424 NOTICE

Page 8 of 32

CITATION NUMBER: 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | 2 to prevent further falls. |

The care plan for the actual fall on 9/10/16, was to continue plan of care. The fall risk care plan, initiated on 8/12/16, did not indicate new approaches and did not specify providing supervision to Resident 2 to prevent further falls.

Fifth Fall:

The Nurse's Note, dated 9/14/16, at 7:55 p.m., revealed Resident 2 had an unwitnessed fall and sustained a skin tear at his left elbow and injury in the back of Resident 2's head which required Resident 2 to be sent to an Emergency room for evaluation.

The IDT Conference Record, dated 9/15/16, indicated on 9/14/16, at 7:55 p.m., Resident 2 was found on the floor next to the bed. The IDT note indicated an alarm was present but was not engaged. The IDT note indicated a fall prevention plan which included care alert posted in Resident 2's room. The IDT note did not specify how the facility would provide supervision to prevent Resident 2 from further falls.

The Care Alert, dated 9/15/16, posted in Resident 2's room, indicated, "[Resident 2] is a high fall risk with a recent fall requiring a trip to the ER. Please make sure [Resident 2] has his loud alarm attached at all times! Check frequently as he is able to inadvertently remove the alarm..." The Care Alert did not specify how frequently to check the alarm or Resident 2.

During an interview on 11/3/16, at 2:35 p.m., regarding, "Check frequently" for the alarm indicated in the Care Alert, the DON (Director of Nursing) stated she expected the staff check the alarm when staff made rounds every two hours; the Hall Monitor (an employee) walked back and forth in the hall, and when walking to Resident 2's room, the Hall Monitor could look inside the room from the hallway to see if the alarm was intact. When asked if the Hall Monitors were trained on how to prevent falls, the DON stated the Hall Monitors were trained to look if alarms were intact or pads were on the floor and to report to the nursing staff if anything was out of the ordinary. The DON stated a Hall Monitor was a facility staff member, but was not a caregiver. The DON stated the Hall Monitors did not do hands-on resident care; they could guide the resident and gently hold the resident's hands/elbows.

The IDT Conference Record, dated 9/16/16, for safety review related to the fall on 9/14/16, indicated to evaluate Resident 2's room to, "reconfigured room to have bed at

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

**SECTION 1424 NOTICE**

Page 9 of 32

**CITATION NUMBER:** 11-2707-0012902-F

Date: 02/28/2017   Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | a slight angle decreasing the likelihood of striking head during a fall. Mats at both side of bed." The IDT note did not specify providing supervision to Resident 2 to prevent further falls. |
| | The fall risk care plan, initiated on 8/12/16, did not indicate new approaches and did not specify providing supervision to Resident 2 to prevent further falls. |
| | During a concurrent observation and interview on 10/25/16, at 10 a.m., Resident 2 was in bed and awake. One floor mat was placed on Resident 2's right side, and one mat was up leaning against the wall below the window. When asked about his fall on 9/14/16, Resident 2 stated he did not remember the fall. |
| | During an interview on 10/25/16, at 3 p.m., regarding Resident 2's fall on 9/14/16 at 7:55 p.m., Licensed Staff C stated a Hall Monitor found Resident 2 on the floor. Licensed Staff C stated when she arrived at the scene, Resident 2 was laying on the floor mat with the head against the wall on the left side of the bed. Licensed Staff C stated she did not hear the alarm. She stated Resident 2 took the alarm off all the time. When asked about fall prevention, Licensed Staff C stated when Resident 2 was not in bed, Resident 2 sat at the Nurse's Station. When Resident 2 was in bed, staff would listen to the alarm or Resident 2 yelling. Licensed Staff C stated they did not have a set time to check on Resident 2 because Resident 2 was not on an every 15 minute check. |
| | During a concurrent observation and interview on 10/25/16, at 3:05 p.m., in Resident 2's room, one floor mat was on the right side of the bed, and one mat was up against the wall. Licensed Staff C stated the floor mat should be on the left side because Resident 2 got out of the bed from his left side. |
| | During a concurrent interview and record review of Resident 2's care plans for fall and fall risk on 10/25/16, at 3:13 p.m., Licensed Staff C stated a care plan described what was the best care provided to the resident and communication with the care team. Licensed Staff C stated all nurses should review the care plans. When asked if the care plans specify providing supervision to Resident 2, Licensed Staff C reviewed the care plans, initiated on 8/12/16 and 8/15/16, and stated the supervision was to observe and monitor Resident 2 for 72 hours. When asked what happened after 72 hours, Licensed Staff C stated, "none" and the care plans did not specify supervision. |
| | During an interview on 10/25/16, at 4:40 p.m., Unlicensed Staff O stated when Resident 2 was in bed, she would check Resident 2 approximately every five minutes. When |

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

State of California - Health and Human Services Agency

Case 2:19-cv-09983-MWF-JPR Document 1 Filed 11/22/19 Page 157 of 257 Page ID #:421

Department of Public Health

SECTION 1424 NOTICE

Page 10 of 32

CITATION NUMBER: 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | asked how she knew about the five minutes, Unlicensed Staff O stated, "from the text book." When asked how she knew the care needed for a resident, Unlicensed Staff O stated she would ask other staff or look at the care plans, which would tell her about the resident. When reviewing Resident 2's care plan, which indicated Resident 2 had four falls from 8/12/16 to 9/10/16, Unlicensed Staff O stated she did not know Resident 2 had so many falls, "like constantly falling." Unlicensed Staff O stated by looking at the falls indicated in the care plan, Resident 2 should not be left alone. Unlicensed Staff O stated the care plan did not specify the frequency of checking Resident 2. |

During a concurrent interview and record review on 10/26/16, at 2:50 p.m., the DON stated they tried different interventions including alarm, pad, and visual monitor for one shift only. The DON reviewed the fall and fall risk care plans, and stated the care plans did not specify providing supervision to Resident 2 to prevent falls.

During an interview on 10/26/16, at 3:55 p.m., Unlicensed Staff L stated he did not witness Resident 2's fall. Unlicensed Staff L stated he was not assigned to Resident 2, but he still helped check on Resident 2 and the alarm function at least every hour. Unlicensed Staff L stated when Resident 2 had repeated falls (4 - 5 times in a month), staff should be with Resident 2 all the time. Unlicensed Staff L stated they did not have enough CNAs (Certified Nursing Assistant) in the hall where Resident 2 resided. Unlicensed Staff L stated because of short staffing, they were not able to check residents as frequently as they would, to prevent residents from falling.

The Emergency Department Report, dated 9/14/16, indicated Resident 2 sustained a wound 2 cm in length in the head, and the wound was repaired with staples. The Emergency Department report indicated Resident 2 did not receive any imaging or extensive work-up because Resident 2 was on hospice with comfort measures only.

Resident 2 had three more falls after 9/14/16, as follows:

a. The IDT note, dated 10/26/16, indicated Resident 2 fell from a wheelchair to the floor in the TV room;

b. The IDT note, dated 11/7/16, indicated Resident 2 fell on 11/5/16, witnessed by a Hall Monitor; and

c. The IDT note, dated 11/28/16, indicated Resident 2 fell on 11/26/16, sliding out of a wheelchair.

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

**SECTION 1424 NOTICE**

**CITATION NUMBER:**    11-2707-0012902-F

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | During an interview on 12/7/16, at 11:45 a.m., Unlicensed Staff BB stated there was no communication from the management to, "us" [Certified Nursing Assistants]. Unlicensed Staff BB stated they just put up signs in the utility room and in the resident's room and, "hoping us to know" what was going on. Unlicensed Staff BB stated when she looked at the sign with a picture of a bed without written instructions in Resident 2's room, she thought it was the instruction to put the head of the bed down with feet up and so she did. Unlicensed Staff BB stated after that they wrote, "keep bed low, keep bed at an angle." |

During an interview on 12/9/16, at 7:20 a.m., the DON stated the plan was to put the bed in an angle to prevent injuries from falls. The DON stated she educated the staff about the sign but did not have a log to ensure all staff were educated and understood the sign.

1c. During a concurrent observation and interview on 10/25/16, at 8:30 a.m., in Resident 3's room, Resident 3 stated she fell approximately at 3 a.m. four days ago from her bed to the floor. Resident 3 stated she climbed back to bed because no staff were around to assist her. Resident 3 stated she told a nurse about the fall at approximately 5:30 a.m. the day she fell. She stated the nurse just told her to go back to bed.

Resident 3's MDS dated 8/9/16, indicated Resident 3's BIMS (Brief Interview for Mental Status) score was 13, which indicated Resident 3 was cognitively intact.

Resident 3's Fall Risk Evaluation, dated 8/4/16, indicated Resident 3 was at high risk for falls due to multiple problems including history of falls, ambulatory and elimination status, and gait/balance problem.

During an interview on 10/25/16, at 11:10 a.m., Licensed Staff B stated approximately seven hours after Resident 3 fell last Wednesday or Thursday, Licensed Staff B assessed Resident 3 by asking how Resident 3 was doing and also performed a head-to-toe assessment. Licensed Staff B stated he documented the assessment.

The Nurse's Note, dated 10/20/16 at 10:15 a.m., indicated, "[Resident 3] [up out of bed] in [wheelchair]. Denies any residual pain [secondary to fall]. [Resident 3] in wheelchair, going up and down hallway [without] difficulty. Will continue to monitor." The note did not indicate a head-to-toe assessment. There was no documentation of physician notification.

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

**SECTION 1424 NOTICE**

**CITATION NUMBER:**      11-2707-0012902-F

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | During a concurrent interview and record review on 10/26/16, at 8:10 a.m., Licensed Staff B stated there was no specific document for the head-to-toe assessment. Licensed Staff B stated he documented the head-to-toe assessment in the Nurse's Note. When asked about the Nurse's Note, Licensed Staff B stated the Nurse's Note, dated 10/20/16 at 10:15 a.m., was written by him. When asked for the fall protocol, Licensed Staff B stated they filled out the information forms which the night shift nurse should have done and turned it in to the DON. |
| | During a concurrent interview and record review on 10/26/16, at 8:35 a.m., the DON reviewed Licensed Staff B's Nurse's Note, dated 10/20/16 at 10:15 a.m., and stated it was not well documented and did not show the head-to-toe assessment. The DON stated the post-fall protocol included completing the incident report, post-fall assessment, post-fall huddle, and neurological check flow sheet for unwitnessed fall. The DON stated staff had not notified her of Resident 3's fall. The DON stated staff did not complete the post-fall protocol procedures for Resident 3's fall on 10/20/16. |
| | Review of the Fall Management Program Policy No. FA-01, documented following each fall, the licensed nurse would perform a post-fall assessment, the licensed nurse would notify the Director of Nursing and / or Administrator, and the Licensed Nurse would notify the resident's attending physician and responsible party of the fall incident. |
| | 1d. Resident 5's admission record indicated Resident 5 was admitted to the facility on 3/10/16, with diagnoses including difficulty in walking, muscle weakness, dementia with behavioral disturbance. |
| | Resident 5's fall risk evaluation, dated 10/10/16, 11/24/16, and 12/6/16, indicated Resident 5 was at high risk for falls due to multiple problems including mental status (disoriented or intermittent confusion), history of falls, gait and balance problems, and medications. Resident 5 was on Risperdal (an antipsychotic medication which works by changing the effects of the chemicals to the brain. Common side effects includes dizziness, drowsiness, and tired feeling) 0.5 mg by mouth every day and Haldol (an antipsychotic medication which may work by blocking some chemical effects in the brain. Major common side effects include loss of balance control, muscle spasms, and shuffling walk) 70 mg intramuscularly every month for dementia with psychosis. |
| | Resident 5's MDS, dated 3/17/16 and 9/16/16, indicated Resident 5's cognition was moderately to severely impaired. |

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | First fall: |

First fall:

The Nurse's Note, dated 5/24/16 at 11 p.m. and the IDT note, dated 5/25/16, indicated Resident 5 had an unwitnessed fall on 5/24/16 at 7:45 p.m. in the bathroom. Resident 5 was found in the bathroom sitting on the floor wet with urine. Resident 5 complained of left shoulder pain and treated with Norco (pain medication). The IDT note indicated Resident 5 received antipsychotic (Haldol injection) prior to the fall. The IDT note indicated the Charge Nurse's plan to increase monitoring for a few hours after the monthly Haldol injection and recommended non-slip shoes for Resident 5.

Resident 5's care plan for fall risk prevention and management, initiated on 3/11/16, and re-evaluated on 6/16, 9/16, and 12/16, indicated interventions including, "Call light within reach, Remind resident to use call light - unable to use call light due to dementia, bed in low position..." The care plan indicated an intervention started on 11/7/16:  Continue B-wing for increased supervision. The fall risk care plan did not reflect nor specify how to increase monitoring after the monthly Haldol injection.

Second fall:

The IDT note, dated 10/3/16, indicated Resident 5 had an unwitnessed fall in his room on 10/3/16 at 1:15 a.m. The IDT note indicated referring for physical and occupational therapy and continue to encourage wearing the hipster (Padded pants that cover the hip to cushion a fall to prevent injuries to the hip) when ambulating. The IDT note did not specify providing supervision to Resident 5.

Third fall:

The Nurse's Note, dated 10/9/16 at 2:30 a.m. and the IDT note, dated 10/10/16, indicated Resident 5 had an unwitnessed fall in his room on 10/9/16, with unknown time of fall. The IDT note indicated referring for physical and occupational therapy and continue to encourage wearing the hipster when ambulating. The IDT note did not specify providing supervision to Resident 5.

Fourth fall:

The IDT note, dated 11/24/16, indicated Resident 5 had a fall on 11/23/16 at 12 p.m. The IDT note indicated Resident 5 was walking in the hallway, "but still asleep." The Hall Monitor headed toward Resident 5, "but before she got to him he fell onto his [left] hip

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

State of California - Health and Human Services Agency

Case 2:19-cv-09963-MWF-JPR Document 1 Filed 11/22/19 Page 161 of 257 Page ID #:425

SECTION 1424 NOTICE

Page 14 of 32

CITATION NUMBER: 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
|  | and elbow." The IDT note indicated, "will make a referral to PT/OT [Physical Therapy/Occupational Therapy]..." The IDT note did not specify providing supervision to Resident 5.<br><br>Fifth fall:<br><br>The Nurse's Note, dated 11/23/16, and the IDT note, dated 11/24/16, indicated Resident 5 had an unwitnessed fall in his room on 11/23/16 at 9:35 p.m. Resident 5 sustained a small skin tear on the top ridge of the nose. The IDT note indicated, "observe and monitor for 72 hours and on 15 [minutes check]."<br><br>Sixth Fall:<br><br>The Nurse's Note, dated 12/6/16 at 3 a.m., and the IDT note, dated 12/6/16, indicated Resident 5 was found on the floor in his room. The IDT note indicated every 15 minute checks was initiated after the first hour of neuro checks.<br><br>Resident 5's care plan for fall risk prevention and management, initiated on 3/11/16, re-evaluated on 6/16, 9/16, and 12/16, indicated interventions including, "Call light within reach, Remind resident to use call light - unable to use call light due to dementia, bed in low position..." The care plan indicated an intervention started on 11/7/16: Continue B-wing for increased supervision. The fall risk care plan did not reflect the 15 minute checks and who was/how to check Resident 5.<br><br>During a concurrent interview and record review on 12/8/16, at 8:35 a.m., regarding supervision for Resident 5, Unlicensed Staff CC stated she checked on Resident 5 whenever she saw him. Unlicensed Staff CC stated every staff in the hall was responsible to check on Resident 5. Unlicensed Staff CC stated she also reviewed care plans for resident care. When she reviewed Resident 5's fall risk care plan and asked her what did, "...increase supervision..." mean to her, Unlicensed Staff CC stated, "To me, may need one-to-one..." When asked her if Resident 5 was on one-to-one supervision, Unlicensed Staff CC stated she needed to check the documentation and found Resident 5 was on every 15 minute checks. Unlicensed Staff CC stated all staff were responsible for monitoring and documentation.<br><br>During a concurrent interview and record review on 12/8/16, at 8:55 a.m., Licensed Staff NN reviewed the fall risk care plan and stated, "...increase supervision..." meant every 15 minute checks. Licensed Staff NN stated the DON or ADON was responsible to |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT
VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | review and update the care plans. Licensed Staff NN stated the care plan was used for following-up on residents and making goals for resident care.<br><br>During an interview on 12/9/16, at 7:20 a.m., Resident 5's fall risk care plan was reviewed with the DON. The DON stated the care plan did not specify supervision for Resident 5, and she understood that staff could have interpreted differently for, "...increase supervision."<br><br>1e. Resident 4's admission record and MDS, dated 10/3/16, documented Resident 4 was admitted 4/1/10. Resident 4's diagnoses included Chronic Obstructive Pulmonary Disease, Hypertension (high blood pressure), Cardiac Arrhythmia (problem with the rate or rhythm of the heartbeat), schizophrenia (a mental illness in which someone cannot think or behave normally and often experiences delusions), and muscle weakness (general).<br><br>Resident 4's MDS, dated 10/03/16, revealed the BIMS (Brief Interview for Mental Status) score was 3, which indicated Resident 4 was severely cognitively impaired. The MDS assessment indicated Resident 4 required supervision with one person physical assist with transfers and walking in his room. The MDS assessment indicated Resident 4 required one person physical assist for walking in the corridor and toilet use.<br><br>Resident 4's care plan for fall risk prevention and management, initiated on 10/04/16, indicated fall risk prevention and management approaches included, "Orient resident to environment each time changes are made, remove hazards from environment, maintain bed in low position and continue alarms in place on bed..." The care plan did not specify providing supervision to prevent Resident 4 from falling.<br><br>The short-term care plan (written care plan done for the actual fall), initiated on 10/14/16, indicated fall risk prevention and management approaches including, "hipsters" (padded type pants that cover the hips to cushion a fall), continue alarms, "replace when resident removes."<br><br>Short term care plan, re-evaluated on 10/18/16, indicated fall risk prevention and management approaches including video monitor of Resident 4's bed area, continue frequent observation, per discretion of nurse, every 15 minute mini-checks, and all other monitoring as needed.<br><br>During an interview on 11/09/16 at 9:15 a.m., Licensed Staff B was asked what every |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

State of California - Health and Human Services Agency

Department of Public Health

Case 2:19-cv-09983-MWF-JPR Document 1 Filed 11/22/19 Page 163 of 257 Page ID #:427

SECTION 1424 NOTICE

Page 16 of 32

CITATION NUMBER: 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | fifteen minute mini-checks and all other monitoring would mean to him. Licensed Staff B stated it would mean different things depending on what the issue was. When asked about falls, in relationship to every fifteen mini-checks and all other monitoring, he stated that would mean neuro checks for the licensed personnel, and for the CNA (Certified Nursing Assistant) it would mean vital signs. Regarding all other monitoring, he stated it would mean wanderguards, tag alarms, and alarms for bed and wheelchair.

During an interview on 11/9/2016 at 3:55 p.m., Unlicensed Staff R was asked about, "mini-checks" and what that meant to him. Unlicensed Staff R stated it would mean the nurse would do neuro checks, and he would do vital signs every 15 minutes times 2 hours, then every 30 minutes for 2 hours, then every hour for 4 hours. When asked about, "all other monitoring" he stated he would watch for pain, level of consciousness and safety. When asked regarding safety, he stated it could be done with alarms, like bed and chair alarms and a 1:1 (one staff to one resident), if possible.

During an interview on 11/9/16 at 4:05 p.m., Unlicensed Staff K was asked about, "mini-checks" and what that meant to her. Unlicensed Staff K stated it would mean vital signs (not sure how frequently) and checking them [the residents] to see how alert they were. When Unlicensed Staff K was asked what, "all other monitoring" meant to her, she stated alarms could be used, "sometimes a 1:1."

First Fall:

The Nurse's Note, dated 8/15/16, no time, indicated Resident 4 was found on the floor by his bed. Resident 4 had open abrasions to his knuckles that were cleaned and bandaged. He was placed in Geri-chair in front of the Nurse's Station on A-wing. A bed alarm, bed lowered, floor mat and alarm were placed on Resident 4.

The Interdisciplinary Team Conference Record, dated 8/16/16, regarding Resident 4's fall on 8/15/16 at 5:45 p.m., indicated Resident 4 had attempted a self-transfer and fell at the side of the bed. It indicated, "alarm" was on and hipsters were in place. The IDT Conference Record indicated to continue hipsters and alarms and care plans updated. There was no short-term care plan found.

Second Fall:

There was no documentation in the Nurse's Note for the fall of 8/21/16. |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

SECTION 1424 NOTICE

CITATION NUMBER:     11-2707-0012902-F

Date: 02/28/2017  Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | The IDT Conference Record, dated 8/22/16, indicated at 1:30 p.m., Resident 4 was up in a chair, and he attempted to reposition himself and slid down to the floor.  Resident 4 slightly re-opened his right hand skin tears, and they were re-bandaged. The IDT Conference Record indicated to continue alarm and hipsters. The IDT Conference Record indicated care plans were updated.

There was no short-term care plan found.

Third Fall:

The Nurse's Note, dated 9/20/16, no time, indicated a, "Late Entry" for 9/17/16 at 9:55 a.m., Resident 4 was sitting in bed and leaned forward.  The Nurse's Note indicated Resident 4 went to the floor. There were no visible injuries and no complaint of pain per the Nurse's Note.
The IDT Conference Record, dated 9/19/16, no time noted, indicated Resident 4's fall was not witnessed. The record indicated Resident 4 was sitting up in his chair and leaned forward and fell forward on his knees. The record indicated Resident 4 was at risk for falls related to his end stage Chronic Obstructive Pulmonary Disease (COPD - lung disease that makes it hard to breath), and he had poor safety awareness and often tried to transfer himself. The record indicated Resident 4 was to have a wheelchair and bed alarm in place. The IDT note did not specify providing supervision to Resident 4 to prevent further falls.

Resident 4's fall risk care plan, dated 10/4/16, indicated Resident 4 had an actual fall 9/20/16, and alarms were in place on the bed. No other changes were indicated.

Fourth Fall:

There was no documentation of a Nurse's Note found for the fall that occurred on 10/13/16.

Physician's Progress Notes, dated 10/14/16, indicated Resident 4 had another fall. "Patient attempted to get up as he felt strong enough.  He has poor balance. Medically stable, physically and mentally failing. Very high risk to fall."

Within the Nurse's Note, dated 10/17/16, at 2:30 p.m., written by the RT (Respiratory Therapist), it was indicated Resident 4 sustained a fall, which included bruising around the nose. |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

Case 2:19-cv-09585-MWF-JPR Document 1 Filed 11/22/19 Page 165 of 257 Page ID #:429

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | The IDT (Interdisciplinary Team) Conference Record, dated 10/14/16, indicated he [Resident 4],....."had been safe in bed with hipsters on and alarm in place per care team, when he unexpectedly got up, took his own alarm and hipsters off but had his boots on and ambulated to the closet area near a lift, falling to the floor..." The Physician had requested trial of mattress on the floor. Per PT (Physical Therapy) it was indicated the mattress on floor would increase risk, so would use a low bed, with mats at the bedside. The record indicated care plans were updated. |

The fall risk care plan, dated 10/04/16, did not indicate any changes were made.

During an interview on 10/26/16 at 11:05 a.m., Licensed Staff F stated she found him [Resident 4] in his room but nearer the wall by the door, on his hands and knees trying to get up. Licensed Staff F did not witness the fall. She stated Resident 4 had a bloody nose. She called code STAT (immediately) for a fall and had help immediately. Licensed Staff F stated Resident 4 went to the Emergency Room. Licensed Staff F stated Resident 4 had a 1:1 [supervision] after he returned from the Emergency Room, but it did not occur too often due to staffing issues and stated there were not enough staff to cover for current residents and not able to find someone to come in to stay with residents.

Fifth Fall:

There was no documentation of Nurses Notes for the fall which occurred on 10/15/16.

During an interview on 10/26/16, at 12:01 p.m., Unlicensed Staff M stated she was aware (she stated she was in the shower room on 10/15/16, when resident fell) that Resident 4, "tripped over a hoyer lift (a mechanical lift) that someone forgot to take out." Unlicensed Staff M stated she came over (the hoyer lift was still in the room), but there were staff already helping him. She was aware Resident 4 went to the Emergency Room. Unlicensed Staff M stated with the 1:1 for the resident, it was much better. Unlicensed Staff M stated, "Especially on PM's there is not enough staff to watch everyone so a 1:1 for the resident really helps."

During an interview on 12/9/16 at 7:20 a.m., regarding Resident 4's fall on 10/15/16, with a hoyer lift in his room, the DON stated two CNAs were getting ready to assist Resident 4's roommate with a hoyer lift. The DON stated the two CNAs heard a code, "STAT" [immediately] from another room. The two CNAs left Resident 4's room to attend

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

**SECTION 1424 NOTICE**

**CITATION NUMBER:** 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | to the code, "STAT." The two CNAs left the hoyer lift in Resident 4's room. After the two CNAs left the room, Resident 4 might have gotten up from his bed and fell. Resident 4's face might have hit the base of the hoyer lift because the base of the hoyer lift had blood on it. The DON stated the two CNAs should have removed the hoyer lift from Resident 4's room prior to attending to the code, "STAT" and should not put one resident in danger in order to help another resident. |
| | The IDT (Interdisciplinary Team) Conference Record, dated 10/17/16, indicated on 10/15/16, he [Resident 4] was found in a seated position in his room next to nightstand. "Resident is on 15 minute checks due to prior fall....Resident will be observed and monitored 72 hours." The IDT Conference Record indicated to continue with hipsters and a mat at the bedside. The Conference Record indicated Resident 4 had a, "history of falls" related to forgetting to use his call light/waiting for assistance, taking off bed/chair alarms, and could not stand or ambulate without staff assistance. |
| | The fall risk care plan, dated 10/04/16, did not indicate any changes were made. |
| | Sixth Fall: |
| | There was no documentation of Nurse's Notes for the fall that occurred on 10/17/16. The IDT (Interdisciplinary Team) Conference Record, dated 10/18/16, indicated on 10/17/16, Resident 4 had an unwitnessed, non-injury fall while attempting to get out of bed. Resident 4 had been at the Nurse's Station with a nurse before this fall and had requested to go back to bed. |
| | The Nurse's Note, dated 10/24/16, indicated he [Resident 4] continued to attempt to ambulate and self transfer. "High fall risk.... Resident turning off alarm and picking it up and walking with it. Poor Safety awareness." |
| | The Care Alert, dated 8/22/16, and updated/reviewed on 10/17/16, and posted in Resident 4's room indicated, "[Resident 4] is at high risk of fall with injury due to his restlessness and frailty. Please make sure he is offered assistance with a urinal/toileting at least every 2 hours. Please make sure he has an alarm on at all times, keep a mat on the floor next to his bed; if he is out of bed, assist him to wear hipsters and appropriate non-slip foot wear. [Resident 4] may enjoy being up in a Geri-Chair for relaxation. If he does not choose to utilize a Geri-Chair, offer him his regular wheelchair. If he does use the Geri-Chair, please supervise him closely and assist him to safely get up when he wants to get up." The Care Alert did not specify a timeframe for, "supervise |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

SECTION 1424 NOTICE

CITATION NUMBER:      11-2707-0012902-F

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | him closely." |

During a concurrent observation and interview with Resident 4, on 10/25/16, at 10 a.m., Resident 4 was in the activity room, currently painting alone at a table. Resident 4 stated he enjoyed painting. Resident 4 stated he did not remember the ball.  He hurt, "all the time." When asked about pain, he stated he had arthritis. He stated they gave him pain medication, and it helped. The Activity Assistant was helping two other residents at another table with art work. There were no other personnel in the activity room.

During an interview on 10/26/16, at 8:45 a.m., Licensed Staff E stated she did not use the care plan/update as it was difficult to use, and she was not sure how to use it. Licensed Staff E stated, "sometimes there's a 1:1 (person who cares for just one resident), but not often." Licensed Staff E stated the staff at the facility kept an eye on residents in the hallway. She stated, "This is how we manage."

During an interview with Licensed Staff B, on 10/26/16, at 10:15 a.m., when asked about Resident 4, he stated Resident 4 had days when he was, "hyperactive" (moving around, cannot keep still) and other days when he was, "hypoactive" (slept most of the day-only awake for meals). He stated the 1:1 made a difference, but due to staffing it did not always happen.

1f. Resident 6's admission record indicated Resident 6 was admitted to the facility on 3/25/16, with diagnoses including Alzheimer's disease (a brain disease causing a memory loss and disorientation), epilepsy (seizure) and depressive disorder.

The Admission Minimum Data Set, dated 4/1/16, and the most recent quarterly MDS, dated 9/29/16, indicated Resident 6 had a short-term and long-term memory loss and severely impaired cognition.

The CAA (CAA, a tool used to identify concerns and develop an individualized care plan), dated 4/1/16, indicated Resident 6 was a risk for falls, had Alzheimer's-type dementia, and was on Psychotropic drugs.

During a record review on 12/7/16, a Nurse's Note, dated 11/25/16, indicated at 2:45 a.m., while ambulating on B Hallway, Resident 6 tripped on a pedal of another resident's wheelchair; thus causing a fall. Resident 6 had a laceration on the right side of her head. Resident 6 had a hipster on.  The Nurse's Note also indicated, "prior to the fall, Resident 6, per report from the Night Shift nurse, was agitated, combative and in constant motion.

State of California - Health and Human Services Agency                                    Department of Public Health

**SECTION 1424 NOTICE**                                                                          Page 21 of 32

**CITATION NUMBER:**    11-2707-0012902-F

                                                                          Date: 02/28/2017  Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | Resident 6's behavior escalated to screaming, hitting staff and kicking other residents. PRN was given, but no avail."  Staff was planning to notify her husband to help calm her prior to her fall.<br><br>During observation, and interview on 12/7/16 at 8:45 a.m., Resident 6 was walking down the hallway back and forth multiple times, without being accompanied by anyone. When asked why Resident 6 was walking alone, Licensed Staff NN stated she did not know why the Hall Monitors were not walking with her. Licensed Staff NN also stated Resident 6 did not like Hall Monitors getting closer to her and if they did, Resident 6 started pushing and yelling at them and got agitated and combative, so they had to walk behind Resident 6. When asked how was that going to prevent Resident 6 from falling, Licensed Staff NN stated she did not know what to do.<br><br>During record review on 12/7/16, a care plan, dated 11/25/16, documented an intervention for Resident 6 to have 1:1 supervision upon return from ED;<br><br>During an interview on 12/9/16 at 8:20 a.m., Licensed Staff D stated she witnessed the fall on 11/25/16 at 8:45 a.m. Resident 6 was walking the hallway, tripped on the pedal of another resident's wheelchair and fell. Licensed Staff D stated she assessed Resident 6, and noted Resident 6 had a laceration to her right forehead. Licensed Staff D stated she called the treatment nurse who came, cleaned and put pressure on the wound. Licensed Staff D then called an ambulance that came and took Resident 6 to the hospital for evaluation and treatment.<br><br>During record review on 12/7/16, IDT (interdisciplinary team) notes indicated Resident 6 had multiple falls from the date of admission (3/25/16) to date of the survey (12/5/16). Three of these falls caused injuries to Resident 6's head, which required Resident 6 to be sent to the acute care hospital for evaluation and treatments.<br><br>During a record review on 12/7/16, an IDT note, dated 8/2/16, indicated on 8/1/16, Resident 6 was ambulating all morning as Resident 6 usually was unable to sit still. Resident 6 was noted to be irritable and poking staff as they walked by. At one point Resident 6 grabbed the neck of one staff who was attempting to pick up Resident 6's Teddy Bear. Resident 6's Gait was shuffling as was usual, and she was leaning back as she stood.  Suddenly, Resident 6 witnessed to be standing and fell backward bumping her right elbow and back of her head. Resident 6 had some bleeding in her head, pressure was applied and 911 was called for transport to the ED for evaluation and treatment. The physician was faxed regarding reducing meds. |

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
|  | During a record review on 12/7/16, an IDT note, dated 10/26/16, indicated on 10/13/16, Resident 6 had a fall and sustained a laceration, to the left side of her head, requiring eight staples. The physician ordered increased Depakote (anti-seizure medication) for seizures, and Resident 6 continued to be at risk for falls. Resident 6's gait was steady, and Hall Monitors were available in B wing, according to IDT notes.

1g. Review of Resident 14's admitting History and Physical, indicated Resident 14 had severe dementia and was admitted to the facility on 7/6/16, after increasingly falling.

The, "Fall Risk Assessment" dated 7/6/16, indicated Resident 14 was at high risk for falls due to multiple problems including disoriented, three or more falls in the past three months and poor vision. Resident 14's, "Fall Risk Assessment," dated 11/7/16, indicated he was at high risk for falls due to one to two falls in the past three months.

Review of Resident 14's Post-Fall Assessments, Nursing Notes, and IDT Conference Record, indicated Resident 14 had a witnessed non-injury fall on 8/12/16 and 8/19/16 and an unwitnessed fall with injury on 11/5/16. IDT Conference Record, dated 11/5/16, indicated a Certified Nursing Assistant (CNA) found Resident 14 on the floor next to his bed on 11/4/16 at 9:15 p.m., laying on his left elbow and had a skin tear at left elbow. Resident 14's Nurse's Notes, dated 11/5/16, indicated: 1. CNA notified nurse Resident 14 was not able to bear weight on left leg and was complaining of pain, 2. Nursing assessment indicated Resident 14's left leg had a slight external rotation, and 3. Resident 14 was sent to the Emergency Department (ED) per Physician's Order. IDT Conference Record indicated the ED nurse contacted the facility's charge nurse who reported Resident 14 had a pelvic fracture.

Review of, "Physician Orders," dated for the month of December, indicated starting on 11/5/16, Resident 14 was to be, "one-on-one with staff at all times."

Review of, "Resident Care Plan Fall Risk Prevention and Management," revised and re-written on 11/8/16, indicated Resident 14: 1. Was at high risk for falls, 2. Had severe dementia, and 3. Had a significant change in condition whereby Resident 14 had a pelvic fracture, which occurred on 11/4/16; there was no indication for Resident 14 to be, "one-on-one with staff at all times."

Review of Resident 14's Care Plan Short-Term (start date 12/5/16), indicated an approach to the fall problem was for staff to notify the Charge Nurse immediately of any |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | changes in behavior for reassessment of supervision needed;" there was no indication for Resident 14 to be "one on one with staff at all times." |
| | The facility's policy and procedure titled, "Fall Management Program," revised 3/1/16 and 11/7/16, indicated, "The Facility will implement a Fall Management Program that supports providing an environment free from the hazards...The IDT will initiate, review, and update resident fall risks and Plan of Care at the following intervals:  Admission, quarterly, annually, upon significant change of condition identification, and post fall as needed...Post-Fall Response A. Following each resident fall, the Licensed Nurse will perform a Post-Fall Assessment utilizing FA-01-Form A-Post Fall Assessment, and update, initiate or revise a Plan of Care. B. The Licensed Nurse will complete the FA-01-Form B-Neurological Flow Sheet for an un-witnessed fall, or witnessed fall with suspected or known head injury for seventy-two (72) hours following the fall incident. The Attending Physician will be informed if there is a deviation from the resident's normal status for further instruction...D. The Licensed Nurse will notify the resident's Attending Physician and responsible party of the fall incident...Post Fall Huddle A. Within 15-20 minutes after a fall the Licensed Nurse will initiate a post fall huddle utilizing the Post fall Huddle form...Fall Investigation/Reporting and Documentation A. Following a resident incident of fall, the Licensed Nurse who has the most knowledge about the incident, will complete AP-31-Form A-Incident and Accident Report Forms...E. The IDT will summarize conclusions after their review of the fall and circumstances surrounding the fall on an IDT note. The plan of care will also reviewed and the care plan will be revised as necessary in an effort to prevent further falls with major injury...Recurrent Falls...These residents may require more frequent observation of activities and whereabouts..." |
| | 2a. During a concurrent observation and interview on 10/25/16, at 8:05 a.m., Resident 17 was in bed and alert. Resident 17 stated sometimes she had to wait for a long time, up to approximately 30 minutes, for staff answering her call light and assisting her. Resident 17 stated this long waiting time happened anytime of the day. Resident 17 stated she felt really bad when she needed to go to the bathroom. When asked what would happen if she needed to go to the bathroom, Resident 17 stated, "just have to wait." |
| | During a concurrent observation and interview on 12/5/16, at 3:05 p.m., Resident 17 was sitting in a wheelchair at her bedside. Resident 17 stated she usually had to wait for more than 30 minutes for staff answering her call light and assisting her. Resident 17 stated she felt bad when she had to urinate on herself and stayed wet for a long time. Resident 17 also stated she told the CNAs (Certified Nursing Assistants) every day that |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT
VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

SECTION 1424 NOTICE

CITATION NUMBER:    11-2707-0012902-F

Date: 02/28/2017  Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | she [Resident 17] wanted to be out of the bed by 9:30 a.m. She stated the CNAs said they would help her as soon as they could, but they were always late until 10 a.m. or after 10 a.m. Resident 17 stated they did not have enough CNAs.

Resident 17's MDS (Minimum Data Set, a clinical assessment process providing a comprehensive assessment of the resident's functional capabilities and helps staff identify health problems), dated 10/19/16, revealed Resident 17's BIMS (Brief Interview for Mental Status) score was 14, which indicated Resident 17 was cognitively intact.

During an interview on 12/7/16, at 10:55 a.m., Unlicensed Staff AA stated she usually assisted Resident 17 up at 9:30 a.m. or 10 a.m. Unlicensed Staff AA stated she did not remember if Resident 17 told her about getting up by 9:30 a.m.

Resident 17's care plan for Activities of Daily Living (ADLs), initiated on 11/2/15, and re-evaluated on 11/16, indicated Resident 17 required assistance for ADLs including transfer, dressing, and personal hygiene.

2b. During a concurrent observation and interview on 12/5/16, at 2:17 p.m., Resident 18 was in bed and awake. Resident 18 stated sometimes he had to wait 5 to 10 minutes for the staff to answer the call light. When asked how the 5 to 10 minutes wait time affected Resident 18, he stated, "depends what I needed." Resident 18 stated they did not have enough CNAs to help the residents.

Resident 17 and 18 were deemed by the facility to be interviewable.

The facility's policy and procedure titled, "Communication – Call System," revised 1/1/12, indicated, "...Nursing Staff will answer call bells promptly, in a courteous manner..."

During an interview on 12/9/16, at 7:20 a.m., regarding call light waiting time and the facility's policy and procedure of, "...answer call bells promptly...," the DON (Director of Nursing) stated staff should respond to call lights as quickly as possible with the goal of 3-5 minutes.

During an interview on 10/26/16, at 3:55 p.m., Unlicensed Staff L stated they did not have enough CNAs. Unlicensed Staff L stated the facility reduced the number of CNAs from three to two CNAs on B wing (a memory unit for residents who have memory problems). Unlicensed Staff L stated it was very stressful because Unlicensed Staff L |

State of California-Health and Human Services Agency
Case 2:19-cv-09938-MWF-JPR Document 1 Filed 11/22/19 Page 172 of 257 Page ID #:436
Page 25 of 32
California Department of Public Health

**SECTION 1424 NOTICE**

**CITATION NUMBER:** 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | could not do things for the residents as he wanted to do (i.e. brush their teeth, wash their hands, giving a bed bath, and other things) because of short staffing. Unlicensed Staff L stated they were not able to check residents as frequently as they would, to prevent residents from falling. Unlicensed Staff L stated two CNAs were not enough, and they needed three CNAs. Unlicensed Staff L stated the Hall Monitors (staff) could not provide any resident care; they just watched the residents and walked with the residents.

During an interview on 10/26/16, at 2:50 p.m., regarding staffing for fall prevention and management, the DON stated they increased Hall Monitors to B wing.

During an interview on 11/10/16, at 10:40 a.m., the Administrator stated B wing was the memory unit (residents had memory problems). The Administrator stated originally they had a total of three Hall Monitors covering from 6 a.m. to 8:30 p.m., but not at one time. The Administrator stated the first Hall Monitor worked from 6 a.m. to 2:30 p.m.; the second Hall Monitor worked from 9 a.m. to 5:30 p.m.; and the third Hall Monitor worked from 12 p.m. to 8:30 p.m. The Administrator stated about a week ago they increased the Hall Monitor to a total of four to cover 24 hours. She stated now the third Hall Monitor worked from 2:15 p.m. to 10:45 p.m., and the fourth Hall Monitor worked from 10:45 p.m. to 7:15 a.m. the next day.

During an interview on 12/6/16, at 5:20 p.m., in B wing, Unlicensed Staff K stated she usually worked in C Wing where residents were more stable. Unlicensed Staff K stated she worked PM (afternoon/evening) shift from 2:45 p.m. to 11:15 p.m., and cared for 10 to 12 patients each work shift. Unlicensed Staff K stated she felt they had enough staffing, and she could stay with and help the residents as long as she needed. When asked what tasks included in one work shift for 10 to 12 residents, Unlicensed Staff K itemized the routine tasks with time required as following: (the numbers in parentheses at the end of each task were used for calculation of the minimum minutes required for one work shift)

1. Changing briefs (cloth protectors): 30 min (minutes) per resident for 3-4 residents every 1.5-2 hours equals to 90 - 120 min (90)
2. Water round: 15 - 20 min (15)
3. Dinner set up: 5 min per resident for 4 - 5 residents equaled to 20 - 25 min (20)
4. Feeding resident: 15 min for set up and 30 min for feeding for one resident equaled to 45 min (45)
5. Changing and emptying urinals: 10 min per resident for 2 - 3 residents equaled to 20 - 30 min (20) |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFETY CODE, FAILURE TO CORRECT
VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | 6. Emptying urinary catheter bags: 10 min per resident for 2 residents equaled to 20 min (20) |
| | 7. Routine changing/making beds: 5 min per resident for 2 - 3 residents equaled to 10 - 15 min (10) |
| | 8. Changing wet beds: 5 min per resident for 2 residents equaled to 10 min (10) |
| | 9. Taking vital signs (blood pressure, temperature, etc.): 5 min per resident for 3 - 4 residents equals to 15 - 20 min (15) |
| | 10. Recording intake and output: 5 min (5) |
| | 11. Documentation of activities of living flow sheet: 20 min (20) |
| | 12. Shift change report: 15 min each for 2 reports equals to 30 min (30) |
| | 13. Breaks: 10 min each for 2 breaks equals to 20 min (20) |
| | 14. Meal break: 30 min (30) |
| | 15. Shower for residents: 20 - 30 min per resident for 2 - 3 residents equaled to 40-90 min (40) |
| | 16. Cleaning resident after meals: 20 min for total of 4 residents (20) |
| | 17. Assisted resident to bed: 10 min per resident for 4 - 5 residents equaled to 40-50 min (40) |
| | 18. Oral care: 5 - 10 min per resident for 2 residents equals to 10 - 20 min (10) |
| | 19. Toileting: 5 - 10 min per resident for 6 residents equals to 30 - 60 min (30) |
| | 20. Nail care: 10 min per resident for 3 resident equals to 30 min (30) |
| | 21. Peri care: 5 min per resident for 4 residents 4 times per shift equals to 80 min (80) |
| | 22. Grooming/shaving: 10 min for 4 residents equals to 40 min (40) |
| | 23. Dressing: 10 min per resident for 6 residents equals to 60 min (60) |
| | 24. Snack: 10 min (10) |
| | 25. Hand washing: before and after resident care: uncalculated |
| | 26. Answering call light: uncalculated |
| | The calculation revealed:  One CNA had a total of 510 minutes per shift from 2:45 p.m. to 11:15 p.m., including breaks. A minimum of 710 minutes were required to complete the routine tasks in one work shift including breaks. This 710 minutes did not include the time for hand washing, answering call lights, reporting change of condition, and other unexpected circumstances. There were 200 minutes short for the staff to complete the routine tasks. |
| | During an interview on 12/7/16, at 9:44 a.m., Unlicensed Staff PP, who worked in A Wing (one of the resident care unit), stated she worked both AM (morning) and PM shifts. Unlicensed Staff PP stated they usually had three CNAs on morning shift, and each CNA had eight residents; they had two CNAs PM shift, and each CNA had 13 |

State of California - Health and Human Services Agency

Department of Public Health

SECTION 1424 NOTICE

Page 27 of 32

CITATION NUMBER:     11-2707-0012902-F

Date: 02/28/2017  Time: _____

Case 2:19-cv-09983-MWF-JPR  Document 1  Filed 11/22/19  Page 174 of 257  Page ID #:438

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | residents. Unlicensed Staff PP stated they needed three CNAs for PM shift. Unlicensed Staff PP stated they had not been had enough CNAs since she returned to work in June 2016. Unlicensed Staff PP stated they needed adequate staffing to feed residents properly and ensure safety and prevent falls. When asked about the tasks and time required for caring for the residents for one work shift, Unlicensed Staff PP provided the time for the routine tasks. The calculation of the time required for completion of the routine tasks revealed a minimum of 754 minutes for AM shift and 1052 minutes for PM shift, including all tasks and breaks. The CNAs shifts (AM, PM, & Nights) consisted of a total of 510 minutes, which included the breaks. There were a minimum of 244 minutes short for AM shift and 542 minutes short for PM shift. This calculation did not include time for hand washing, answering call lights, reporting change of condition, other unexpected situations, and toileting, as she stated toileting required 6 - 10 minutes per one resident, and she assisted different residents throughout eight hours.<br><br>During an interview on 12/7/16, at 11:45 a.m., Unlicensed Staff BB, who worked in B wing, stated they, "never" staffed sufficiently. Unlicensed Staff BB stated they had two CNAs, and she had 12 residents. Unlicensed Staff BB stated they needed at least three CNAs.<br><br>During an interview on 12/7/16, at 4:45 p.m., Staffing Coordinator DD stated she did the schedules for all CNAs and RNAs (Restorative Nursing Assistants). Staffing Coordinator DD stated she scheduled staff according to the resident census and number of falls. Staffing Coordinator DD stated for full census, she usually scheduled three CNAs for AM and PM shifts in one unit (The facility had three units: A wing, B wing, C wing), and each CNA had 12 residents; two CNAs for night shift each unit, and each CNA had 22 residents. Staffing Coordinator DD stated if there were a lot of falls (on 12/8/16 at 10:35 a.m., she stated, to her one fall was a lot) in a unit, she would schedule more CNAs or Hall Monitors to that unit. Staffing Coordinator DD stated Hall Monitors walked back and forth in the hallway. If the Hall Monitor saw a resident getting out of bed, the Hall Monitor reported to the CNA or the nurse. The Hall Monitors were not certified for resident care. Staffing Coordinator DD stated the Hall Monitor might not be able to prevent the fall, because when the CNA or nurse arrived to the resident's room, the resident might have already fallen.<br><br>Staffing Coordinator DD stated the staffing one CNA to 12 to 22 residents was, "doable" because the resident census and care fluctuated. She stated she was also a CNA. When asked about the routine tasks required for one CNA in one work shift, Staffing Coordinator DD provided time required for each routine task. She stated AM |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

**SECTION 1424 NOTICE**                                              Page 28 of 32

**CITATION NUMBER:**    11-2707-0012902-F

Date: 02/28/2017  Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | and PM shifts were about the same. The calculation of the time revealed a minimum of 850 minutes for one CNA to complete the routine tasks in a given AM or PM shift; each CNA had a total of 510 minutes per shift, which was 340 minutes short. Staffing Coordinator DD did not provide details of all tasks for night shift but stated the tasks for night shift were more on repositioning, toileting, catheter care, and peri care (cleaning the urinary, vaginal, and rectal areas). |
| | Upon request for the days and shifts when Staff Coordinator DD scheduled more CNAs than a routine schedule because of, "a lot of falls," twice on 12/8/16 at 10:35 am., and 6:40 p.m., Staff Coordinator DD did not provide the days and shifts. |
| | During an interview on 12/8/16, at 9:40 a.m., Unlicensed Staff QQ, who worked in Wing A (one of the resident care units), stated she worked AM (morning) shift. Unlicensed Staff QQ stated they usually had two CNAs on morning shift, and each CNA had 14 residents, and she had 14 residents this day. Unlicensed Staff QQ stated they needed more staff for each shift to provide good care for the residents. Unlicensed Staff QQ also stated they needed adequate staffing to feed, shower, and bathe residents properly and ensure safety and prevent falls. When asked about the tasks and time required for caring the residents for one work shift, Unlicensed Staff QQ stated it was a lot of work and it was very hard to complete all the work adequately. When asked how long each of the routine daily tasks she performed took her to complete, she stated the following: |
| | 1. Shower per resident: 25/30 minutes times (2/3) residents equaled to 50-90 (50).<br>2. Bathing bed bath per resident: 25/30 minutes X (2/3) residents equaled to 50-90 (50).<br>3. Oral care: 10minutes X (14) residents equaled to (140) minutes.<br>4. Making a bed when resident is out: 10 minutes X (10) residents (100) minutes.<br>5. Making a bed when resident is in bed: 20 minutes X (2) residents equaled to (40) minutes.<br>6. Meal tray setup/document %: 10 minutes X (4/5) resident equaled to 40-50 (40) minutes.<br>7. Hand feeding: 40 minutes X (2/3) residents equaled to 80-120 (80) minutes.<br>8. Toileting residents: 10 minutes X (5/6) residents equaled to 50-60 (50) minutes.<br>9. Nail care: 15 minutes x (3/4) residents equaled to 45-60 (45) minutes.<br>10. Peri-care: 15 minutes X (4/5/) residents equaled to 80-100 (60) minutes.<br>11. Grooming/shaving: 15 minutes X (3/4) residents equaled to 45-60 (45) minutes.<br>12. Dressing residents: 20/30 minutes X (4) residents equaled 80-120 (80) minutes.<br>13. Catheters (empty/measure): 10 minutes X (3) residents equaled to (30) minutes.<br>14. Vital signs: 10 minutes X (14) residents equaled to (140) Minutes. |

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

SECTION 1424 NOTICE

CITATION NUMBER: 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | 15. Charting each resident at the end of the shift: 5 minutes X (14) residents equaled to (70) minutes.<br>16. Serving supplements: 3 minutes X (10) residents equaled (30) minutes.<br>17. Massage to bony prominence: 10 minutes X (4/5) residents equaled to 40-50 (40) minutes.<br>18. Reposition each resident: 10 minutes X (7) residents equaled to (70) minutes.<br>19. Handwashing prior to each resident: 2 minutes X (14) residents equaled to (28) minutes.<br>20. Reporting change in condition: 10 minutes X (3) residents equaled to (30) minutes.<br>21. Answering call lights: 5 minutes X (14) residents equaled to (70) minutes.<br>22. Changing wet beds: 10 minutes X (3) residents equaled to (30) minutes.<br>23. Breaks: 10 minutes X 2 equaled to (20) minutes.<br>24. Meal break: 30 minutes X (1) equaled to (30) minutes.<br>25. Assisting residents in bed: 5 minutes X (5) residents equaled to (25) minutes.<br>26. Recording intake and output: 10 minutes (10) minutes.<br>27. Recording of activities of daily living: 20 minutes (20) minutes.<br>28. Water rounds not included.<br><br>The calculation indicated a minimum of 1593 minutes were required for one CNA to complete all the tasks, including breaks, for an AM shift. The 510 minutes allotted for the morning Shift starting from 7:15 a.m. to 2:45 p.m. was not enough; it required more than 3 times of that (1593) minutes to provide an adequate care for the residents.<br><br>During an interview on 12/8/16, at 2:20 p.m., Unlicensed Staff RR stated she worked on C Wing for a long time, mostly on AM shift. Unlicensed Staff RR stated working on C Wing was a lot of work, but she got used to it. Unlicensed Staff RR had 13 Residents this day.<br><br>During an interview on 12/8/16, 2:45 p.m., Unlicensed Staff SS stated she worked morning shifts on B wing for a long time, and she always had 12 residents except this week. Unlicensed Staff SS stated this week she had eight residents because the State was there. Unlicensed Staff SS stated they needed to have more staffing on the B Wing because there were a lot of confused residents who required more help and care. Unlicensed Staff SS added even though there were Hall Monitors on the floor, they could not do a lot of things the CNAs could do such as caring, cleaning, bathing, assisting residents to bed, and making beds. |

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

**SECTION 1424 NOTICE**

**CITATION NUMBER:**     11-2707-0012902-F

Date: 02/28/2017  Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | During an interview on 12/7/16, at 8:15 a.m., Resident 6's family member, who was there everyday, stated he was not complaining, but he thought the facility needed more staffing for the B wing because of the large number of confused residents in the wing. During an interview on 12/7/16 at 5:50 p.m., when Unlicensed Staff MM was asked how long it took her to do her CNA duties on the PM Shift for the 13 residents she was assigned to on C wing, Unlicensed Staff MM stated: |

1. Shower depended on if the resident was a total lift or just needed supervisions: Total lift: 25-30 min, Bed bath: 20-30 min, wheelchair/stand: 15-20 min, or supervised: 20 min. Unlicensed Staff MM had two residents whose baths were scheduled: 40 mins
2. Oral care: 5-15 min depending if residents were mobile, had dentures, or bedridden: 2 bedridden (30 min) plus if 11 residents were mobile (55 min): 85 min
3. Meal tray set-up: 20 min
4. Feeder: 20-30 min. Unlicensed Staff MM had one feeder: 20 min
5. Toilet resident at least 3 times: 10 min. Unlicensed Staff MM had one resident that used the toilet: 30 min
6. 12 residents were incontinent: checked each resident 3 times per shift; if residents were dry it took 15 min and if half the residents are wet it took 40 min. 1 round all dry: 15 min and, 2 rounds whereby half the residents were wet: 40 x 2= 80 min for a total of 95 min.

7. Dress for bed: 12 min per resident x 13 residents = 156 min
8. Empty a Foley catheter: 2 min (Unlicensed Staff MM had 1)
9. Vital Signs: on average 3/4 residents took 15-20 min: 15 min
10. Passing Snack/Supplements: 20 min
11. Changing residents' water cup for the entire hall took 30-40 min: 30 min
12. Charting on 13 residents took 30-40 min: 30 min
13. Unlicensed Staff MM breaks included a 30-minute meal break and two 10-minute breaks: 50 min

The calculation revealed, if Unlicensed Staff MM was to perform all the above PM tasks on her own during a total of 510 minutes per shift from 2:45 p.m. to 11:15 p.m., including breaks for 13 residents, it would have taken her a minimum of 593 min. This did not account for hand washing in between each resident, reporting change of condition, repositioning residents every two hours (Unlicensed Staff MM had two bedridden residents), answering call lights, and other unexpected circumstances.

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

**SECTION 1424 NOTICE**

**CITATION NUMBER:** 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | The facility's policy and procedure titled, "Nursing Department - Staffing, Scheduling & Postings," revised 1/1/12, indicated, "The Facility will employ Nursing Staff that will be on duty in at least the number and with the qualifications required to provide the necessary nursing services for residents admitted for care." |
| | Therefore, the facility failed to ensure adequate nursing staff to provide quality care, which caused harm to its residents as evidenced by: |
| | 1. The facility did not provide adequate supervision and assistance, revise fall risk care plans and implement the care plans, follow fall protocol for post-fall assessment and management to prevent falls and injuries, for Residents 1, 2, 3, 4, 5, 6, and 14 when: |
| | a. Resident 1 walked to the restroom unassisted, grabbed the rod across the restroom entrance and fell on the floor on 8/28/16. This caused Resident 1 to sustain a left humeral neck (upper arm bone just under the shoulder joint) fracture which required admission to an acute care hospital for treatment. |
| | b. Resident 2 had five falls during a one-month period from 8/12/16 to 9/14/16. Resident 2 sustained a head injury from the last fall on 9/14/16, which required Resident 2 to be sent to an acute care hospital for evaluation and treatment. After 9/14/16, Resident 2 had three more falls on 10/26/16, 11/5/16, and 11/26/16. |
| | c. Staff did not follow their fall protocol for post-fall assessment and notify the physician of a fall, when Resident 3 reported having fallen on 10/20/16. This resulted in Resident 3 not being evaluated after the fall until 10/25/16 (five days later). |
| | d. Resident 5 had six falls during a six and one-half month period from 5/24/16 to 12/6/16. On 5/24/16, Resident 5 fell and sat on the floor in the bathroom which was wet with urine. A fall on 11/23/16, resulted in Resident 5 sustaining a small skin tear on the top ridge of the nose on 11/23/16 at 9:35 p.m. (This was the second fall this day). |
| | e. Resident 4 had three falls during a one-month period from 8/16/16 to 9/17/16. Resident 4 sustained a skin tear on the right hand from a fall on 8/16/16, and re-opened a skin tear on the right hand from a fall on 8/21/16. Resident 4 had three more falls during a one-week period from 10/13/16 to 10/17/16, which resulted in a nasal bone (nose) fracture from a fall on 10/13/16. |

**NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE**

SECTION 1424 NOTICE

Page 32 of 32

CITATION NUMBER: 11-2707-0012902-F

Date: 02/28/2017 Time: _____

| SECTIONS VIOLATED | CLASS AND NATURE OF VIOLATIONS |
|---|---|
| | f. Resident 6 had multiple falls in a six-month period from 5/22/16 to 11/25/16. Resident 6 sustained bleeding in the head from the fall on 8/1/16; a laceration (cut) on the left side of the head which required eight staples from the fall on 10/13/16. Resident 6 sustained a laceration on the right side of the head from the fall on 11/25/16. |
| | g. Licensed Staff did not revise Resident 14's (who had one unwitnessed fall on 11/4/16, which resulted in a skin tear to the left elbow and a fractured pelvis), "Fall Care Plan" to indicate Resident 14 was to be on, "one-on-one" with staff at all times starting 11/5/16, per Physician's Order. This failure to revise Resident 14's, "Fall Care Plan" had the potential for Resident 14 to fall again, causing injury or even death. |
| | 2. Residents' care needs were not being met when call lights were not answered in a timely manner for Resident 17 and 18, and Resident 17's need of getting out of the bed earlier in the morning was not honored. These failures resulted in Resident 17 staying wet with the urine and feeling bad, potentially compromising the residents' physical and psychosocial well-being. |
| | The violation of the regulation had presented either imminent danger that death or serious harm would result or a substantial probability that death or serious physical harm would result. |

NOTE: IN ACCORDANCE WITH CALIFORNIA HEALTH AND SAFTEY CODE, FAILURE TO CORRECT VIOLATIONS IS GROUNDS FOR SUSPENSION OR REVOCATION OF YOUR LICENSE

## CIVIL MONEY PENALTY ASSESSMENT

Facility :     Eureka Rehab & Wellness Center, LP

| DATE | CITATION # | CLASS | PENALTY ASSESSED | TOTAL DUE |
|------|-----------|-------|------------------|-----------|
| 02/28/2017 | 11-2707-0012902-F | A | $20,000.00 | $20,000.00 |
| SECTION(S) VIOLATED | | | | |
| F353 | | | | |

This citation has been issued as a Class A.                          Full Payment Due By : 04/29/2017

---

**PAYMENT OPTIONS**

Per Health and Safety Code, Section 1428.1, licensee may pay 65% of the amount shown above in the "Total Due" within 30 business days after issuance of this citation, or the minimum amount defined by law, whichever is greater in lieu of contesting the citation (Class A  Citation penalty minimum amount defined by law is $2000).  If licensee chooses not to exercise the 65% / 30 business day option, the full amount is due.

**Make Check Payable To:**
Department of Public Health
Include Citation Number

**Mailing Address:**

Licensing and Certification Program
Fiscal Services and Revenue
Collections Unit
P.O. Box 997434, MS 3202
Sacramento, CA  95899-7434

**COLLECTION OF DELINQUENT PAYMENTS**

CDPH will pursue collection of delinquent payments, including, but not limited to Medi-Cal offset (per Health & Safety Code, Section 1428). This will result in withholding of the licensee's Medi-Cal payments until the full amount of the citation is collected. In order to present a valid objection to the use of Medi-Cal offset, please contact the Grant and Fiscal Assessment Unit at the address listed above.

**CONTESTING A CLASS A  CITATION**

A licensee may contest a class "A" citation or penalty assessment by directly filing an action in Superior Court. (Health and Safety Code Section 1428.)

To contest a class "A" citation or penalty assessment, a licensee must send written notification to the Department advising of its intent to adjudicate the validity of the citation in court.  (Health and Safecty Code Section 1428.)

Please note, effective January 1, 2012, Assembly Bill No. 641 (Chapter 729, Statutes of 2011) amended Health and Safety Code Section 1428 to repeal the citation review conference process for "A" citations issued on or after January 1, 2012.  Therefore, if a licensee exercised its right to a citation review conference prior to January 1, 2012, the citation review conference and all notices, reviews, and appeals thereof shall be conducted pursuant to Section 1428 as it read on December 31, 2011.

The citation review conference process is no longer available to a licensee for citations issued on or after January 1, 2012.

Any written notification must be sent to the district office that issued the citation and must be postmarked within fifteen (15) business days after the service of the citation.  Please submit written notification to:

Department of Public Health
Licensing & Certification Program
Santa Rosa/Redwood Coast District Office
2170 Northpoint Parkway
Santa Rosa, CA 95407

_____
Signature of District Manager/Designee

_____
Date

# EXHIBIT H

**EXHIBIT H**

1  Amelia F. Burroughs (CSB #221490)
   Megan A. Yarnall (CSB #275319)
2  JANSSEN MALLOY LLP
   730 Fifth Street
3  P.O. Drawer 1288
   Eureka, CA 95501
4  Telephone: (707) 445-2071

5  Michael D. Thamer (CSB #101440)
   LAW OFFICE OF MICHAEL D. THAMER
6  Old Callahan School House
   12444 South Highway 3
7  P.O. Box 1568
   Callahan, CA  96014-1568
8  Telephone: (530) 467-5307

9  Attorneys for Theresa Kruger,
   as individual and as successor-in-interest
10 to Randy Lee Kruger, deceased

11

12                  SUPERIOR COURT OF CALIFORNIA

13                     COUNTY OF HUMBOLDT

14

15 THERESA KRUGER, as individual and as
   successor-in-interest to RANDY KRUGER,      Case No.:  DR 170144
16 deceased,

17
                                               COMPLAINT FOR DEPENDENT ADULT
18       Plaintiff,                            ABUSE – NEGLECT (WELFARE AND
                                               INSTITUTIONS CODE SECTION 15610.57)
19 vs.                                         AND WRONGFUL DEATH

20 EUREKA REHABILITATION & WELLNESS
21 CENTER, LP, EUREKA WELLNESS GP,
   LLC, ROCKPORT ADMINISTRATIVE
22 SERVICES, LLC DBA ROCKPORT
   HEALTHCARE SERVICES, BRIUS
23 MANAGEMENT CO., INC., BRIUS, LLC,
   EUREKA-LET, LP, EUREKA-LET GP, LLC,
24 SHLOMO RECHNITZ, and DOES 1 through
25 100, inclusive,

26
         Defendants
27 ///

28
   COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
   (WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
   WRONGFUL DEATH                                                    1

FILED
MAR 10 2017
SUPERIOR COURT OF CALIFORNIA
COUNTY OF HUMBOLDT

## GENERAL ALLEGATIONS

1.      Plaintiff Theresa Kruger is a resident of Humboldt County, California.  In making the claims herein, plaintiff brings this action on behalf of herself and the decedent, Randy Lee Kruger, who died on November 9, 2016.  Pursuant to Code of Civil Procedure §377.60, et seq., plaintiff acts as the personal representative of her now deceased husband. Plaintiff has complied with Code of Civil Procedure sections 364 and 377.32.  In addition, plaintiff is informed and believes that she has standing under Welfare and Institutions Code section 15657.3(d) to commence and maintain this action as decedent's lawful heir and has standing as an individual to bring this said cause of action for the wrongful death of her husband.

2.      Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein defendant EUREKA REHABILITATION & WELLNESS CENTER, LP (hereinafter referred to as "Eureka"), was and is a limited partnership formed and existing under the laws of the State of California.  Eureka is skilled nursing facility, licensed to operate 99 beds by the California Department of Public Health ("CDPH").

3.      Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein defendant EUREKA WELLNESS GP, LLC was and is a limited partnership formed and existing under the laws of the State of California, formed for the purpose of protecting the revenue generated at Eureka.

4.      Plaintiff is further informed and believes, and based thereon alleges, that at all times mentioned herein defendant ROCKPORT ADMINISTRATIVE SERVICES, LLC DBA ROCKPORT HEALTHCARE SERVICES (hereinafter referred to as "Rockport") was and is a limited liability company formed and existing under the laws of the State of California.  Though Rockport is not a licensed administrative company for Eureka, it functions as such and it was involved in making many of the decisions herein on behalf of Eureka that resulted in Mr. Kruger's death.

5.      Plaintiff is also informed and believes, and based thereon alleges, that at all times mentioned herein defendant BRIUS MANAGEMENT CO., INC. was and is a California

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH

2

1    corporation formed for the purpose of protecting the revenue generated at Eureka.

2          6.     Plaintiff is additionally informed and believes, and based thereon alleges, that at

3    all times mentioned herein defendant BRIUS, LLC, was and is a California limited liability

4    company formed for the purpose of protecting the revenue generated at Eureka.

5          7.     Plaintiff is also informed and believes, and based thereon alleges, that at all times

6    mentioned herein defendant EUREKA-LET, LP was and is a limited partnership formed and

7    existing under the laws of the State of California formed for the purpose of protecting the

8    revenue generated at Eureka.

9          8.     Plaintiffs is additionally informed and believes, and based thereon alleges, that at

10   all times mentioned herein defendant EUREKA-LET GP, LLC was and is a limited liability

11   company formed and existing under the laws of the State of California formed for the purpose

12   of protecting the revenue generated at Eureka.

13         9.     Plaintiff is informed and believes, and based thereon alleges, that at all times

14   mentioned herein defendant SHLOMO RECHNITZ is a citizen of the State of California, with a

15   place of residence in Los Angeles, California.  Mr. Rechnitz is identified as the sole owner

16   having a five-percent or more equity interest in Eureka, and he is the sole governing board

17   officer and member identified for the facility in CDPH licensing documents.

18         10.    The true names and capacities, whether individual, corporate, associate, or

19   otherwise of the defendant designated herein as DOES 1 through 100 are presently unknown to

20   plaintiff, who, therefore, sues said defendants by such fictitious names.  Plaintiff is informed

21   and believes, and based thereon, alleges, that each of the defendants designated herein as a

22   "Doe" is legally responsible for the events and happenings hereinafter referred to, and

23   proximately caused or contributed to the injuries and damages as hereinafter described.

24   Plaintiff will seek leave of the court to amend this complaint, to show the true names and

25   capacities of such parties, when the same has been ascertained.

26         11.    Plaintiff is informed and believes, and based thereon alleges, that at all times

27   herein mentioned, each of the defendants was the agent, partner, joint venturer, aider and

28   abettor, alter ego, and/or employee of each of the remaining defendants, and was acting within

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH

3

1  the course and scope of such agency, partnership, joint venture, and/or employment or in the

2  capacity of an aider and abettor or alter ego.

3        12.    Plaintiff is informed and believes, and based thereon alleges that defendants are

4  required to provide skilled nursing care, room and board, twenty-four-hour supervision, and

5  personal care and assistance to the residents.  Care and supervision required of said defendants

6  included custodial care and services, physician services, skilled nursing services, dietary

7  services, pharmaceutical services, and activities services as more specifically described in 22

8  California Code of Regulations section 72301, *et seq.*

9        13.    It is well known and has been expressly noted by the California legislature in its

10 adoption of Welfare and Institutions Code section 15600(a)-(d), that the dependent adult

11 population is particularly subject to various forms of abuse and neglect.  Physical infirmity or

12 mental impairment, such as those experienced by Mr. Kruger, often place one in a dependent

13 and vulnerable position.  At the same time, such infirmity and dependence leave those such as

14 Mr. Kruger as incapable of asking for help or protection.

15       14.    Recognizing the problems described in the preceding paragraph, the California

16 legislature promulgated the Elder Abuse and Dependent Adult Civil Protection Act

17 ("EADACPA").  This act is codified in Welfare and Institutions Code section 15600 et seq.

18 Pursuant to additions, the California legislature found and declared that infirm, elderly, and

19 dependent adults are a disadvantaged population, and that few civil cases are brought in

20 connection with their abuse due to the problems of proof and delays, plus the lack of incentive

21 to prosecute such suits.

22       15.    EADACPA defines a "dependent adult" as any person who resides in California

23 and is between 18 and 64 years old that has certain mental or physical disabilities that keep him

24 or her from being able to perform normal activities or protect himself or herself. (Welfare &

25 Institutions Code section 15610.23)

26       16.    As further defined under EADACPA, "abuse" of a dependent adult includes: (a)

27 physical abuse, neglect, financial abuse, abandonment, isolation, abduction, or other treatment

28 with resulting physical harm or pain or mental suffering; or (b) the deprivation by a care

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH                                                        4

1   custodian of goods or services necessary to avoid physical harm or mental suffering. (Welfare

2   & Institutions Code section 15610.07.)

3       17.    Welfare and Institutions Code section 15610.57 defines "neglect" to include:

4   "The negligent failure of any person having the care or custody of an elder or a dependent adult

5   to exercise that degree of care that a reasonable person in a like position would exercise."

6   (Welfare & Institutions Code section 15610.57(a)(1).)  Under the code, neglect includes but is

7   not limited to: (a) failure to provide medical care for physical or mental health needs; and (b)

8   failure to protect from health and safety hazards. (Welfare & Institutions Code section

9   15610.57(b).)

10       18.    In or about May of 2015, Mr. Kruger became infected with *Baylisascaris*

11   *procynis* roundworms which caused a sudden and rapid neurologic decline. Following extensive

12   treatment at St. Joseph's Hospital in Eureka California and at the University of California, San

13   Francisco, Mr. Kruger was admitted to Eureka for continued rehabilitation. At the time of his

14   admission, he could ambulate with assistance, though his balance was impaired and he had

15   reduced strength.  Mr. Kruger required assistance with daily living tasks such as eating,

16   ambulation, and toileting. At the time of his admission, he was not able to self-administer his

17   own medications.

18       19.    Title 42 of the Code of Federal Regulations section 483.25(b) provides that a

19   nursing home facility must ensure that: (1) A resident who enters the facility without pressure

20   sores does not develop pressure sores unless the individual's clinical condition demonstrates

21   that they were unavoidable; and (2) a resident having pressure sores receives necessary

22   treatment and services to promote healing, prevent infection, and prevent new sores from

23   developing.

24       20.    A "pressure ulcer" is a lesion caused by unrelieved pressure that results in

25   damage to the underlying tissues. A pressure ulcer is "avoidable" if a resident developed a

26   pressure ulcer and the facility did not do one or more of the following: evaluate the resident's

27   clinical condition and pressure ulcer risk factor; define and implement interventions that are

28   consistent with resident needs, resident goals, and recognized standards of practice; monitor and

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH

5

1  evaluate the impact of the interventions; or revise the intervention as appropriate.

2      21.    A pressure ulcer can occur whenever pressure has impaired circulation to the

3  tissue. Critical steps in pressure ulcer prevention and healing include: identifying the individual

4  resident at risk for developing pressure ulcers, identifying and evaluating the risk factors and

5  changes in the resident's condition, identifying and evaluating factors that could be removed,

6  implementing individualized interventions in an attempt to stabilize, reduce, or remove

7  underlying risk factors, monitor the impact of the interventions, and modify the interventions as

8  appropriate.

9      22.    Because pressure ulcers can develop within two to six hours of the onset of

10 pressure the at risk resident needs to be identified and have interventions implemented promptly

11 to attempt to prevent pressure ulcers.

12     23.    Among the risk factors for pressure ulcers are:

13     •   Impaired/decreased mobility and decreased functional ability;

14     •   Cognitive impairment;

15     •   Exposure of skin to urinary and fecal incontinence; and

16     •   Nutrition and hydration deficits.

17     Whenever these factors are present it is absolutely critical that nursing staff regularly

18 conduct thorough skin assessments on each resident who is at risk for developing pressure

19 ulcers.

20     24.    Mr. Kruger was admitted to Eureka for skilled nursing services and rehabilitation

21 on or about July 21, 2015. He was 63 years of age and a "dependent adult" within the legal

22 definition.

23     25.    Mr. Kruger resided in Eureka for approximately fifteen months.

24     26.    On August 24, 2016, the records note that defendants first observed a pressure

25 ulcer on Mr. Kruger's coccyx. By November 2, 2016, that pressure ulcer had progressed to the

26 point where it was a full thickness, stage four pressure ulcer protruding to the bone.

27     27.    On November 2, 2016, Mr. Kruger complained of chest pain, fever, and pain to

28 his tail bone area. Mr. Kruger was transported by ambulance from Eureka to St. Joseph's

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH

6

1   Hospital where he was admitted.

2      28.    On November 9, 2016, Mr. Kruger died of pneumonia and osteomyelitis.

3   **FIRST CAUSE OF ACTION FOR DEPENDENT ADULT ABUSE**

4      29.    Plaintiff refers to and incorporates herein by reference all preceding paragraphs

5   above as though fully set forth herein.

6      30.    During Mr. Kruger's residency at Eureka, he was a "dependent adult" within the

7   meaning of California's Welfare & Institutions Code section 15610.23 and was in the care and

8   custody of defendants.

9      31.    Defendants are "care custodians" within the meaning of California's Welfare &

10  Institutions Code section 15610.17.

11     32.    At all times herein mentioned, the residents at Eureka, including Mr. Kruger,

12  were relatively helpless, infirm, disabled, frail, vulnerable, and dependent individuals, in

13  constant need of adequate and reasonable care and services.

14     33.    As such, defendants, and each of them, had a duty, under applicable federal and

15  state laws (which were designed for the protection and benefit of residents such as Mr. Kruger)

16  to provide for and to protect plaintiff's health and safety, including his mental well-being.

17  Defendants, and each of them, also had a common law duty to provide for the health and

18  welfare of Mr. Kruger.

19     34.    Defendants neglected Mr. Kruger within the meaning of Welfare and Institutions

20  Code section 15610.57 in that defendants failed to exercise the degree of care that a reasonable

21  person having the care and custody of Mr. Kruger would exercise.  Defendants' conduct as

22  herein alleged also constitutes the reckless and wanton neglect of Mr. Kruger's health and

23  safety.  In particular, and without limiting the generality of the foregoing, defendants failed to

24  consistently check Mr. Kruger's skin condition and failed to appropriately care for Mr. Kruger's

25  skin to avoid development of a stage four pressure ulcer.

26     35.    As a result, Mr. Kruger developed a stage four pressure ulcer on his coccyx that

27  required hospitalization, lead to bone infections, and Mr. Kruger's death.

28     36.    As a result of said defendants' continuing pattern of dependent adult abuse, as

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH                                                              7

1    alleged above, Mr. Kruger suffered the following damages for which plaintiff seeks

2    compensation:

3              a.      mental and emotional distress, all to Mr. Kruger's damage in a sum that

4    will be proven at trial;

5              b.      Extra expenses for transportation and medical care, according to proof at

6    trial;

7              c.      General and special damages in an amount that will be proven at trial;

8    and

9              d.      Payment of funds for services which were not rendered, according to

10   proof at trial.

11       37.   At all times herein mentioned, defendants knew of the need to comply with the

12   laws applicable to the ownership, operation, management, and/or supervision of Eureka, and

13   further knew that non-compliance with such laws would put the health and welfare of the

14   residents, including plaintiff, unreasonably at risk.  Defendants also knew that the continual

15   failure or refusal to discharge their duties to Mr. Kruger would likely result in injury.

16       38.   The conduct of defendants, as alleged above, constitutes "abandonment" and

17   "neglect," as those terms are defined in Welfare & Institutions Code section 15610.57, in that

18   defendants failed to exercise the degree of care that a reasonable person having the custody of

19   plaintiff would exercise.  The continuing pattern of abuse, as alleged above, was a direct result

20   of defendants' conscious plan to operate Eureka at inadequate staffing and patient care levels to

21   wrongfully maximize their business profits, including patient dumping to avoid incurring costs

22   associated with transfer to another appropriate facility under the law.  Under Welfare &

23   Institutions Code Section 15657(a)-(b), defendants are liable to plaintiff for damages related to

24   her personal injuries, medical expenses, plus attorneys' fees and costs.

25       39.   As a result of the above-described oppressive, malicious and fraudulent conduct

26   of defendants, plaintiff alleges that she is entitled to an award of punitive and exemplary

27   damages pursuant to Civil Code §3294.

28   / / /

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH

8

**SECOND CAUSE OF ACTION FOR VIOLATION OF PATIENT'S RIGHTS**

**PURSUANT TO HEALTH AND SAFETY CODE §1430(b)**

40.     Plaintiff refers to and incorporates herein by reference all preceding paragraphs above as though fully set forth herein.

41.     During Mr. Kruger's residency at Eureka, he was (a) a dependent adult and (b) in the care and custody of defendants.

42.     As such, defendants, and each of them, had a duty, under applicable federal and state laws (which were designed for the protection and benefit of residents such as Mr. Kruger) to provide for and to protect Mr. Kruger's health and safety, including not neglecting him. Defendants, and each of them, also had a common law duty to provide for the health and welfare of Mr. Kruger.  Without limiting the generality of the foregoing, defendants had, among other duties, the duty with respect to Mr. Kruger's health and welfare to:

        a.     Protect Mr. Kruger from sustaining injuries to his person;

        b.     Monitor and accurately record Mr. Kruger's condition, and notify the attending physician and family members of any meaningful change in his condition;

        c.     Note and properly react to emergent conditions;

        d.     Establish and implement a care plan for Mr. Kruger, based upon, and including, an ongoing process of identifying his health and care needs and making sure that such needs were timely met;

        e.     Accurately monitor and provide for Mr. Kruger's health, comfort and safety;

        f.     Maintain accurate records of Mr. Kruger's condition and activities;

        g.     Adopt, observe, and implement written infection control policies;

        h.     Maintain in number and qualification sufficient staff to meet residents' needs; and

        i.     Treat Mr. Kruger with dignity and respect, and without abuse and neglect.

43.     Additionally, Title 22 C.C.R. §72311(a)(3) required Eureka to promptly notify

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH

9

1    Mr. Kruger's healthcare practitioner of "[a]ny sudden and/or marked adverse change in signs,

2    symptoms or behavior exhibited by a patient;" and § 72329.1 requires specific levels and types

3    of nursing staff to meet resident needs. Eureka violated all of these regulations.

4         44.    In addition to federal rights, Mr. Kruger enjoyed numerous state rights,

5    including: (a) the facility shall employ an adequate number of qualified personnel to carry out

6    all of the functions of the facility and (b) each patient shall show evidence of good personal

7    hygiene and be given care to prevent bedsores. Eureka violated Mr. Kruger's state rights.

8         45.    During Mr. Kruger's residency at Eureka, defendants, and each of them, failed to

9    use the degree of care that a reasonable person in the same situation would have used in

10   protecting Mr. Kruger from health and safety hazards, including the development of pressure

11   ulcers. Defendants, and each of them, declined to provide Mr. Kruger with appropriate

12   assessment with respect to his risk of injury or death. Defendants, and each of them,

13   deliberately did not staff Eureka in such a way as to permit Eureka's employees to properly care

14   Mr. Kruger, and Defendants' actions were a conscious choice of a course of action with respect

15   to Mr. Kruger's risk assessment and the determination of his needs, with knowledge of the

16   serious danger in which Mr. Kruger was placed as a result such actions.

17        46.    As a direct result of each defendant's neglect, Mr. Kruger was injured in his

18   person and health, and sustained serious physical injuries and damages, and ultimately death.

19        47.    Defendants' conduct constitutes "neglect" as that term is defined in Welfare and

20   Institutions Code §§15610.63 and 15610.57 in that defendants failed to use the degree of care

21   that a reasonable person having the custody of Mr. Kruger would exercise. Under Welfare and

22   Institutions Code §15651(a)-(b), defendants are liable to plaintiffs for damages related to Mr.

23   Kruger's damages related to personal injuries and medical expenses.

24        48.    As a result of defendants' neglect as alleged, plaintiff, on behalf of herself and as

25   Mr. Kruger's personal representative, seeks all economic damages to which she is entitled

26   according to proof at trial.

27   ///

28   ///

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH                                                    10

## **THIRD CAUSE OF ACTION FOR WRONGFUL DEATH**

49.     Plaintiff refers to and incorporate herein by reference all preceding paragraphs above as though fully set forth herein.

50.     As a consequence of the injuries suffered by Mr. Kruger at Eureka, he died on November 9, 2016.

51.     As a result of the acts of defendants Eureka and DOES 1 through 100, inclusive, and each of them, as alleged above, Mr. Kruger died, and plaintiff lost the love, companionship, comfort, affection, and society of her husband, for which plaintiff seeks general damages.

52.     As a further result of the acts of the defendants, and each of them, as alleged above, the decedent's family incurred funeral and burial expenses for the burial of Mr. Kruger, for which the plaintiff seeks special damages.

## **FOURTH CAUSE OF ACTION FOR NEGLIGENCE**

53.     Plaintiff refers to and incorporates herein by reference all preceding paragraphs above as though fully set forth herein.

54.     At all times herein mentioned, defendants failed to exercise the degree of skill and care commonly required of skilled nursing facilities for dependent adults pursuant to state laws detailed above.

55.     As a legal result of defendants' negligence and carelessness, Mr. Kruger was severely injured and thereafter died.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

1.     For damages pursuant to Health and Safety Code §1430(b);

2.     For general damages in a sum to be proven at the time of trial;

3.     For special damages in a sum to be proven at the time of trial;

4.     For pre-death pain and suffering pursuant to Welfare and Institutions Code §15657;

5.     For punitive damages;

6.     For pre-judgment and post-judgment interest, according to law;

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH

11

1       7.    For attorneys' fees;

2       8.    For costs of suit herein; and

3       9.    For such other and further relief as the Court may deem just and

4           proper.

5 Dated March 10, 2017       JANSSEN MALLOY LLP

6

7                  By:

8                     Amelia F. Burroughs
                          Attorneys for Theresa Kruger, as individual and

9                     as successor-in-interest to Randy Kruger

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH

# EXHIBIT I

**EXHIBIT I**

1   Amelia F. Burroughs (CSB #221490)
    Megan A. Yarnall (CSB #275319)
2   JANSSEN MALLOY LLP
    730 Fifth Street
3   P.O. Drawer 1288
    Eureka, CA 95501
4   Telephone: (707) 445-2071

5   Michael D. Thamer (CSB #101440)
    LAW OFFICE OF MICHAEL D. THAMER
6   Old Callahan School House
    12444 South Highway 3
7   P.O. Box 1568
    Callahan, CA 96014-1568
8   Telephone: (530) 467-5307

9   Attorneys for SHERRI MCKENNA,
    as personal representative of the Estate
10  of ALAN DEWEY, Decedent

**FILED**

MAR 10 2017

SUPERIOR COURT OF CALIFORNIA
COUNTY OF HUMBOLDT

11

12              **SUPERIOR COURT OF CALIFORNIA**

13                 **COUNTY OF HUMBOLDT**

14

15  SHERRI MCKENNA, as personal            Case No.:   **DR 170143**
    representative of the Estate of ALAN DEWEY,
16  Decedent,

17                                         COMPLAINT FOR DEPENDENT ADULT
           Plaintiff,                      ABUSE – NEGLECT (WELFARE AND
18                                         INSTITUTIONS CODE SECTION 15610.57)
    vs.                                    AND WRONGFUL DEATH
19

20  EUREKA REHABILITATION & WELLNESS
    CENTER, LP, EUREKA WELLNESS GP,
21  LLC, ROCKPORT ADMINISTRATIVE
    SERVICES, LLC DBA ROCKPORT
22  HEALTHCARE SERVICES, BRIUS
    MANAGEMENT CO., INC., BRIUS, LLC,
23  EUREKA-LET, LP, EUREKA-LET GP, LLC,
    SHLOMO RECHNITZ, and DOES 1 through
24  100, inclusive,
25
26           Defendants
27  / / /

28

    COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
    (WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
    WRONGFUL DEATH                                                    1



**GENERAL ALLEGATIONS**

1.      Plaintiff Sherri McKenna is a resident of Humboldt County, California. In making the claims herein, plaintiff brings this action as the Personal Representative and the executor of the Estate of Alan Dewey, who will be duly appointed by the Superior Court, and as such has standing to bring this action on behalf of herself and the decedent, Alan Dewey, who died on October 18, 2016. Pursuant to Code of Civil Procedure §377.60, et seq., plaintiff acts as the personal representative of her now deceased brother. Plaintiff has complied with Code of Civil Procedure sections 364 and 377.32. In addition, plaintiff is informed and believes that she has standing under Welfare and Institutions Code section 15657.3(d) to commence and maintain this action as decedent's lawful heir and has standing as an individual to bring this said cause of action for the wrongful death of her brother.

2.      Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein defendant EUREKA REHABILITATION & WELLNESS CENTER, LP (hereinafter referred to as "Eureka"), was and is a limited partnership formed and existing under the laws of the State of California. Eureka is skilled nursing facility, licensed to operate 99 beds by the California Department of Public Health ("CDPH").

3.      Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein defendant EUREKA WELLNESS GP, LLC was and is a limited partnership formed and existing under the laws of the State of California, formed for the purpose of protecting the revenue generated at Eureka.

4.      Plaintiff is further informed and believes, and based thereon alleges, that at all times mentioned herein defendant ROCKPORT ADMINISTRATIVE SERVICES, LLC DBA ROCKPORT HEALTHCARE SERVICES (hereinafter referred to as "Rockport") was and is a limited liability company formed and existing under the laws of the State of California. Rockport is not a licensed administrative company for Eureka but functions as such and it was involved in making many of the decisions herein on behalf of Eureka that resulted in Mr. Dewey's death.

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH

2



1        5.      Plaintiff is also informed and believes, and based thereon alleges, that at all times

2  mentioned herein defendant BRIUS MANAGEMENT CO., INC. was and is a California

3  corporation formed for the purpose of protecting the revenue generated at Eureka.

4        6.      Plaintiff is additionally informed and believes, and based thereon alleges, that at

5  all times mentioned herein defendant BRIUS, LLC; was and is a California limited liability

6  company formed for the purpose of protecting the revenue generated at Eureka.

7        7.      Plaintiff is also informed and believes, and based thereon alleges, that at all times

8  mentioned herein defendant EUREKA-LET, LP was and is a limited partnership formed and

9  existing under the laws of the State of California formed for the purpose of protecting the

10  revenue generated at Eureka.

11       8.      Plaintiffs is additionally informed and believes, and based thereon alleges, that at

12  all times mentioned herein defendant EUREKA-LET GP, LLC was and is a limited liability

13  company formed and existing under the laws of the State of California formed for the purpose

14  of protecting the revenue generated at Eureka.

15       9.      Plaintiff is informed and believes, and based thereon alleges, that at all times

16  mentioned herein defendant SHLOMO RECHNITZ is a citizen of the State of California, with a

17  place of residence in Los Angeles, California.  Mr. Rechnitz is identified as the sole owner

18  having a five-percent or more equity interest in Eureka, and he is the sole governing board

19  officer and member identified for the facility in CDPH licensing documents.

20      10.     The true names and capacities, whether individual, corporate, associate, or

21  otherwise of the defendant designated herein as DOES 1 through 100 are presently unknown to

22  plaintiff, who, therefore, sues said defendants by such fictitious names.  Plaintiff is informed

23  and believes, and based thereon, alleges, that each of the defendants designated herein as a

24  "Doe" is legally responsible for the events and happenings hereinafter referred to, and

25  proximately caused or contributed to the injuries and damages as hereinafter described.

26  Plaintiff will seek leave of the court to amend this complaint, in order to show the true names

27  and capacities of such parties, when the same has been ascertained.

28

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH                                      3

1      11.    Plaintiff is informed and believes, and based thereon alleges, that at all times

2   herein mentioned, each of the defendants was the agent, partner, joint venturer, aider and

3   abettor, alter ego, and/or employee of each of the remaining defendants, and was acting within

4   the course and scope of such agency, partnership, joint venture, and/or employment or in the

5   capacity of an aider and abettor or alter ego.

6      12.    Plaintiff is informed and believes, and based thereon alleges that defendants are

7   required to provide skilled nursing care, room and board, twenty-four-hour supervision, and

8   personal care and assistance to the residents.  Care and supervision required of said defendants

9   included custodial care and services, physician services, skilled nursing services, dietary

10   services, pharmaceutical services, and activities services as more specifically described in 22

11   California Code of Regulations section 72301, *et seq.*

12      13.    It is well known and has been expressly noted by the California legislature in its

13   adoption of Welfare and Institutions Code section 15600(a)-(d) that the dependent adult

14   population is particularly subject to various forms of abuse and neglect.  Physical infirmity or

15   mental impairment, such as those experienced by Mr. Dewey, often place one in a dependent

16   and vulnerable position.  At the same time, such infirmity and dependence leave those such as

17   Mr. Dewey as incapable of asking for help or protection.

18      14.    Recognizing the problems described in the preceding paragraph, the California

19   legislature promulgated the Elder Abuse and Dependent Adult Civil Protection Act

20   ("EADACPA").  This act is codified in Welfare and Institutions Code section 15600 et seq.

21   Pursuant to additions, the California legislature found and declared that infirm, elderly, and

22   dependent adults are a disadvantaged population, and that few civil cases are brought in

23   connection with their abuse due to the problems of proof and delays, plus the lack of incentive

24   to prosecute such suits.

25      15.    EADACPA defines a "dependent adult" as any person who resides in California

26   and is between 18 and 64 years old that has certain mental or physical disabilities that keep him

27   or her from being able to do normal activities or protect himself or herself.  (Welfare &

28

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH                                                                4

1 | Institutions Code section 15610.23.)

2 |     16.    As further defined by EADACPA, "abuse" of a dependent adult includes: (a)

3 | physical abuse, neglect, financial abuse, abandonment, isolation, abduction, or other treatment

4 | with resulting physical harm or pain or mental suffering; or (b) the deprivation by a care

5 | custodian of goods or services necessary to avoid physical harm or mental suffering.  (Welfare

6 | & Institutions Code section 15610.07.)

7 |     17.    Welfare and Institutions Code section 15610.57 defines "neglect" to include:

8 | "The negligent failure of any person having the care or custody of an elder or a dependent adult

9 | to exercise that degree of care that a reasonable person in a like position would exercise."

10 | (Welfare & Institutions Code section 15610.57(a)(1).)  Under the code, neglect includes but is

11 | not limited to: (a) Failure to provide medical care for physical or mental health needs; and (b)

12 | Failure to protect from health and safety hazards. (Welfare & Institutions Code section

13 | 15610.57(b).)

14 |     18.    Alan Dewey was admitted to Eureka for skilled nursing services and

15 | rehabilitation on December 22, 2014 from the Humboldt County Jail.  He was 63 years of age

16 | and a "dependent adult" within the legal definition.  He suffered a significant brain injury in

17 | 1975 and a stroke, which affected his vision.  He had a seizure disorder and multiple complex

18 | medical problems, including bi-polar disorder, chronic pain, anxiety, blindness, and

19 | encephalopathy due to hypertension and COPD.  He also suffered from dementia, became easily

20 | agitated, and had angry outbursts of behavior.  At the time of his admission, he was not able to

21 | self-administer his own medications.

22 |     19.    Mr. Dewey resided in Eureka for approximately two-and-one-half years.

23 |     20.    On October 13, 2016, Eureka informed plaintiff that Mr. Dewey could no longer

24 | reside in its facility.

25 |     21.    On October 14, 2016, Eureka deposited plaintiff at the Clarion Hotel, a hotel in

26 | Eureka, California, simply telling Mr. Dewey that he could stay there for 30 days.  Eureka drove

27 | Mr. Dewey to the hotel in its van, and left Mr. Dewey at the hotel with his many medications,

28 |

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH          5

1    one of which he was to take because he was a "danger to others", a half-gallon of milk, instant

2    noodles, and Velveeta macaroni and cheese.  Eureka also left Mr. Dewey with a cpap machine

3    without the oxygen concentrator that he had used while a resident at Eureka. Eureka also

4    promised to institute home health visits.

5         22.    Mr. Dewey could not see well enough to attend breakfast in the lobby of the

6    hotel, could not see well enough to sort and take his medications appropriately, and could not

7    see well enough to use the key card to enter his room or navigate his surroundings.

8         23.    No home health visit was made to Mr. Dewey at the Clarion Hotel.

9         24.    Four days after defendants abandoned Mr. Dewey at the Clarion Hotel, Mr.

10   Dewey was found unresponsive in his hotel room.  He died on October 18, 2016.

11        25.    During this time period, Eureka had notified the public through its Brius and

12   Rockport entities that it would close its facility.  Prior to closing, Eureka is required to give 30

13   days' prior notice to each resident, perform an appropriate assessment of each resident, and

14   arrange for appropriate future medical care and services.  Plaintiff is informed and believes that

15   defendant Eureka discharged Mr. Dewey in an effort to clear its facility and decrease the

16   onerous requirements for resident transfers.

17              **FIRST CAUSE OF ACTION FOR DEPENDENT ADULT ABUSE**

18        26.    Plaintiff refers to and incorporates herein by reference all preceding paragraphs

19   above as though fully set forth herein.

20        27.    During Mr. Dewey's residency at Eureka, he was (a) a "dependent adult" within

21   the meaning of California's Welfare & Institutions Code section 15610.23 and (b) in the care

22   and custody of defendants.

23        28.    Defendants are "care custodians" within the meaning of California's Welfare &

24   Institutions Code section 15610.17.

25        29.    At all times herein mentioned, the residents at Eureka, including Mr. Dewey,

26   were relatively helpless, infirm, disabled, frail, vulnerable, and dependent individuals, in

27   constant need of adequate and reasonable care and services.

28

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH                                                              6

1    30.    As such, defendants, and each of them, had a duty, under applicable federal and

2    state laws (which were designed for the protection and benefit of residents such as Mr. Dewey)

3    to provide for and to protect plaintiff's health and safety, including his mental well-being.

4    Defendants, and each of them, also had a common law duty to provide for the health and

5    welfare of Mr. Dewey.

6    31.    With respect to Mr. Dewey, defendants abandoned him within the meaning of

7    California Welfare and Institutions Code section 15610.05, with the desertion and/or willful

8    forsaking of Mr. Dewey under circumstances in which a reasonable person would continue to

9    provide care and custody.

10    32.    Defendants also neglected Mr. Dewey within the meaning of Welfare and

11    Institutions Code section 15610.57 in that defendants failed to exercise the degree of care that a

12    reasonable person having the care and custody of Mr. Dewey would exercise.  Defendants'

13    conduct as herein alleged also constitutes the reckless and wanton neglect of Mr. Dewey's

14    health and safety.  In particular, and without limiting the generality of the foregoing, defendants

15    were required to employ appropriate discharge and/or transfer procedures before summarily

16    discharging Mr. Dewey from Eureka.  Defendants failed to document the resident's clinical

17    record by a physician if the ostensible reason for discharge is the health of others in the facility;

18    notify the resident and family member of the discharge and reasons therefor in a writing that

19    includes the reasons for transfer, the effective date of transfer, the location to which the resident

20    is transferred; provide Mr. Dewey with notice of Mr. Dewey's right to appeal the discharge

21    decision, as well as the name and address of the Long-Term Care Ombudsman, and provide Mr.

22    Dewey with certain requirements for residents with mental illnesses and/or developmental

23    disabilities.  Nor did defendant provide notice as soon as practicable before discharge.

24    Defendants also failed to provide Mr. Dewey with sufficient preparation and orientation to

25    ensure the safe and orderly transition from the facility.

26    33.    As a result of said defendants' continuing pattern of dependent adult abuse, as

27    alleged above, Mr. Dewey suffered the following damages for which plaintiff seeks

28

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH                                                                7



1   compensation:

2           a.      mental and emotional distress, all to Mr. Dewey's damage in a sum that
3   will be proven at trial;

4           b.      Extra expenses for transportation and medical care, according to proof at
5   trial;

6           c.      General and special damages in an amount that will be proven at trial;
7   and .

8           d.      Payment of funds for services which were not rendered, according to
9   proof at trial.

10      34.     At all times herein mentioned, defendants knew of the need to comply with the
11  laws applicable to the ownership, operation, management, and/or supervision of Eureka, and
12  further knew that non-compliance with such laws would put the health and welfare of the
13  residents, including plaintiff, unreasonably at risk.  Defendants also knew that the continual
14  failure or refusal to discharge their duties to Mr. Dewey would likely result in injury.

15      35.     The conduct of defendants, as alleged above, constitutes "abandonment" and
16  "neglect," as those terms are defined in Welfare & Institutions Code section 15610.57, in that
17  defendants failed to exercise the degree of care that a reasonable person having the custody of
18  plaintiff would exercise.  The continuing pattern of abuse, as alleged above, was a direct result
19  of defendants' conscious plan to operate Eureka at inadequate staffing and patient care levels to
20  wrongfully maximize their business profits, including patient dumping to avoid incurring costs
21  associated with transfer to another appropriate facility under the law.  Under Welfare &
22  Institutions Code Section 15657(a)-(b), defendants are liable to plaintiff for damages related to
23  her personal injuries, medical expenses, plus attorneys' fees and costs.

24      36.     As a result of the above-described oppressive, malicious and fraudulent conduct
25  of defendants, plaintiff alleges that she is entitled to an award of punitive and exemplary
26  damages pursuant to Civil Code §3294.

27  / / /

28
    COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
    (WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
    WRONGFUL DEATH                                                    8



## SECOND CAUSE OF ACTION FOR VIOLATION OF PATIENT'S RIGHTS
## PURSUANT TO HEALTH AND SAFETY CODE §1430(b)

37.     Plaintiff refers to and incorporates herein by reference all preceding paragraphs above as though fully set forth herein.

38.     During Mr. Dewey's residency at Eureka, he was (a) a dependent adult and (b) in the care and custody of defendants.

39.     As such, defendants, and each of them, had a duty, under applicable federal and state laws (which were designed for the protection and benefit of residents such as Mr. Dewey) to provide for and to protect Mr. Dewey's health and safety, including not abandoning him or neglecting him.  Defendants, and each of them, also had a common law duty to provide for the health and welfare of Mr. Dewey.  Without limiting the generality of the foregoing, defendants had, among other duties, the duty with respect to Mr. Dewey's health and welfare to:

    a.     Protect Mr. Dewey from sustaining injuries to his person;

    b.     Monitor and accurately record Mr. Dewey's condition, and notify the attending physician and family members of any meaningful change in his condition;

    c.     Note and properly react to emergent conditions;

    d.     Establish and implement a care plan for Mr. Dewey, based upon, and including, an ongoing process of identifying his health and care needs and making sure that such needs were timely met;

    e.     Accurately monitor and provide for Mr. Dewey's health, comfort and safety;

    f.     Maintain accurate records of Mr. Dewey's condition and activities;

    g.     Adopt, observe, and implement written infection control policies;

    h.     Maintain in number and qualification sufficient staff to meet residents' needs; and

    i.     Treat Mr. Dewey with dignity and respect, and without abuse and neglect.

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH                                                                                          9

1    40.    Additionally, Title 22 C.C.R. §72311(a)(3) required Eureka to promptly notify

2  Mr. Dewey's healthcare practitioner of "[a]ny sudden and/or marked adverse change in signs,

3  symptoms or behavior exhibited by a patient," and § 72329.1 requires specific levels and types

4  of nursing staff to meet resident needs.  Eureka violated all of these regulations.

5    41.    During Mr. Dewey's residency at Eureka, defendants, and each of them, failed to

6  use the degree of care that a reasonable person in the same situation would have used in

7  protecting Mr. Dewey from health and safety hazards. Defendants, and each of them, declined

8  to provide Mr. Dewey with appropriate assessment with respect to his risk of injury or death at

9  discharge. Defendants, and each of them, deliberately did not staff Eureka in such a way as to

10  permit Eureka's employees to properly care Mr. Dewey, and defendants discharged Mr. Dewey

11  in an effort to decrease their obligation in closing the facility.  Defendants' deliberate decision

12  was in an effort to avoid increased labor costs with Mr. Dewey's continued residency. As a

13  result, defendants withheld care from Mr. Dewey and deliberately disregarded the high degree

14  of probability that injury to Mr. Dewey would result.  Defendants' actions were a conscious

15  choice of a course of action with respect to Mr. Dewey's risk assessment and the determination

16  of his needs, with knowledge of the serious danger in which Mr. Dewey was placed as a result

17  such actions.

18    42.    As a direct result of each defendant's neglect, Mr. Dewey was injured in his

19  person and health, and sustained serious physical injuries and damages, and ultimately death.

20    43.    Defendants' conduct constitutes "neglect" as that term is defined in Welfare and

21  Institutions Code §§15610.63 and 15610.57 in that defendants failed to use the degree of care

22  that a reasonable person having the custody of Mr. Dewey would exercise.  Under Welfare and

23  Institutions Code §15651(a)-(b), defendants are liable to plaintiffs for damages related to Mr.

24  Dewey's damages related to personal injuries and medical expenses.

25    44.    As a result of defendants' neglect as alleged, plaintiff, on behalf of herself and as

26  Mr. Dewey's personal representative, seeks all economic damages to which she is entitled

27  according to proof at trial.

28

COMPLAINT FOR DEPENDENT ADULT ABUSE – NEGLECT
(WELFARE AND INSTITUTIONS CODE SECTION 15610.57) AND
WRONGFUL DEATH                                              10

 

## THIRD CAUSE OF ACTION FOR WRONGFUL DEATH

45.    Plaintiff refers to and incorporate herein by reference all preceding paragraphs above as though fully set forth herein.

46.    As a consequence of the injuries suffered by Mr. Dewey at Eureka, he died on October 18, 2016.

47.    As a result of the acts of defendants Eureka and DOES 1 through 100, inclusive, and each of them, as alleged above, Mr. Dewey died, and plaintiff lost the love, companionship, comfort, affection, and society of her brother, for which plaintiff seeks general damages.

48.    As a further result of the acts of the defendants, and each of them, as alleged above, the decedent's family incurred funeral and burial expenses for the burial of Mr. Dewey, for which the plaintiff seeks special damages.

## FOURTH CAUSE OF ACTION FOR NEGLIGENCE

49.    Plaintiff refers to and incorporates herein by reference all preceding paragraphs above as though fully set forth herein.

50.    At all times herein mentioned, defendants failed to exercise the degree of skill and care commonly required of skilled nursing facilities for dependent adults pursuant to state laws detailed above.

51.    As a legal result of defendants' negligence and carelessness, Mr. Dewey was severely injured and thereafter died.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

     1.    For damages pursuant to Health and Safety Code §1430(b);

     2.    For general damages in a sum to be proven at the time of trial;

     3.    For special damages in a sum to be proven at the time of trial;

     4.    For pre-death pain and suffering pursuant to Welfare and Institutions Code §15657;

     5.    For punitive damages;

1        6.     For pre-judgment and post-judgment interest, according to law;

2        7.     For attorneys' fees;

3        8.     For costs of suit herein; and

4        9.     For such other and further relief as the Court may deem just and

5             proper.

6  Dated March 10, 2017       JANSSEN MALLOY LLP

7

8                   By:_____

9                   Amelia F. Burroughs

10               Attorneys for Sherri McKenna, as individual and
                   as successor-in-interest to Alan Dewey

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT J

**EXHIBIT J**

U.S. v. Starks, 157 F.3d 833 (1998)

12 Fla. L. Weekly Fed. C 146

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by U.S. ex rel. Bartlett v. Ashcroft, W.D.Pa., August 21, 2014

157 F.3d 833
United States Court of Appeals,
Eleventh Circuit.

UNITED STATES of America,
Plaintiff–Appellee, Cross–Appellant,

v.

Angela F. STARKS, Defendant–Appellant,
Andrew R. Siegel, Defendant–
Appellant, Cross–Appellee.

No. 96–3117.
|
Oct. 9, 1998.

**Synopsis**

Government employee and president of drug treatment provider were convicted in the United States District Court for the Middle District of Florida, No. 94–156–CR–T–23C, Steven D. Merryday, J., for violating anti-kickback provision of Social Security Act. Employee and president appealed, and United States cross-appealed sentence. The Court of Appeals, Birch, J., held that: (1) statute did not require knowledge that arrangement for referrals to treatment program violated the statute; (2) statute was not unconstitutionally vague; (3) president was ineligible for sentence reduction for acceptance of responsibility; and (4) district court should have used guideline for bribery of a public official, rather than guideline for fraud and deceit, in sentencing president.

Affirmed in part, reversed in part, and remanded.

**Attorneys and Law Firms**

**\*835** Miriam L. Sumpter, Tampa, FL, for Defendant–Appellant.

Arnold D. Levine, Levine, Hirsch, Segall & Northcutt, P.A., Tampa, FL, for Siegel.

Charles R. Wilson, U.S. Atty., Tamra Phipps, Terry A. Zitek and Susan H. Rothstein, Asst. U.S. Attys., Tampa, FL, Susan Humes Raab, Asst. U.S. Atty., Jacksonville, FL, for Plaintiff–Appellee, Cross–Appellant.

Appeals from the United States District Court for the Middle District of Florida.

Before ANDERSON and BIRCH, Circuit Judges, and PAINE [*], Senior District Judge.

**Opinion**

BIRCH, Circuit Judge:

Defendants Angela Starks and Andrew Siegel seek to overturn their convictions under the anti-kickback provision of the Social Security Act, 🚩 42 U.S.C. § 1320a–7b ("the Anti–Kickback statute"). Specifically, Starks and Siegel argue that the district court erred by refusing to instruct the jury concerning the relevant *mens rea*. In addition, Starks and Siegel contend that the Anti–Kickback statute is unconstitutionally vague. While denying the defendants' allegations of error, the government cross-appeals Siegel's sentence on the grounds that the district court should not have reduced his offense level for acceptance of responsibility, and that the district court should have applied the guideline for bribery of a public official rather than the guideline for fraud and deceit. We AFFIRM IN PART, REVERSE IN PART, and REMAND.

BACKGROUND [1]

In 1992, Andrew Siegel was both the president and the sole shareholder of Future Steps, Inc., a corporation that developed and operated treatment programs for drug addiction. On April 22, 1992, Future Steps contracted with Florida CHS, Inc. to run a chemical dependency unit for pregnant women at Florida CHS's Metropolitan General Hospital ("the Hospital"). In return, Florida CHS promised to pay Future Steps a share of the Hospital's profits from the program. As a Medicaid provider, the Hospital performed medical services for indigent and disabled persons and received payment for these activities through Consultec, the fiscal intermediary for the Florida Medicaid program. Before executing the Future Steps–Florida CHS contract, Siegel initialed each page of the agreement, which included a provision explicitly forbidding Future Steps from making any payment for patient referrals in violation of the Anti–Kickback statute.

At the time Siegel signed this contract, Angela Starks and Barbara Henry had just become community health aides in the employ of the State of Florida Department of **\*836** Health

and Rehabilitative Services ("HRS"). [2] Although Starks and Henry were employees of HRS, they actually worked in a federally-funded research project in Tampa, Florida known as "Project Support." As part of their duties, Starks and Henry advised pregnant women about possible treatment for drug abuse. Upon beginning their work at HRS, Starks and Henry learned from their supervisor both that they could not accept any outside employment that might pose a conflict of interest with their work at HRS and that they were obligated to report any outside employment to HRS.

During the spring of 1992, Future Steps had difficulty attracting patients. One of Future Steps's salaried "liaison workers," Robin Doud–Lacher, however, identified Project Support as a potential source of referrals because of its relationship with high-risk pregnant women. When Doud–Lacher's initial efforts to establish a referral relationship between Future Steps and Project Support failed, Siegel suggested to Doud–Lacher that she spend more time at Project Support, give diapers to Project Support, take Project Support workers to lunch, and otherwise build a relationship with Project Support's employees.

During one of her subsequent visits to Project Support, Doud–Lacher learned from Starks and Henry that cuts in federal spending threatened to reduce their work hours. When Starks and Henry asked if Doud–Loucher knew of other available work, she promised to inquire for them about opportunities at Future Steps.

After discussing Starks and Henry's interest with her immediate supervisor, Doud–Lacher spoke directly with Siegel about hiring the two women. Despite Starks and Henry's extant employment with HRS, Siegel told Doud–Loucher that he would pay Starks and Henry $250 for each patient they referred: $125 when a referred woman began inpatient drug treatment with Future Steps and $125 after each such woman had stayed in Future Steps's program for two weeks. [3] After accepting Siegel's terms, Starks and Henry did not report their referral arrangement to anyone at Project Support or HRS.

At the outset of their work for Future Steps, Starks and Henry received checks written on Future Steps's account and signed by Siegel. Before issuing these checks, Siegel verified that the referred patients had actually entered the Future Steps program; he did not, though, verify that the referrals were legal. Although the checks Siegel signed were coded variously as payments for aftercare, counseling, and marketing expenses, Siegel was actually only paying Starks and Henry for their referrals. In fact, Siegel did not at any time pay Starks and Henry for any of their time, effort, or business expenses, or for any covered Medicare service.

When Doud–Lacher left Future Steps, Siegel had Michael Ix, another liaison worker, assume responsibility for the Starks and Henry referral arrangement. Generally, either Starks or Henry would call Ix and ask him to pick up a referral directly from the Project Support clinic. When Ix arrived at Future Steps with the referred patient, Siegel would give Ix a check for Starks and Henry. Later, after Henry told Ix that she did not want anyone at Project Support to see her receiving checks from Future Steps, Ix agreed to deliver the checks to Starks and Henry either in the Project Support parking lot or at a restaurant. Between June 1992 and January 1993, Future Steps wrote checks payable to Starks totaling $2750 and to Henry totaling $1975.

At the end of 1992, Future Steps began paying Starks and Henry in cash. To make these payments, Ix would withdraw cash from his personal bank account and meet Starks and Henry either at a restaurant or at a twelve-step program; Siegel and Future  *837  Steps would then reimburse Ix. On one occasion, Siegel accomplished this reimbursement by meeting Ix in a restaurant restroom and giving him $600. In total, Ix paid Starks and Henry approximately $1000 to $1200 in cash.

Beyond the impropriety of Starks and Henry's acceptance of referral payments from Siegel, the referral arrangement directly affected Starks and Henry's counseling of the pregnant women who relied on them and Project Support for help. At trial, several of Future Steps's clients testified that Starks and Henry threatened that HRS would take away their babies if they did not receive treatment for their drug addictions; in some instances, Starks and Henry threatened women with the loss of their babies if they did not go specifically to Future Steps. According to these women's testimony, Starks and Henry informed them only about Future Steps's program (eschewing discussion of alternative treatments), and most waited with Starks and Henry at the Project Support clinic until someone from Future Steps arrived to take them to the Hospital. Starks and Henry's physician supervisor also testified that she told the two HRS employees to be more evenhanded in their advice to Project Support's patients, after the number of women going to Future Steps from Project Support increased substantially.

In total, Starks and Henry referred eighteen women from Project Support to Future Steps. From these referrals, the Hospital received $323,023.04 in Medicaid payments.

On July 29, 1994, a federal grand jury indicted Siegel, Starks, Henry, and Doud–Lacher on five counts related to the referrals. Count One charged all four defendants with conspiring against the United States, in violation of 18 U.S.C. § 371, by offering to pay remuneration for referral of Medicare patients, in violation of 42 U.S.C. § 1320a–7b(b)(2)(A), and by soliciting and receiving such referral payments, in violation of 42 U.S.C. § 1320a–7b(b)(1)(A). Counts Two and Three charged Siegel and Doud–Loucher with paying remuneration to Starks and Henry to induce referrals of Medicaid patients, in violation of 42 U.S.C. § 1320a–7b(b)(2)(A). Finally, Count Four charged Starks and Count Five charged Henry with soliciting and receiving referral payments, in violation of 42 U.S.C. § 1320a–7b(b)(1)(A).

On February 22, 1996, the jury returned guilty verdicts as to all of the defendants on all five counts. Thereafter, the district court sentenced Siegel to serve three concurrent terms of twenty-four months of imprisonment and five years supervised release. In choosing this sentence, the district court reduced Siegel's offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility and applied the guideline for fraud, U.S.S.G. § 2F1.1. The district court sentenced Starks to two concurrent terms of thirty months of home detention.

## DISCUSSION

On appeal, defendants Starks and Siegel renew two contentions from their trial. First, they claim that the district court committed reversible error when it refused to instruct the jury that, because of the Anti–Kickback statute's *mens rea* requirement, Starks and Siegel had to have known that their referral arrangement violated the Anti–Kickback statute in order to be convicted. Second, Starks and Siegel argue that the Social Security Act's prohibition on paid referrals, when considered together with the Act's safe harbor provision, 42 U.S.C. § 1320a–7b(b)(3) ("the Safe Harbor provision"), is unconstitutionally vague. We address each of these arguments before turning to the government's cross-appeals concerning Siegel's sentence.

## I. STARKS AND SIEGEL'S APPEALS

### A. THE "WILLFULLY" INSTRUCTION

Starks and Siegel argue that the district court erred in its instruction concerning the *mens rea* required under the Anti–Kickback statute. According to 42 U.S.C. § 1320a–7b(b), it is illegal for a person to "knowingly and willfully solicit[ ] or receive[ ] any remuneration" for referrals for services covered by the federal government. At trial, the district court gave our circuit's pattern instruction regarding the term "willfully":

> The word willfully, as that term is used from time to time in these instructions, **\*838** means the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law.

R26 at 18; *see also* 11th Cir. Pattern Jury Instr. 9.1. In reviewing the district court's charge, we determine whether the court's instructions as a whole sufficiently informed the jurors so that they understood the issues and were not misled. *See U.S. v. Hooshmand,* 931 F.2d 725, 733 (11th Cir.1991). [4]

In support of their claim, Starks and Siegel rely heavily on *United States v. Sanchez–Corcino,* 85 F.3d 549 (11th Cir.1996), and *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). Since we heard oral argument on this case, however, the Supreme Court has issued an opinion in *Bryan v. United States,* 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998), that clearly refutes Starks and Siegel's position.

In *Sanchez–Corcino,* a panel of this court held that the term "willfully" in 18 U.S.C. § 922(a)(1)(D) (requiring license for firearms), meant that the government had to prove that a defendant "acted with knowledge of the [ § 922(a)(1)(D)

] licensing requirement." *Id.* at 553, 554 ("[k]nowledge of the general illegality of one's conduct is not the same as knowledge that one is violating a specific rule"). In *Bryan,* though, the Supreme Court explicitly rejected our decision in *Sanchez–Corcino. See Bryan,* 524 U.S. at ——, 118 S.Ct. at 1946. According to the *Bryan* Court, a jury may find a defendant guilty of violating a statute employing the word "willfully" if it believes "that the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful." *Id.* at ——, 118 S.Ct. at 1946. Further, the Supreme Court distinguished tax or financial cases, such as *Ratzlaf,* that "involved highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct." *Id.*[5] Because "the jury found that [the defendant] knew that his conduct was unlawful," the *Bryan* Court wrote, "[t]he danger of convicting individuals engaged in apparently innocent activity that motivated our decisions in the tax cases and *Ratzlaf* is not present here." *Id.* (footnote omitted). Thus, the Court held that "the willfulness requirement of § 924(a)(1) (D) does not carve out an exemption to the traditional rule that ignorance of the law is no excuse; knowledge that conduct is unlawful is all that is required." *Id.*[6]

Analogously, the Anti–Kickback statute does not constitute a special exception. Section 1320a–7b is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct. Indeed, the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal; compared to the licensing provisions that the *Bryan* Court considered, such kickbacks are more clearly *malum in se,* rather than *malum prohibitum. Compare Bryan,* 524 U.S. at ——, 118 S.Ct. at 1946.[7] **\*839** Thus, we see no error in the district court's refusal to give Starks and Siegel's requested instruction.[8] *Accord United States v. Davis,* 132 F.3d 1092, 1094 (5th Cir.1998); *United States v. Jain,* 93 F.3d 436, 440 (8th Cir.1996), *cert. denied,* 520 U.S. 1273, 117 S.Ct. 2452, 138 L.Ed.2d 210 (1997); *United States v. Bay State Ambulance and Hosp. Rental Serv., Inc.,* 874 F.2d 20, 33 (1st Cir.1989). *But cf. Hanlester Network v. Shalala,* 51 F.3d 1390, 1400 (9th Cir.1995).

B. VAGUENESS

Starks and Siegel also argue that the Anti–Kickback statute is unconstitutionally vague because people of ordinary intelligence in either of their positions could not have ascertained from a reading of its Safe Harbor provision that their conduct was illegal.[9] Under the Safe Harbor provision, the Anti–Kickback statute's prohibition on referral payments

shall not apply to ... any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items and services....

42 U.S.C. § 1320a–7b(b)(3); *see also* 42 C.F.R. § 1001.952. According to Starks and Siegel, this provision is vague because ordinary people in their position might reasonably have thought that Starks and Henry were "bona fide employees" who were exempt from the Anti–Kickback statute's prohibition on remuneration for referrals.

Starks and Siegel are correct that a criminal statute must define an offense with sufficient clarity to enable ordinary people to understand what conduct is prohibited. *See, e.g., Hofstatter,* 8 F.3d at 321. Both the particular facts of this case and the nature of the Anti–Kickback statute, however, undercut Starks and Siegel's vagueness argument. First, even if Starks and Siegel believed that they were bona fide employees, they were not providing "covered items or services." As the government has shown, Starks received payment from Siegel and Future Steps only for referrals and not for any legitimate service for which the Hospital received any Medicare reimbursement. At the same time, persons in either Siegel's or Starks's position could hardly have thought that either Starks or Henry was a bona fide employee; unlike all of Future Steps's other workers, Starks and Henry did not receive regular salary checks at the Hospital. Instead, they clandestinely received their checks (often bearing false category codes) or cash in parking lots and other places outside the Project Support clinic so as to avoid detection by other Project Support workers.

Furthermore, beyond these particular facts, we see no reason to view the Anti–Kickback statute as vague. In *Village of Hoffman Estates v. The Flipside,* 455 U.S. 489, 498–499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982), the Supreme Court set out several factors for a court to consider in determining whether a statute is impermissibly vague, including whether the statute (1) involves only economic regulation, (2) provides only civil, rather than criminal,

penalties, (3) contains a scienter requirement mitigating vagueness, and (4) threatens any constitutionally protected rights. As two of **\*840** our sister circuits have already concluded, these factors militate against finding the Anti–Kickback statute unconstitutional. *See Hanlester,* 51 F.3d at 1398; *Bay State,* 874 F.2d at 32–33. Indeed, the statute regulates only economic conduct,[10] and it does not chill any constitutional rights. Moreover, although the statute does provide for criminal penalties, it requires "knowing and willful" conduct, a *mens rea* standard that mitigates any otherwise inherent vagueness in the Anti–Kickback statute's provisions. *Hanlester,* 51 F.3d at 1398; *Bay State,* 874 F.2d at 33. In sum, we agree with the district court that the Anti–Kickback statute gave Starks and Siegel fair warning that their conduct was illegal and that the statute therefore is not unconstitutionally vague.

## II. THE GOVERNMENT'S CROSS–APPEAL

In its cross-appeal, the government contends that the district court incorrectly granted Siegel a U.S.S.G. § 3E1.1 reduction for acceptance of responsibility. In addition, the government maintains that the district court erred by sentencing Siegel under the fraud and deceit guideline, U.S.S.G. § 2F1.1, rather than the bribery of a public official guideline, U.S.S.G. § 2C1.1.

### A. ACCEPTANCE OF RESPONSIBILITY

On appeal, the government argues that Siegel should not have received a three-level reduction for acceptance of responsibility because he denied having had any guilty intent. In response, Siegel contends that he was entitled to the reduction because he admitted all the relevant facts and cooperated with the government's investigation, while preserving his legitimate legal position regarding the applicability of the statute to his conduct. We review the district court's determination that Siegel accepted responsibility for clear error. *United States v. Anderson,* 23 F.3d 368, 369 (11th Cir.1994) (per curiam).

To receive a reduction under § 3E1.1, a defendant must prove that he clearly accepted responsibility for his offense. *See id.* The reduction does not apply to "a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, comment. (n.2). Nonetheless, a defendant may, "[i]n rare situations," be entitled to this reduction if he goes to trial to assert and preserve issues unrelated to factual guilt, such as the applicability of a statute to his conduct. *Id.* Still, a defendant who contends that he did not possess fraudulent intent is making a factual, not a legal, challenge to the government's criminal allegations that precludes a sentence reduction for acceptance of responsibility. *See United States v. Smith,* 127 F.3d 987, 989 (11th Cir.1997) (en banc) cert. denied, 523 U.S. 1011, 118 S.Ct. 1202, 140 L.Ed.2d 330 (1998); *see also Sanchez–Corcino,* 85 F.3d at 555–56.

By its terms, 42 U.S.C. § 1320a–7b(b)(2) makes it illegal for any person knowingly to offer any payment "to induce" a referral for services covered by the federal government. Citing this provision, Siegel argues that by conceding at trial that he made payments to Starks and Henry, he admitted all the conduct prohibited by the statute. As the government correctly points out, however, Siegel has denied having had any intent *to induce referrals,* an essential element of the charges on which he was convicted. Because Siegel put the government to its burden of proof by contesting his intent to violate 42 U.S.C. § 1320a–7b(b), Siegel's arguments at trial amounted to a factual denial of guilt and were therefore inconsistent with acceptance of responsibility.[11] Given the factual positions that Siegel **\*841** has taken—and continues to take—we conclude that he should not have been eligible for a reduction for acceptance of responsibility and that the district court therefore clearly erred in awarding him a three-level reduction under § 3E1.1.

### B. THE FRAUD AND DECEIT GUIDELINE

Additionally, the government argues that the court erred by sentencing Siegel under the § 2F1.1 "Fraud and Deceit" guideline rather than the § 2C1.1 "Bribe" of a public official guideline. Appendix A of the Sentencing Guidelines references three guideline sections which are applicable to violations of § 1320a–7b: U.S.S.G. § 2B1.1 (larceny), U.S.S.G. § 2B4.1 (commercial bribery), and § 2F1.1 (fraud). U.S.S.G. app. A, at 384. If more than one guideline section is referenced for the particular statute, Appendix A instructs the sentencing court to use the guideline most

appropriate for the nature of the conduct charged. *See* U.S.S.G. app. A, at 373 (introduction). Further, the Appendix provides that if, "in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, [courts should] use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." *Id.* We review the district court's determination of the applicable guideline *de novo. United States v. Acanda,* 19 F.3d 616, 618 (11th Cir.1994). [12]

Regarding the three guidelines listed as potentially applicable in Appendix A, the government and Siegel properly agree that Siegel should not be sentenced under 🚩 § 2B1.1 or 🚩 § 2B4.1. Since 🚩 § 2B1.1 applies to crimes involving stolen property, it clearly has no relevance. Moreover, since 🚩 § 2B4.1 applies only to "bribery offenses and kickbacks that *do not involve officials* of federal, state, or local government," 🚩 § 2B4.1 comment. (n.1), this guideline provision, too, cannot be appropriate for Siegel, who illegally induced referrals from a state employee working in a federal Medicare project. [13]

Siegel, however, asserts that the third listed guideline, 🚩 § 2F1.1, is relevant and applicable. To support this position, which was also that of the district court, Siegel relies on 🔖 *United States v. Adam,* 70 F.3d 776, 781 (4th Cir.1995). In that case, the Fourth Circuit affirmed a district court's sentence, under 🚩 § 2F1.1, of a physician who had violated the Anti–Kickback statute. Although *Adam* involved application of 🚩 § 2F1.1 to the Anti–Kickback statute, we find the case to be of little help to our consideration of Siegel's sentence, because the *Adam* court addressed only the district court's calculation of the government's "loss," without discussing whether 🚩 § 2F1.1 or some other provision was the most appropriate guideline. *See* 🔖 *id.* at 781–82.

Further, we see little reason to view 🚩 § 2F1.1 as any more applicable to Siegel's conduct than 🚩 § 2B1.1 or 🚩 § 2B4.1. As a central part of any application of 🚩 § 2F1.1, a district court must calculate the "loss" suffered by the defrauded or deceived victim. *See generally* 🚩 § 2F1.1. Yet, in this case Siegel did not steal from anyone, including the government;

Siegel did not file false Medicare claims but rather engaged in a kickback scheme that corrupted Project Support's referral process. While a district court should sentence persons committing Anti–Kickback crimes involving fraud or false statements **\*842** under 🚩 § 2F1.1, this provision is not appropriate for this case.

In fact, Siegel's crime presents the "atypical case" in which the listed guideline for the Anti–Kickback statute is inapposite and a court should resort to a more applicable section, in this instance 🚩 § 2C1.1. First, we note that the term "induce" in 🔖 42 U.S.C. § 1320a–7b(b)(2) can be reasonably understood in this case to connote bribery. Indeed, the term "induce" is defined as "[t]o bring on or about, to affect, cause, to influence to an act or course of conduct ...," *Black's Law Dictionary* at 775; in the context of this case, "induce" and "bribe" are thus virtually synonymous, since Siegel induced Starks and Henry to refer patients to Future Steps through illicit payments. *Compare id.* at 191 ("Any money, ... preferment ... or undertaking to give any [money or preferment] ... with a corrupt intent to *induce* ... action, vote, or opinion .... ") (emphasis added).

*See also* 🔖 *United States v. Kummer,* 89 F.3d 1536, 1540 (11th Cir.1996) (discussing meaning of "bribe"). Second, the Anti–Kickback statute explicitly refers to "kickbacks, bribes, and rebates" as prohibited forms of remuneration for referrals, bringing Siegel's crime within the purview of the terms of 🚩 § 2C1.1. *See* 🔖 42 U.S.C. § 1320a–7b(b)(2) (A). Thus, the indictment and jury instructions in this case referred to payment of "remuneration (including kickbacks, bribes, or rebates)." R1–2 at 3 (indictment); *see also* R26 at 24 (instruction defining remuneration). Finally, by paying Starks and Henry for referrals, Siegel sought to corrupt their execution of their duties as state employees and workers in a federal program—just the sort of corrosive activity that the Sentencing Commission designed 🚩 § 2C1.1 to punish. *Cf.* 🚩 § 2C1.1 comment. (background). [14] Therefore, we hold that the district court erred in applying 🚩 § 2F1.1 rather than 🚩 § 2C1.1 in sentencing Siegel.

## CONCLUSION

In this case, Starks and Siegel ask that we reverse their convictions for violating and conspiring to violate the Anti–

Kickback statute, while the government requests that we reverse the district court's application of two guideline provisions to Siegel's sentence. With regard to Starks and Siegel's appeal, we hold that the district court did not err when it refused to give their requested instruction, and that the Anti–Kickback statute is not unconstitutionally vague as applied to Starks and Siegel. Therefore, we AFFIRM these parts of the district court's judgment. With regard to the government's cross-appeal, we hold that the district court clearly erred in granting Siegel a reduction for acceptance of responsibility, and we conclude that the district court should have sentenced

Siegel under ▭ § 2C1.1 rather than ▭ § 2F1.1. Therefore, we REVERSE these parts of the district court's judgment and REMAND for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

**All Citations**

157 F.3d 833, 12 Fla. L. Weekly Fed. C 146

## Footnotes

\*    Honorable James C. Paine, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1    Because this case arises from a jury verdict against Starks and Siegel, we view the facts in the light most favorable to the prosecution. *See United States v. Sanchez,* 722 F.2d 1501, 1505 (11th Cir.1984).

2    Although Henry was convicted along with Starks and Siegel for violating the AntiKickback statute, she died during the course of this appeal. We have therefore vacated her sentence and instructed that she be dismissed from the case.

3    Although Starks and Henry had suggested limiting their referrals to patients living outside the area surrounding Project Support and/or restricting their recruiting for Future Steps to their non-HRS hours, Siegel imposed no bounds on the nature of their referral efforts.

4    In *Hooshmand,* we explained further that "[a] trial court's refusal to give a requested instruction is reversible error only if (1) the substance of the instruction was not covered in an instruction given, (2) the requested instruction is a correct statement of the law, (3) the requested instruction deals with an issue properly before the jury, and (4) the party seeking the requested instruction suffered prejudicial harm by the court's refusal." 931 F.2d at 734.

5    In *Ratzlaf,* the Court reviewed a gambler's conviction for illegally structuring his banking transactions so as to avoid technical reporting requirements. ▭ *See* 510 U.S. at 137–38, 114 S.Ct. at 657.

6    The *Bryan* Court thus upheld a jury instruction strikingly similar to the district court's "willfully" charge in this case:

   A person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law. Now, the person need not be aware of the specific law or rule that his conduct may be violating. But he must act with the intent to do something that the law forbids.

   ▭ 524 U.S. at ——, 118 S.Ct. at 1944. *Compare* R26 at 18 *and* 11th Cir. Pattern Jury Instr. 9.1.

7    Regardless of their knowledge of the law, Starks and Siegel should reasonably have anticipated that their kickback scheme for referrals was "immoral in its nature and injurious in its consequences," because of the obvious risk it posed of corrupting Project Support and HRS's roles as providers of medical advice to drug addicted pregnant women. *Cf. Black's Law Dictionary* 959 (6th ed.1990) (defining *malum in se* ).

8    Starks and Siegel also claim that the evidence was not sufficient to prove that they acted "willfully." Given that the government only had to show that they knew that they were acting unlawfully, however, this claim is unpersuasive. The government produced ample evidence, including the furtive methods by which Siegel remunerated Starks and Henry, from which the jury could reasonably have inferred that Starks and Siegel knew that they were breaking the law—even if they may not have known that they were specifically violating the Anti–Kickback statute.

9    Starks and Siegel offer a variety of arguments to the effect that persons working in the medical field cannot anticipate what is prohibited under the Anti–Kickback statute and what is protected by that statute's Safe Harbor provision. They do not, and cannot, challenge, however, the government's contention that, since this is not a First Amendment case, we must evaluate their claim of vagueness only on an as-applied basis. *See Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857–58, 100 L.Ed.2d 372 (1988). Thus, we consider Starks and Siegel's claim in light of the facts of this individual case, looking only to the constitutionality of the Anti–Kickback statute as the government has applied it to

12 Fla. L. Weekly Fed. C 146

Starks and Siegel. *See* *United States v. Hofstatter,* 8 F.3d 316, 321 (11th Cir.1993); *United States v. Awan,* 966 F.2d 1415, 1424 (11th Cir.1992).

10   In *Hoffman Estates,* the Court explained that "economic regulation is subject to a less strict vagueness test because its subject is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." 455 U.S. at 498, 102 S.Ct. at 1193 (footnote omitted).

11   Moreover, Siegel contested other aspects of the offense, further supporting the government's claim that he did not accept responsibility: that he signed a contract that specifically forbade him to pay for referrals or to "take any action in violation of § 1320a–7b"; that he agreed to the specifics of Starks and Henry's payment arrangements; that he reimbursed Michael Ix for cash payments made to Starks and Henry for referrals; and that he instructed his secretary to prepare referral checks for Starks and Henry.

12   At sentencing, the government did not explicitly object to the district court's application of § 2F1.1 once the court found that this provision governed Siegel's sentence. The government did, however, vigorously contend that Siegel's conduct constituted bribery. Because the government objected to this factual determination, and the decision about which guideline to apply necessarily followed from the district court's ruling, the issue has been preserved for appeal.

13   By contending that § 2B4.1 does not apply because Siegel's kickback scheme involved a public official, Siegel appears to concede that we should treat Starks and Henry as government officials in reviewing his sentence.

14   At Siegel's sentencing hearing, the district court refused to sentence him under § 2C1.1 because it "didn't charge the jury" on bribery of public employees. R29 at 30. The district court's reasoning, however, conflated two separate issues: first, whether Siegel was involved in bribery; and second, if so, whether he had been involved with bribery of a public official. If Starks and Henry were bribed but were not public officials, then § 2B4.1 (commercial bribery) would have applied. *See* *Jain,* 93 F.3d at 442–43 (affirming application of § 2B4.1 to a physician who violated § 1320a–7b by paying another, private physician for a referral). Since, as Siegel has conceded to this court, Starks and Henry were government officials, then, if Siegel bribed them, § 2C1.1 (bribery of a public official) should apply. It would be incongruous for this court to hold that a defendant who paid a private person for an illegal § 1320a–7b referral should be sentenced for bribery, but that another defendant who participated in the same conduct with a government official should be sentenced for fraud rather than bribery of a public official.

---

End of Document       © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT K

**EXHIBIT K**

KeyCite Red Flag - Severe Negative Treatment

Vacated and Remanded by United States v. Luis, 11th Cir.(Fla.), June 16, 2016

966 F.Supp.2d 1321
United States District Court,
S.D. Florida.

UNITED STATES of America, Plaintiff,
v.
Sila LUIS, et al., Defendants.

Case No. 12–23588–CIV.
|
June 21, 2013.

**Synopsis**

**Background:** Government moved to convert temporary restraining order (TRO) into preliminary injunction restraining assets of defendant who was charged, in parallel criminal prosecution, with conspiracy to commit health care fraud, conspiracy to defraud United States and to commit offenses against United States, and paying health care kickbacks. Defendant moved to modify restraining order to release assets for her defense in related prosecution.

**Holdings:** The District Court, Paul C. Huck, J., held that:

probable cause supported issuance of preliminary injunction;

defendant was entitled to hearing at which she had opportunity to cross-examine FBI special agent;

safe-harbor provisions of Medicare's anti-kickback statute and related regulation did not apply to payments made to nurses to recruit patients for defendant's health care businesses;

court could find, in support of preliminary injunction, that defendant's conduct satisfied knowing misrepresentation element of charge of conspiracy to commit health care fraud;

government did not have to demonstrate that it had suffered a loss to obtain preliminary injunction to restrain defendant's assets;

conspiracy to pay kickbacks to receive benefits under Medicare, in violation of general conspiracy statute,

could provide basis for preliminary injunction restraining defendant's assets; and

court could restrain assets that defendant sought to use to pay attorney fees in parallel criminal case, although court had discretion to release assets for payment of such fees.

Government's motion granted; defendant's motion denied.

**Attorneys and Law Firms**

**\*1325** Susan Torres, U.S. Attorney's Office, Miami, FL, for Plaintiff.

Howard Milton Srebnick, Black Srebnick Kornspan & Stumpf, Scott Alan Srebnick, Miami, FL, for Defendants.

### ORDER

PAUL C. HUCK, District Judge.

THIS MATTER is before the Court upon the United States of America (the "Government['s]") Emergency *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction under 18 U.S.C. § 1345 [D.E. # 4] and Defendant, Sila Luis ("Luis['s]") Motion to Modify the Restraining Order to Release Assets for the Defense of the Related Criminal Case [D.E. # 46]. For the reasons discussed below, the Motion for Preliminary Injunction is granted and Luis's Motion to Modify the Restraining Order is denied.

### A. Background

a. *Statutory Basis for Injunctive Relief Under 18 U.S.C. § 1345*

Section 1345 allows courts to grant injunctive relief to prevent certain types of fraud and to prevent alienation of property associated with the fraud. 18 U.S.C. § 1345. Thus, a court may enter an injunction under § 1345 preventing mail fraud, wire fraud, banking laws, or the commission of a federal health care offense. [1] *Id.* Section 1345 also allows a court to enter an injunction when an individual alienates or disposes of any property

obtained as a result of such violations, to prevent any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value. [2] *Id.* The "equivalent value" language means that when some of the assets that were obtained as a result of fraud cannot be located, a person's substitute, untainted assets may be restrained instead. *See United States v. DBB, Inc.,* 180 F.3d 1277, 1281 (11th Cir.1999).

### b. *The Burden of Proof and Elements for Injunctive Relief Under § 1345*

As to the elements for injunctive relief, a reasonable reading of § 1345 indicates **\*1326** that the Government bears the burden to establish that: (1) a Federal health care offense has been committed; (2) the total amount of proceeds obtained from the criminal activity; and (3) that there has been dissipation of assets received as a result of the criminal activity. *See United States v. Brown,* 988 F.2d 658, 663 (6th Cir.1993) (finding § 1345 requires the Government demonstrate that a predicate offense has been committed and the extent of the fraud); *see also* § 1345 (requiring dissipation of assets for a court to award injunctive relief).

Regarding the applicable burden of proof, there is considerable disagreement in the case law. Several courts have applied the preponderance of the evidence standard to claims for injunctive relief under § 1345. *See Brown,* 988 F.2d 658, 663 (6th Cir.1993); *United States v. Williams,* 476 F.Supp.2d 1368, 1374 (M.D.Fla.2007) (applying the preponderance of the evidence standard); *United States v. Sriram,* 147 F.Supp.2d 914, 938 (N.D.Ill.2001) (same); *United States v. Barnes,* 912 F.Supp. 1187, 1198 (N.D.Iowa 1996) (same); *United States v. Quadro Corp.,* 916 F.Supp. 613, 617 (E.D.Tex.1996) (same); *see also United States v. Legro,* 284 Fed.Appx. 143, 145 (5th Cir.2008) (recognizing disagreement about whether probable cause or preponderance of the evidence standard applies to state a claim for injunctive relief under § 1345 and declining to resolve the issue). Other courts have concluded that a showing of only probable cause is required. *See United States v. Livdahl,* 356 F.Supp.2d 1289, 1294 (S.D.Fla.2005); *United States v. Fang,* 937 F.Supp. 1186,

1197 (D.Md.1996); *United States v. Davis,* No. 88–1705–CIV–ARONOVITZ, 1988 WL 168562, at \*1 (S.D.Fla.1988). This Court agrees with those courts that found probable cause is the correct burden of proof

### c. *Evidence of Federal Health Care Offenses and Dissipation of Assets*

Pursuant to § 1345, the Court previously entered a temporary restraining order ("TRO") restraining all of Luis's assets. The Government seeks to convert the TRO into a preliminary injunction, and the Court held a hearing on that matter on February 6, 2013. As a basis for the requested injunctive relief, the Government points to the parallel criminal prosecution, where Luis is charged with violations of 18 U.S.C. § 1349 (conspiracy to commit health care fraud) and 18 U.S.C. § 371 (conspiracy to defraud the United States and to commit offenses against the United States). Luis is also charged with violation of 42 U.S.C. § 1320a–7b(b)(2)(B) (paying health care kickbacks) and a forfeiture count under 18 U.S.C. § 982. Luis was indicted by a grand jury on these charges. According to the indictment, the offenses resulted in \$45 million of improper Medicare benefits being paid. The parties agree that Luis has much less than \$45 million in personal assets.

At the hearing, the Court accepted three declarations of Federal Bureau of Investigation Special Agent Clint Warren ("Special Agent Warren") as direct testimony. Special Agent Warren investigated Luis's businesses, LTC Professional Consultants, Inc. ("LTC") and Professional Home Care Solutions, Inc. ("Professional") for Federal health care fraud. During the investigation, Special Agent Warren received information from nine cooperating witnesses ("CWs") who worked as nurses and patient recruiters for LTC, Professional, or both.

The CWs said that LTC and Professional defrauded Medicare during the period of January 2006 to June 2012. Before the fraudulent scheme was put into place, Luis signed Medicare enrollment agreements in **\*1327** 2003, 2004, and 2005, whereby she agreed to abide by Medicare laws and regulations, including the Anti-kickback statute. According to the information provided to Special Agent Warren, LTC and Professional paid nurses to recruit patients. The nurses, in turn, gave the patients a portion of the kickbacks in the form of direct payments. The CWs also told Special Agent Warren

that LTC and Professional fraudulently billed Medicare for services that were not medically necessary or were not actually provided. One CWs estimated that at least 90% of all Professional and LTC patients were receiving kickbacks. Eight of these CWs specifically identified patients who received kickbacks. The total paid by Medicare for claims submitted on behalf of these patients who were identified was $ 4,356,553.85. During the period of this fraud, however, LTC and Professional collected a total of approximately $45 million from Medicare billings.

Special Agent Warren's declarations also provided information about assets being dissipated. Luis and the other defendants transferred monies from LTC and Professional to themselves directly and by the use of shell corporations that were owned by Luis's family members. There was also evidence that Luis used the funds to purchase luxury items, real estate, automobiles, and to travel. According to the declarations, Luis also received approximately $4,490,000 of the funds directly. In addition, although the investigation uncovered the fact that Medicare paid LTC and Professional $45 million dollars, only a fraction of the funds were located.

**B. Discussion**

a. *The Indictment and Declarations of Special Agent Warren Establish Probable Cause to Satisfy the Elements of § 1345*

Initially, the indictment and declarations establish probable cause to satisfy the elements for injunctive relief under § 1345. That is, there is probable cause to believe that: (1) Federal health care offenses have been committed; (2) $45 million was obtained illegally as a result of those offenses; and (3) that there has been dissipation of those monies. An indictment is sufficient to establish probable cause that offenses have been committed and the amount of the proceeds from those offenses. *See United States v. Bissell,* 866 F.2d 1343, 1349 (11th Cir.1989). Here, the Grand Jury indicted Luis for committing Federal health care offenses and found that LTC and Professional improperly obtained $45 million from those offenses.

Furthermore, in other situations where probable cause is required, the finding of probable cause may properly rest upon the affidavit of a law enforcement officer. *See Illinois v. Gates,* 462 U.S. 213, 226, 103 S.Ct. 2317, 76 L.Ed.2d 527

(1983) (explaining that issuance of a search warrant may be based upon an affidavit of a law enforcement officer when based upon a proper information source). Section 1345 requires there be dissipation of the proceeds. As discussed above, in his investigation, Special Agent Warren discovered that Luis used the funds to purchase luxury items, real estate, automobiles, and for travel. In addition, the investigation uncovered the fact that Medicare paid LTC and Professional $45 million dollars, but only a fraction of the assets could be located. The declaration, which is based upon information discovered in the criminal investigation, establishes probable cause to believe that there has been dissipation of assets.

Thus, the initial requirement to obtain a preliminary injunction, restraining up to **\*1328** $45 million of Luis's assets, has been met. [3]

b. *Luis's Right to a Hearing and Right to Challenge the Factual Basis of the Probable Cause Finding*

The parties disagree about whether Luis was entitled to a hearing and, if so, the scope of the hearing and whether she has the right to challenge the probable cause determination. The Government's position is that Luis has no right to challenge the factual basis of the probable cause finding, which is based solely upon the indictment and declarations of Special Agent Warren. Luis, on the other hand, argues that she is entitled to a full adversarial hearing where she should be allowed to cross-examine the CWs. In this case, Luis was permitted a hearing, where she was allowed to cross-examine Special Agent Warren but was not permitted to cross-examine the CWs.

As an initial matter, § 1345 does not require a hearing by its language. However, the Fifth Amendment provides "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Accordingly, the general rule is that a person cannot be deprived of property without a prior hearing. *Bissell,* 866 F.2d at 1352. However, there is an exception that exists when a criminal defendant's assets are seized or restrained. *See id.* But this exception does not mean that a criminal defendant subject to asset restraint is never permitted a hearing; a post-seizure hearing is sometimes required. *Id.*

In the criminal forfeiture context, the factors to determine whether a hearing is required are derived from the Supreme Court's Sixth Amendment speedy trial analysis in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *Bissell,* 866 F.2d at 1352. However, because § 1345 is a civil statute, the factors from *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) are determinative. These factors are: "the private interest that will be affected by the official action; ... the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and ... the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335, 96 S.Ct. 893.

The *Mathews* factors weigh in favor of a hearing when all of a criminal defendant's assets are restrained under § 1345, which is the case here. The Eleventh Circuit has explained that "[b]eing effectively shut out by the state from retaining the counsel of one's choice in a serious criminal case is a substantial source of prejudice." *United States v. Kaley (Kaley I),* 579 F.3d 1246, 1258 (11th Cir.2009); *see also United States v. Kaley (Kaley II),* 677 F.3d 1316, 1332 (11th Cir.2012) (Edmonson, J., concurring) ("Property rights, in themselves, deserve to be amply guarded by American courts. But when a citizen's liberty ... depends to a high degree on his property, the stakes are particularly high."). Moreover, there is also a risk of erroneous deprivation without a hearing: "A prosecutor has everything to gain by restraining assets that ultimately may not be forfeited. By doing so, he can stack the deck in the government's **\*1329** favor by crippling the defendant's ability to afford high-quality counsel." *Kaley I,* 579 F.3d at 1266 (Tjoflat, J., concurring). Although there is no indication of prosecutorial abuse in this case, the existence of these incentives increase the likelihood the risk of an erroneous deprivation without a hearing. The third factor—the government's interest and the burdens associated with additional procedural requirements—also weighs in favor of a hearing. While the Government has an interest in not previewing its criminal case before the criminal trial, this problem can be alleviated by properly limiting the scope of the hearing.

The Government, however, contends that no hearing was required because § 1345 permits restraint of substitute assets that are not traceable to criminal activity. As discussed above, the indictment and declarations establish probable cause to believe that Luis committed Federal health care benefits being paid, and that she has dissipated those assets. There is also no dispute over the fact that Luis is in possession of much less than \$45 million in personal assets. As such, assuming the probable cause finding is correct, because § 1345 permits the restraint of substitute assets, there is no possibility that a preliminary injunction could reach assets that are not properly subject to restraint under § 1345. Therefore, the Government's position is that there is nothing that could be challenged at a hearing because Luis "may not challenge the validity of the indictment itself...." *Bissell,* 866 F.2d at 1349.

However, the Government's position on the due process right to a hearing was rejected by *Kaley I*. In that case, the district court found that there was probable cause to believe that certain assets were traceable to a criminal offense and, therefore, properly subject to a protective order restraining the property. *Kaley I,* 579 F.3d at 1256. Relying on *Bissell,* the district court further found that an evidentiary hearing was not required because the defendants were not permitted to challenge the validity of the indictment. *Id.* The *Kaley I* court found that the district court erred on this point. *Id.* at 1257–58. According to the opinion, "notwithstanding the ... probable cause determination, the [defendants] were entitled to challenge the restraints on their assets; in doing so, they would not be requiring the Government to establish the charged offense." *Id.* at 1258.

In accordance with her due process right to a hearing, Luis was permitted an evidentiary hearing and the opportunity to cross examine Special Agent Warren. Contrary to Luis's position, however, she had no right to cross-examine the CWs. This type of extensive hearing would be tantamount to requiring the Government to preview its entire case. However, for the reasons discussed above, the Government's position that Luis was not permitted to a hearing and is not permitted to challenge the initial probable cause finding is misplaced.

c. *Luis's Arguments Opposing a Preliminary Injunction*

Luis raises two arguments challenging the factual basis for probable cause. First, she argues that the Government has not proffered evidence of a violation of the Anti-kickback Statute, 42 U.S.C. § 1320a–7b(b)(2)(B). According to Luis, in this case, payment of kickbacks falls within the safe-harbor provision of 42 C.F.R. § 1001.952 because the payments were to employees of LTC and Professional. Luis further argues that there is no evidence of a violation of 18 U.S.C. §§ 1347, 1349 because the Medicare certifications she **\*1330** signed were submitted before the alleged kickback scheme took place.

Additionally, Luis makes several other arguments challenging the entering of a preliminary injunction in this case. She argues that the application of § 1345 violates the *ex post facto* clause. Luis further argues that the Sixth Amendment requires the release of funds to pay attorney's fees and argues that the language of § 1345 does not permit the restraint of assets needed for attorney's fees. Each of these arguments is discussed below.

i. *The payment of kickbacks in this case do not fall within the safe-harbor provisions of the Anti-kickback statute*

Luis first contends that some of the payments made to nurse/patient recruiters do not violate the Anti-kickback statute, § 1320a–7b(b)(2)(B). [4] To support this position, she relies upon the "safe-harbor" provision contained in 42 C.F.R. § 1001.952, which provides:

> As used in section 1128B of the Act, "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

42 C.F.R. § 1001.952. A similar safe-harbor provision is contained in the statute itself. That version of the safe-harbor provides that the prohibition against paying kickbacks will not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a–7b(b)(3)(B).

Special Agent Warren's declaration indicates that CW1, CW2, CW3, and CW6 were employees of LTC, Professional, or both. Based on this, Luis argues that these individuals fall into the ambit of the safe harbor and contends that payments to them for recruiting patients were not improper. According to Luis, the safe-harbor will apply so long as "payments to them for referring patients ... [generated revenue] for services rendered and medically necessary." As such, Luis contends that $1,826,746 of revenue generated by payment patient referrals was not generated illegally. However, Luis misinterprets the scope of the safe-harbor provisions.

For either safe-harbor provision to apply, the remuneration must have been made to the employee for furnishing or providing covered items or services or for items or services payable under Medicare. This is evident from the text of the safe-harbor provisions, as well as the Eleventh Circuit's decision in *United States v. Starks,* 157 F.3d 833 (11th Cir.1998). The text of the safe-harbor provision upon which Luis relies states that "remuneration" **\*1331** does not include "any amount paid by an employer to an employee ... *in the furnishing* of any item or service for which payment may be made in whole or in part under Medicare." 42 C.F.R. § 1001.952 (emphasis added). Similarly, the safe harbor contained in § 1320a–7b states that it will apply to "any amount paid by an employer to an employee ... *for employment in the provision* of covered items or services." § 1320a–7b(b)(3)(B) (emphasis added). The emphasized language in both of these provisions makes clear that the safe-harbor provisions will only apply when payments made to an employee compensate the employee for furnishing or providing covered items or services or items or services payable by Medicare, not simply for referring patients.

This was also the Eleventh Circuit's view in *Starks,* 157 F.3d at 839, where the court considered a vagueness challenge to the employee safe-harbor provisions. In that case, two individuals (Angela Starks and Barbara Henry) were paid for referring patients to Future Steps, Inc, which was a "corporation that developed and operated treatment programs for drug addiction." *Id.* at 835. Although Starks and Henry referred patients, they did not personally provide any medical

services. *Id.* at 835–36. Starks, Henry, and Andrew Siegel, the owner of Future Steps, were convicted of violations of the Anti-kickback statute. *Id.* at 837. Starks and Siegel appealed their convictions, arguing that the safe-harbor provision contained in § 1320a–7b is unconstitutionally vague. *Id.* at 839. Rejecting this argument, the court found that, even if Starks and Siegel believed they were bona fide employees, the safe-harbor was not vague, as applied, because Starks and Henry were not compensated for providing "covered items or services." *Id.; see also United States v. Borrasi,* 639 F.3d 774, 782 (7th Cir.2011) (finding as long as some portion of a payment is for referrals, the safe-harbor provisions will not apply).

Here, Special Agent Warren's declaration states that CW2, CW3, and CW6 were paid for recruiting patients.[5] Even if these patients ultimately received legitimate medical care, payments to these nurse/recruiters for referring patients to LTC and Professional violate the Anti-kickback statute. Therefore, it is irrelevant whether the nurses were bona fide employees paid for "covered items or services" because the payments to them were, at least in part, for their illegal patient referrals.

Furthermore, even if Luis's view of the scope of the safe harbor provisions were correct, her contention that the patients, who were referred by these CWs, received medically necessary services is dubious. According to the declaration, after patient recruiters were compensated for referring patients, "LTC and Professional ... would then fraudulently bill Medicare for home health services that were not medically necessary or were never provided." For this additional reason, the safe-harbor provisions do not apply here.

*ii. There is probable cause to establish a knowing misrepresentation to Medicare sufficient to constitute violations of 18 U.S.C. §§ 1347, 1349*

Luis further argues that there is not sufficient evidence to find that there has been a knowing misrepresentation sufficient to amount to a violation 18 U.S.C. §§ 1347, 1349[6] and, therefore, the Government cannot establish "Federal health care offenses" to restrain her assets under **\*1332** § 1345.

To support this argument, Luis argues that a violation of §§ 1347, 1349 requires her to submit a representation that she will comply with Medicare rules *during* the period of time she submits improper Medicare claims. This argument fails because, as discussed below, all that is required is that a certification of compliance be submitted *at some point before* a non-complying claim is knowingly submitted. That requirement is satisfied here.

Luis's erroneously relies upon *United States v. Medina,* 485 F.3d 1291 (11th Cir.2007). One issue considered in *Medina* was whether there was sufficient evidence of health care fraud to sustain convictions against four individuals who were convicted for violations of § 1347. *Id.* at 1295. The court first found that a conviction under § 1347 requires the defendant make a "knowing false or fraudulent representation to Medicare." *Id.* at 1298. The court then found that, as to one of the defendants, her conviction for violation of § 1347 that was based on claims submitted before she signed Medicare provider applications (agreeing to abide by Medicare rules) should be reversed because there was no evidence of a knowing, false representation. *Id.* at 1298. However, the convictions that were based on kickback tainted claims that were submitted after she signed Medicare provider applications were upheld. *Id.* As to those counts, there was sufficient evidence to sustain the convictions because the defendant made a knowing false or fraudulent representation to Medicare by signing the provider applications, promising to comply, and then knowingly submitted tainted claims to Medicare. *Id.*

In this case, Luis acknowledged that she signed Medicare enrollment applications in 2003, 2004, and 2005 and, by doing so, certified that she would abide by Medicare law. There is evidence that she later submitted claims that violated the law, including the Anti-kickback provision. Under *Medina,* it does not matter that the representations in certifications were made several years before the claims were submitted. All that is required is that there is a representation that one will comply with Medicare law followed by a knowingly non-compliant claim. Therefore, by allegedly submitting non-compliant claims to Medicare after signing the applications, the knowledge requirement of § 1347 and § 1349 is satisfied for purposes of § 1345.

Luis makes an additional argument that the Government must demonstrate the United States suffered a "loss" to restrain assets under § 1345. In Luis's view, despite the payment of kickbacks, the United States does not suffer a loss as long as medically necessary services are performed. This argument fails because § 1345 does not require the United States to suffer a loss. All that is necessary is that a person is "alienating or disposing of property, or intends to alienate or dispose of property" that is "obtained as a result of a ... Federal health care offense ...." § 1345.

### iii. The application of § 1345 to this case does not violate the ex post facto clause

Luis further argues that the *ex post facto* clause, contained in **\*1333** Article I, Section 9 of the U.S. Constitution, prohibits § 1345 from applying here. Luis points out that the statutory term "Federal health care offense" did not include payment of kickbacks until March 23, 2010. *See* 18 U.S.C. § 24 (prior to 2010 amendment). Therefore, § 1345 did not authorize the restraint of assets based upon payment of kickbacks until that date. Luis argues that because the Government's proffer of evidence relates solely to kickbacks that occurred before March 2010, restraint of assets is not permitted.

However, even assuming that the *ex post facto* clause is implicated by § 1345, Luis's argument is fundamentally flawed. The prior version of § 24, which defines the term "Federal health care offense," included violations of the general conspiracy statute, 18 U.S.C. § 371. *Id.* A violation of § 371 was included in the definition of Federal health care offense to the extent that the crime involved "a health care benefit program." *Id.* The term "health care benefit program" was defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." *Id.* Accordingly, under the older version of the statute, a conspiracy to pay kickbacks to receive benefits under Medicare in violation of § 371 was a Federal health care offense and could properly result in an injunction under § 1345. *See id.*

Here, the indictment charges Luis with a count for conspiracy to pay kickbacks in violation of § 371. In addition to establishing probable cause to believe the Anti-kickback statute has been violated, the evidence before the Court is sufficient to establish probable cause to believe that § 371 has been violated and resulted in $45 million of improper Medicare benefits being paid. Thus, even under the older version of § 24, an injunction could be entered under § 1345 for violation of § 371. As such, there is no *ex post facto* issue.

### iv. The Sixth Amendment does not prohibit the restraint of substitute, "untainted" assets

Luis also argues that the Sixth Amendment guarantees her a right to use assets that are not traceable to Federal health care offenses to select and retain counsel of her choice for her defense in the parallel criminal case. The Government's argument is that regardless of whether or not assets were obtained legitimately, there is no Sixth Amendment impediment to the assets being frozen as long as a statute permits restraint of substitute assets. According to the Government, because § 1345 allows substitute, untainted assets to be restrained, Luis has no Sixth Amendment right to use the assets to hire counsel of her choice.

It is undisputed that "an element of [the Sixth Amendment right to counsel] is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez–Lopez,* 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). Indeed, "[t]he Sixth Amendment comprehends a qualified right to select and be represented by counsel of choice because 'were a defendant not provided the opportunity to select his own counsel at his own expense, substantial risk would arise that the basic trust between counsel and client, which is a cornerstone of the adversary system, would be undercut.' " *Bissell,* 866 F.2d at 1351 (quoting *United States v. Koblitz,* 803 F.2d 1523, 1528 (11th Cir.1986)). However, this qualified right does not permit a criminal defendant to use assets that are the proceeds of criminal **\*1334** activity to retain counsel. *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 626, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); *Bissell,* 866 F.2d at 1351. This is so because "[a] defendant has no

Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those assets are the only way that that defendant will be able to retain the attorney of his choice." *Caplin,* 491 U.S. at 626, 109 S.Ct. 2646.

The more difficult question is the one presented here. That is, whether a criminal defendant has a Sixth Amendment right to use untainted, substitute assets to retain counsel of choice. Although the answer to this question is far from clear, the Fourth Circuit's opinion in *In re Billman,* 915 F.2d 916, 921 (4th Cir.1990) supports the Government's position. In *Billman,* a defendant was charged with racketeering and a forfeiture count, and the defendant then transferred some of the assets to another person. *Id.* at 918. The district court found that the assets that were transferred could not be directly linked to the racketeering, and the circuit court determined that it was bound to accept this finding. *Id.* As such, they were "substitute" assets. *Id.* at 920. The transferee argued that she had a Sixth Amendment right to use the funds to retain counsel of her choice. *Id.* at 921–22. The court rejected this argument because the substitute assets were subject to restraint under § 1963. *Id.* Therefore, the *Billman* court's view is that there is no Sixth Amendment impediment to the seizure of substitute assets pursuant to the statute because those assets are "contraband," even if they were not the proceeds of criminal activity. *Id.* at 922; *see also United States v. Am. Therapeutic Corp.,* 797 F.Supp.2d 1289, 1293–94 (S.D.Fla.2011) (finding no Sixth Amendment right to use untainted, substitute assets that are restrained under § 1345).

This view is common sense. An example by the Fourth Circuit that was related by the *Bissell* decision is instructive:

> Suppose a bank is robbed and $100,000 taken. A defendant is arrested in possession of $100,000 and nothing more. The defendant protests his innocence and claims, without the slightest proof, that the $100,000 was in fact a gift from a friend. Surely no one will contend that the $100,000 must be made available to pay the defendant's lawyer, and not be kept

available for return to the bank in the event the defendant is found guilty.

*Bissell,* 866 F.2d at 1351 (quoting *In re Forfeiture Hearing As to Caplin & Drysdale, Chartered,* 837 F.2d 637, 645 (4th Cir.1988), *aff'd sub nom., Caplin,* 491 U.S. 617, 109 S.Ct. 2646).

The reason the bank robber is not permitted to use the $100,000 to hire a lawyer is obvious. The money does not belong to him. But suppose the bank robber in the example above spent the $100,000 that he stole. It just so happens, however, that he has another $100,000 that he obtained legitimately. Should his decision to spend the $100,000 he stole mean that he is free to hire counsel with the other $100,000 when Congress has authorized restraint of those substitute assets? The reasonable answer is no. The bank has the right to have those substitute, untainted assets kept available for return as well. Therefore, in accord with the Fourth Circuit's view, the most reasonable conclusion is that there is no Sixth Amendment right to use untainted, substitute assets to hire counsel.

*v. Section 1345 allows for the restraint of assets that would otherwise be used for payment of attorney's fees*

Luis also argues that the purpose of § 1345 is to insure that the defendant is **\*1335** not wasting or hiding assets, not to punish the defendant. As such, she argues that assets that will be used for attorney's fees should not be restrained. To the extent that Luis is arguing that the statute does not permit such assets to be restrained, this argument fails. However, the Court does have discretion to release assets for payment of attorney's fees.

In exercising its discretion for release of assets for payment of attorney's fees, the Court should consider whether the defendant is able to afford representation in the § 1345 proceedings. *See United States v. Speqtrum, Inc.,* No. CIV.A. 10–2111 JEB, 2012 WL 517526, at \*2 (D.D.C. Feb. 16, 2012); *United States v. Jaime,* No. 2:10–CV–00498, 2011 WL 145196, at \*1–2 (S.D.W.Va. Jan. 18, 2011). If "restrained property is a defendant's only means of securing counsel" the Court may wish to exercise its discretion to release assets

to secure counsel. *See Speqtrum, Inc.,* 2012 WL 517526, at *2. In this case, Luis was represented throughout the § 1345 proceedings by competent counsel. Therefore, this consideration is no longer relevant. In the criminal prosecution, Luis will be appointed counsel if she cannot afford representation.

**C. Conclusion**

For the foregoing reasons, the Government's Motion for a Preliminary Injunction under 18 U.S.C. § 1345 [D.E. # 4] is GRANTED. The preliminary injunction order will be entered shortly. Luis's Motion to Modify the Restraining Order to Release Assets for the Defense of the Related Criminal Case [D.E. # 46] is DENIED.

**All Citations**

966 F.Supp.2d 1321

Footnotes

1    As used in this title, the term "Federal health care offense" means a violation of, or a criminal conspiracy to violate—

(1) section 669, 1035, 1347, or 1518 of this title or section 1128B of the Social Security Act ( 42 U.S.C. 1320a–7b);or

(2) section 287, 371, 664, 666, 1001, 1027, 1341, 1343, 1349, or 1954 of this title section 301 of the Federal Food, Drug, and Cosmetic Act ( 21 U.S.C. 331), or section 501 of the Employee Retirement Income Security Act of 1974 ( 29 U.S.C. 1131), or section 411, 518, or 511 of the Employee Retirement Income Security Act of 1974, [1] if the violation or conspiracy relates to a health care benefit program.

18 U.S.C. § 24.

2    The following is the statutory language creating the right to injunctive relief to prevent alienation of property:

(a)(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a [Federal health care offense] or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court—

(A) to enjoin such alienation or disposition of property; or

(B) for a restraining order to—

(i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value ...

18 U.S.C. § 1345.

3    Even under the preponderance standard, the Government has carried its burden of proof to enter an injunction restraining at least $40.5 million dollars, which is 90% of $45 million. This finding is based on the indictment, as well as Special Agent Warren's affidavits detailing the crimes, receipt of Medicare funds, and dissipation of assets, including CW9's statement that 90% of LTC and Professional's patients received kickbacks.

4    Section 1320a–7b(b)(2)(B) provides:

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a–7b(b)(2)(B).

5    Although Luis refers to CW1 when making this argument, CW1 was not a patient recruiter and, therefore, is not relevant to her argument.

6    Section 1347 provides, in pertinent part:

**U.S. v. Luis, 966 F.Supp.2d 1321 (2013)**

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program.

🚩 18 U.S.C. § 1347. Section 1349 makes conspiracy to violate 🚩 § 1347 a crime. *See* 18 U.S.C. § 1349.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT L

**EXHIBIT L**

KeyCite Yellow Flag - Negative Treatment

Distinguished by Ernst v. City of Chicago, 7th Cir.(Ill.), September 19, 2016

639 F.3d 774
United States Court of Appeals,
Seventh Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Roland BORRASI, Defendant–Appellant.

No. 09–4088.
|
Argued Oct. 22, 2010.
|
Decided May 4, 2011.

**Synopsis**

**Background:** Defendant, a medical doctor, was convicted in the United States District Court for the Northern District of Illinois, William J. Hibbler, J., of conspiracy to defraud the government, and multiple counts of Medicare-related bribery. Subsequently, defendant's posttrial motions for a new trial and for acquittal, 2009 WL 3672117, were denied. Defendant appealed.

**Holdings:** The Court of Appeals, Kanne, Circuit Judge, held that:

substantive descriptions in certain committee reports about medical services, which were contained in hospital committee meeting minutes, were inadmissible hearsay;

any error in admission of those descriptions or committee reports was harmless;

portion of payments received by the defendant that compensated him for his past referrals or induced future referrals for health care services paid for by the federal Medicare program violated the Medicare fraud statute;

reduction in loss amount calculation at sentencing by $150,000 based on the estimated fair market value of the professional services defendant rendered was reasonable;

leadership role sentencing enhancement was warranted; and

72-month prison sentence was reasonable.

Affirmed.

**Attorneys and Law Firms**

**\*776** Christopher Grohman (argued), Attorney, Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Edward M. Genson, Attorney, Genson & Gillespie, Marc W. Martin (argued), Attorney, Marc Martin, Ltd., Chicago, IL, for Defendant–Appellant.

Before KANNE, TINDER, and HAMILTON, Circuit Judges.

**Opinion**

KANNE, Circuit Judge.

Roland Borrasi, a medical doctor, was convicted of Medicare fraud after he accepted a salary from a hospital in exchange for continually referring patients to the facility, a violation of 42 U.S.C. § 1320a–7b. In this appeal, Borrasi attacks both his conviction and his sentence. We find that the district court did not err by admitting minutes from hospital committee meetings to prove attendance records while excluding discussion of reports to which the minutes refer, as the latter constituted inadmissible hearsay. Because the Medicare fraud statute criminalizes payments when induction of referrals is among the purposes for the payments, we also find that the district court did not err in instructing the jury. Accordingly, we affirm his conviction. In addition, we find that the district court did not err in sentencing Borrasi. It reasonably estimated the loss amount in determining his offense level, it properly assessed a leadership enhancement to his offense level, and it expressed adequate reasons to sentence Borrasi to a longer term than his co-defendant. Accordingly, we affirm his sentence as well.

**I. BACKGROUND**

Dr. Borrasi owned Integrated Health Centers, S.C. ("Integrated"), a corporate group of healthcare providers in Romeoville, Illinois. He worked primarily at nursing homes and hospitals. Through this work, he became acquainted with Chief Executive Officer Wendy Mamoon, Director of Operations Mahmood Baig, and other officers and directors of Rock Creek Center, L.P., a licensed inpatient psychiatric hospital in Lemont, Illinois. Reimbursements from the

Medicare federal health care program constituted the vast **\*777** majority of payments received by Rock Creek.

At some time between 1999 and 2002, Borrasi, Mamoon, Baig, and others conspired to pay bribes to Borrasi and other individuals at Integrated in exchange for an increasing stream of Medicare patient referrals. Doctors Zafer Jawich, Bruce Roper, and Abhin Singla, as well as psychologist Agnes Jonas, were among those employed at Integrated at that time. Over that period, a sum of $647,204 in potential bribes was paid to Borrasi and Integrated physicians by Rock Creek. In 2001 alone, Borrasi referred approximately 484 Medicare patients to Rock Creek.

In order to conceal these bribes, Borrasi and other Integrated employees were placed on the Rock Creek payroll, given false titles and faux job descriptions, and asked to submit false time sheets. Borrasi, for example, was named "Service Medical Director" and was allegedly required to be available at all times; Baig later testified that Borrasi was not expected to perform any of the duties listed in his job description. According to minutes of Rock Creek's various committee meetings, Borrasi and some Integrated physicians occasionally attended meetings and submitted reports of their work. But they attended only a very small percentage of the actual meetings, and multiple witnesses testified to rarely seeing them in the Rock Creek facility for meetings or other duties. Jonas, Jawich, and Roper each testified that the Integrated physicians did not perform their assigned administrative duties, their reports and time sheets notwithstanding. Baig testified that he, Borrasi, and Mamoon did not expect the Integrated physicians to perform any actual administrative duties.

In addition, Rock Creek paid the salary for Integrated's secretary, as well as lease payments for one of Integrated's offices. This arrangement purportedly gave Rock Creek an outpatient clinic at Borrasi's building and certainly supplemented Borrasi's rent. Further, Baig was paid both to oversee the admission and stays of Integrated's referrals to Rock Creek and also to ensure the referred patients were returned to nursing homes and facilities that Borrasi could access and control. These methods enabled Rock Creek and Borrasi to maximize their Medicare reimbursement claims.

In December 2006, a grand jury returned an indictment against Borrasi, Mamoon, and Baig, charging them with one count of conspiracy to defraud the United States government, in violation of 18 U.S.C. § 371, and six

counts each of Medicare-related bribery, in violation of 42 U.S.C. § 1320a–7b *et seq.* Baig pled guilty to all seven counts, but Mamoon and Borrasi proceeded to trial. The three-week trial included testimony from Integrated and Rock Creek employees; documentary evidence comprising time sheets, attendance records from meeting minutes, and Medicare reimbursement claims; and recordings of Borrasi's conversations with Integrated physicians recorded by Singla, including one in which Borrasi admitted to referring patients in exchange for "free money" from Rock Creek. The jury returned verdicts of guilty on each count against Borrasi and Mamoon.

The district court then held a joint, two-day sentencing hearing for Borrasi and Mamoon. Both defendants were in criminal history category I. After considering the presentence report (PSR) and the parties' arguments regarding increasing the offense level to reflect the loss amount and enhancing the offense level due to their leadership roles, the court calculated Borrasi's offense level at 28 (yielding a range of 78–97 months' imprisonment) and Mamoon's offense level at 26 (yielding a range **\*778** of 63–78 months' imprisonment). The district court then heard the defendants' mitigation evidence, including testimony regarding a severely debilitating accident Mamoon's son had suffered that left Mamoon as his sole caregiver. The court sentenced Borrasi to seventy-two months' imprisonment and two years' supervised release. Mamoon was sentenced to six months' imprisonment, one year of home confinement, and five years' supervised release. Each defendant was required to pay $497,204 in restitution.

Borrasi then moved the district court to reconsider his sentence, arguing that it should be significantly lower to comport with Mamoon's. After holding a hearing on the matter, the district court denied his motion, concluding that the disparate sentences were justified by the facts of the case and the individual defendants' characteristics. Borrasi then timely appealed.

## II. ANALYSIS

Borrasi challenges both his conviction and his sentence in this appeal. He first argues that two errors during the guilt phase of his trial require a new trial. He then argues that, even if his conviction stands, we must remand for resentencing because of three errors during the sentencing phase. The government argues that the decisions about which Borrasi complains were

not erroneous. We will consider each of Borrasi's five issues in turn, beginning with the alleged infirmities in his conviction.

### A. Challenges to Conviction

At the conclusion of his trial, Borrasi moved for a new trial or, in the alternative, a judgment of acquittal, alleging twelve separate grounds for relief that included alleged evidentiary, procedural, and instructional errors. On appeal, he wisely limits his attack on his conviction to two allegations of error.

*See* *Ehrhart v. Sec'y of Health and Human Servs.,* 969 F.2d 534, 537 n. 2 (7th Cir.1992) ("[I]t behooves litigants to choose with care a few select issues for review, preferably those not forfeited by waiver."). His first allegation of error involves an evidentiary ruling, and the second focuses on the government's commentary during closing arguments regarding the statute he was charged with violating. We find neither argument persuasive.

### 1. Exclusion of Hearsay

Borrasi first argues that the district court erroneously interpreted and applied the Federal Rules of Evidence when it prevented him from using comments in meeting minutes during his defense, despite its earlier decision to allow the government to introduce the minutes into evidence and use them for a different purpose. According to Borrasi, this ruling prejudiced his case and warrants reversal of his conviction. We review the district court's decision to exclude the evidence or limit its use for an abuse of discretion, but we review its interpretation of the Rules *de novo.* *United States v. Rogers,* 587 F.3d 816, 819 (7th Cir.2009). Even if we determine the evidentiary decision was erroneous, we will not reverse it if the jury's ultimate decision was not influenced by the error. *United States v. Oros,* 578 F.3d 703, 707 (7th Cir.2009).

The meeting minutes at issue were taken during Rock Creek committee meetings. The face sheet of each set of minutes lists attendees at the meetings. The government sought to introduce them to support its expert's summary of the attendance of Borrasi and his Integrated physicians at Rock Creek meetings. This summary purported to show that they did not participate sufficiently in their assigned committees to justify receiving salaries **\*779** from Rock Creek for their respective activities. The government and Borrasi stipulated to the minutes' admissibility, and Borrasi now argues that the scope of the stipulation agreement was not limited to specific contemplated uses of the evidence.

Some of the minutes contained comments about committee reports submitted to Rock Creek's board of directors. Borrasi sought to introduce the minutes as exhibits so the jury could consider the information in those referenced reports, including the descriptions of medical services he and his employees allegedly performed for Rock Creek. He believed the substantive information in the reports—partially incorporated by the minutes—would refute the government's assertion that he and the other Integrated employees did not have to perform any work to receive a salary from Rock Creek.

On the government's objection, the district court ruled the minutes' substantive descriptions of the reports inadmissible because the statements would constitute hearsay. It did allow Borrasi to examine Rock Creek witnesses about whether they received the reports, and Borrasi questioned Mamoon about the reports and committee meetings at length. Nevertheless, Borrasi contends that the exclusion was erroneous because the reports met the business-records exception to the hearsay prohibition.

Federal Rule of Evidence 803(6) excepts certain "records of regularly conducted activity" from Rule 802's general ban on the admission of hearsay evidence. Borrasi argues that hospital committee meeting minutes plainly fall within the scope of the business records exception because they were "record [s] ... of acts, events, conditions, opinions, or diagnoses, made at or near the time ... kept in the course of a regularly conducted business activity" and that it was Rock Creek's regular practice to take minutes of business meetings. Fed.R.Evid. 803(6). The district court accepted the parties' stipulation that the minutes themselves would fall within this exception. Borrasi now contends that, because the government did not limit the uses to which the minutes could be put upon their admission, it waived any opportunity to later limit the evidentiary uses to which he could apply the minutes. To support this broad premise, he cites Rule 105, [1] yet he cites no case for his proposition that the Rule has such a preclusive effect at the moment of admission. Indeed, this argument inverts the very spirit of the Rule. Rule 105 is a vehicle for the enforcement of the Federal Rules of Evidence, but Borrasi's attorney would turn it into a trap—set upon admission of evidence and sprung later in trial—to effectively prevent enforcement of the Rules.

The meeting minutes almost certainly fell within Rule 803(6), especially given that—despite the involvement of Rock

Creek officers in the fraudulent scheme—the government did not question the reliability of the documents. *See* Fed.R.Evid. 803(6) (excluding from the business records exception those records whose "source of information or ... method or circumstances of preparation indicate lack of trustworthiness"). Borrasi, however, challenges the exclusion of the reports referenced in the minutes and any comments in the minutes regarding the substance of those reports. Those reports and any statements therefrom are hearsay, as each **\*780** comprises statements written by physicians not testifying before the court that Borrasi wished to introduce for the truth of the matters asserted. *See* Fed.R.Evid. 801(c).

The government argues—and Borrasi does not refute—that Borrasi never laid any additional foundation for the admission of these reports or the minutes' substantive discussion of them. That alone justifies the district court's decision to bar the jury's receipt of the reports, as courts may not permit the introduction of hearsay contained within hearsay unless *each* layer is properly admitted under an exception to Rule 802. Fed.R.Evid. 805. Specifically, "statements made by third parties in an otherwise admissible business record cannot properly be admitted for their truth unless they can be shown independently to fall within a recognized hearsay exception." *United States v. Christ,* 513 F.3d 762, 769 (7th Cir.2008) (*quoting* *Woods v. City of Chicago,* 234 F.3d 979, 986 (7th Cir.2000)). Borrasi broadly concludes that the minutes are not "double hearsay" because the minutes did not contain statements of outsiders to Rock Creek, but rather statements of reports by Integrated physicians with privileges at Rock Creek. But he does not—and could not—argue that the reports were themselves trustworthy business records falling within Rule 803(6) or any other exception. Accordingly, the statements contained in the reports, as well as any quotations from or specific references to them in the minutes, constituted inadmissible hearsay.

The district court did not erroneously interpret Rules 802 and 803(6). It properly allowed Borrasi to argue that certain reports were made and then tendered during the meetings, and it allowed him to use the admitted minutes in an attempt to prove those arguments. But the court did not abuse its discretion in refusing to admit any substantive descriptions of the reports in the minutes or the reports themselves.

Had we found the exclusion erroneous, we would nevertheless have found it to constitute harmless error because it could not have had a substantial and injurious effect on the outcome of the trial. *See Oros,* 578 F.3d at 709. Borrasi argues that he was prejudiced in his defense because he was barred from showing the jury that he and other Integrated physicians earned their salaries. Yet Borrasi was able to expound on this theory of defense throughout his cross-examinations, his case-in-chief, and his closing arguments. Even if the court allowed Borrasi to introduce the minutes' specific discussions of the reports purporting to show the Integrated physicians' work, it is highly unlikely that the evidence would have offset the overwhelming evidence that Borrasi and the other physicians were being paid in significant part for their referrals instead of their services. Baig testified that he paid kickbacks to Borrasi; Jawich testified that he did minimal administrative work for Rock Creek and that his contract's job description was not accurate; and the jury heard recorded conversations in which Borrasi described the "free money" Integrated received for their referrals. Accordingly, "any error the district court committed was harmless and a reversal is not warranted." *Id.* at 710.

*2. Interpretation of* 🚩 *42 U.S.C. § 1320a–7b*

Borrasi's second challenge to his conviction turns on the interpretation of the criminal statute he was charged with violating and conspiring to violate. Because medical services for the patients Borrasi referred to Rock Creek were paid for by Medicare, his referrals and conduct were subject to certain statutory restrictions. **\*781** Borrasi was charged, for example, with violating one statute designed to help combat health care fraud:

> [W]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) ... in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program ... shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

*U.S. v. Borrasi, 639 F.3d 774 (2011)*

85 Fed. R. Evid. Serv. 320

42 U.S.C. § 1320a–7b(b)(1). The government theorized that Borrasi and the other Integrated physicians received payments—in the guise of salaries—from Rock Creek for their referrals of Medicare patients.

Borrasi points out, however, that the statute exempts some behavior from its coverage. It does not criminalize "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a–7b(b)(3). Seizing this language, Borrasi argues that the prosecution prejudicially misstated the law in its closing argument by suggesting that it did not matter if any portion of Rock Creek's payments to him or other Integrated physicians was pursuant to legitimate employment relationships because the statute was violated if any portion of the payments was for patient referrals. He contends that the government's argument to the jury nullified his theory of defense and that the district court did not cure the misconduct by striking the argument and by giving an adequate curative instruction.

Because Borrasi's challenge to the district court's jury instructions necessarily implicates a question of law—the scope of § 1320a–7b(b)(3)'s exemption—we review the district court's instructions *de novo. United States v. DiSantis,* 565 F.3d 354, 359 (7th Cir.2009). We also review *de novo* whether a particular instruction was appropriate as a matter of law. *United States v. Tanner,* 628 F.3d 890, 904 (7th Cir.2010). We will affirm Borrasi's conviction if the jury instructions fairly and accurately summarized the law, and we will reverse only if the instructions misled the jury and prejudiced his defense. *United States v. Quintero,* 618 F.3d 746, 753 (7th Cir.2010).

Borrasi urges us to adopt a "primary motivation" doctrine, under which the trier of fact would determine the defendants' intent in any given case and find them not guilty if the primary motivation behind the remuneration was to compensate for bona fide services provided. Under the primary motivation doctrine, the district court's instructions in this case would have been both inaccurate as to the law and inadequate to cure any prejudice from the government's statements during its closing arguments. He contends that such a construction is necessary both to avoid the possibility of conviction based on innocent or *de minimis* conduct and also to give effect to the rule of lenity in the face of statutory ambiguity.

Persuasive authority weighs heavily against Borrasi's proposal. He relies on *United States v. Bay State Ambulance and Hosp. Rental Serv., Inc.,* 874 F.2d 20 (1st Cir.1989), where the First Circuit affirmed the appellants' convictions after "the district court instructed that the defendants could only be found guilty if the payments were made primarily as [referral] inducements." *Id.* at 30. But contrary to his allegation, there does not appear **\*782** to be a circuit split regarding the appropriate interpretation of § 1320a–7b(b). The First Circuit did not decide in *Bay State* "whether the government must show that such payments were made primarily or solely with a corrupt intent." *Id.* Rather, it held that the district court's instruction at least "comport[ed] with congressional intent." *Id.* Each circuit to actually reach the issue has rejected the primary motivation theory Borrasi advocates. *See United States v. Greber,* 760 F.2d 68, 71 (3d Cir.1985) ("The text refers to 'any remuneration.' That includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended."); *United States v. Davis,* 132 F.3d 1092, 1094 (5th Cir.1998) (holding that § 1320a–7b(b)(2) is violated whenever the benefits extended were partially to induce patient referrals); *United States v. Kats,* 871 F.2d 105, 108 (9th Cir.1989) ("[T]he Medicare fraud statute is violated if 'one purpose of the payment was to induce future referrals.'" (*quoting Greber,* 760 F.2d at 69)); *United States v. McClatchey,* 217 F.3d 823, 835 (10th Cir.2000) ("[A] person who offers or pays remuneration to another person violates the Act so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals.").

We find the reasoning of the Third, Fifth, Ninth, and Tenth Circuits convincing, and we decline Borrasi's invitation to create a circuit split. Nothing in the Medicare fraud statute implies that only the primary motivation of remuneration is to be considered in assessing Borrasi's conduct. We join our sister circuits in holding that if part of the payment compensated past referrals or induced future referrals, that portion of the payment violates 42 U.S.C. § 1320a–7b(b)(1).

The district court's instructions comported with this common-sense holding. The instruction tracked the language of

§ 1320a–7b(b)(1), combining it with a definition of remuneration. To convict Borrasi, the instruction required the jury to find—beyond a reasonable doubt—that some amount was paid not pursuant to a bona fide employment relationship. The trial court did not err in instructing the jury, and the government's comments during its closing arguments did not entitle Borrasi to a curative instruction. Because at least part of the payments to Borrasi was "intended to induce" him to refer patients to Rock Creek, "the statute was violated, even if the payments were also intended to compensate for professional services." *Greber,* 760 F.2d at 72.

*B. Challenges to Sentencing*

Borrasi also attacks his sentence, arguing that three errors require us to remand for resentencing. First, he alleges the district court did not make adequate findings as to his offense level based upon the value he received from his Rock Creek activities. Second, he contends the district court erred by increasing his offense level due to his purported leadership role in the criminal scheme. Finally, he asserts that the great disparity between his sentence and that of his co-defendant warrants resentencing. We are unpersuaded by his three contentions and will affirm his sentence.

*1. Sufficiency of Loss Calculation*

Borrasi argues that the district court did not make findings as to the loss amount sufficient to determine the appropriate level of his offense. Specifically, he contends that the district court should have given him more than the $150,000 credit it gave him for the value of the actual services he performed for Rock Creek. According to **\*783** Borrasi, the district court's findings lacked the requisite specificity to deny him a greater discount based upon his objections to the PSR. The government argues that any credit was inappropriate and that the loss amount should have been the full amount listed in the PSR.

Based on Borrasi's criminal conduct, the district court assessed his base offense level at 8 under U.S.S.G. § 2B4.1, Bribery in Procurement of Bank Loan and Other Commercial Bribery. That section requires augmenting the base offense level according to § 2B1.1, considering the value of benefits received through the crime. U.S.S.G. § 2B4.1(b)(1). After considering the PSR and arguments from both Borrasi and the government, the district court determined that Borrasi accepted bribes totaling $647,204, a

sum that included the administrative salaries of Borrasi and his Integrated group, the value of the lease Rock Creek paid for Borrasi, and a portion of Baig's salary. Borrasi did not object to that calculation, but rather argued that he should have received a significant credit against that amount based on the 24–hour on-call services his team rendered, their membership and participation in Rock Creek committees, and various administrative services they provided to Rock Creek.

The district court noted that the $647,204 loss amount corresponded to a 14–level increase. It then found that Borrasi had performed some valuable services for Rock Creek, but noted that it was difficult to measure the exact value of that benefit. The district court reduced the loss amount by $150,000 to "compensate for the efforts of the various individuals which did in fact benefit the patients at [Rock Creek], and some adjustment for the availability 24 hours a day of certain medical personnel to be at the beck and call for the residents of [Rock Creek]." (Sent. Tr. 52.) This reduction did not change the offense level, *see* U.S.S.G. § 2B1.1, but did reduce the restitution required of Borrasi to $497,204.

The loss amount calculated by the district court for sentencing is a factual determination, one which we review for clear error. *United States v. Ali,* 619 F.3d 713, 720 (7th Cir.2010). We will uphold the district court's loss calculation unless we are left with a definite and firm conviction that the district court made a mistake. *United States v. Salem,* 597 F.3d 877, 884 (7th Cir.2010). Our deference will not excuse an absence of findings altogether, *id.* at 886, but a court's findings need only be a reasonable estimate of the loss, *United States v. Christianson,* 586 F.3d 532, 537 (7th Cir.2009). Borrasi's burden of proof on appeal requires him to demonstrate that the district court's determination was inaccurate and outside the realm of permissible computations. *Id.*

Borrasi argues that he must be resentenced because the district court's determination of how much to reduce the loss amount—based on the fair market value of the services he rendered—was not sufficiently detailed to constitute a reasonable estimate based on the evidence. He asserts that the district court did not identify the formula or methodology it used and thus did not provide the particularity required for sentencing determinations.

We disagree with Borrasi's contention. The government proved the loss value to be $647,204. Borrasi did not object to that amount, and he bore the burden of providing

"substantiated evidence ... to counter the government's explicit proof of loss." *United States v. Gordon,* 495 F.3d 427, 432 (7th Cir.2007). He needed to convincingly refute the government's proof with his own, but there was no testimony as to the value of the on-call services, and there was much evidence showing that the alleged administrative services were nonexistant or **\*784** *de minimis. See United States v. Sensmeier,* 361 F.3d 982, 989 (7th Cir.2004) ("[W]hile we acknowledge that the burden is on the government to prove loss, the defendants' wholly unsubstantiated statements are not enough to undermine, nor even question, the court's acceptance of the government's proof of loss."). Were we to give effect to each of Borrasi's vague valuations, in fact, the credits for services rendered would have *exceeded* the total loss proven by the government. Ultimately, Borrasi has not met his heavy burden of proving that the district court's determination was "outside the realm of permissible computations." *United States v. Peterson–Knox,* 471 F.3d 816, 822 (7th Cir.2006) (quoting *United States v. Lopez,* 222 F.3d 428, 437 (7th Cir.2000)).

The government argues—and from the cold record we are inclined to agree—that "if anything, the district court was overly generous in crediting Borrasi with $150,000" because the services he allegedly rendered were either illusory or valueless. (Appellee's Br. at 36–37.) The district court gave Borrasi the benefit of the doubt by crediting his alleged services in any amount, and it is the district court's lack of specificity in doing so that he now attacks. Granted, the district court could have been more specific in discussing how it calculated the credit against the loss amount generated by Borrasi's criminal activities. But we have previously found such estimation reasonable to determine the loss amount for sentencing, notably in a fraud case in which factual complexities about the existence and value of medical services abounded. *See United States v. Vivit,* 214 F.3d 908, 914–16 (7th Cir.2000). Given the complexities of this Medicare fraud case, as well as the lack of evidence to establish the existence and value of any legitimately rendered services, we find the district court's estimate of the amount to credit Borrasi reasonable. The district court did not clearly err when it determined the loss value attributed to Borrasi's crime.

*2. Application of Leadership Enhancement*

Borrasi next argues that the district court was not justified in assessing a four-level leadership enhancement against him while assessing only a two-level enhancement against Mamoon. The district court increased Borrasi's offense level under U.S.S.G. § 3B1.1(a) after finding that he was an organizer or leader of Integrated and Rock Creek's criminal activities. Borrasi argues that the court did not consider the appropriate enhancement factors on the record. He also argues that he was only a middleman between the Integrated physicians and the Rock Creek hierarchy—a hierarchy that included Mamoon, who Borrasi venomously asserts should have borne the brunt of any leadership enhancement.

We review the district court's factual finding regarding the four-level enhancement for clear error, and Borrasi's arguments do not leave us with a "firm and definite conviction that an error has been made." *Tanner,* 628 F.3d at 907. The court explicitly adopted the PSR's assessment of the leadership enhancement. The PSR examined seven factors relevant in determining Borrasi's role in this criminal scheme, *see United States v. Curb,* 626 F.3d 921, 924–25 (7th Cir.2010), and concluded that each supported the enhancement in this case. Of particular note, Borrasi actively recruited physicians into his scheme, controlled the Integrated physicians, solidified and expanded the relationship between Integrated and Rock Creek, and established Baig's role in Rock Creek's admissions department to facilitate the scheme. *See United States v. House,* 110 F.3d 1281, 1284 (7th Cir.1997) (affirming organizer and leader enhancement **\*785** where the appellant was the common connection between the criminals, where he "brought ... people together, both individually and as a group, to further the business of the conspiracies," and where he had substantial decision-making authority).

Although the district court assessed only a two-level enhancement to Mamoon, Rock Creek's CEO, her actual role in the fraudulent scheme was less extensive and fundamental than Borrasi's. We conclude that the district court did not clearly err in assessing a four-level enhancement to Borrasi based on his role in the offense.

*3. Sentencing Discrepancy*

Borrasi finally argues that his sentence was unreasonable because it was much longer than that imposed on his co-defendant. We review the district court's sentencing procedures, including its consideration of the 18 U.S.C. § 3553(a) factors, *de novo. United States v. Pulley,* 601 F.3d 660, 664 (7th Cir.2010). If the court properly applied

those procedures, we review the sentence's substantive reasonableness for an abuse of discretion. *Id.*

When determining the appropriate sentence for a given defendant, the district court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 🚩 18 U.S.C. § 3553(a)(6). The district court found that the guidelines range was reasonable and fair for Borrasi, but gave him a minimal downward adjustment accounting for his medical service to under-served groups; it ultimately sentenced him to 72 months' incarceration. By contrast, the district court found Mamoon's case to be outside the heartland of the statute, found her to be the critical caregiver for her profoundly disabled son, and found the guidelines range to be considerably longer than necessary to prevent Mamoon from re-offending; it ultimately sentenced her to 6 months' incarceration. In denying Borrasi's motion to reconsider his sentence based on this disparity, the district court explained that the discrepancy in sentencing was not only justified but demanded by their respective actions and circumstances.

Borrasi now argues that a plain application of 🚩 § 3553(a) (6) mandates vacatur of his sentence in light of Mamoon's, which he complains was markedly lenient compared to his own. We disagree because 🚩 § 3553(a)(6) allows for *warranted* disparities among co-defendants' sentences. *Pulley,* 601 F.3d at 668. Here, the district court made individual, particularized sentencing determinations based on

the 🚩 § 3553(a) factors as to Borrasi and Mamoon during both the sentencing hearing and the hearing on Borrasi's motion for reconsideration. It followed the appropriate procedures and considered the avoidance of disparity in arriving at its sentences. We find that the district court properly calculated the guidelines range in Borrasi's case and that the below-guidelines sentence it imposed is reasonable. *See id.* at 668 ("[I]f the district court provides an adequate statement of reasons, consistent with 🚩 § 3553(a), for believing that the sentence is appropriate, and it is within the Guidelines range, we presume the sentence is substantively reasonable."). Accordingly, the district court did not err in sentencing Borrasi.

### III. CONCLUSION

The district court erred in neither its evidentiary rulings nor its jury instructions, so we AFFIRM the district court's judgment of conviction. The district court reasonably estimated the amount of loss in determining Borrasi's offense level, properly enhanced the offense level due to his **\*786** leadership role, and correctly considered and rejected his disparate sentencing argument. Accordingly, we AFFIRM the sentence imposed.

**All Citations**

639 F.3d 774, 85 Fed. R. Evid. Serv. 320

---

Footnotes

1    Federal Rule of Evidence 105 provides: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

---

                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   8

# EXHIBIT M

**EXHIBIT M**

U.S., ex rel. Landis v. Hospice Care of Kansas, LLC, Not Reported in F.Supp.2d (2010)

Med & Med GD (CCH) P 303,617

2010 WL 5067614
United States District Court, D. Kansas.

UNITED STATES of America, ex rel. Beverly
LANDIS, Plaintiffs,
v.
HOSPICE CARE OF KANSAS, LLC and Voyager
Hospicecare, Inc., Defendant.

.
|
Dec. 7, 2010.

**Attorneys and Law Firms**

David W. White, Jacqueline Sexton, Joseph J. Roper,
Lauren Perkins Allen, Foland, Wickens, Eisfelder, Roper
& Hofer, P.C., Kansas City, MO, for Plaintiffs.

Alisa Nickel Ehrlich, Lynn D. Preheim, Stinson Morrison
Hecker LLP, Wichita, KS, Andrew C. Bernasconi,
Thomas C. Fox, Reed Smith, LLP, Washington, DC,
Defendants.

*MEMORANDUM AND ORDER*

CARLOS MURGUIA, District Judge.

**\*1** The United States and Beverly Landis[1] ("Plaintiffs")
bring this action under the Federal Claims Act, 31
U.S.C. § 3729 et seq., and the common law or equitable
theories of unjust enrichment and payment by mistake.
The Complaint[2] alleges that defendants Hospice Care of
Kansas, Inc. ("HCK") and Voyager Hospicecare, Inc.
("Voyager") knowingly submitted false or fraudulent
claims to Medicare in violation of 31 U.S.C. §
3729(a)(1).[3] This matter is before the court on Defendant
Voyager Hospices, Inc.'s Individual Motion to Dismiss
the Complaint as to Voyager (Doc. 50) and Defendants'
Joint Motion to Dismiss the Complaint (Doc. 52).
Defendants request a hearing on their motions; however,
the court finds that a hearing is unnecessary. The court
makes its ruling on the record before it. The court denies
defendants' motions for the following reasons.

**I. Background**

HCK, which was purchased by Voyager in September
2004, provides hospice care to Medicare patients.
Overseen by the Department of Health and Human
Services ("HHS"), Medicare is directly administered by
the Centers for Medicare & Medicaid Services ("CMS"),
an HHS agency. Hospice care is a benefit provided under
Medicare Part A, a 100% federally subsidized health
insurance program. Under Medicare Part A, institutional
health care providers, like defendants, provide health care
services to Medicare patients and then submit claims to
Medicare for reimbursement. Cahaba Government Benefit
Administrators ("Cahaba"), on behalf of CMS, is
responsible for processing and paying—with federal
funds—HCK's Medicare claims. Hospices submit claims
on a monthly basis and are paid a per diem rate based on
the number of days and level of care provided during the
relevant period.

Initially, hospice care is available for a 90–day period. To
receive care, the initial 90–day period must be certified by
(a) the medical director of the hospice or
physician-member of the hospice inter-disciplinary group
and (b) the patient's attending physician. Subsequently, a
patient may receive one additional 90–day period and
then an unlimited number of 60–day periods. One of the
above-mentioned physicians must certify the patient's
terminal condition in writing at the beginning of each
subsequent period. Written certification "requires: (1) a
statement that the individual's medical prognosis is that
their life expectancy is 6 months or less if the terminal
illness runs its normal course; (2) specific clinical
findings and other documentation supporting a life
expectancy of six months or less; and (3) the signature(s)
of the physician(s)." (Doc. 30, at 8, citing 42 CFR §
418.22; Medicare Benefit Policy Manual, Chapter 9, §
20.1.)

To be eligible for hospice care under Medicare Part A, a
patient must be certified as "terminally ill" in accordance
with 42 CFR § 418.22. (Doc. 30, at 8, citing 42 CFR §
418.20.) "Terminally ill" means that a person "has a
medical prognosis that his or her life expectancy is 6
months or less if the illness runs its normal course ."
(Doc. 30, at 8, citing 42 CFR § 418.3.) Cahaba issued
Local Coverage Determinations (LCDs) to help providers
determine whether an individual is terminally ill. The
LCDs set forth general and disease-specific clinical
variables. It also advises that a patient should be

U.S., ex rel. Landis v. Hospice Care of Kansas, LLC, Not Reported in F.Supp.2d (2010)

Med & Med GD (CCH) P 303,617

considered for discharge from the hospice if a patient improves to the point where his or her life expectancy is greater than six months from the most recent recertification evaluation or definitive interim evaluation.

**\*2** To be covered by Medicare, hospice services must be:

> Reasonable and necessary for the palliation and management of the terminal illness as well as related conditions. The individual must elect hospice care in accordance with § 418.24. A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56. That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care. A certification that the individual is terminally ill must be completed as set forth in § 418.22.

(Doc. 30, at 9, citing 42 CFR § 418.200.)

The United States contends that defendants submitted Medicare claims for ineligible hospice patients and followed business practices that caused the "admission, retention, and submission of claims to Medicare for patients that were ineligible for the hospice benefit." (Doc. 30, at 11, 12.) Those business practices included: setting aggressive census targets for each HCK branch office; staff incentives and monetary bonuses for meeting the aggressive census targets; threatening staff with terminations or reductions in hours if the census fell below targets; instructing staff to inaccurately document the condition of patients to make them appear appropriate for hospice and to avoid detection if medical files were reviewed by Cahaba; implementing procedures that delayed the discharge or made it difficult to discharge ineligible patients; challenging or ignoring staff and physician recommendations to discharge patients; and disregarding or ignoring compliance concerns raised by an outside consultant.

The complaint sets out examples of these practices, including the following:

• Despite a warning from an outside consultant that incentives based on census could be inappropriate, defendants set up census-based bonus programs. These included the 2005 "Summer Sizzle," "Christmas Cash Blitz," and "Fall Frenzy." In 2007, Voyager began a promotion in which it offered to pay for a trip to Cancun for all HCK full-time staff if HCK maintained an average daily census of 725 patients for 30 consecutive days between September 2007 and September 2008.

• Staff received regular communications from superiors informing them of each branch's census goals, current census, and the need to increase census.

• Training documents instructed staff, "Remember to chart negative ... Celebrate the good things but no need to document"; "Don't document discharge planning"; and not to use phrases such as "Stable," "No change," "Slow decline," or "May possibly not be appropriate for hospice." (Doc. 30, at 18–19 .) They also instructed staff that a proper recertification note "Accentuates the negatives" but does not use terms such as "Stable, chronic, unchanged" or "within normal limits." (*Id.*)

• An Advanced Registered Nurse Practitioner ("ARNP"), noted in an e-mail that a patient's condition was likely chronic, not terminal; that the patient had gained weight; and that the patient's oxygen saturation was okay. Despite this assessment, the ARNP wrote in the patient's History & Physical, a document usually included in a patient's medical records, that the patient had experienced functional decline and should continue services.

**\*3** • In February 2006, HCK enacted a discharge policy that mandated a 30–day discharge process for every patient "once the determination has been made that a patient no longer meets the requirements for continued services." (Doc. 30, at 28.) At the end of the 30–day period, an additional review for eligibility was required and a recommendation was sent to the "care team" and the President and Vice President "for review, comment, and/or direction ." (*Id.*)

• Outside consultants and employees of HCK informed both defendants that (1) HCK needed to develop more consistent and better review processes, procedures, and education for staff, (Doc. 30, at 20); (2) that HCK was at risk of admitting patients ineligible for hospice, (Doc. 30, at 23); (3) that roughly one-third of the patients referred at the

U.S., ex rel. Landis v. Hospice Care of Kansas, LLC, Not Reported in F.Supp.2d (2010)

Med & Med GD (CCH) P 303,617

Lenexa branch were ineligible for hospice, and that "there appears to be a gate-keeping problem that we need to fix up front." (Doc. 30, at 24, quoting Nov. 2006 email.)

• Voyager tied resources to increasing census. In September 2007, Voyager's Regional Vice President sent an e-mail to several HCK branch executive directors telling them they need to work with their staff to decrease "constant requests for resources." (Doc. 30, at 16.) The email stated, "It is time that we help [staff] understand.... To remain financially viable, we must stay within our budgets. Of course, with that said, 'high water covers a lot of stumps.' In other words, when we get our census up, that will free resources." (*Id.,* quoting Sept. 2007 email.)

• In October 2007, Voyager's Regional Vice President sent an e-mail stating that the census total was "not acceptable." The Regional Vice President instructed the HCK marketing consultants and executive directors to "kick it into high gear" because "[t]his organization operates on two things, patient care and business development. We are sorely lacking in business development." (Doc. 30, at 18, quoting Oct. 2007 email.)

• In January 2008, Voyager's Regional Vice President sent e-mails on consecutive days to the branch executive directors stating, "Let's PLEASE try to minimize these [live discharges]," and "We really have to find a way to stop all these live discharges ." (Doc. 30, at 32, quoting Jan. 2008 emails.)

The Complaint also alleges that defendants had ineffective training and compliance programs that made it likely they would submit false claims for patients ineligible for the hospice benefit.

The Complaint identifies 27 patients plaintiffs allege were not terminally ill but for whom defendants submitted Medicare claims. The Complaint sets forth the factual details underlying the patients' alleged false certifications, the claims submitted by defendants, and the reimbursements paid by Medicare. (Doc. 30, at 33–58.)

**II. Legal Standard**
To survive a motion to dismiss under Rule 12(b)(6), a complaint must present factual allegations that "raise a right to relief above the speculative level" and must

contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly,* 550 U.S. 544, 555, 570 (2007); *see also Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). The allegations must be enough that, if assumed to be true, the plaintiff plausibly, not merely speculatively, has a claim for relief. *Robbins v. Oklahoma,* 519 F.3d 1242, 1247–48 (10th Cir.2008). " 'Plausibility' in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the [plaintiff 'has] not nudged [its] claims across the line from conceivable to plausible.' " *Id.* (quoting *Twombly,* 550 U.S. at 570). Under this standard, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir.2007).

*\*4* In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court assumes as true all well-pleaded facts in plaintiffs' complaint and views them in a light most favorable to plaintiffs. *See Zinermon v. Burch,* 494 U.S. 113, 118 (1990); *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984).

**III. Discussion**
The FCA "covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,* 543 F.3d 1211, 1217 (10th Cir.2008) (internal quotations omitted). Section 3729(a)(1) provides a cause of action against any person who "knowingly presents, or causes to be presented ... [to] the United States Government ... a false or fraudulent claim for payment or approval." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah,* 472 F.3d 702, 709 (10th Cir.2006). "Knowingly" includes (1) having actual knowledge or (2) acting in deliberate ignorance, or reckless disregard, of the truth or falsity of the information. *United States ex rel. Burlbaw v. Orenduff,* 548 F.3d 931, 945 n. 12 (10th Cir.2008) (citing 31 U.S.C. § 3729(b)(1)-(3))[5].

The government brings its FCA claims under an "implied-false-certification theory." (Doc. 58, at 19–20.) Rather than focusing on the payee's statements to the

U.S., ex rel. Landis v. Hospice Care of Kansas, LLC, Not Reported in F.Supp.2d (2010)

Med & Med GD (CCH) P 303,617

government, claims under an implied-false-certification focus "on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.,* 614 F.3d 1163, 1169 (10th Cir.2010) (citing *Conner,* 543 F.3d at 1218). The pertinent inquiry for such claims is "whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment." *Id.* at 1169.

The inquiry does not end there. The false certification, even if implied, must be material to the government's decision to pay the claim. *Id.* "A false certification is therefore actionable under the FCA only if it leads the government to make a payment which it would not otherwise have made." *Conner,* 543 F.3d at 1219.

When making these allegations, plaintiffs must comply with Federal Rule of Civil Procedure 9(b). *Lemmon,* 614 F.3d at 1172.

### a. False and Material Claims

Defendants argue that a medical opinion regarding whether a patient is terminally ill—a life expectancy of less than six months—is a subjective medical opinion that cannot be false. FCA liability must be based on an objectively verifiable fact; however, facts that rely upon clinical medical judgments are not automatically excluded from liability under the FCA. *See United States ex rel. Morton v. A Plus Benefits, Inc.,* 139 F. App'x 980, 983 (10th Cir.2005) (agreeing that FCA liability must be predicated on an objectively verifiable fact, but acknowledging that the court was not "prepared to conclude that in all instances, merely because the verification of a fact relies upon clinical medical judgments ... the fact cannot form the basis of an FCA claim."). Additionally, plaintiffs do not allege that the physicians made false certifications independently, but that the physicians could not legitimately exercise their medical judgment because defendants provided false information on which the physicians relied.

**\*5** Defendants next argue that plaintiffs have not alleged that defendants submitted false claims. But allegations that a defendant caused a false claim to be submitted may be sufficient to state a cause of action under § 3729(a)(1). *See, e.g., United States v. Gwinn,* No. 06–cv–00267, 2008 WL 867927, at \*15 (S.D.W.Va. Mar.

31, 2008) (finding sufficient allegations that alleged the defendants supplied information about patients' medical conditions with knowledge that the answers were inaccurate because the defendants caused false claims to be submitted); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 377–78 (5th Cir.2004) (overruling dismissal of FCA claim and finding that allegations that the defendant caused false claims to be submitted were sufficient even if the defendants did not file the claim). A person need not be the one that submitted the claim to be liable under the FCA; causing the false claim to be submitted is enough. *United States ex rel. Baker v. Cmty. Health Sys., Inc.,* 709 F.Supp.2d 1084, 1118 (D.N.M.2010). In such cases, the "appropriate focus of the inquiry is on 'the specific conduct of the person from whom the Government seeks to collect'" and whether that conduct causes the presentment of a false claim." *Id.* (quoting *Sikkenga,* 472 F.3d at 714).

The Complaint states such allegations. The United States alleges that by submitting Medicare claims, defendants represented that the patients were terminally ill; that defendants' intentional, reckless business practices lead physicians to inaccurately certify patients as terminally ill; and that defendants submitted claims even though they knew, or had reckless disregard for the fact, that the patients that were not terminally ill. Additionally, although Voyager did not submit the Medicare claims, the Complaint alleges specific facts regarding how Voyager's conduct led to a fraudulent claim for payment by the Government. Specifically, the Complaint alleges that Voyager pressured employees to certify, recertify, or not discharge patients regardless of whether they were eligible for hospice benefits and disregarded concerns from consultants and employees that their practices created a risk of approving patients who were ineligible for hospice.[6] Thus, plaintiffs have sufficiently alleged that defendants knowingly or recklessly filed, or caused to be filed, false claims for patients who were not in fact terminally ill.

Similarly, the Complaint sets forth facts that the alleged falsities were material. It alleges that to be eligible for hospice care under Medicare the patient must be certified as terminally ill under 42 C.F.R. § 418.22; that "terminally ill" means a person with a life expectancy of less than six months if the illness runs its natural course; that to participate in the Medicare hospice program, a hospice must maintain a record with correct clinical information; and that defendants' business practices led to incorrect records, which in turn led to the false certification of patients as terminally ill. Because a patient must be certified as terminally ill to be eligible for

U.S., ex rel. Landis v. Hospice Care of Kansas, LLC, Not Reported in F.Supp.2d (2010)

Med & Med GD (CCH) P 303,617

Medicare, false terminally-ill certifications may lead "the government to make a payment which it would not otherwise have made." 📙 *Conner, 543 F.3d at 1219.*

### b. Rule 9(b)

**\*6** Claims under the FCA require compliance with Rule 9(b). Pre-*Twombly* cases required plaintiffs alleging FCA claims to plead the " 'who, what, when, where and how of the alleged [claim],' " *Lemmon,* 614 F.3d, 1171 (quoting 📕 *Sikkenga,* 472 F .3d at 727), which required plaintiffs to identify the "time, place, content, and consequences of the fraudulent conduct." *Id.* Post-*Twombly* and *Iqbal,* the rule's purpose remains the same—"to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based." *Id.* at 1172 (citations and quotations omitted). Thus, FCA claims "need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.*

Plaintiffs have met Rule 9(b)'s standard by providing specific factual allegations regarding the who, what, when, where, and how of the alleged claims. The *who*—plaintiffs allege specific acts by each corporation and by employees within the corporations. The employees are not identified by name, but they are identified by title. Defendants can easily identify the individuals by cross-referencing the employees' title with the date and the written communication, event, or patient file. The *what*—plaintiffs allege specific regulations and business practices that allegedly caused the false submissions. Further, plaintiffs identify 27 patients, specific instances related to those patients that they allege caused false claims, and the false claims submitted for payment. The *when*—plaintiffs alleged the date, or series of dates, when specific business practices were in use; when communications took place; when claims where

submitted; and when the alleged violations occurred. The *where*—although the specific branch is not always identified, defendants can determine the location by identifying the employee or patient involved in the specific events laid out in the Complaint. The *how*—the Complaint clearly sets out the scheme plaintiffs allege defendants used to submit hospice claims for ineligible patients. Plaintiffs provide detailed information regarding how the defendants used their business practices to allegedly violate the FCA. They also alleged the conduct that led to the violation, including specific policies and actions taken by their employees.

Plaintiffs are not required to provide a factual basis for every allegation; nor must every allegation contain all the necessary information. 📙 *Lemmon,* 614 F.3d, 1173. After reviewing the Complaint, the court finds that the allegations in the Complaint are sufficiently specific to identify the who, what, when, where, and how of the alleged claims. Thus, plaintiffs have satisfied Rule 9(b).

Defendants rely on these same arguments in moving to dismiss plaintiffs' unjust enrichment and payment by mistake claims. For the reasons stated above, the court finds that plaintiffs have alleged facts sufficient to state a claim for unjust enrichment and payment by mistake.

**\*7 IT IS THEREFORE ORDERED** that Defendant Voyager Hospices, Inc.'s Individual Motion to Dismiss the Complaint as to Voyager (50) is denied.

**IT IS FURTHER ORDERED** that Defendants' Joint Motion to Dismiss the Complaint (Doc. 52) is denied.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 5067614, Med & Med GD (CCH) P 303,617

Footnotes

1    Relator Beverly Landis, a current HCK employee, originally filed this lawsuit on behalf of herself and the United States pursuant to the *qui tam* provisions of the FCA, 🚩 31 U.S.C. § 3730(b)(1). The United States intervened pursuant to 🚩 § 3730(b)(2) and (4) of the FCA.

2    The court relies on the United State's Complaint ("Complaint") (Doc. 30), filed June 30, 2010.

3    In its Response, the United States clarified that it is alleging claims under 🟡 § 3729(a)(1) only. To the extent the United States alleges claims under any other provisions of 🟡 § 3729, those claims are dismissed pursuant to the United States' representations in its Response. (*See* Doc. 58, at 19–20, 27 n. 12.)

**U.S., ex rel. Landis v. Hospice Care of Kansas, LLC, Not Reported in F.Supp.2d (2010)**

Med & Med GD (CCH) P 303,617

4    Section 3729 was amended in May 2009. Fraud Enforcement and Recovery Act of 2009, Pub.L. No. 111–21, 123 Stat. 1617. Among the amendments, the subsections of § 3729 were reordered. Section 3729(a)(1) was designated as § 3729(a)(1)(A). Section 3729(a)(1)(A) is not retroactive, and thus, does not apply to plaintiffs' claims. *Id.* ("The[se] amendments ... shall apply to conduct on or after the date of enactment, except that [ § 3729(a)(1)(B) ] ... shall ... apply to all claims under the [FCA] that are pending on or after [June 7, 2008]."). For clarity, the court will refer to pre-amendment § 3729(a)(1).

5    The court disregards defendants' argument regarding whether the government knew of their billing practices because it relies on facts outside of the Complaint.

6    Plaintiffs' claim against Voyager is based on Voyager's direct involvement with the false claims, not simply that Voyager is the parent company of HCK. Accordingly, the court need not address defendants' "alter ego" and "piercing the corporate veil" arguments. *See e.g., United States ex rel. Pfeifer v. Ela Med., Inc.,* No. 07–cv–01460, 2010 WL 1380167, at *14 (D.Colo. Mar. 31, 2010) (" 'Relator must be able to demonstrate either that [the defendant] is liable under a veil piercing or alter ego theory, or that it is directly liable for its own role in the submission of false claims.' ") (quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,* 498 F.Supp.2d 25, 60 (D.D.C.2007)).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT N

**EXHIBIT N**

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

2015 WL 5568614
United States District Court, D. Colorado.

UNITED STATES of America EX REL. Terry Lee
FOWLER and Lyssa Towl, Plaintiff,
v.
EVERCARE HOSPICE, INC., n/k/a Optum
Palliative and Hospice Care, a Delaware
corporation, Ovations, Inc., a Delaware
corporation, and OptumHealth Holdings, LLC, a
Delaware limited liability corporation,
Defendants.
United States of America ex rel. Sharlene Rice,
Plaintiff,
v.
Evercare Hospice, Inc., Defendant.

Civil Action No. 11-cv-00642-PAB-NYW, Civil
Action No. 14-cv-01647-PAB
|
Signed 09/21/2015

**Attorneys and Law Firms**

Michael S. Porter, Michael S. Porter, The Law Firm, Paul
Stephen Enockson, Enockson Law LLC, Wheat Ridge,
CO, Richard C. Lafond, Richard C. Lafond, P.C.,
Boulder, CO, for Plaintiffs.

Michael C. Theis, David A. Demarco, Emily Mary Lyons,
Hogan Lovells US LLP, Denver, CO, Corey William
Roush, Hogan Lovells US LLP, Washington, DC, for
Defendants.

**ORDER**

PHILIP A. BRIMMER, United States District Judge

**\*1** This matter is before the Court on the Motion to
Dismiss the Government's Complaint in Intervention
[Docket No. 67] filed by defendant Evercare Hospice,
Inc. ("Evercare"), and the Motion to Dismiss Relators'
Second Amended Qui Tam Complaint [Docket No. 101]
filed by defendants Evercare, Ovations, Inc. ("Ovations"),
and OptumHealth Holdings, LLC ("Optum"). The Court

has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. BACKGROUND**[1]
This action arises under the False Claims Act ("FCA"), 31
U.S.C. § 3729 *et seq*. Relators initiated a *qui tam* action
on March 15, 2011, alleging that defendants knowingly
submitted, or caused to be submitted, claims for Medicare
hospice benefits for patients who were ineligible for such
benefits. *See* Docket No. 1. On August 25, 2014, the
United States (the "government") partially intervened in
this action. *See* Docket No. 34.

**A. The Medicare Hospice Benefit**
The Department of Health and Human Services
reimburses hospice providers for services provided to
eligible beneficiaries on a *per diem* basis. *See* 79 Fed.
Reg. 26538, 26543 (May 8, 2014). The Centers for
Medicare and Medicaid Services ("CMS") are the
agencies within the Department of Health and Human
Services charged with the administration of Medicare. *See*
*Sw. Pharm. Solutions, Inc. v. Ctrs. for Medicare and
Medicaid Servs.*, 718 F.3d 436, 439 (5th Cir. 2013). T he
Medicare program is divided into four major
components—Parts A, B, C, and D. Part A, the relevant
part for this action, provides for hospital insurance
services, including inpatient hospital services,
post-hospital extended care services, home health
services, and hospice care. 42 U.S.C. § 1395d(a).

The Medicare statute provides that "no payment may be
made ... for any expenses incurred for items or
services—... in the case of hospice care, which are not
reasonable and necessary for the palliation or
management of terminal illness[.]" 42 U.S.C. §
1395y(a)(1)(C). To be eligible for the hospice care benefit
(the "hospice benefit"), an individual's attending
physician and the hospice program's medical director
must certify that the patient is terminally ill "based on the
physician's or medical director's clinical judgment
regarding the normal course of the individual's illness."
42 U.S.C. § 1395f(a)(7). The statute defines "terminally
ill" as "a medical prognosis that the individual's life
expectancy is 6 months or less." 42 U.S.C. §
1395x(dd)(3)(A). By electing to receive hospice benefits
under Medicare, a patient waives all rights to Medicare
payments for curative treatment of the underlying
terminal illness. 42 U.S.C. § 1395d(d)(2)(A)(ii)(I). After

2015 WL 5568614, Med & Med GD (CCH) P 305,433

the initial certification for a patient, Medicare provides up to two 90-day benefit periods, followed by an unlimited number of 60-day benefit period extensions. 42 U.S.C. § 1395d(a)(4). At the end of each benefit period, the medical director or physician must recertify that, based on his or her clinical judgment, the patient remains terminally ill. 42 U.S.C. §§ 1395f(a)(7)(A)(i)-(ii).

**\*2** While the Medicare statute requires only that a physician "certify in writing" a patient's terminally ill prognosis, accompanying regulations impose additional requirements. The regulations provide, in relevant part, that

> [t]he certification must conform to the following requirements:

> (1) The certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course.

> (2) Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification as set forth in paragraph (d)(2) of this section. Initially, the clinical information may be provided verbally, and must be documented in the medical record and included as part of the hospice's eligibility assessment.

42 C.F.R. § 418.22(b).

### B. Alleged False Claims

#### 1. The Government's Claims against Evercare

Evercare provides hospice care to Medicare participants. Docket No. 46 at 6, ¶ 10. At times relevant to this action, Evercare operated for-profit hospice programs in 13 states: Alabama, Arizona, California, Colorado, Georgia, Illinois, Ohio, Maryland, Massachusetts, Missouri, Pennsylvania, Texas, and Virginia. Id. at 5, ¶ 8. From at least January 1, 2007, Evercare has received hundreds of millions of dollars from Medicare for hospice benefits, including $91.5 million for hospice patients who received hospice care for longer than one year. Docket No. 46 at 34, ¶ 162.

The government alleges that Evercare violated the FCA

by presenting or causing to be presented claims for hospice care for individuals for whom Evercare knew that its medical records did not support a prognosis of terminal illness. Docket No. 46 at 17-18, ¶ 67. According to the government, Evercare pressured its employees, including its physician Medical Directors, to meet patient "census" targets without regard to whether patients were eligible for hospice benefits. Id. at 20, ¶ 73. These census targets were handed down by Evercare's corporate office, id. ¶ 74, and Evercare's director of finance and one Regional Director acknowledged that the census targets were unrealistic. Id. at 20-21, ¶ 78. Despite the acknowledged unrealistic census targets, Evercare's leadership pressured site leaders to meet them in a "hostile, aggressive, and intimidating" manner. Id. at 21, ¶ 79.

In addition to pressuring employees to meet census goals, Evercare incentivized employees to admit patients into hospice care. Docket No. 46 at 21, ¶ 80. Evercare employees were paid bonuses for each patient admitted into hospice care, id. ¶ 81, and clinical staff were paid additional compensation if their sites met Evercare's census targets. Id. ¶ 82. Evercare's policy of pressuring and incentivizing employees to admit patients resulted in multiple complaints that management was pressuring employees to admit and retain inappropriate patients. Id. at 22, ¶ 86. At one point, Beth Imlay, a Regional Director, stated that Evercare hospice should operate like a funnel: "easy to access end-of-life care (wide at the top) and hard to get out of (narrow end of funnel at the bottom)." Id. ¶ 87.

Evercare's general patient admission policy was as follows: when a patient was referred to an Evercare hospice, a nurse evaluated the patient to determine whether or not to admit him or her. Docket No. 46 at 22, ¶¶ 88(a)-(b). T he nurse then orally communicated his or her findings to the Medical Director on duty, who issued a verbal order to admit the patient. Id. ¶ 88(c). Shortly after the order to admit the patient, a medical director (sometimes, but not always the same director who admitted the patient) signed the required certification of terminal illness. Id. at 23, ¶ 88(d). Thus, both the medical director who issued the order to admit a patient and (if different) the medical director who signed the certification of terminal illness often did so without seeing the patient and without evaluating medical records. Id. at 25-26, ¶¶ 108-111.

**\*3** Evercare's nurses, often the only clinical staff to meet with patients, were crucial to Evercare's process of admitting patients into hospice care and certifying patients' terminally ill prognoses. Docket No. 46 at 23, ¶ 90. Yet many of these nurses were hired with little or no

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

prior hospice experience. *Id.* ¶ 91. Notably, Evercare's proportion of patients with Alzheimer's, dementia, and debility was higher than the national average for hospices due to Evercare's heavy reliance on referrals from nursing homes. *See id.* at 19, ¶¶ 71-72. But Evercare did not provide its staff with comprehensive training on identification of hospice-eligible patients with conditions such as Alzheimer's disease, dementia, and debility, and the clinical progression of those illnesses. *Id.* at 23, ¶ 92. W hat training Evercare did provide focused on the process of entering information into patients' electronic medical records rather than identifying terminally ill patients. *Id.* at 24, ¶ 96. As a result, Evercare's physicians observed that nurses were not adequately trained to assess hospice eligibility. *Id.* ¶ 99. One medical director in Massachusetts stated that, when she joined Evercare, the "majority" of patients seen by the nurse who was responsible for training other new nurses were not eligible for hospice care. *Id.* ¶ 100.

Evercare also allegedly implemented an asymmetric process for reviewing the admission decisions of clinical staff. While decisions to admit a patient were "seldom, if ever, questioned," decisions that a patient was not terminally ill were "subject to intense scrutiny." Docket No. 46 at 25, ¶ 102. Most Evercare locations had a policy that employees could not deny admission without the approval of the site manager. *Id.* ¶ 103. Thus, when a nurse made a decision that a patient was not terminally ill, Evercare often sent a second nurse to admit the patient before a physician was called for an opinion about the patient's eligibility. *Id.* ¶¶ 104-05. This practice occurred more frequently when patient census was low. *Id.* ¶ 106.

Evercare's recertification decisions (that is, decisions to certify that a patient was eligible for additional benefit periods) were made at interdisciplinary group meetings. Docket No. 46 at 26, ¶ 113. At those meetings, each patient was discussed and a medical director would thereafter sign a certification of terminal illness. *Id.* The medical director who signed the recertification often did not personally examine the patient and instead relied on oral reports of nurses during the interdisciplinary group meeting as well as patients' medical records. *Id.* at 26-27, ¶ 115. These records were often inaccurate and lacking in information necessary to support a hospice determination. *Id.* at 27, ¶ 116. Moreover, former Evercare employees noted a pattern in which nurses, in response to pressure to meet census goals, began emphasizing information that supported hospice eligibility from admissions assessments and in patients' medical records, and downplaying or omitting information that would tend to indicate a life expectancy of greater than six months. *Id.* at 28, ¶ 125. A nurse who worked for Evercare in Phoenix stated that, in

response to pressure to meet admissions or census goals, nurses began to document only what patients could not do, and omitted any information about what patients were able to do. *Id.* ¶ 126.

According to the government, Evercare's policy for discharging patients also tended to discourage discharging patients who were ineligible for hospice. Evercare's policy required all medical directors' decisions to discharge patients to be reviewed by Ms. Imlay and Director of Quality Terry Zelenak. Docket No. 46 at 29, ¶ 134. Evercare had no similar policy for decisions to recertify patients for additional hospice periods. *Id.* ¶ 135. Thus, clinical staff had to ask for permission to discharge patients, and one employee described the process as presenting "final findings to corporate for final approval" of discharge. *Id.* at 30, ¶ 136. In some cases, Evercare's management succeeded in persuading medical directors to recertify patients for whom the medical directors had requested discharge. *Id.* ¶ 137. At least one medical director who did not follow Evercare's discharge review policy was penalized. *Id.* ¶ 139. Additionally, Evercare managerial employees challenged or disregarded the opinions of physicians that patients were not terminally ill and should be discharged. *Id.* at 31, ¶¶ 144-146. When one medical director refused to change her mind when pressured to do so by an executive director, Hugh Henderson, a regional director, instructed the executive director to tell her that "she is not in line with our company philosophy and we may have to part ways." *Id.* ¶ 147.

**\*4** Additionally, Evercare conducted internal audits that, according to Ms. Zelenak, " 'always' revealed a pattern of the clinical documentation in the medical record not supporting a terminal prognosis." Docket No. 46 at 32, ¶ 150. Evercare's internal audits of various sites conducted between 2009 and 2012 revealed that the majority of records audited did not support the terminal prognosis and initial certification. *See id.* at 32-33, ¶¶ 151-152 (showing that documentation did not support terminal prognosis in 33 of 61 total charts reviewed). Evercare never considered refunding Medicare for payments that it received for the patients whose records did not support a terminal prognosis. *Id.* at 33, ¶ 154. In addition, when Medicare claims processors denied payment for claims that had been selected for review on the grounds that the patient's medical record did not support a terminally ill prognosis, Evercare decided not to appeal the denial of payment about 20% of the time. *Id.* at 33-34, ¶¶ 158-160.

The government brings claims for violation of the FCA and common law claims for payment by mistake and unjust enrichment. By way of examples of patients for

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

whom Evercare caused false claims to be submitted, the government identifies six patients, each of whom spent considerable time in hospice care, and each of whose records allegedly did not support a terminally ill prognosis. *See* Docket No. 46 at 35-52.

### 2. Relators' Additional Allegations

Relators bring a single claim for violation of the FCA against Evercare, Optum, and Ovations. Ovations was the sole shareholder of Evercare at all times relevant to this action up to December 31, 2010. Docket No. 86 at 5, ¶ 22. Optum has been Evercare's sole shareholder from January 1, 2011 to the present. *Id.* at 6, ¶ 23.

Relators' Second Amended Complaint ("SAC") contains numerous factual allegations that are similar to those in the government's complaint in intervention. *See generally* Docket No. 86.[2] Relators allege that Evercare's fraud was perpetuated by the policies handed down by employees of Ovations and later Optum, each of which dominated and controlled Evercare as its sole shareholder. Docket No. 86 at 19, ¶¶ 82-4. Specifically, Ovations and Optum employed Jeff Maloney, an Ovations (and later Optum) employee who served as the "President and effective CEO of Evercare." Docket No. 86 at 19, ¶ 85. Mr. Maloney participated in quarterly conferences with executive directors at which hospice census goals were "discussed and stressed," and was directly involved in at least one instance where clinical staff (relator Fowler) was reprimanded for discharging patients. *Id.* at 20, ¶¶ 88, 92. Two other employees of Ovations/Optum, Patricia Ford and Rick McNatt, were part of a four-person senior management team that handed census goals to executive directors, discouraged discharge of eligible patients, and developed a discharge review policy that erected hurdles to discharge of ineligible patients. *See id.* at 21, ¶¶ 96-98. These individuals directly reported to Mr. Maloney. *Id.* ¶ 99.

According to relators, defendants targeted patients with conditions like debility, dementia, and Alzheimer's disease because defendants knew that "once certified as 'terminally ill' [d]efendants would be able to keep these types of patients on census for lengthy periods of time." Docket No. 86 at 34, ¶¶ 172-3. Many of these types of patients were live discharged after having received hospice care for more than 300 days. *Id.* ¶ 175.

Eventually, Medicare claims carriers responsible for

reviewing certain of defendants' locations began to target defendants' patients for review and to deny hospice benefits for ineligible patients. Docket No. 86 at 34, ¶ 176. Defendants received numerous denials of payment for patients on the grounds that the patients were not terminally ill. *Id.* at 35, ¶ 178. On many occasions, defendants elected not to appeal their carriers' denial of payment after reviewing the patient's chart. *Id.* ¶¶ 179, 181. As of December 28, 2010, defendants had elected not to appeal 19% of the denials received at its Boston location, 4% for Cincinnati, 25% for Phoenix, 3% for Tucson, 67% for Denver, and 38% for Colorado Springs. *Id.* ¶ 182. On many occasions, however, defendants neither immediately discharged a patient whose claim for payment had been denied nor examined the patient to justify continuing to provide that patient with hospice care. *Id.* at 36, ¶ 184. Instead, defendants kept many "no appeal" patients in hospice and continued to bill the government for those patients. *Id.* ¶ 186. Defendants' billing office labeled these patients "bill the next claim—no appeal—continue to bill." *Id.* ¶ 187. The manager of the billing office, Ed Glancey, stated that it would be a waste of time to perform an internal audit to discharge and/or bill ineligible patients at $0 because the billing office would continue to bill for those patients. *Id.* ¶ 188. Mr. Glancey also stated that the billing office attempted to determine the order in which Evercare's carriers pulled claims for audit review and would sequence suspect claims in order to avoid detection. *Id.* at 37, ¶ 189. For example, if Evercare's billing office determined that the carrier was selecting every fifth claim, the billing office would slot "clearly valid claims" such as cancer patients in every fifth slot and place suspect claims in different slots. *Id.*

### II. STANDARD OF REVIEW

**\*5** The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is sufficient to plausibly state a claim. Fed. R. Civ. P. 12(b)(6); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted). A district court may take into account "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado*, 493 F.3d at 1215 (citation and quotation marks omitted).

The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

themselves are plausible. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).

### III. ANALYSIS

The FCA, in relevant part, imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). As defined by the FCA, the term "knowingly" means either that the person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729 (b)(1). The term "claim," in relevant part, means "any request or demand ... for money or property ... that [ ] is presented to an officer, employee, or agent of the United States." *Id.* § 3729 (b)(2)(A)(i). Thus, to state a claim for false presentment under the FCA, a plaintiff must allege (1) a false or fraudulent claim, (2) is presented to the United States f or payment or approval, (3) with knowledge that the claim is false or fraudulent. *See United States ex rel. Troxler v. Warren Clinic, Inc.*, 2014 WL 5704884, at *2 (N.D. Okla. Nov. 5, 2014). Additionally, the FCA authorizes private individuals to bring *qui tam* actions in the name of the government based on violations of Section 3729 of Title 31 of the United States Code. 31 U.S.C. § 3731(b)(1).

"The FCA recognizes two types of actionable claims—factually false claims and legally false claims." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008). A f actually false claim requires proof that the government payee has submitted "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.* (citation and quotation omitted). A legally false claim, in contrast, requires a plaintiff to demonstrate that the defendant has " 'certified compliance with a statute or regulation *as a condition* to government payment,' yet knowingly failed to comply with such statute or regulation." *Id.* (quoting *Mikes v. Straus*, 274 F.3d 687, 695-96 (2d Cir. 2001)) (emphasis in original). In the Tenth Circuit, a legally false claim can rest on either a theory of "express false certification" or "implied false certification." *Id.* An express false certification theory occurs when a payee "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Id.* An implied false certification theory, in contrast, "focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Id.* at 1218 (citing *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000). "If a contractor knowingly violates such a condition while attempting to collect remuneration from the government, he may have submitted an impliedly false claim." *Id.* In other words, for purposes of analyzing an implied false certification claim, the pertinent inquiry is not "whether a payee made an affirmative or express false statement, but whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010) (citation and quotation omitted).

#### A. The Government's Complaint

**\*6** The government's FCA claim is based on the interplay between the Medicare statute and the regulations implementing that statute. The government argues that Evercare is liable under the FCA because it "claimed reimbursement for Medicare hospice benefits while knowing the clinical facts in the patients' medical records did not support that the patients were terminally ill and needed hospice care." Docket No. 92 at 3. The government's claim, therefore, is based on a theory of implied false certification. "To state viable implied-false-certification claims, [the government's complaint] need[s] to contain sufficient factual allegations to show that [Evercare] knowingly submitted legally false requests for payment to the government, that the government paid the requests and that, had the government known of the falsity, it may not have paid." *Lemmon*, 614 F.3d at 1169. The Court, therefore, must decide whether compliance with the regulations' requirement that medical records support the certifying physicians' clinical judgment is a prerequisite to payment and, if so, whether the government has alleged that Evercare failed to comply with the requirement.

#### 1. Condition of Payment vs. Condition of Participation

Evercare argues that the government fails to state a claim

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

that Evercare violated the documentation requirement contained in § 418.22(b) of Title 42 of the Code of Federal Regulations because the requirement is a "condition of participation" in the Medicare program, not a "condition of payment" under the Medicare hospice benefit, and cannot therefore support an FCA claim. Docket No. 67 at 14-19.

"The success of a false certification claim depends on whether it is based on 'conditions of participation' in the Medicare program (which do not support an FCA claim) or on 'conditions of payment' from Medicare funds (which do support FCA claims)." *United States ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013) (citations omitted). "Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." *Conner*, 543 F.3d at 1220. "Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment." *Id.*

Evercare first argues that the documentation requirement is not a condition of payment because "[n]othing in § 418.22(b)(2) or elsewhere in the applicable statute or regulations expressly conditions payment to a hospice on compliance with the requirement" that clinical information and other documentation that supports the terminally ill prognosis accompany the certification. Docket No. 67 at 17 (defendant's emphasis removed). The Court disagrees. Evercare acknowledges that the governing statute conditions payment for hospice care on a written certification. *See id.* (noting that 42 U.S.C. § 1395f is titled "Conditions of and limitations on payment for services," and that it requires a physician's written certification that a patient is terminally ill). The regulations go further than the statute and detail the requirements for the certification. *See generally* 42 C.F.R. § 418.22. Specifically, the regulation provides that, with certain narrow exceptions, "the hospice must obtain the written certification before it submits a claim for payment[,]" *id.* § 418.22(a)(2), and, importantly, outlines the required contents of the certification. *Id.* § 418.22(b). The contents of the certification listed in the regulations are not mere suggestions. Rather, by the plain terms of the regulation, they are requirements to which a physician's certification *"must conform."* *Id.* (emphasis added). This language unmistakably conditions payment on execution of a physician's certification that complies with the regulation's content requirements.

Evercare next argues that Medicare's "regulatory structure" reinforces that the requirements in 42 C.F.R. § 418.22(b) are mere conditions of participation. *See* Docket No. 67 at 17-18. In support, Evercare points to another provision in the Code of Federal Regulations, 42 C.F.R. § 418.104, titled "Condition of participation: Clinical records." That provision requires hospice providers to maintain "[a] clinical record containing past and current findings" for each hospice patient, and that the record "must contain correct clinical information that is available to the patient's attending physician and hospice staff." *Id.*[3] One of the records that must be maintained as a condition of participation under this section is the "[p]hysician certification and recertification of terminal illness as required in § 418.22..." *Id.* § (a)(5). Evercare argues that, because this provision is titled a "Condition of participation" and refers to the certification requirement in Section 418.22(b), then Section 418.22(b) must also be a condition of participation. *See* Docket No. 67 at 18. The Court finds Evercare's argument unpersuasive. Section 418.104 requires hospice providers to take adequate steps to maintain and safeguard the entirety of patients' medical records, including the physician's certification of a terminally ill prognosis. There is no contradiction between conditioning payment to a hospice provider on obtaining a detailed written certification that a patient is terminally ill and conditioning continued participation on maintaining that certification as part of a patient's medical record. As such, § 418.104 does not alter the Court's conclusion that the content requirements of § 418.22(b) are a condition of payment.

**\*7** Third, Evercare argues that § 418.22(b) cannot be a condition of payment because, if it were, then any violation of its requirements would be actionable under the FCA. Docket No. 67 at 18. Evercare points specifically to § 418.22(b)(3)(i), which requires that a physician "include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms" and that "[i]f the narrative is part of the certification or recertification form, then the narrative must be located immediately prior to the physician's signature." Evercare posits that, were a physician accustomed to signing the certification before the narrative rather than after, the certification would be actionable under the FCA and therefore § 418.22(b) cannot possibly be a condition of payment. Docket No. 67 at 18. The Court does not agree with Evercare's *reductio ad absurdum* argument. The Tenth Circuit has recognized that implied false certification claims "includ[e] a materiality requirement" that "necessitates showing that the false certification was 'material to the government's decision to pay out moneys to the claimant.'" *Lemmon*,

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

614 F.3d at 1169 (quoting *Conner*, 543 F.3d at 1219). At the pleadings stage, a complaint need only allege facts that make it plausible that "the government *may* not have paid" had it known of the false certification. *Id.* at 1170 (emphasis in original). Thus, under Tenth Circuit case law, courts may distinguish between material and merely technical noncompliance with a condition of payment. The Court finds that the government's allegations satisfy the materiality requirement, as it is plausible that the government may have withheld payments to Evercare if it knew that hospice patients' records lacked supporting documentation of a terminal illness. The Court takes no position on whether Evercare's hypothetical concerning signature placement would satisfy the materiality requirement.

In sum, the Court finds that the requirement that physicians' certifications are accompanied by clinical information and other documentation that support a patient's prognosis is a condition of payment under applicable Medicare statutes and regulations.

### *2. Evercare's Reliance on Physicians' Clinical Judgment*

Evercare argues that the government fails to plead any false representation because the certifications rely on the clinical judgments of Evercare's certifying physicians and those judgments cannot be objectively false. Docket No. 67 at 10-11. Evercare cites *United States ex rel. Morton v. A Plus Benefits, Inc.*, for the proposition that "[e]xpressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false." 139 Fed.Appx. 980, 982 (10th Cir. 2005) (unpublished) (citations omitted). While *Morton* noted that liability under the FCA "must be predicated on an objectively verifiable fact," the Tenth Circuit expressly rejected the argument that the exercise of clinical judgment poses an absolute bar to FCA liability. *See id.* at 983 ("we are not prepared to conclude that in all instances, merely because the verification of a fact relies upon clinical medical judgments ... the fact cannot form the basis of an FCA claim"). For example, FCA liability has been found in false certification cases where a hospice provider's business practices created an environment in which "physicians could not legitimately exercise their medical judgment because defendants provided false information on which the physicians relied." *United States ex rel. Landis v. Hospice Care of Kansas, LLC*, 2010 WL 5067614, at *4 (D. Kan. 2010).

Here, unlike *Morton*, the government's allegations are "susceptible to proof of truth or falsity," *Morton,* 139 Fed.Appx. at 983, and are therefore sufficient to state a claim. Specifically, the government alleges that the physicians who issued orders to admit patients into hospice care did not examine the patients and relied on oral reports of the nurses who evaluated them. See Docket No. 46 at 25, ¶¶ 108-09. The government further alleges that the physicians who signed the certifications (often different from the admitting physicians) frequently signed them without seeing patients, *see* Docket No. 46 at 26, ¶¶ 111, 115, and thus had to rely on medical records or oral reports from nurses. *See id.* at 26-7, ¶ 115.

While the Medicare regulations do not require that a certifying physician conduct an in-person examination, the government's complaint contains extensive allegations that suggest that the information on which the physicians relied (which consisted of oral reports from nurses who evaluated the patients) was not reliable and therefore precluded those physicians' legitimate exercise of clinical judgment. Specifically, the complaint alleges that Evercare's management placed intense pressure on employees to admit patients into hospice care, with one regional director stating in an email that Evercare's hospice service should be a "funnel" that provided "easy to access end-of-life care (wide at the top) and hard to get out of (narrow end of funnel at the bottom)." Docket No. 46 at 22, ¶ 87. This pressure, according to the complaint, took many forms, including setting unrealistic "target census numbers" for hospice patients, Docket No. 46 at 20, ¶ 76, and pressuring site leaders to meet those targets in a "hostile, aggressive, and intimidating" manner. *Id.* at 21, ¶ 79. Evercare also incentivized employees to admit hospice patients by providing bonuses for each patient admitted into hospice, *id.* ¶ 81, and threatened layoffs and disciplined or terminated staff to pressure employees to meet census expectations. *Id.* ¶ 83. As a result of these tactics, Evercare received "multiple complaints" that "management pressured and instructed employees to admit and retain inappropriate patients." *Id.* at 22, ¶ 86.

**\*8** The government also alleges that the nurses' reports on which Evercare's certifying physicians relied were "inaccurate" and lacked "information and detail necessary to support a hospice determination," *id.* at 27, ¶ 116, both because Evercare's nurses were poorly trained and because Evercare's policy of pressuring clinical staff to admit patients caused nurses to censor their reports. Specifically, the government alleges that Evercare hired nurses with "little or no prior hospice experience" and did not provide them with "comprehensive training on the identification of hospice-eligible patients with

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

Alzheimer's disease, dementia, and the clinical progression of these illnesses," Docket No. 46 at 23, ¶¶ 91-9 2, which constituted a large percentage of Evercare's hospice patients. *Id.* at 19, ¶ 71. The government alleges that nurses' decisions not to admit patients were subject to intense scrutiny, but decisions to admit a patient were "seldom, if ever, questioned[.]" *Id.* at 25, ¶ 102. As a result of this pressure, the government alleges, "nurses learned how to show hospice eligibility by documenting *only* what a patient was not able to do, not what a patient was able to do." *Id.* at 28, ¶ 126 (emphasis in original).

The complaint further alleges that Evercare's management exerted direct pressure on physicians to recertify ineligible patients. The complaint alleges that "[a]t least one Medical Director who did not follow the discharge review policy was penalized" and was accused of "ruining the budget" for discharging ineligible patients. *Id.* at 30, ¶ 139. The complaint details a separate incident in Ohio in which an executive director unsuccessfully attempted to convince a physician to change her mind and recertify patients who she believed were ineligible for hospice care, and the executive director was subsequently instructed to tell the physician that "she is not in line with our company philosophy and we may have to part ways." *Id.* at 31, ¶¶ 146-47.

The Court finds that the government's allegations are sufficient to render its claims plausible that Evercare's "intentional, reckless business practices lead physicians to inaccurately certify patients as terminally ill, and that [Evercare] submitted claims even though [it] knew, or had reckless disregard for the fact, that the patients were not terminally ill." *Landis*, 2010 WL 5067614, at *5 (holding that allegations that a hospice provider "pressured employees to certify, recertify, or not discharge patients regardless of whether they were eligible for hospice benefits" were sufficient to allege that the provider claimed reimbursement with reckless disregard for whether the patients were terminally ill).

### 3. The FCA's Knowledge Requirement

Evercare argues that the government does not plausibly allege facts that satisfy the FCA's knowledge requirement for two reasons. First, Evercare argues that the complaint does not allege that any physicians certified patients who they knew were not terminally ill or that Evercare provided hospice services knowing that patients were not

eligible for the hospice benefit. This argument, however, is irrelevant to the government's theory of liability. The government argues that Evercare, not its physicians, made fraudulent claims for reimbursement for hospice because it knew (or acted with reckless disregard of the possibility) that its hospice patients' medical records did not support that patients were terminally ill. *See* Docket No. 92 at 3. FCA liability "may be predicated on knowingly causing [a false] record or statement to be made or used." *United States ex rel. Baker v. Cmty. Health Syss., Inc.*, 709 F. Supp. 2d 1084, 1118 (D.N.M. 2010). The Court finds that the government's allegations concerning Evercare's policy of pressuring employees to admit patients, failing to train nurses to recognize when patients with various conditions are terminally ill, and threatening and disciplining physicians who exercise their clinical judgment and decline to admit patients, satisfy the FCA's knowledge requirement. As the government argues, *see* Docket No. 92 at 13, these allegations make it plausible that Evercare failed to ensure that its physicians received adequate information to exercise proper clinical judgment and that Evercare sought to influence its physicians' clinical judgment. This is sufficient to allege that Evercare acted, at a minimum, "in reckless disregard of the truth or falsity" of whether its physicians' terminally ill prognoses were supported by adequate documentation. 31 U.S.C. § 3729(b)(1)(A)(iii).

**\*9** Second, Evercare argues that it could not "knowingly" fail to comply with the documentation requirement because the term "support" is ambiguous. Docket No. 67 at 21. Evercare argues that the word "support" in § 418.22(b)(2) means only that "the record must lend some assistance to the physician's terminal-illness prognosis," while the government's theory requires a patient's medical records to "prove the patient's terminal illness to any clinician who happens to review it subsequently." *Id.* at 22. The Court need not decide on the proper interpretation of § 418.22(b), as the complaint alleges facts sufficient to conclude that Evercare failed to satisfy even its lenient interpretation of the word "support." Specifically, the government alleges that Evercare's Director of Quality acknowledged that its internal reviews of medical records " 'always' revealed a pattern of the clinical documentation in the medical record not supporting a terminal prognosis." Docket No. 46 at 32, ¶ 150. T he government also alleges that Evercare's internal audits of various sites conducted between 2009 and 2012 revealed that the majority of records audited did not support the terminal prognosis and initial certification. *See id.* at 32-33, ¶¶ 151-152 (showing that documentation did not support terminal prognosis in 33 of 61 total charts reviewed). Despite this substantial finding of non-compliance with the regulation that requires

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

supporting documentation, Evercare did not consider refunding Medicare payments that it received for individuals for whom its audits revealed that payments were inappropriate. *Id.* at 33, ¶ 154. Thus, Evercare's own audits showed that more than 50% of the charts reviewed did not satisfy the "support" requirement, however Evercare claims to have interpreted that requirement. The Court finds that the government sufficiently alleges that Evercare acted with at least reckless disregard for the possibility that its physician certifications were unsupported.

### 4. Rule 9(b)

Defendants argue that the government fails to satisfy Rule 9(b)'s heightened pleading requirements.[4] Docket No. 67 at 26. "Rule 9(b) joins with [Rule] 8(a) to form the general pleading requirements for claims under the FCA." *Lemmon*, 614 F.3d at 1171. Rule 9(b) requires that, in a pleading alleging fraud, the circumstances constituting fraud or mistake must be stated with particularity. *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994); *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006). A complaint alleging fraud must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof. *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citing *Lawrence v. Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991)). To satisfy Rule 9(b)'s requirements in the FCA context, a pleading must "show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Lemmon*, 614 F.3d at 1172 (citations omitted).

Evercare argues that the complaint fails to satisfy Rule 9(b)'s requirements because it does not allege a nexus between Evercare's business practices and a specific false or fraudulent claim. Docket No. 67 at 26. Evercare cites *United States ex rel. Sikkenga*, 474 F.3d 702 (10th Cir. 2006), for the proposition that an FCA plaintiff cannot rely on general allegations about a fraudulent scheme to satisfy Rule 9(b)'s heightened pleading requirement. *Id.* The Court finds that, to the extent the government is required to "tie a[ ] specific claim" to its allegations of a fraudulent scheme, *Sikkenga*, 474 F.3d at 728, n.34, it has satisfied this burden. The government identifies six patients, who it refers to as LH, RS, DH, VB, LG, and ZF, each of whom spent considerable time in hospice care and

each of whose records allegedly did not support a terminally ill prognosis. *See* Docket No. 46 at 35-52. The complaint contains detailed information about each patient's condition and the clinical findings in their records that tend to show that their terminal prognosis was not supported. *See id.* Evercare does not defend these patients' specific certifications. Instead, Evercare argues that the government's allegations in each case merely reflect a "different medical judgment than the certifying physician." Docket No. 67 at 27. The Court has already rejected this argument. Evercare rightly points out that, if the complaint was based entirely on disagreements with Evercare's certifying physicians in specific cases, the government's references to these six patients would be insufficient to state a claim. The government's allegations are not so limited, however. As the Court has already found, the government has plausibly alleged that Evercare adopted a policy that resulted in widespread over-certification of patients as hospice-eligible. The Court finds that the medical records of the six patients highlighted in the complaint "provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Lemmon*, 614 F.3d at 1172 (citations omitted).

### 5. Payment by Mistake and Unjust Enrichment

**\*10** Evercare argues in cursory fashion that the government's second and third claims—respectively, payment by mistake and unjust enrichment—should be dismissed because the government "does not allege that hospice services were not rendered." Docket No. 67 at 29. The Court disagrees. The common law doctrine of payment by mistake "is available to the United States and is independent of statute." *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970). It requires a showing that the government made "payments under an erroneous belief which was material to the decision to pay[.]" *Id.* Evercare's argument that the government does not allege payment for any hospice care that Evercare did not provide misses the point. It appears to be undisputed that Evercare provided hospice care for all patients for which it made claims for payment. The government, however, alleges that it made payments for patients who were ineligible for hospice care. The Court finds that the government's theory is sufficient to state a claim for payment by mistake.

Evercare's argument regarding unjust enrichment is deficient for the same reason. Unjust enrichment requires

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

a showing that "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Robinson v. Colo. State Lottery Division*, 179 P.3d 998, 1007 (Colo. 2008).[5] To sustain this theory, the government is not required to allege that it paid for services that were not rendered. The Court finds that the complaint satisfies all three elements of this claim.

### B. Relators' Complaint

Defendants Ovation and Optum (collectively, "defendants") move to dismiss the SAC on three grounds, two of which mirror the arguments that Evercare made in seeking dismissal of the government's complaint in intervention. The Court addresses each of defendants' arguments in turn.

### *1. Objectively False Claim*

Defendants argue that relators do not allege an objectively false or fraudulent claim. *See* Docket No. 101 at 3-4. The Court rejects this argument for the reasons detailed in this Order with respect to the government's complaint. The relators' complaint, like the government's complaint in intervention, alleges that defendants gave priority to their census numbers over the clinical judgment of their medical staff. Relators allege that defendants discouraged discharge of patients who medical staff believed were ineligible for hospice, *see* Docket No. 86 at 21, ¶ 97, pressured physicians to certify and recertify ineligible patients, *id.* at 24, ¶ 112, instituted a discharge policy that allowed unqualified administrators to second-guess the discharge recommendations of treaters, *id.* at 29, ¶¶ 148-49, disciplined nurses and physicians for discharging ineligible patients, *id.* at 27, ¶ 134, 27-28, ¶ 137, actively discouraged staff from learning more about LCDs[6] and regulations regarding hospice eligibility, *id.* at 29 ¶¶ 145-46, and attempted to reverse-engineer their carrier's audit procedure in order to avoid detection of bills submitted for patients who had previously been deemed ineligible. *Id.* at 37, ¶ 189. Upon reviewing the SAC, the Court finds that relators, like the government, have sufficiently alleged the particulars of an intentional business practice that led to the submission of claims with at least reckless disregard for whether patients were terminally ill. *Landis*, 2010 WL 5067614, at *5.

### *2. Rule 9(b)*

**\*11** Relators provide examples of 21 patients (referred to as Patients 1-21) for whom defendants allegedly submitted claims for reimbursement despite knowing that they were ineligible for hospice. *See* Docket No. 86 at 37-44, ¶¶ 192-212. Many of relators' allegations are based on defendants' continued submission of bills for patients even though defendants' carrier determined, through a review process, that those patients were ineligible for hospice care and defendants elected not to appeal the denial of payment. *See generally id.*

Defendants argue that relators' examples are insufficient because the claims of ineligibility are made in a conclusory fashion. The Court agrees with respect to certain patients. Specifically, a number of the 21 specifically-identified patients in the SAC never had claims denied on the basis that they were ineligible for hospice care. *See generally* Docket No. 86 at 37-44.[7] With respect to those patients, relators' allegations are inadequate. With respect to Patient 1, for instance, relators allege only that at the time of his or her discharge, "it was determined that for the approximate 780 days that Patient 1 had been on hospice service that Patient 1 had probably not been eligible." Docket No. 86 at 37, ¶ 192. Relators' allegations do not include sufficient facts that show who determined Patient 1's past ineligibility and how defendants' certification of Patient 1 for hospice care fits into relators' general allegations of a fraudulent scheme. *Sikkenga*, 474 F.3d at 728, n.34 (noting that an FCA relator's claims did not "tie any specific claim ... to th[e] series of events" that comprised the alleged fraudulent scheme). The Court finds similar pleading defects with respect to Patients 5, 12, 14, 16, 18, and 21.

The Court, however, finds that relators have satisfied Rule 9(b) with respect to the remaining patients, each of whom had a claim denied, which denial defendants did not appeal. Defendants argue that there is no evidence that "a rejection of a claim for an earlier certification period—for unspecified reasons—renders a physician's subsequent certification of a terminal prognosis false." Docket No. 101 at 8. Defendants ignore the Tenth Circuit's holding that an FCA plaintiff need only "show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme" to satisfy the requirements of Rule 9(b). *Lemmon*, 614 F.3d at 1172 (citations omitted).

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

Relators alleged that, when defendants elected not to appeal a denial of payment for a patient that the carrier deemed ineligible, they neither immediately discharged the patient nor examined the patient to obtain a legitimate justification for keeping him or her in hospice care. *See* Docket No. 86 at 36, ¶ 184. In fact, rather than re-evaluate patients whose claims were denied, relators allege that defendants' billing office would label those patients "bill the next claim—no appeal—continue to bill," *id.* ¶ 187, and that the billing office would "make its best effort to determine the order in which the carriers were pulling claims for audit and review and would intentionally sequence the suspect claims in a fashion to avoid detection." *Id.* at 37, ¶ 189. The Court finds that relators' allegations concerning the remaining example patients are sufficiently tied to their allegations that defendants fraudulently continued billing for patients deemed ineligible for care to satisfy Rule 9(b)'s requirements as stated in *Lemmon*.

**\*12** Defendants also argue that, in certain cases, relators' allegations show that some patients whose claims were denied were discharged for a time and then readmitted. *See* Docket No. 101 at 8 (noting that Patient 6 was discharged between April 6, 2010 and May 25, 2010 and that Patient 8 had one six-month break from hospice care). The Court has identified five patients—Patients 4, 6, 8, 9, and 19—who did not receive continuous hospice care. Having found relators' allegations sufficient with respect to the majority of Patients 1-21, the Court need not address this argument. Nevertheless, the Court notes that, with the exception of Patient 4,[8] each patient's temporary discharge from hospice care came several months after defendants' claims for those patients were denied, and relators allege that defendants continued to bill Medicare for those patients until their discharge. *See* Docket No. 86 at 39-40, ¶¶ 197, 199, 200, 43, ¶ 210.

### 3. Relators' Authority to Pursue their Claims

#### a. Duplication of the Government's Claims

Defendants argue that relators' complaint should be dismissed because it merely duplicates the government's FCA claim against Evercare and differs from the government's complaint only in that Relators name Evercare's corporate parents, Ovations and Optum, as

additional defendants. *See* Docket No. 101 at 11-13. Relators respond that FCA violators are jointly and severally liable for their actions, so they are entitled to bring separate claims against Ovations and Optum. *See* Docket No. 105 at 5. The Court agrees with relators. The FCA provides that, "[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action. ..." 31 U.S.C. § 3730(c)(1). Although courts often dismiss superseded claims, dismissal is not required where defendants make "no showing that the Relators' participation during the course of the litigation will cause them undue burden or expense that would justify limiting their participation." *United States ex rel. Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 3d 37, 47 (D. D.C. 2014) (citing cases). The Court finds that relators' continued participation in this action is appropriate, particularly given relators' claims against Ovations and Optum, in which the government did not intervene. As relators note, multiple defendants acting in concert in violation of the FCA are jointly and severally liable, *see United States v. Williams*, 2003 WL 21384640, at *6 (N.D. Ill. June 12, 2003) (citing *United States v. Hughes*, 585 F.2d 284, 286 n.2 (7th Cir. 1978)), so relators' claim, which names Evercare, Ovations, and Optum as defendants, is not merely duplicative of the government's FCA claim against Evercare.

#### b. Relators' Direct and Alter Ego Allegations against Ovation and Optum

Defendants argue that relators fail to state a direct liability claim against Ovations and Optum because they merely "lump Ovations, Optum, and Evercare all together as 'Defendants,' thereby disguising allegations solely regarding Evercare's actions as the acts of Ovations and Optum." Docket No. 106 at 8. First, defendants improperly raise this issue for the first time on reply. Second, relators allege that Ovations and Optum, as Evercare's sole shareholder, employed a number of people who participated in the allegedly fraudulent scheme, including Jeff Maloney, an Ovations (and later Optum) employee who served as the "President and effective CEO of Evercare." Docket No. 86 at 19, ¶ 85. Mr. Maloney, according to relators, participated in quarterly conferences with executive directors at which hospice census goals were "discussed and stressed" and was directly involved with reprimanding relator Fowler for discharging patients. *Id.* at 20, ¶¶ 88, 92. Relators also

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

allege that two other employees of Ovations/Optum, Patricia Ford and Rick McNatt, were part of a four-person senior management team that perpetuated the alleged fraudulent scheme. *See id.* at 21, ¶¶ 94-5. The SAC alleged that this senior management team handed census goals to executive directors, discouraged discharge of eligible patients, and developed a discharge review policy that erected hurdles to discharging ineligible patients. *See id.* ¶¶ 96-98. Ms. Ford and Mr. McNatt reported directly to Mr. Maloney. *Id.* ¶ 99. In sum, the Court finds that relators have sufficiently alleged participation of Ovations and Optum in the scheme to collect payments for ineligible patients.

**\*13** Defendants challenge relators' allegation that Ovations and Optum are vicariously liable for Evercare's actions on the grounds that Evercare was the alter ego of its parent corporations. *See* Docket No. 101 at 14. A request to pierce the corporate veil is governed by the law of the defendant company's state of incorporation. *Restatement (Second) of Conflicts § 307 (1971); see also* Charles Alan Wright et al., *7 Fed. Prac. & Proc. Civ. § 1826 (3d ed.)* ("Under prevailing conflicts principles, state law typically will direct that a plaintiff's status be tested by the law of the corporation's state of incorporation."). Evercare, Ovations, and Optum are (or were) all Delaware corporations. Docket No. 86 at 3, ¶ 9, 5, ¶ 22, 6, ¶ 23. "Delaware law permits a court to pierce the corporate veil of a company where there is fraud or where it is in fact a mere instrumentality or alter ego of its owner." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (internal citation and alterations omitted). To prevail on an alter ego claim, "a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness is present." *Id.* (internal citations and alterations omitted).

The first prong of the alter ego test requires showing "exclusive domination and control ... to the point that [the child company] no longer has legal or independent significance of its own." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (internal citation and alterations omitted). The second prong requires a showing of fraud or injustice inherent "in the defendants' use of the corporate form." *In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003). "The underlying cause of action, at least by itself, does not supply the necessary fraud or injustice."

*Id.* Any tort, statutory violation, or breach of contract is "in some sense, an injustice. Obviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989).

The Court assumes, but does not decide, that relators satisfy the first prong of Delaware's alter ego test. The Court finds, however, that relators have not alleged facts sufficient to satisfy the second prong. Relators argue that the SAC satisfies the second prong because "Ovation and Optum used Evercare to perpetrate the fraudulent scheme." Docket No. 105 at 23. This is insufficient, as relators' argument is inseparable from its underlying claim. *Mobil Oil, 718 F. Supp. at 268.* Because relators have not pled facts that support a finding that respecting Evercare's corporate form will result in an injustice, the Court finds that relators have failed to state an alter ego claim against Optum and Ovations.

**IV. CONCLUSION**
For the foregoing reasons, it is

**ORDERED** that the Motion to Dismiss the Government's Complaint in Intervention filed by defendant Evercare Hospice, Inc. [Docket No. 67] is **DENIED**. It is further

**ORDERED** that the Motion to Dismiss Relators' Second Amended *Qui Tam* Complaint filed by defendants Evercare Hospice, Inc., Ovations, Inc., and OptumHealth Holdings, LLC [Docket No. 101] is **GRANTED** in part and **DENIED** in part. It is granted with respect to relators' alter ego theory of liability against defendants Ovations, Inc. and OptumHealth Holdings, LLC. It is denied in all other respects.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 5568614, Med & Med GD (CCH) P 305,433

Footnotes

1    The following facts are drawn from the United States' complaint in intervention, Docket No. 46, and relators' second am ended *qui tam* complaint, Docket No. 86, and are assumed to be true for the purposes of the present motion. *See Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) ("W e must accept all the well-pleaded allegations of the complaint as true and must

United States ex rel. Fowler v. Evercare Hospice, Inc., Not Reported in Fed. Supp. (2015)

2015 WL 5568614, Med & Med GD (CCH) P 305,433

construe them in the light most favorable to the plaintiff.").

2    In the interest of brevity, the Court only recites those allegations that are specific to Relators' claims against Optum and Ovations or that do not appear in the government's complaint in intervention.

3    Section 418.104 also requires entries in the clinical record to be "legible, clear, complete, and appropriately authenticated and dated," *id.* § (b), requires the hospice provider to safeguard the information against loss or unauthorized use, *id.* § (c), requires the provider to maintain the records for six years after the death or discharge of the patient, *id.* § (d), provides for transfer of records upon discharge or transfer of care, *id.* § (e), and requires records to be made "readily available on request by an appropriate authority." *Id.* § (f).

4    Evercare also argues that the complaint fails to satisfy Rule 8(a) because the government does not plead facts that render the falsity or knowledge elements of its FCA claim plausible. Docket No. 67. The Court has already held that the government's complaint satisfies the plausibility standard with respect to both falsity and scienter. *See* Parts III(A)(2)-(3) *supra*.

5    The government does not take issue with Evercare's citation of Colorado law to describe the elements of unjust enrichment. At least for purposes of this motion, the Court will operate under the same premise. *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption").

6    "LCDs" refers to Hospice Local Coverage Determinations, which are created by carriers and "set forth certain general and disease specific clinical variables" for determining terminal status. *See* Docket No. 86 at 12, ¶¶ 54-55.

7    These are Patients 1, 5, 12, 14, 16, 18, and 21.

8    Relators' allegations concerning Patient 4 state only that he or she had "a few brief interludes" in hospice care, and the Court cannot therefore determine whether those interludes followed the carrier's denial of defendants' claims for that patient in November and December 2009. *See* Docket No. 86 at 38, ¶ 195.

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.